1
2
3
4
5

**KNEUPPER & COVEY, PC**
Kevin Kneupper, Esq. (CA SBN 325413)
Kevin@kneuppercovey.com
321 N. Orange St. #306
Glendale, CA 91203
Tel: (512) 420-8407

6
7
8

*Attorneys for Plaintiffs Janet Sihler,*
*Charlene Bavencoff, and the putative Class*

9
10
11

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

JANET SIHLER, Individually and On
Behalf of All Others Similarly Situated;
CHARLENE BAVENCOFF, Individually
and On Behalf of All Others Similarly
Situated,,

                                          Plaintiffs,

v.

THE FULFILLMENT LAB, INC;
RICHARD NELSON; BEYOND
GLOBAL INC.; and JOHN DOES 1-10,

                                          Defendants.

Case No.:   '20 CV 1528 JM   MSB

**CLASS ACTION COMPLAINT FOR:**

(1) Violation of California's Consumer
    Legal Remedies Act;
(2) Violation of California's False
    Advertising Law;
(3) Violation of the Unfair and Fraudulent
    Prongs of California's Unfair
    Competition Law;
(4) Violation of the Unlawful Prong
    California's Unfair Competition Law;
(5) Civil RICO;
(6) Violation of Various Consumer
    Protection Laws;
(7) Aiding and Abetting;
(8) Conspiracy.


**DEMAND FOR JURY TRIAL**

27
28

        Plaintiffs Janet Sihler ("Ms. Sihler") and Charlene Bavencoff ("Ms. Bavencoff"),

individually and on behalf of all others similarly situated nationwide and in the State of

California, by and through the undersigned counsel, hereby file this Class Action Complaint against Defendants THE FULFILLMENT LAB, INC. and RICHARD NELSON (collectively, the "TFL Defendants"), BEYOND GLOBAL INC., and JOHN DOES 1 THROUGH 10, and allege as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter because this is a class action in which, on information and belief, the damages exceed $5 million, exclusive of interest and costs, the number of class members exceeds 100, and as demonstrated below, the parties are diverse pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The believed scope of the damages and number of class members are based on Plaintiffs' investigation and the BBB report attached as Exhibit 1.

2.      This court also has jurisdiction because Plaintiffs' Racketeer Influenced and Corrupt Organizations Act ("RICO") claim, 18 U.S.C. §§ 1961, *et seq.*, arises under federal law.

3.      This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367.

4.      This Court has personal jurisdiction over the TFL Defendants because they conduct business in California, including this District. Specifically, the TFL Defendants offer numerous "white label" products for wholesale purchase to its business clients, including the scammers who created the Keto Products at issue and who are named as Keto Doe Defendants herein, for e-commerce and internet marketing brand. On information and belief, the TFL Defendants also provide fulfillment services consisting of labeling, packaging, product returns, and other services for its clients, including the Keto Doe Defendants. Indeed, the packing slips for the Keto Products are identical to the packing slips generated by the TFL Defendants' specialized software, which is shown to potential clients on its website, and  the return address listed on the packing slips for the Keto Products is the Post Office closest to the TFL Defendants' office in Tampa, Florida.

5.     The TFL Defendants have sufficient minimum contacts with this State and/or sufficiently availed themselves of the markets in this State through their return processing of the Keto Products to consumers in this State, including this District, to render the exercise of jurisdiction by this Court permissible. As the return processor, the TFL Defendants are aware of the locations of dissatisfied customers who submit the products for return, including those customers residing in this District. As described in further detail herein, each Defendant purposely directed their conduct towards California residents.

6.     Defendant Beyond Global Inc. sold the Keto Products and is subject to personal jurisdiction because it purposely directed its advertising and sales to California residents as described herein.

7.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b) because a substantial part of the events giving rise to Plaintiffs' claims occurred while they resided in this judicial district, including purchasing the Keto Products at issue.

## NATURE OF THE ACTION

8.     This action involves a form of fraud and cybercrime that has become increasingly common –and lucrative—across the Internet. This particular scam is designed to lure consumers into purchasing worthless weight-loss pills branded "Ultra Fast Keto Boost" and "Instant Keto" (collectively, "Keto Products") by using fake celebrity and magazine endorsements and claiming that well-known celebrities have endorsed the Keto Products.  The operators of this scam deceive consumers by falsely advertising that the purchase prices of the Keto Products are significantly lower than the amounts actually charged to the victims' debit or credit cards.

9.     The scammers' only goal is to fraudulently obtain the victims' credit card and bank account information. Once they have it, they send their victims five bottles of bogus Keto Products (more than what they actually agreed to purchase), and then charge their victims the exorbitant price for all five bottles, a fact to which the victims never agreed and were never properly informed. Simply put, the scammers brazenly overcharge their victims for Keto Products that they never intended, nor consented, to purchase.

10.     Using multiple websites, the scammers present one face to the consumer—a "landing page" website offering consumers to "Buy 3 Bottles, Get 2 Free" and "Buy 2 Bottles, Get 1 Free" with advertised prices around $120 or less, without any upfront disclosure that, in truth, the consumer will be sent five bottles of pills – regardless of the number of bottles the consumer chose to purchase - and will be billed for all five bottles at a price around $200. They present a completely different face to the banks and credit card companies investigating complaints and requests for chargebacks, which is a second website appearing to fully comply with the law and fully disclose the actual prices of the bottles. However, the second website—the "false front"—is never viewed by the consumer. Instead, the consumer purchases the product from one of the landing pages on a completely different website. Consequently, consumers are left with no recourse because the scammers have defrauded their banks and credit card companies into believing the consumers consented to be billed the actual prices that are listed on the "false front" website, when in fact they did not.

11.     These scammers operate in rings, as described in Exhibit 1. Those rings generally include: (1) the marketers/branders of the products, including Beyond Global Inc., who create the landing pages to lure unwitting victims to purchase the Keto Products and also operate a "false front" website to avoid detection by the banks and credit card companies, (2) the fulfillment companies, including the TFL Defendants, who provide generic "white label" products to the marketers/branders, assist the marketers/branders with affiliate marketing and advertising, distribute the products to unwitting consumers nationwide, and handle returns when customers complain, (3) the affiliate networks, who offer generic landing pages for the marketers/branders to simply add the name of their product and logo on the bottle and connect the marketers/branders to individual affiliates who are paid to advertise the fake celebrity and magazine endorsements, (4) the companies who provide specialized software for the scammers to create their landing pages and "false front" websites and to utilize multiple merchant accounts and chargeback/re-billing screening in order to avoid fraud detection by banks and credit card companies, and (5) the

"crooked processors" who assist the scammers in avoiding detection by bank and credit card companies.

12. These rings of scammers are structured in this way in the mistaken belief that the members of the ring will avoid liability by pretending to be legitimate businesses and pretending to have no knowledge of the actions of the others. But every member knows full well what they are doing—the marketers/branders intentionally seek out affiliates to do their dirty work under the pretense of "independent contractor" agreements and operate different websites to avoid fraud detection by banks and credit card companies, the fulfillment companies, including the TFL Defendants, handle numerous consumer complaints for the unauthorized billing of products the consumers did not purchase, the affiliate networks offer generic landing pages for the marketers/branders to simply add the name of their product and logo on the bottle and connect the marketers/branders to individual affiliates who are paid to advertise the fake celebrity and magazine endorsements, as well as the "crooked processors" who openly pitch themselves as being able to help their clients avoid fraud detection and chargebacks.

13. Although the marketers/branders of the Keto Products are unknown at this time (other than Beyond Global Inc.) and, therefore, referred to as "Keto Doe Defendants" herein (with Beyond Global Inc. included in that definition), the TFL Defendants should be held jointly and severally liable for the fraud perpetrated by the Keto Doe Defendants. The TFL Defendants knowingly enabled the Keto Doe Defendants to operate the Keto scam—and similar scams—and perpetrated the fraud against consumers.

14. Indeed, as described in detail herein, all of the Defendants together created a lucrative enterprise selling the Keto Products and they have defrauded countless consumers, including Ms. Sihler and Ms. Bavencoff.

15. This lawsuit seeks to hold accountable the members of the Keto scam that defrauded Ms. Sihler and Ms. Bavencoff, defrauded their banks and credit card companies, and defrauded many other consumers as well.

16.

## THE PARTIES

### Plaintiffs

17.     Plaintiffs Janet Sihler is a citizen of the State of California and resides in the city of Coronado, County of San Diego, California, where she resided at the time of her purchase of the "InstaKeto" product.

18.     On or around December 11, 2019, Ms. Sihler signed up for a "Buy 3 bottles, Get 2 free" promotion of the InstaKeto product with the expectation that she would be billed for three bottles of the product at $39.74 each bottle, and she would receive two additional "free" bottles, for a total purchase price of $119.22.  Without her knowledge or authorization, Ms. Sihler's debit card was overcharged $198.70, which represents the total price for five bottles at $39.74 each.  A few days later, she received five bottles branded "Instant Keto."  Ms. Sihler called the Customer Service number listed on the packing slip to dispute the charge, but she was unable to obtain a refund. In fact, the customer service representative informed Ms. Sihler that she would have to ship the bottles back at her own expense to obtain even a partial refund. Ultimately, Ms. Sihler never recovered any of the money taken from her by Defendants.

19.     Plaintiffs Charlene Bavencoff is a citizen of the State of California and resides in the city of Santee, County of San Diego, California, where she resided at the time of her purchase of the product. On or around October 14, 2019, Ms. Bavencoff saw a Facebook advertisement for "Ultra Fast Keto Boost" and clicked through to a fake news article claiming the product was endorsed unanimously by all six celebrity sharks on the hit series, "Shark Tank."  Ms. Bavencoff reviewed the purchase options and chose one of the options where she would receive additional bottles at no cost.  Like Ms. Sihler, Ms. Bavencoff had the same expectation—that she would not be billed for the additional "free" bottles. Several days later, she received five bottles of "Ultra Fast Keto Boost." However, without her knowledge or authorization, Ms. Bavencoff's credit card was overcharged $198.70, which represents the full price of $39.74 for each bottle.

20.    After Ms. Bavencoff tried one bottle and decided it did not work, she called the Customer Service number listed on the packing slip, but the telephone number was disconnected.   Ms. Bavencoff never recovered any of the money taken from her by Defendants.

## The Defendants

21.    Plaintiffs are informed and believe Defendant THE FULFILLMENT LAB, INC. ("TFL") is, and at all times herein mentioned was, a corporation organized and existing under the laws of the State of Florida, with its principal place of business located at 5136 West Clifton Street, Tampa, Florida, 33634.

22.    Plaintiffs are informed and believe Defendant RICHARD NELSON ("Nelson") is, and at all times herein mentioned was, a resident of the State of Florida, residing at 16506 Amberwind Lane, Apartment #108, Lutz, Florida 33558-4976. Defendant Nelson is TFL's current President.

23.    Plaintiffs are informed and believe, and based thereon allege, that at all times mentioned herein, each of the TFL Defendants was and now is the agent, servant, employee, representative, and/or alter ego of each of the remaining TFL Defendants, and in so doing the acts alleged herein, was acting within the scope of the authority of such agency, service, employment, representation, and/or alter-ego relationship with permission and consent of each of the remaining TFL Defendants, and is jointly and severally liable for the damages asserted herein.

24.    Plaintiffs are informed and believe Defendant BEYOND GLOBAL INC. is a corporation organized and existing under the laws of Wyoming, who lists its address as 2232 Dell Range Blvd., Suite 245, Cheyenne, WY 82009 (a virtual office with many other companies listed there), but whose actual principle place of business is unknown.

25.    Plaintiffs are informed and believe DEFENDANTS JOHN DOE 1 THROUGH 10 are any other individuals, corporations, or entities responsible for marketing, branding, and/or selling the Keto Products, and any individuals, corporations, or entities providing the capacity to evade fraud detection through services relating to credit

card or debit card processing (collectively, the "Doe Defendants"). The true names and capacities of the Doe Defendants sued herein as JOHN DOE 1 through 10, inclusive, are currently unknown to Plaintiffs, who therefore sue such Defendants by fictitious names. Each of the Doe Defendants designated as a JOHN DOE is legally responsible for the unlawful acts alleged herein. Plaintiffs will seek leave of Court to amend this Complaint to reflect the true names and capacities of the JOHN DOE Defendants when such identities become known.

26.     Plaintiffs are informed and believe, and based thereon allege, that each of the Defendants aided and abetted one another by providing substantial encouragement and/or assistance in doing the acts alleged herein, with knowledge of the wrongful nature of the conduct and the harm to Plaintiffs that would result therefrom. There is, and was, a substantial causal connection between the conduct of the aider and abettor and the harm to Plaintiffs, and the encouragement and/or assistance was a substantial factor in causing the resulting harm. As a result, Defendants are not only liable for their direct torts and tortious conduct but are secondarily liable to Plaintiffs as a result of their aiding and abetting.

## FACTUAL ALLEGATIONS

### Background on the Scam

27.     The Internet has been plagued in recent years by a flood of scams enticing consumers into purchasing worthless weight-loss products by using fake news articles, fake celebrity endorsements, and fake customer reviews that boast miraculous results and benefits of the products—none of which are true.  The scammers advertise their products for a certain price, including promotional offers such as "Buy 3 Bottles, Get 2 Free," then send all of their victims five bottles of the product, regardless of the number of bottles they actually purchased. The customers soon discover that their debit or credit cards are overcharged for all five bottles that they did not order and never intended to purchase—a "straight sale" scam that is anything but straight.

28.     The scammers make the refund and return process virtually impossible, and as a result, most customers are unable to recover their money, including Ms. Sihler and

Ms. Bavencoff.  This has become a lucrative business as the scammers churn out the same bottles of bogus weight-loss products with different names and labels to continue perpetrating their scheme.  The efforts by the Federal Trade Commission ("FTC") and other regulators to shut down these scams has created a virtual "whack-a-mole" in that scammers can close up shop with one bogus product, then quickly and easily start selling another product using the same fraudulent techniques.

29.     These scams are not just deceptive—they are criminal. This lawsuit seeks to shut down the ring of scammers who defrauded an unknown number of people, including the named plaintiffs, Janet Sihler and Charlene Bavencoff.

30.     The Better Business Bureau ("BBB") issued a study in December 2018 titled "Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements." *See* Exhibit 1 attached hereto. Written by C. Steven Baker, an International Investigations Specialist for the BBB and former Director for the Midwest Region of the FTC, the report explains in detail the tactics used by scammers to exploit customers who are unaware of their fraudulent techniques.

31.     According to the report, these scams have "infested the internet and social media." Ex. 1, at p. 1. Although the report focuses on "free trial" scams, the same fraudulent techniques used by those scammers are used by the Defendants here, and in fact, the scam here is an evolution of the "free trial scam" designed to avoid FTC scrutiny by billing for a group of unordered bottles all at once, rather than through a continuity subscription. The similarities are clear. For example, all of these scams start out the same way: "You've seen them on the internet: ads or links leading to pictures of celebrities and products that sound intriguing. The ads claim these 'miracle' products will help you lose weight easily, combat wrinkles or whiten teeth. Often, fraudulent operations involved with these types of ads employ the latest internet marketing techniques and professional looking websites."

32.     While victims of the traditional "free trial scam" are enticed to purchase products through a "risk-free" trial, victims of this "straight sale" scam like Ms. Sihler and Ms. Bavencoff are enticed by the promise of "free bottles." They are subjected to fake

celebrity endorsements and fake customer reviews showing extreme weight loss, as well as the promotional offers to receive "free" bottles of the product. Later, they are shocked to discover that their debit or credit cards have been charged almost $200.  The report continues: "There may be a risk that the product doesn't work as claimed, but it costs next to nothing to find out. Just enter your name, address and credit card number and act quickly; supplies are limited. Better Business Bureau's (BBB's) in-depth investigative study found that many of these free trial offers are not free. They do not just send free product samples to try. If you can locate and read the fine print on the order page, or the terms and conditions buried by a link, you'll discover that you may have only 14 days to receive, evaluate and return the product to avoid being charged $100 or more. In addition, the same hidden information may state that by accepting the offer, you've also signed up for monthly shipments of the products. Those also will be charged to your credit card and become subscription traps. Many people find it difficult to contact the seller to stop recurring charges, halt shipments and get a refund." Ex. 1, at p. 1.

33.    The Defendants used similar fraudulent techniques to perpetrate their illegal scam here—indeed, they learned them through a long history of perpetrating "free trial scam" prior to changing their methods to offering "free bottles." And as the BBB recognized in its study, the sellers of these products are not the only active participants in these scams: "The fraud involves a variety of players, from those who obtain the products to advertisers, shippers and credit card processors." Ex. 1 at 1.

34.    For example, the companies involved often hire "affiliates" to place advertisements for them or to create fake celebrity ads, paying them commissions. Ex. 1 at 3. Those affiliates are often hired or paid through a separate "affiliate network." *Id.*

35.    The BBB describes the role of affiliates and affiliate networks as follows: "Many fake free trial offers use affiliate networks to advertise their products. Someone who wants to drive traffic to their website hires an affiliate network, which in turn hires individual affiliates to place advertising. The affiliates often buy space for ads or sponsored content on popular websites. Clicking on one of these ads will take people to a website

where products are sold, or to a 'landing page' that then refers users to the main site for the product. Commissions are paid to the affiliate network, which in turn pays the affiliates. Affiliates can either be paid per click or per order placed. Commissions for these misleading 'free trial' offers can be $30 to $50 for every person who signs up." Ex. 1 at 6.

36.     Another typical player in the scam operations is the "fulfillment company"— which is a company that manufactures and ships the products to consumers, but in fact plays a much greater role in the scam, acting as consultants and creating turn-key scam products knowing full well how they are being sold. The BBB study makes clear that these fulfillment companies are active participants: "The free trial offer operations also have to get the product shipped to victims. Often, fraudulent free trial operations use fulfillment companies to ship the products and, presumably, accept returns." Ex. 1, at p. 9.

37.     A final type of participant in these scams are third party companies which assist in preventing the scammers from losing their merchant accounts with credit card companies or otherwise being flagged for their fraud: "Using a crooked processor. Banks that offer credit card processing hire Independent Sales Organizations (ISO's) to solicit and sign up merchants for them. The banks require that these agents comply with detailed rules before opening accounts to determine if they are legitimate and to monitor their activity for signs of fraud, such as reviewing chargeback rates and other suspicious activity. But what if those providing processing services are in on the fraud? The FTC has sued a number of these ISOs over the years, often alleging that these third parties were aware of the fraud or actively assisted in helping a fraudulent company evade the rules of the credit card system. For example, in one FTC case an ISO spread the credit card charges over 26 merchant accounts to disguise the fraud activity." Ex. 1 at 11.

38.     The fact that "affiliate marketing" is rife with illegal scam operations is well known in the industry. At the *Affiliate Summit West* in 2019, the preeminent conference for affiliate marketers, the keynote speaker, Neil Patel, repeatedly acknowledged in frank language how widespread such scams are among Internet marketers and among attendees

of the conference:[1]

> The sad reality is, at least for a lot of affiliates, the way affiliate marketing was a few years ago isn't gonna exist anymore and it's gonna get tougher and tougher. You know, I remember years ago in San Diego I was meeting some friends and they're like, yeah, we're selling some skin care product, we got to zero to $100 million dollars a year in revenue in twelve months with a brand new company. Those days are long gone. **As you can guess some of those guys probably got hit by the FTC as well.**

39.    Mr. Patel continued:[2]

> I've got a marketing blog. I see what a lot of affiliate marketers think 'cause a shit load of 'em hit me up every single day, I think I'm number one on Google for affiliate marketing. I could be wrong, maybe number two. Either way I just get a ton of affiliate marketing traffic. So, let's go over fact number one: how affiliates currently make money. And hopefully you guys don't get offended, I'm just gonna be stating the facts. Churn and burn model with Facebook accounts. You guys know what I'm talking about, you used to pay people fifty bucks, it used to be crazy back in the day, people were paying hundreds of dollars for Facebook accounts and then they would churn and burn 'em. You guys familiar with this? No? I love it, you have the biggest smile and you're like, no, and now you're turning away, you're like don't look at me, hopefully no camera's on me. (LAUGHTER). That's okay. Everyone has to make a livin'. Hopefully you crushed it while you can. **The next model: fake news landing pages. "The Shocking Reason Why Joy Behar Is Quitting The View." Well it's because she took this new wrinkle cream.** (LAUGHTER). She looked ten years younger and now this is what she's selling. And you know what? Joy's story is so amazing, on that landing page is also a testimonial from her friend Oprah. (LAUGHTER). On how this wrinkle cream also made Oprah look twenty years younger. And you know what? Oprah also lost ten pounds while taking this wrinkle cream. (LAUGHTER). She was so addicted to it she was taking it at night, but luckily when her power went off she had one of those flashlights, the survival ones. (LAUGHTER). Right?

---

[1] Neil Patel, *The Future of Affiliate Marketing: It's Not What You Think*, https://www.youtube.com/watch?v=2hUdbztKLY4 at 0:20 (last visited Jan. 3, 2019) (emphasis added).

[2] *Id.* at 5:41.

**That's how affiliate marketers make money. And again, I've seen it, there's nothing wrong with it. Some of you guys do straight sells, so when they click from that Oprah landing page, they go into a straight sell instead of forced continuity.** And that's fine as well. And again this is forced continuity, you tell 'em it's a free trial, but they don't really see in the fine print that they're gonna get billed every single month. And then you target the older demographics who have no idea why they're continually getting rebilled. **And then some of you guys have what's called a quote-unquote hell room that just deals with the calls. And the refunds. Or the credit card processors where you guys rotate up the chargebacks so then that way, then you guys can keep processing the money.**

40.     Mr. Patel acknowledged that a widespread FTC crackdown was occurring:[3]

The FTC has been cracking down on certain companies and industries, hence you're seeing a lot less forced continuity. You guys, many of you have issues with credit card processing, so you'll do things like, I forgot what the saying is but they rotate up the MIGS or the MIDS, I don't know what the saying is but it's more so they're controlling where the chargebacks are going.

41.     Mr. Patel described the FTC efforts to target not just affiliate marketers but companies such as Facebook:[4]

But they get pressure. 'Cause those old grandmas are like, hey! Facebook screwed me over! They sold me this wrinkle cream! One, I still have my wrinkles. Two, they keep advertising these false products. So they get pressure. The government doesn't just want to stop the companies, they go to the source and say, stop them from advertising.

42.     At a Keynote Panel that followed Mr. Patel's speech, several panelists who operate affiliate networks addressed the same issue. An audience member who was inexperienced in the industry posed the following question about the fake news articles

---

[3] *Id.* at 10:10.
[4] *Id.* at 16:16.

used by many affiliate marketers:[5]

> **Ok, I'm relatively new to the affiliate game myself**. Uh, I started my business at home, and I have to say that I'm very pleased with the industry coming out of 25 years of health care. So, my question is, what are the regulations from the Federal Trade Commission that publishers are gonna have to deal with that's gonna impact our revenue? And is the fed—you guy's dealing with the Federal Trade Commission, would that impact us? You guys. If there was something that you guys had—you had to deal with, that, would that impact the way we do business with you? .... What is the government looking at as far as publishers, you know, I mean, what do we, what, in the next five years, is gonna be the regulations for us in content? **Like the fake news stuff. Everybody talk about the fake news, but nobody even, like, call people who put fake news out. Nobody calls 'em on it. You know, they continue to do it. If I wanted to put something up about one'a you guys, fake news, what would stop that? You know? What type'a federal laws are gonna be put in place to keep that from happening?**

43.     The inexperienced audience member may not have understood why these illegal practices were being tolerated by the industry, but the panel knew perfectly well. And their response gave away the game. Todd Crawford, the Vice President of Strategic Initiatives at Impact Radius, a company that connects affiliates to advertisers, responded as follows:[6]

> Well, you know, the FTC requires you to disclose that you're earning money from your links, that you may be earning money for referring sales. **You know, if you're promoting fake news, I think that's more of a brand decision or maybe a network decision on their policy of what they accept.** I mean, we even have criteria that, in our marketplace environment, you have to, you know, you can't do certain things that maybe a brand would work with you direct through. So, it, I think there's no simple answer there but the big picture is the disclosures by the FTC, because they're going to come after you.

---

[5] Affiliate Summit West 2019 Keynote Panel, https://www.youtube.com/watch?v=6KRA8fL6hp0&t=281s, at 50:02 (last visited Feb. 9, 2020) (emphasis added).
[6] *Id.* (emphasis added).

44.     Earlier in the panel, Mr. Crawford commented on a question about what affiliate networks do when fraud is detected on their networks:[7]

> Well, for example, this is years ago. I helped found Commission Junction. So when I was working there, a very large publisher violated the agreed upon terms that everybody else in here had agreed to, and we kicked 'em out for over a year, and no other network did anything.... [I]n the U.S., it's so spread out, and it is kinda this every man or woman for themselves. And they're gonna run their business how they want. I'm all for it, but...

45.     Mr. Crawford's statements make clear that the companies that are supporting the scammers are making a policy decision to allow that conduct to occur on their networks. And he further makes clear that some businesses have chosen not to work with these scammers, and that they are perfectly capable of doing so. The companies that work with the scammers are making voluntary, intentional, and knowing decisions to do so—and they are making that choice because it is an extremely profitable one.

46.     Tellingly, representatives for the TFL Defendants attended both the *Affiliate Summit West* in Las Vegas, where Mr. Patel and Mr. Crawford were the keynote speakers, and the *Affiliate Summit East* in New York.   Upon information and belief, these representatives attended the conferences specifically for the purpose of finding scammers to be their clients.

47.     The attitude of Mr. Patel and others in the affiliate marketing "industry" that "there's nothing wrong with" this behavior is deeply disturbing: there is in fact something quite wrong with targeting the unwitting consumer, the poor,  and the elderly with fake news advertisements and fake "free bottle" promotions for the purpose of defrauding their debit and credit cards before the victim notices. It is little more than outright theft conducted under the barest fig leaf of a "business"—and it is precisely what the Defendants were doing here.

---

[7] *Id.* at 21:44.

48.     These scams generally involve more than one individual or companies conspiring together and generally playing the roles described above. Believing that they can pretend that their affiliates are independent contractors, or that they can pretend to see no evil and hear no evil and thus escape legal liability, the conspirators work together as a group to profit from the fraud. But they are quite wrong to believe that they are safe—every member of these conspiracies knows full well what they are doing, and every member is jointly and severally liable for the conduct of the others.

### Plaintiffs Janet Sihler and Charlene Bavencoff are Two of
### Many Victims of the Keto Scheme

49.     On or about December 11, 2019, Plaintiffs Janet Sihler saw an advertisement for a weight loss product called "InstaKeto" as she was browsing the Internet.   The advertisement stated the product was featured on the well-known television show, "Shark Tank."  She clicked on the advertisement, which took her to the InstaKeto landing page, where she purchased the bottles.

50.     Ms. Sihler entered her credit card information and expected to be taken to a final review and submit page that would show her the total purchase price.  Instead, the next page stated: "Your order has been submitted."

51.     Ms. Sihler subsequently received a charge on her debit card for $198.70.  The charge on her debit card showed the merchant account as "VYA*KETOBOOST 8889700695 Port Orange FL."

52.     A few days later, she received five bottles branded "Instant Keto" with a packing slip. The packing slip did not show any prices.[8]

---

[8] Image redacted to remove Ms. Sihler's address.

53.     Although the five bottles were labeled "Instant Keto," the packing slip described the bottles as "KetoBoost" and identified the shipper as "Ultra Fast Instant Keto" with an office located at 3201 Hillsborough Avenue 153201-1378, Tampa, Florida, 33684.

54.     Ms. Sihler called the Customer Service telephone number to request a refund. The Customer Service representative flatly refused and informed Ms. Sihler that she would have to ship the bottles back at her own expense to obtain even a partial refund. Ms. Sihler was never able to recover her money.

55.     Similarly, on or about October 14, 2019, Plaintiff Charlene Bavencoff saw an advertisement on Facebook for a weight-loss product called "Ultra Fast Keto Boost." She clicked on the advertisement, which took her to a fake news article claiming the product was featured on "Shark Tank." She clicked on the advertisement, which took her to the Ultra Fast Keto Boost's landing page, where she purchased the bottles.

56.     Ms. Bavencoff subsequently received a charge on her card for $198.70. The charge on her credit card showed the merchant account as "UltraFast Keto Boost 8444-

7041211NV."

57.     A few days later, she received five bottles branded "Ultra Fast Keto Boost" with a packing slip. The packing slip does not show any prices.[9]



58.     Ms. Bavencoff tried one bottle for a few weeks; however, she decided the product did not work so she did not use it any further.  When she tried contacting Customer Service to obtain a refund, the phone number was disconnected. Like Ms. Sihler, Ms. Bavencoff has not been able to recover her money from Defendants.

59.     Although Ms. Sihler and Ms. Bavencoff purchased different products, their packing slips for "InstaKeto" and "Ultra Fast Keto Boost" are virtually identical.  Both packing slips have the same layout with the same fields, label size, and font.  The shipper's name and return address are identical as Ultra Fast Instant Keto, 3201 Hillsborough Avenue

---

[9] Image redacted to remove Ms. Bavencoff's address.

153201-1378, Tampa, Florida, 33684.

60.    Both Ms. Sihler and Ms. Bavencoff were injured by Defendants' misrepresentations and unfair and unlawful business practices. They suffered a loss of time, inconvenience, and a loss of money. They paid more for the products than they would have had they been aware that Defendants' representations were false, and ended up with products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore suffered injury in fact.

### The Keto Scam:

### A Victim Encounters the Product Advertisement through a "Sales Funnel"

61.    The "sales funnel" for the Keto Products - the series of websites which leads a victim to sign up for a fraudulent purchase—is typical of the scams about which the FTC and BBB have issued repeated warnings to consumers.

62.    The victim initially encounters an advertisement for the product through a third-party site, such as Facebook, which takes the victim to one of the product's landing pages.  Both Ms. Sihler and Ms. Bavencoff viewed online advertisements claiming that the "InstaKeto" and "Ultra Fast Keto Boost" products were unanimously endorsed by all six celebrity "sharks" on Shark Tank.

63.    Many of these landing pages are hidden from search engines, they are made inaccessible to anyone who does not view an advertisement, or they are deleted after a few weeks or months to avoid detection. While the specific pages Ms. Sihler and Ms. Bavencoff viewed are unknown, there are two known landing pages for the Keto Products.[10]

64.    One of the known "Ultra Fast Keto Boost" affiliate pages is titled "Weight Loss Supplement That Naturally Burns Fat Gets Biggest Deal in Shark Tank History."[11]

---

[10] For Ultra Fast Keto Boost, the landing page is https://ultrafastketoboost.com. For InstaKeto, the landing page is http://instaketo.com.

[11] Although the webpage is designed to look legitimate, the actual URL is: https://santa-claus.clientsshopping.com/?Flow=6915668891661758&uid= e20839cde0417e819ec6e97d0cfac59e&access_token=E2gaoH9- zGoFuJ4UuAJGbzrKbDdqeJrKIOD5sF36h=4JuENPNzjMeyrNVUuNXCZ5iWIDdycyr

The webpage is designed to mimic the format of a legitimate news article with a "Vane Local" logo at the top.  A banner running under the title claims that Ultra Fast Keto Boost has been featured in a variety of legitimate publications and beauty websites: Us, New You, Shape, HauteLook, Time, Health & Fitness. The advertisement urges victims to "CLICK HERE to Claim Your Special Offer of Ultra Fast Keto Boost."

AHugAysXC96b2wOvHNuyGndtJ48w8mpl (last accessed Jan. 20, 2020). This webpage is no longer accessible.

**VL** VANE LOCAL        LOVE    CELEBS    BEAUTY    GIFT IDEAS

## Weight Loss Supplement That Naturally Burns Fat Gets Biggest Deal In Shark Tank History

—— *featured in* ——

US  NEW YOU  SHAPE  HAUTELOOK  TIME  health&fitness



EXCLUSIVE

*(Wednesday, March 11, 2020Thursday, September 5, 2019) - It was the most watched episode in Shark Tank history when sisters Anna and Samantha Martin won over the Shark Tank panel.*

N ever before had the judging panel unanimously decided to each invest over 1.3 million dollars into a potential company.

After buying a staggering 25% share in the sisters company, the Shark Tank panel have personally mentored the pair, helping them undergo re-branding and re-packing of their miracle product.

Touting their discovery as "a great step forward in weight loss history, the panel were quick to offer up their hard earned cash to back the entrepreneurial pair. "We were shocked. The most we were hoping for was some advice...we weren't even sure that we would manage to get any investors," explained Samantha. After outstanding offers from each panel member, the sisters burst into tears.

The judges were amazed that one product was able to do all of the following:

- Increase Resting Metabolism More Than 130%
- Flush Out Harmful Toxins
- Lose weight more easily
- Block Excess Fat Production By 110%
- Curb appetite and feel fuller longer
- Improve mood and sense of well-being
- Improve Sleep By 80%
- Lower blood pressure
- Reduce cholesterol
- Decrease body fat
- Regulate blood sugar levels

"It didn't feel real. The fact that all these successful, business-minded people wanted to be apart of Ultra Fast Keto Boost and what we were doing was very emotional!" explained Anna.

The pair are the first contestants in the show's long duration to ever receive a standing ovation and offers of investment from all five panel members. The sisters said they celebrated the success with champagne and cake when the episode wrapped.



### READER RESULTS



Lacey Brown, age 53 submitted this photo of her results with Ultra Fast Keto Boost. You look great, Lacey!

"Ultra Fast Keto Boost is the absolute best weight loss product I've ever used. I thought my days of looking young and thin were long gone. I can't thank you enough for this!"

**Lacey Brown,
Cronulla**

### BEFORE & AFTER



"I've been trying to lose the same 10 lbs for what feels like forever now. Ultra Fast Keto Boost got rid of it in only 2 weeks! Thanks so much!"

**Andrea Taylor,
Gold Coast**

### BEFORE & AFTER



"For the first time in forever I am finally happy when I look in the mirror every morning. I haven't felt this confident in a long time!"

**Kelly Smith,
Melbourne CBD**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*The sisters were the first contestants in Shark Tank history to receive investment offers from all five panel members.*

Since filming their episode, the sisters have been hard at work putting the advice of their mentors into play.

*"We completely re-branded our company and came up with new packaging,"* said Anna.

The pair recently unveiled the product that netted them millions of dollars in investments and made it for sale across Australia and soon to be worldwide.

*"The two products we displayed on the show have been rebranded into the Ultra Fast Keto Boost. It's the original formula, all we've done is change the name and the packaging,"* explained Samantha.

The sisters first launched the products for sale through their **company website** and say they sold out within 5 minutes.

*"We even made sure we had more product than we thought we could sell, but all of it sold out within five minutes!"* exclaimed Samantha.

While the Shark Tank investors are toasting to their smart business move, women across Australia are flocking online to purchase **Ultra Fast Keto Boost** and say the results have been life-changing.

Clinical trials of the **Ultra Fast Keto Boost** have uncovered that women who used the **Ultra Fast Keto Boost Dietary Supplement** were able to lose an average of 21 lbs in 1 month and with continued use keep the weight off.

*"Ultra Fast Keto Boost is revolutionizing weight loss methods,"* explained Barbara Corcoran from Shark Tank.

## WOMEN AND MEN LOVE Ultra Fast Keto Boost

*"For the first time in forever I am finally happy when I look in the mirror every morning. I haven't felt this confident in a long time!"*

**Kelly Smith,
Melbourne CBD**

**Special Offer**

☑ **Step 1:**

**CLICK HERE to Claim Your Special Offer of Ultra Fast Keto Boost**



**Special Offer Are Limited.**
Expires: Wednesday, March 11, 2020

**GET YOUR BOTTLE >>**

**BEFORE & AFTER**



65.    The fake news article claims that the Shark Tank judging panel "unanimously decided to each invest over 1.3 million dollars" in the Ultra Fast Keto Boost product, which was purportedly a company run by two sisters named Anna and Samantha Martin. In fact, there are no such sisters: the women pictured are Shelly Hyde and Kara Haught of Raising

Wild Swimwear, who appeared on Shark Tank in Season 8, but who have no affiliation with Ultra Fast Keto Boost.[12]

66.     The fake news article claims the Shark Tank judges were "amazed" that the Ultra Fast Keto Boost product could do all of the following—"increase resting metabolism more than 130%, flush out harmful toxins, lose weight more easily, block excess fat production by 110%, curb appetite and feel fuller longer, improve mood and sense of well-being, improve sleep by 80%, lower blood pressure, reduce cholesterol, decrease body fat, and regulate blood sugar levels"—a complete falsity. The article features a photograph of all six "sharks"—Mark Cuban, Kevin O'Leary, Daymond John, Barbara Corcoran, Lori Greiner, and Robert Herjavec. The "sharks" are pictured toasting with champagne, presumably to their new investment in Ultra Fast Keto Boost.

67.     The webpage also provides numerous "before and after" photographs of people who have apparently experienced extreme weight loss, all of which is attributed to the Ultra Fast Keto Boost pills.

---

[12] *Raising Wild: What Happened To Bathing Suit Sisters After Shark Tank*, 2Paragraphs, https://2paragraphs.com/2017/10/raising-wild-bathing-suit-sisters-schooled-by-corcoran-after-shark-tank-as-founders-learn-to-prioritize-launch-sunglasses/

1
2
3
4
5
6
7
8
9
10
11
12
13
14

**WOMEN AND MEN LOVE Ultra Fast Keto Boost**



*"Ultra Fast Keto Boost is ground-breaking. 14 kilo in just 3 weeks! I finally have my figure back! They are the only company in the world who are effectively helping women lose weight in a safe, natural and healthy manner."* -



BEFORE & AFTER

*"Thank God I didn't go through with that surgery... I got the same weight loss results, for less than a cup of coffee! I'm so happy!!!"*
*Christina Butler,*
*Hobart*

BEFORE & AFTER

*"I've been using Ultra Fast Keto Boost for 3 months, during that time I've lost 97 lbs! It's been a life-changer for me, it's unbelievable! I haven't felt this healthy since my 20's!*



*"I've only been using the Ultra Fast Keto Boost for 1 month, and I love it!!!!!!!! I have seen a visible change in my weight, and best of all my friends are noticing!"*
*Carol Keeton,*
*Auckland*

BEFORE & AFTER

15   68.   The bottom of the page contains fake Facebook comments touting the
16   beneficial effects of the product.

17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26



☑ **Step 1:** Special Offer of Ultra Fast Keto Boost

**(2094)** Viewing The Special Offer

**GET YOUR BOTTLE >>**

This special offer expires: Thursday, September 5, 2019

CUSTOMER SATISFACTION
**100%**
**GUARANTEED**
★ ★ ★

**Recent # Comments**                                            **Add a comment**

**Tohloria Lewis**
Never even thought about combining the products. I am very much pleased after using this product.
Reply . 13 . Like . 12 minutes ago

**Tanya Porquez**
I saw Anna and Trevor presentingShakra Keto on CNN a while ago and am still using the pill. I've been using the products for about 6 wks. Honestly, this is unbelievable, all I have to say is WOW.
Reply . 6 . Like . 13 minutes ago

**Jennifer Jackson Mercer**
A friend of mine used and recommended it to me 3 weeks ago. I ordered the product and received it within 3 days. The results have been incredible and I can't wait to see what weeks 3 and 4 bring.
Reply . 19 . Like . 25 minutes ago

**Kristy Cash**
I wish I knew about this product before I had liposuction! It would have saved a heck of a lot of money!
Reply . Like . 46 minutes ago

**Katy Barrott**
I can't believe this really worked! I am very much pleased after using this product.
Reply . 43 . Like . about an hour ago

**Amanda Gibson**
I saw this on the news. How lucky is Kim to have been given this opportunity!?!?! Thank you for sharing this article! I just ordered mine.
Reply . 3 . Like . 1 hour ago

**Julie Keyse**
probably I'm a bit more overweight than most of you folks. butShakra Keto worked for me too! LOL! I can't say anything more exciting. Thanks for the inspiration!
Reply . Like . 2 hours ago

27    69.    The affiliate page repeatedly claims that there is a limited supply of Ultra Fast
28  Keto Boost remaining and urges victims to act quickly before supplies run out. Victims are

told that the "Special Offer" will expire in 15 minutes and the timer then counts down—but that timer itself is a misrepresentation. There is in fact no limited supply. The website's code automatically starts a new 15-minute timer every time a user visits the page.

*(Thursday, September 5, 2019) - It was the most watched episode in Shark Tank history when sisters Anna and Samantha Martin won over the Shark Tank panel.*

Never before had the judging panel unanimously decided to each invest over 1.3 million dollars into a potential company.

After buying a staggering **25% share in the sisters company,** the Shark Tank panel have personally mentored the pair, helping them undergo re-branding and re-packing of their miracle product.

Touting their discovery as "a great step forward in weight loss history, the panel were quick to offer up their hard earned cash to back the entrepreneurial pair. "We were shocked. The most we were hoping for was some advice...we weren't even sure that we would manage to get any investors," explained Samantha. After outstanding offers from each panel member, the sisters burst into tears.

**The judges were amazed that one product was able to do all of the following:**

- Increase Resting Metabolism More Than 130%
- Flush Out Harmful Toxins
- Lose weight more easily
- Block Excess Fat Production By 110%
- Curb appetite and feel fuller longer
- Improve mood and sense of well-being
- Improve Sleep By 80%
- Lower blood pressure
- Reduce cholesterol
- Decrease body fat
- Regulate blood sugar levels

*"It didn't feel real. The fact that all these successful, business-minded people wanted to be apart of* **Ultra Fast Keto Boost** *and what we were doing was very emotional!"* explained Anna.

The pair are the first contestants in the show's long duration to ever receive a standing ovation and offers of investment from all five panel members. The sisters said they celebrated the success with champagne and cake when the episode wrapped.

**BEFORE & AFTER**



*"I've been trying to lose the same 10 lbs for what feels like forever now. Ultra Fast Keto Boost got rid of it in only 2 weeks! Thanks so much!"*

*Andrea Taylor,*
*Gold Coast*

**BEFORE & AFTER**



2 Special Offer Slim Down Bottles Left
14 mins 26 secs     Claim Yours!

70.     There is a second known affiliate page for Ultra Fast Keto Boost entitled "28+ lbs in 4 Weeks: New No-Exercise 'Skinny Pill' Melts Belly Fat. Why Every Judge On Shark Tank Backed This Product!"[13]  The webpage is designed to mimic the format of a legitimate news article from Fox News Channel.  A banner running under the title claims that Ultra Fast Keto Boost has been featured in a variety of legitimate publications and beauty websites: The New York Times, Today, The Oprah Network, StyleWatch, and Redbook. As the consumer scrolls the page, a constant banner provides a minute-by-minute countdown as to when the purported "Offer" expires, thereby creating an extreme sense of urgency to click through and purchase the product.



[13] The URL is https://www.duoduojianqian.com (last accessed October 6, 2019). This website is no longer accessible.

71.    The fake Fox News Channel article makes the same false claims as the landing page on the so-called "Vane Local" website, and posts the same photo of all six "sharks" - Mark Cuban, Kevin O'Leary, Daymond John, Barbara Corcoran, Lori Greiner, and Robert Herjavec - toasting with champagne, presumably to their new investment in Ultra Fast Keto Boost.

72.    The website goes on to claim that "Celebrities Love Ultra Fast Keto" and provides fake endorsements from a number of other celebrities, not just the Shark Tank cast. For example, American Idol star, Jennifer Hudson, is pictured with "before" and "after" photos calling Ultra Fast Keto Boost "her only choice" and that she "had lost a total of 80 pounds and had gone from a size 16 to a size 6."



**CELEBRITIES LOVE Ultra Fast Keto**

*It's been six months since the American Idol alum started her weight-loss journey. Among many slimming pills, Ultra Fast Keto is her only choice. In a October 2018 interview with Redbook, she revealed that she had lost a total of 80 pounds and had gone from a size 16 to a size 6. - Jennifer Hudson*

73.     Other celebrities are pictured as endorsers as well. Celebrity talk-show host Wendy Williams supposedly exclaims about Ultra Fast Keto Boost: "I feel amazing…and I finally said, 'Oh, for God's sake, stop worrying about my weight,' and it may be the best thing I've ever done!"



*"I feel amazing…and I finally said, 'Oh, for God's sake, stop worrying about my weight,' and it may be the best thing I've ever done!"* - **Wendy Williams**

74.     Celebrity comedian Drew Carey is quoted as being in "love" with Ultra Fast Keto because "I have a hectic schedule and I don't have a lot of time to devote to workout routines. That's why I love Ultra Fast Keto! Taking just one per day helped me get my body where I really felt comfortable."

*"I have a hectic schedule and I don't have a lot of time to devote to workout routines. That's why I love Ultra Fast Keto! Taking just one per day helped me get my body where I really felt comfortable "* - Drew Carey

75.    The affiliate page continues with endorsements from "Us Today's" offices—presumably a fake combination of well-known publications USA Today and/or US Weekly, and from Fox News that "Fox News is happy to officially recommend it!" The page continues with fake "before" and "after" photos and fake customer reviews—all of which attribute their extreme weight loss to Ultra Fast Keto Boost.

76.    The affiliate page also claims that consumers will not find a bigger discount "anywhere else on the internet!" and urges consumers to claim the "biggest discount" of "buy 4 get 3 free and buy 3 get 2 free and buy 2 get 1 free."

77.    The affiliate page goes on to urge consumers to act quickly because there is a limited supply of Ultra Fast Keto Boost.  Victims are told that "Only 4 Bottles Still Available" and that the "Special Offer" will end on a specific date—but, again, that date itself is a misrepresentation. There is in fact no end date. The website code simply starts a timer each time someone visits the page, but it has no actual effect.

Offer expires
in 14 : 56

Claim ›

78.     On information and belief, victims of the Keto scam were all subjected to similar or identical representations and were funneled from affiliate pages similar or identical to the two affiliate pages described herein to the landing pages for the Keto Products.

79.     The "Shark Tank" affiliate pages are no longer linked to the websites for these Keto Products, but the URLs for these pages included at least https://ultrafastketoboost.com and http://instaketo.com, two websites pages operated by the Keto Doe Defendants.

80.     The existence of these websites would not be apparent to anyone other than the victims, and anyone who did not view the "Shark Tank" affiliate pages would be unable to find the websites for the Keto Products.  This is because the Keto Doe Defendants configured their robots.txt files in a way to prevent search engines like Google or Bing from indexing their pages.  Therefore the URLs above— https://ultrafastketoboost.com and http://instaketo.com—would never show up in a search on these or other search engines. The only way to discover these websites would be via a direct link from a page or advertisement set up by the Doe Defendants.

81.     The Doe Defendants who are affiliates or affiliate networks clearly know about these landing pages because they link directly to these pages.

82.     A partial image of one of the landing pages for "Ultra Fast Keto Boost" appears below:[14]

---

[14] https://ultrafastketoboost.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16  83.   There are no terms of service or disclaimers visible at all on the landing page.

17  Instead, the victims are bombarded by false claims about the beneficial effects of the

18  product, including that it is a "Revolutionary Break-Through" that has "Scientists, Doctors

19  and Celebrities Buzzing" and has helped "thousands who are already losing up to 1 lb. per

20  day."[15]

21  84.   On the landing page, victims are repeatedly told they should rush their order

22  because the supply of Ultra Fast Keto Boost is limited. A pop-up banner at the top warns:

23  "WARNING: Due to extremely high social media demand for our offers with free bottles,

24  there is limited supply of Ultra Fast Keto Boost in stock as of September 24th!   Offer

25  expires in …."[16]   Like on the affiliate page, the timer is just a countdown that resets for

26  each user when they visit the page and is not tied to the existence of any real timed offer.

27

28
[15] https://ultrafastketoboost.com
[16] *Id.*

85.     At the very bottom of the page, there is a "Terms" hyperlink, which a consumer must click and scroll through in order to read a lengthy disclaimer.[17]   This disclaimer is only visible to customers who click on the hyperlink at the bottom of the shipping page.  The websites do not require the customer to read or acknowledge the Terms to complete a checkout.



86.     Buried in the lengthy disclaimer is a section entitled "Refund/Return Policy," which provides the disclosure that, in order to obtain a full refund, the consumer must contact Customer Service by telephone—not by email—and obtain a RMA ("Return Merchandise Authorization") number to place on the package, then must ship the product back at the consumer's own expense within 30 days of the date the consumer ordered the product.  The disclaimer also states the product "must NOT be opened or used" and the consumer must pay a $5.00 restocking fee.  The disclaimer instructs the consumer to send the returned product to Ultra Fast Keto Boost, 9205 W. Russell Road, Suite 240, Las Vegas, Nevada 89148.

87.     The so-called Refund/Return Policy is impossible to follow because it requires the consumer to call—not email—the Customer Service department to obtain the RMA number, but the Customer Service number was not a working number, as it was not working in Ms. Bavencoff's case.  The return policy also requires the consumer to return the item within 30 days of purchase and it must not be opened or used.  This makes no sense when the advertisements emphasize that the product must be used every day for 30 days in order to see results.  The consumer cannot even try it for one day before the refund

---

[17] https://ultrafastketoboost.com/terms-and-conditions

policy is void.

88.    At the bottom of the landing page, there also is a "Refund" hyperlink, which a consumer must click to read a shorter, conflicting policy that all orders are "secured with a 30-day Money Back Guarantee" and that a customer may request a refund by "simply" contacting support@ultrafastketoboost.com or 888-970-0686 to obtain an RMA number.[18]

Refund/Return Policy

In order to obtain your full refund, contact customer service by phone and obtain an RMA (Return Merchandise Authorization) number to place on your package. Write this number on the outside of the shipping package and send the product back to our warehouse at the address provided to you, and within thirty (30) days of the date you originally ordered the product. In order for your full refund to be processed the product must arrive at our fulfillment facility within thirty (30) days of the original purchase date and NOT be opened or used. You pay for return shipping. There is a $5.00 restocking fee per unit you are returning. This fee will be taken out of the refund issued. Once our warehouse has received the returned package, you will be issued a refund. Your refund will be credited back to the same credit card used to make the purchase. Refunds are issues within 48 hours and may take up to 3-5 business days to show in your statement, depending on the speed of the processing bank.

You may request a refund by calling 1-888-970-0686 (Support Line) Monday to Friday 8AM to 5PM PST.

Returns must be sent with your RMA number written on the packaging to:

RMA Returns
Ultra Fast Keto Boost
9205 W. Russell Road, Suite 240
Las Vegas, NV 89148

The Refund will show on your Credit Card statement as KETO BOOST, and you will receive a confirmation email from our warehouse at the time when your refund has been issued.

89.    After the victims enter their personal information on the landing page, including their full name, email address, telephone number, and shipping address, they click "Rush My Order" where they are taken to a check-out page. An image of the top of Ultra Fast Keto Boost's check-out page appears below.[19]

---

[18] https://ultrafastketoboost.com/terms-and-conditions/refunds
[19] https://ultrafastketoboost.com/checkout





ULTRA FAST KETO BOOST
CLAIM OFFER
REVIEW ORDER
YOUR SUMMARY
SAFE CHECKOUT GUARANTEED
OUR SPECIAL OFFER JUST FOR YOU!
A LIMITED TIME PROMO CODE HAS BEEN APPLIED TO YOUR CART.
Current Availability:
LOW STOCK!
Special Discount Expires In in 08:18 HURRY!
BUY 3 GET 2 FREE!
$39.74/BOTTLE
FREE SHIPPING
BUY 2 GET 1 FREE!
$49.97/BOTTLE
FREE SHIPPING
BUY 1 BOTTLE
$69.99/BOTTLE
FREE SHIPPING
FINAL STEP
PAYMENT INFORMATION
Ship To:
Enjoy FREE SHIPPING with your order
Your order will arrive by September 11th
Card #
Card Number
Exp Month
Exp Year
January
2020
CVC Code
CVC
Code On Back Of Card
(what's CVC?)
Promo Code
KETOBOOST
COMPLETE ORDER
Safe & Secure Transaction

90.     Notably, there is no requirement that users click a box or take any other action to agree to any terms of service. Once again, the link to the "Terms" is located at the very bottom of the screen next to several other links, in small text, and it requires users to scroll down to locate it. On the phone or tablet, the design for this page similarly requires no assent to the terms of service in any way, and again requires scrolling to a small link at the bottom to even view the terms.

91.     The check-out page presents victims with a graphic supposedly describing the product's current availability as "Low Stock" and urging them to "HURRY!" because the "Special Discount" will expire in only a few minutes. Victims are also told that they have received a "Special Offer Just For You!" and that a "Limited Time Promo Code" has been applied to their cart. On information and belief, the graphic purporting to be a representation of "Current Availability" is simply a static image that does not reflect the current supply of Ultra Fast Keto Boost at all. And these representations have been constant for the duration of the scam—when there is no shortage of Ultra Fast Keto Boost, and on information and belief, there never has been.

92.     The check-out page provides graphics for three different purchase options: (1) "Buy 3, Get 2 Free" for $39.74 each bottle; (2) "Buy 2, Get 1 Free" for $49.97 each bottle; and (3) "Buy 1 Bottle" for $69.99. The first option is pre-checked so victims need to deselect that option if they do not want to purchase three bottles. The victims then enter their credit card information and click "Complete Order."

93.     Victims who purchase the Ultra Fast Keto Boost bottles through this landing page are subjected to a number of false or misleading representations. Most reprehensible is the fact victims are never told they will be charged for a total price of $198.70.  In fact, the check-out page unambiguously states the opposite: that the consumer will pay a significantly lower purchase price for the bottles.

94.     On information and belief, every victim is charged the full amount of $198.70, regardless of the option the victim selects at the check-out page.

95.     A few days later, victims who expected to be charged the advertised amount for their bottles are understandably shocked to see their debit or credit card billed for nearly $200, to which they did not agree.  Even if they are lucky enough to get through to Customer Service by telephone, they are told they cannot obtain a full refund.

96.     This is nothing more than credit card fraud—lying to customers about what they will pay, taking their credit card information, and billing them for something to which they never agreed.

97.     Like the consumers who purchased the Ultra Fast Keto Boost product, the consumers who purchased "InstaKeto" bottles were subjected to similar misrepresentations throughout the purchasing process.

98.     The same "shark tank" style affiliate pages existed for "InstaKeto" such as the one shown below.[20]



LOVE     CELEBS     BEAUTY     GIFT IDEAS

# Weight Loss Pill That Naturally Burns Fat Gets Biggest Deal In Shark Tank History

AS SEEN IN

  



*(Wednesday, February 12, 2020) - It was the most watched episode in Shark Tank history when sisters Anna and Samantha Martin won over the Shark Tank panel.*

**N**ever before had the judging panel unanimously decided to each invest over a million dollars into a potential company.

After buying a staggering 25% share in the sisters company, the Shark Tank panel have personally mentored the pair, helping them undergo re-branding and re-packing of their miracle product.

Touting their discovery as *"a great step forward in weight loss history,"* the judges were quick to offer up their hard earned cash to back the entrepreneurial pair. "We were shocked. The most we were hoping for was some advice…we weren't even sure that we would manage to get any investors," explained Samantha. After outstanding offers from each panel member, the sisters burst into tears.

**The judges were amazed that one product was able to do all of the following:**

**Special Offer**

☑ **Step 1:**

**CLICK HERE to Claim Your Bottle of InstaKeto**





Bottles are limited.
Expires on Wednesday, February 12, 2020

**GET YOUR BOTTLE >>**

**READER RESULTS**

**BEFORE & AFTER**



*"I've been trying to lose the same 10 lbs for what feels like forever now. InstaKeto got rid of it in only 2 weeks! Thanks so much!"*

*Andrea Taylor,*
*Portland, Maine*

---

[20] http://diet001.club/ (last accessed February 12, 2020).

99.     And users who click the links in these InstaKeto pages are taken to a website, https://instaketo.com, which looks identical, except the brand on the bottle shows "Instant Keto" instead of "Ultra Fast Keto Boost."



100.   At the check-out page, the victims are presented with the same three purchase options, including the option to receive two "free" bottles with the purchase of three bottles.





101.   Again, there are no disclaimers on any of the webpages for the "InstaKeto" product (or "Instant Keto" as it is also referred to in the sales process). The same disclaimer regarding the so-called "Refund/Return Policy" is only visible to customers who scroll to the bottom of the landing page, click on the "Terms" hyperlink in the footer of the page, and scroll through the lengthy disclaimer.

102.   Once again, consumers purchasing bottles of the "InstaKeto" product with the understanding they will pay a certain price for the bottles through this landing page are subjected to a number of false or misleading representations, including that they will pay a lower price, when, in truth, their debit or credit cards are charged for bottles that they never ordered nor agreed to purchase.

### The Keto Doe Defendants Use a "False Front" Website to Deceive
### Banks and Credit Card Companies When a Victim Complains

103.   Just as an old-time speakeasy would maintain a false front of a legitimate business operation to distract law enforcement from their criminal activities, the Keto Doe Defendants also operate a second website for the Ultra Fast Keto Boost product— https://thesuperbooster.com/—whose sole purpose is to trick anyone conducting an investigation into the validity of these purchases, including a bank or credit card company deciding whether to grant a chargeback to a consumer who complains.[21] On information and belief, the InstaKeto product maintained a similar or identical false front.

---

[21] For Instant Keto, the URL for the "false front" website is unknown. The Instant Keto bottle references http://www.instantketoboost.com/; however, that website is not accessible.

104.   If a user types in the URL, www.thesuperbooster.com, an entirely different website appears—a "false front" that is designed to be shown to banks if a victim complains. A partial image of this website appears below:



105.   This "false front" website is designed to appear legitimate. Unlike the landing pages where consumers must scroll through pages of advertisements, "before" and "after" photos, and fake customer reviews in order to locate the "Terms and Conditions" hyperlink, the false front website makes the "Terms and Conditions" hyperlink visible on the second page.

106.   Unlike the check-out page shown to consumers, the check-out page on the "false front" website provides the actual purchase prices for each offer. Specifically, the first option to "Buy 3 Bottles, Get 2 Free" lists the actual purchase price of $198.70, instead of $39.74 for each bottle, and the second option to "Buy 2 Bottles, Get 3 Free" lists the actual purchase price of  $149.97, instead of $49.97 for each bottle.[22]  These actual prices

---

[22] The third option - to purchase one bottle for $69.99 – is the same price shown to consumers.

are never shown to consumers on the landing pages, and they only discover the inflated charges when they review their debit and credit cards.





107.   Notably, there are no false claims of "limited availability" or pop-up banners urging consumers to act immediately while supplies last.  In all respects, the "false front" website is designed to look like a legitimate company and not a scam.

108.   On information and belief, Plaintiffs and other victims of this scam were directed to the landing pages to complete their purchases, rather than to the "false front" website.

109.   On information and belief, the Keto Doe Defendants are using the "false front" websites to fraudulently convince bank and credit card representatives that victims had purchased the Keto Products from those websites, as opposed to the landing pages to which affiliates and advertisers actually directed their traffic.

110.   The maintenance of these "false front" websites is itself an act of deception, intended not just to hide from law enforcement, but to prevent consumers from exercising their lawful right to a chargeback by their bank or credit card company for charges to which they never agreed. Presented only with the false front, banks and credit card companies cannot know that there is fraud being conducted behind it.

111.   The FTC has recognized this tactic as a common one used by this kind of scammer: "The defendants sometimes hosted multiple versions of the same promotion. If consumers navigated from an embedded link on another site – the much more likely way people would learn about a product – they were taken to pages where products were offered for sale with what the FTC says were undisclosed automatic shipment programs. But a funny thing happened if you just typed in the URL – for example, rippedmusclex.com. That took you to an entirely different site that included more visible disclosures of the trial offer. Why would a company create those different versions? The complaint suggests that it could have been done in an attempt to have a 'clean' version for banks, payment processors, and law enforcers."[23]

112.   This is exactly the deception Defendants have committed here. On information and belief, the Keto Doe Defendants operate a host of shell companies, which

[23] Leslie Fair, *Fauxmats, false claims, phony celebrity endorsements, and unauthorized charges*, Federal Trade Commission Business Blog (2017), https://www.ftc.gov/news-events/blogs/business-blog/2017/11/fauxmats-false-claims-phony-celebrity-endorsements (last visited Sept. 6, 2019).

run websites promoting the Keto Products.  This is a common tactic in such scams: every shell company creates a separate website, and every shell company signs up for its own unique merchant account. All of the merchant accounts are rotated through the customer billings to prevent any individual one from being flagged for fraud due to high levels of chargebacks. Each "false front" website for these shell companies presents itself to visitors as if it is the official website of the Keto Products; however, this makes no sense because there is no business reason to sell the same products from different shell companies, with near-identical websites. The true reason scammers create such websites is to make it more difficult for banks to identify the Keto operation as a fraud by separating out and controlling which merchant accounts and which shell companies the chargebacks are attributed to, and thus preventing or delaying any one merchant account from being identified as conducting a fraud.

113.    On information and belief, the Keto Doe Defendants present the "false front" website to customers' banks and credit card companies whenever a chargeback is being investigated, fraudulently representing to the bank that it was the website the customer used to purchase the Keto Products. As the BBB report stated: "in one FTC case an ISO spread the credit card charges over 26 merchant accounts to disguise the fraud activity." Ex. 1, at p. 11.

114.    On information and belief, the Keto Doe Defendants have spread their charges over multiple shell corporations as reflected by multiple merchant accounts to avoid accumulating too many chargebacks on any one account and being flagged for the fraud they are conducting. Each of these shell corporations, while currently unknown, is a John Doe Defendant.

115.    Ms. Sihler and Mr. Bavencoff received almost identical packing slips from the same shipper with the same address, but they were billed from two different merchant accounts—referred to as Merchant Identification Numbers ("MIDs")—for the Keto Products.

116.   This is not a ploy to confuse consumers, but to defraud their banks. The Keto Doe Defendants designed their scam exactly in accordance with the scam Neil Patel described in his keynote speech to a roomful of scammers: "Or the credit card processors where you guys rotate up the chargebacks so then that way, then you guys can keep processing the money.... You guys, many of you have issues with credit card processing, so you'll do things like, I forgot what the saying is but they rotate up the MIGs or the MIDs, I don't know what the saying is but it's more so they're controlling where the chargebacks are going." [24]

117.   As recently as April 11, 2020, victims of the Keto scam have explained in detail their experiences in complaints posted on the BBB website, which were similar or identical to that of Ms. Sihler and Ms. Bavencoff.[25]   Ultra Fast Keto Boost has received the lowest possible "F" rating on the BBB website and has 564 customer complaints in the last three years, all of which make the same basic complaints regarding advertising/sales, billing/collections, delivery issues, guarantee/warranty, and problems with the product. Ultra Fast Keto Boost and Instant Keto Boost are listed as alternate business names, both of which have the same fulfillment and return address of the United States Post Office located at 3201 W. Hillsborough Avenue, #153201-1378, Tampa, Florida, 33684-9001.[26]

118.   Indeed, the BBB's website has a red banner at the top of Ultra Fast Keto Boost's profile stating: "Current Alerts For This Business" that show Ultra Fast Keto Boost products "have a pattern of complaints concerning unauthorized and unexpected charges and unresolved refund disputes" and the business is "using fake celebrity endorsements in

---

[24] Neil Patel, *The Future of Affiliate Marketing: It's Not What You Think*, https://www.youtube.com/watch?v=2hUdbztKLY4 (last visited Jan. 3, 2019) (emphasis added).

[25] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/ultra-fast-keto-boost-0653-90369793/customer-reviews; https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/ultra-fast-keto-boost-0653-90369793/complaints

[26] The BBB website lists a second address for Ultra Fast Keto, which is 153301 Hillsborough Avenue, Tampa, Florida 33684.

its advertising."[27]

119.   On January 1, 2020, a victim of the Keto scam identified as Beth E. posted a similar experience to the Plaintiffs: "Their advertising is completely misleading. I thought I was paying $39.74 per bottle for 3 bottles and then getting 2 free. When they confirmed the order there was no invoice attached which I thought was strange so I had no idea they were going to charge $198.70 until I saw my charge card bill. By the time I had realized all of this plus the fact that I had been traveling, the 30 day period for returns had closed. I tried to put in a claim through my credit card company, but the company is providing my authorized charge and explaining that I was getting 2 bottles free by paying $39.74 per bottle for 5 bottles, even though the shipping address that they have associated with the charge is completely bogus. My credit card company refuses to do anything because they are providing there "evidence" and I can't fight it. Plus now it is a product that I decided that I didn't even want to use in the first place. Do not order from them! (I'm leaving a 1 star rating because I am forced to enter something but, in reality, I would not give it any stars.)"[28]

120.   Another victim identified as Carol B. posted on December 11, 2019: "Complete scam. Charged more than advertised, never received an itemized bill, was told I'd get a refund minus a $25 restocking fee, so I mailed it back with return receipt and then never got reimbursed. I called this morning again and was told they do not give refunds. Star rating is '0.'"[29]

121.   And yet another victim identified as David B. posted on November 27, 2019: "My wife ordered ONE BOTTLE of tablets to be dissolved in water for $37.70. We were charged $198 for FIVE bottles and when they arrived, they were CAPSULES to be

---

[27] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/ultra-fast-keto-boost-0653-90369793

[28] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/ultra-fast-keto-boost-0653-90369793/customer-reviews.

[29] *Id.*

swallowed. Dealing with customer service was a nightmare. The best resolution we received was to return the 5 bottles at OUR expense and they would credit us $178. So we paid $20 plus shipping for a falsely advertised item that we did not want and returned. DO NOT ORDER FROM THESE SCAM ARTISTS!"[30]

122.   These are just a sample of the 564 complaints posted on the BBB website.  It is not a coincidence that so many victims are reporting the exact same thing: that the scammers falsely advertised the purchase prices for the Keto Products, which the consumers relied upon to make their purchases, the consumers later discovered they were overcharged and billed for bottles they did not order and did not agree to purchase, and that when the consumers tried to cancel their unauthorized charges, they were unable to obtain refunds from the company.  This is how Defendants treat all of their victims—and the Keto Products were just a thin excuse to commit rampant credit card fraud.

123.   The Keto Doe Defendants purport to post a "company response" to some complaints by apologizing for "any misunderstanding" and claiming the customers placed orders for the promotional offers  such as "Buy 3, Get 2 Free" that showed the accurate price of $198.70[31] The Keto Doe Defendants' response is just one more part of their deceptive strategy designed to thwart discovery of their fraud because they are referring to the "false front" website, which provides accurate prices.  But this website is only shown to regulators, banks, and credit card companies, not to consumers who are directed to the landing pages.  The consumers never see the "false front" website, and therefore, they never see accurate prices.

---

[30] *Id.*
[31] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/ultra-fast-keto-boost-0653-90369793/complaints

124.  The BBB's website states that in October 2019, the BBB contacted the company regarding its false advertising and false claims about the Keto Products. To date, the company has not responded.[32]

### The Keto Doe Defendants' Misrepresentations Regarding
### Reviews and Endorsements

125.  On information and belief, the Keto Doe Defendants marketed the Keto Products exclusively through affiliate marketing networks, including networks and pages run by other Doe Defendants such that every customer who purchases a product from them will be exposed to and view the fake celebrity and magazine endorsements described herein.  Ms. Sihler and Ms. Bavencoff specifically recall viewing advertisements stating that the products had been endorsed by the six celebrity "Sharks" and well-known magazines and relied on these endorsements in purchasing the products.

126.  These celebrity and magazine reviews are material to the customers' decisions to purchase the Keto Products.  Because these celebrities are well-known with well-guarded reputations, their positive, yet fraudulent, "reviews" of the products misleads customers into believing that the Keto Doe Defendants are a credible, well-established company. These celebrities are generally beautiful with desirable appearances, so their fake quotes suggesting they obtained their beauty by using the Keto Products misleads customers about the type of results they may expect from using the products.

### The Keto Doe Defendants' Misrepresentations and Omissions
### Regarding the Actual Prices that Consumers Are Charged

127.  A second way the Keto Doe Defendants deceive consumers on their landing pages is to claim that the consumers will pay the advertised price for a certain number of bottles of the Keto Products, when in fact all of the consumers will receive five bottles and will be charged for all five bottles, which they never agreed to purchase because they were

---

[32] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/ultra-fast-keto-boost-0653-90369793/details

told that some of the bottles would be "free."  The first page a victim views is an affiliate page, such as the fake "Shark" Tank article, which is run by one or more of the Doe Defendants.  These pages urge consumers to click on the product to receive a "special offer." The second page a victim views is a website controlled by the Keto Doe Defendants - https://ultrafastketoboost.com or https://instaketo.com/ - both falsely representing that the consumers will receive "free bottles" and encouraging them to "Get Your Risk Free Bottle."  When a victim views the final check-out page, the victim is presented with several offers, including promotional offers such as "Buy 3 Bottles, Get 2 Free" for $39.74 per bottle, which should result in a total price of $119.22.  On information and belief, every consumer who clicks on "Complete Order" receives five bottles of the Keto Products - regardless of the specific offer selected and the number of bottles the consumer agreed to purchase—and every customer is billed for all five bottles, in an amount nearly $200.

128.  On information and belief and based on the sales funnel structure, every consumer who purchased Keto Products was exposed to these misrepresentations about the actual prices of the bottles.

129.  The Keto Doe Defendants made material omissions regarding the actual prices of the bottles on their websites by omitting material information, which they were under a duty to disclose relating to the actual prices of the bottles. The Keto Doe Defendants failed to disclose to consumers who viewed the landing pages that the actual prices charged for the bottles would be significantly higher than the advertised prices, and, in fact, that the consumers would be billed for five bottles of Keto Products, even though they never agreed to purchase five bottles. These terms were never disclosed to the consumers.

130.  The Keto Doe Defendants were under a duty to Plaintiffs and the Class Members because they made partial representations—that consumers would pay the advertised price of the promotional offers—but also suppressed, concealed, or did not disclose material facts that qualify those representations, namely, that they would be charged for all five bottles delivered to them, in an amount totaling almost $200, regardless

of the number of bottles they ordered and agreed to purchase, and that none of the bottles were actually "free."

131.   The Keto Doe Defendants knew, or by the exercise of reasonable care should have known, that their omissions were untrue and misleading, and deliberately made the aforementioned omissions in order to deceive reasonable consumers like Plaintiffs and other Class Members. Those omissions could have been corrected by including the true total price of the Keto Products on the check-out page and in any other place where references to "free" bottles occurred.

132.   The Keto Doe Defendants' omissions regarding the actual prices were material to consumers. A reasonable consumer would attach importance to the truth or falsity of these omissions in deciding whether to purchase the products because if consumers had known they were paying a higher price for the bottles they ordered – and they would be billed for bottles they did not order - they would not have agreed to the offer.

133.   Ms. Sihler and Ms. Bavencoff were damaged by these misrepresentations and omissions individually as described herein, and they relied on them in that they would not have signed up for the offers had they been informed of the actual terms of the offers.

## The Keto Doe Defendants' Misrepresentations
## Regarding Limited Supply

134.   Both the affiliate websites and the Keto Doe Defendants' websites also include representations of limited supply, as described herein. But on information and belief, those purported limitations and the representations that there was "low stock," "limited quantities available," or that the "promotional pricing" or "special offer" was expiring soon were false.

135.   These misrepresentations are designed to induce consumers to purchase the bottles and to create a false sense of urgency. As a result of these misrepresentations, consumers purchase products they would not have purchased and they pay more for the products than they otherwise would have and are damaged by discovering later that they have been billed for products to which they did not agree.

136.   The Keto Doe Defendants' misrepresentations regarding their purported limited supply are material to consumers. A reasonable consumer would attach importance to the truth or falsity of these misrepresentations in deciding whether to purchase the products because if they knew that the products were not limited in supply and could be purchased at any time, consumers would not feel the need to purchase on impulse and under time pressure that did not exist based on these representations. Plaintiffs and the Class Members reasonably relied upon these representations in making their purchase decisions.

### The Keto Doe Defendants' Misrepresentations and Omissions Regarding the "False Front" Website

137.   The Keto Doe Defendants also deceived the consumers' banks and credit card companies by maintaining a "false front" website at the URL described herein. This website was created intentionally to make it appear to outsiders that the victims of the scheme had been informed of the actual purchase price of the bottles and had consented to the price. The Keto Doe Defendants were under a duty to disclose to Plaintiffs and the Class Members that they maintained this "false front" websites and to disclose that they routinely used that website to deceive banks and credit card companies to prevent consumers from exercising their right to a chargeback.

138.   Plaintiffs and the Class Members were damaged by these misrepresentations and omissions. All members of the class were damaged because had the banks and credit card companies not been unlawfully deceived, the scheme would have been shut down and none of the Class Members would have been billed. The Keto Doe Defendants further owed duties to all of the Class Members to inform them that there was a "false front" website, and the failure to do so injured every member of the Class.

139.   The Keto Doe Defendants made material omissions regarding the "false front" websites by omitting material information which they were under a duty to disclose relating to those sites. The Keto Doe Defendants failed to disclose to consumers who viewed the landing pages at https://ultrafastketoboost.com and https://instaketo.com that there was another website, which the Keto Doe Defendants designed to intentionally deceive the

consumers' banks and credit card companies if they attempted a chargeback, and that they were not bound by any of the terms or other disclosures on the scam websites.

140.   The Keto Doe Defendants were under a duty to disclose this information to Plaintiffs and the Class Members because the Keto Doe Defendants had exclusive knowledge of material facts not known to them, namely that there was another website being used as a "false front."

141.   Plaintiffs and the Class Members did not know this, and it was difficult to discover because that information was not located on the website where they purchased the products because the landing pages were  designed to be inaccessible and unsearchable from any search engine, and because the "false front" website was placed on an entirely separate URL, which was not linked to the landing pages.

142.   The Keto Doe Defendants were under a duty to disclose this information to Plaintiffs and the Class Members because the Keto Doe Defendants engaged in active concealment, and they have engaged in affirmative acts of hiding, concealing, and covering up this matter. The Keto Doe Defendants made efforts to hide their landing pages from view as described above, to make the landing pages difficult to find, to delete various advertisements so customers could not find them again, and by creating the "false front" website to conceal from their victims and others the actual landing pages that the victims visited.

143.   The Keto Doe Defendants were further under a duty to Plaintiffs and the Class Members because they made partial representations to the banks and credit card companies—that they had sold the Keto Products to their victims—but also suppressed, concealed, and did not disclose material facts that qualify those representations, namely that none of the victims had actually purchased the products on the "false front" website that was shown to banks and credit card companies. The Keto Doe Defendants further made partial representations to Plaintiffs and the Class Members—that they would pay the advertised price —without disclosing that if they attempted a chargeback, the Keto Doe

Defendants intended to lie about the terms of the agreement to the consumers' banks and credit card companies.

144.   The Keto Doe Defendants knew, or by the exercise of reasonable care should have known, that their omissions were untrue and misleading, and deliberately made the aforementioned omissions in order to deceive reasonable consumers like Plaintiffs and other Class Members. Those omissions could have been corrected by including the omitted information in proximity to the offers contained on the landing pages, or on the packing slips delivered to their victims, or in proximity to their representations to banks and credit card companies.

145.   The Keto Doe Defendants' misrepresentations and omissions regarding the "false front" website were material to consumers. A reasonable consumer would attach importance to the truth or falsity of these omissions in deciding whether to purchase the products because if consumers had known that the Keto Doe Defendants were maintaining a fake website for the purpose of defrauding their banks and credit card companies, they would not have purchased the Keto Products with the understanding they were receiving the products at the advertised price.

146.   Ms. Sihler and Ms. Bavencoff were damaged by these misrepresentations and omissions individually as described herein, and relied on them in that they would not have signed up for the offers had they been informed of this information.

### Beyond Global Inc. and the Keto Doe Defendants

147.   The "Keto Doe Defendants" are a group of Defendants who created, sold, advertised, and otherwise were involved in the creation, sale, and advertising of the Ultra Fast Keto and Instant Keto products.

148.   The only currently known member of this group is Beyond Global Inc., a named Defendant, which for purposes herein is included in the definition of the "Keto Doe Defendants."

149.   Beyond Global Inc. is a Wyoming corporation which is listed on the bottle for Ultra Fast Keto, which states that the product is "distributed by" Beyond Global Inc.

150.   Its address is listed on the bottle as being 9205 W. Russell Rd., Suite 240, Las Vegas, NV 89148.

151.   Wyoming shell corporations are commonly used by Internet scammers because it enables them to hide their identities. The true names of the Does behind Beyond Global Inc. are currently unknown.

152.   On information and belief, Beyond Global Inc. is a shell company being used to mask its owners' identities, and the company and its owners were involved not only in the distribution of the products but in their creation and marketing.

153.   The Keto Doe Defendants and Beyond Global Inc. purposely directed their activities towards California by shipping products to California residents, accepting and processing returns and complaints from California residents, and consulting with the TFL Defendants on sales that they knew would be made to California residents.

154.   These intentional acts were expressly aimed at California residents. The Keto Doe Defendants and Beyond Global Inc. targeted their conduct at California residents, including the Plaintiffs, and knew they were California residents by virtue of their shipping addresses and other contact information. On information and belief, these acts involved ongoing, systemic, and continuous contact with California because the shipment of Keto Products has been ongoing since at least February 2018, and consumers continue to complain even as of filing. The acts were entirely commercial in nature, as the Keto Doe Defendants and Beyond Global Inc. profited by billing consumers for unordered bottles of Keto products.

155.   The Keto Doe Defendants and Beyond Global Inc. generated substantial profits from their acts aimed at California residents. They intentionally placed the Keto Products into the stream of commerce, knowing and intending that they would be advertised over the Internet to and purchased by California consumers, and conducting and directing such advertising (which was identical or substantially similar to the examples shown herein).

156.   The Keto Doe Defendants and Beyond Global Inc. knew or should have foreseen that their actions would cause harm in California. As described above, they intentionally assisted the scammers over a lengthy period of time. They did so knowing that California consumers are being harmed by the scam, and specifically interacting with those consumers when they attempted to obtain refunds from the fraudulent charges. Had they not provided these services, the California consumers would not have been harmed because the Keto Products would not have been shipped to them and their accounts would not have been improperly billed.

157.   Because of these facts, personal jurisdiction is appropriate in California over the Keto Doe Defendants and Beyond Global Inc.

### The TFL Defendants' Participation in the Keto Scam

158.   Essential to the Keto scheme are the TFL Defendants, who are familiar players in affiliate marketing schemes, including the "straight sale" scam that is the subject of this Complaint. The "TFL Defendants" includes defendants The Fulfillment Lab, Inc. and Richard Nelson.

159.   TFL was the target of a Florida news channel investigation in December 2019 where a Tampa resident, Norman Harris, reported that he was "shocked" to receive five bottles of Instant Keto pills, which he never ordered and did not know the product at all, and he was even more shocked when his credit card was charged $200 for the bottles.[33] The news channel investigator matched the address on the bottle label, 3201 Hillsborough Avenue, Tampa, Florida, with TFL's shipping address on the BBB's website.  When the investigator personally visited TFL's office in Tampa, no one from the company would appear on camera.  The company's COO, Ray Schlecter, told the investigator off camera that the company "ships for companies across the country and is not responsible for their clients' billing practices." The investigator later received a call from TFL's CEO,

---

[33] https://www.wfla.com/8-on-your-side/better-call-behnken/man-receives-keto-pills-he-never-ordered-charged-nearly-200/  (posted on December 16, 2019, updated on December 17, 2019).

Defendant Rick Nelson, who told her the same thing, that TFL ships millions of products for companies across the country, and that he "severs relationships with companies that have a high volume of complaints."

160.   The BBB conducted its own investigation into TFL's business practices as far back as July 2017.  The BBB's website posts a red "Current Alerts For This Business" banner across the top of TFL's profile stating that in July 2017, BBB contacted TFL because "BBB had received significant complaint activity involving a large number of products using addresses owned, operated, and/or affiliated with the business."[34] The company did not respond to BBB's request for information.[35]

161.   Based on its investigation, the BBB identified more than 400 product lines having their orders fulfilled and shipped by TFL.[36]  The BBB concluded:

> The Fulfillment Lab appears to be *a hub* for problematic online sellers to conduct business.  The Fulfillment Lab *has knowledge* that it has, as customers, many online sellers using deceptive practices to enroll consumers in continuity programs.  *The Fulfillment Lab chooses to continue to do business with these customers, profiting off their financial successes that are born from these deceptive practices.*[37]

---

[34] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/the-fulfillment-lab-inc-0653-90142042
[35] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/the-fulfillment-lab-inc-0653-90142042/details
[36] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/the-fulfillment-lab-inc-0653-90142042/details#all-alerts
[37] *Id.*

162.   Moreover, the BBB determined that a product line is marketed, with TFL's knowledge and assistance, "until it generates significant complaint activity, at which time that product line is discontinued."[38]

163.   Consumers have posted numerous complaints regarding TFL on the BBB's website.[39]   The complaints make the same general allegations that the products that TFL ships have prices that are falsely advertised, the consumers are billed substantially more than the advertised prices, and the consumers are unable to obtain refunds.

164.   The company purports to post a "company response" to some of the complaints by stating there is nothing it can do to assist the consumers because it is "not the manufacturer of any products and does not care for customer billing or advertising for any companies. TFL cares only for warehousing, packaging, and shipping as an entirely separate company altogether….TFL cannot control how another company chooses to handle customer billing issues or monitor how they advertise to consumers."[40]

165.   But, TFL's website shows it is much more than a simple fulfillment center. The company's marketing and advertising materials to its clients—including scammers—boast TFL's assistance with, and active participation in, its clients' businesses. The company's website provides detailed offers to attract clients with "On-demand products," "Affiliates," "Proprietary Software," and "Dynamic Integration."

166.   TFL provides its own white-label product line called "Global On-Demand Fulfillment Portal" for clients to simply affix their own design and logo and sell as scams.[41] TFL boasts that its clients will "be able to create an initial product offering, instantly add complementary on-demand products, create a customized label, and start selling without

---

[38] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/the-fulfillment-lab-inc-0653-90142042/details

[39] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/the-fulfillment-lab-inc-0653-90142042/complaints

[40] *Id.*

[41] A white-label product is considered a product or service produced by one company that marketers rebrand to make it appear as if they had made it.

having to purchase the products yourself or make an upfront investment.  These on-demand products can be white-labeled or private-labeled with customization that aligns with your brand and meets the needs of your customers. With our on-demand fulfillment solutions, the opportunities for complementary product combinations and upsells that drive additional revenue are nearly endless!" [42]

167.   In addition to offering white-label products, TFL also offers its clients an Affiliate Program and provides "Affiliate Marketing Resources" that include articles entitled "3 Reasons to Start an Affiliate Partnership with the Fulfillment Lab"; "How an Affiliate Program Creates New Wholesale Revenue Streams"; "The Best Affiliate Programs for eCommerce Businesses"; and "5 Affiliate Partnership Factors You Need to Consider."[43]

168.   TFL's website states: "By signing up, you'll receive a unique code so you can quickly and easily share it with your contacts. We'll even send you resources to market and sell TFL with ease that can be directly passed along.  Once one of your contacts creates an account using your affiliate code and begins shipping, you'll get credit and start earning commissions immediately. So sit back, relax, and watch the residual income start rolling in! It's one of the most simple, speedy, and streamlined ways to increase revenue without increasing the amount of time and effort you have to put in."

169.   Plaintiffs are informed and believe that TFL is the fulfillment company for both "Instant Keto" and "Ultra Fast Keto Boost" products, and both products are the same white-labeled products offered by TFL.  Photographs of the two products side-by-side demonstrate there is no significant distinction between them.  The bottles are the same size, the ingredients and supplement information are identical, the suggested use and caution statements are identical, and the certification labels are the same.

---

[42] https://www.thefulfillmentlab.com/on-demand
[43] https://www.thefulfillmentlab.com/affiliates



CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





170.   Similarly, the packing slips sent with the "Instant Keto" bottles to Ms. Sihler and with the "Ultra Fast Keto Boost" bottles to Ms. Bavencoff are the same, and they follow the exact template of the generic packing slip that is part of TFL's software presented to potential clients in online demonstration videos regarding their "Proprietary Software."[44] Compare the Keto packing slip (top) to the TFL generic packing slip (bottom):

---

[44] https://www.thefulfillmentlab.com/proprietary-software



ULTRA FAST KETO BOOST
3201 HILLSBOROUGH AVE  153201-1378
TAMPA FL, 33684

8172152

**Bill To:**

**Ship To:** CHARLENE BAVENCOFF

ShpDate: 2019/10/15
SLSORD: 354760
REF: 11457221-17061
SHIPPER: Ultra Fast Keto Boost
SHPORD# 29631

| SKU | QTY | Description |
|---|---|---|
| Ultra Fast Keto Boost | 5 | Ultra Fast Keto Boost |

Thank you for your order!

v14.8.56

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



22    171.    The packing slips for both "Instant Keto" and "Ultra Fast Keto Boost" list the

23 same return address as 3201 Hillsborough Avenue 153201-1378, Tampa, Florida 33684.

24 This address is a United States Post Office, which is the closest post office from the TFL

25 office located only 2.4 miles away at 5136 W. Clifton Street, Tampa, Florida 33634.

26 Tellingly, the BBB website lists the TFL office as the same Post Office on Hillsborough

27
28

Avenue.[45]

172.   On information and belief, the TFL Defendants not only provide the white-label products to the Keto Doe Defendants perpetrating the Keto scheme, the TFL Defendants also handle the returns from unhappy customers.  The packing slips for the Keto Products follow the exact same template of the packing slip in TFL's software, which is shown in TFL's online demonstration videos.[46]

173.   On information and belief, as Ultra Fast Keto Boost and Instant Keto's return processor, TFL is aware of the numerous customers who submit the products for return. Along with these returns, TFL is notified by unhappy victims that they are being scammed with false advertisements and fake celebrity endorsements.

174.   The TFL Defendants' role in handling product returns means that they necessarily would have had knowledge of customer complaints about the Keto Products. On information and belief, they would have received numerous complaints similar to the ones flooding various Internet pages regarding the Keto Products.

175.   TFL is not a mere fulfillment company—in fact, they are a scam consulting operation masquerading as one. They provide numerous additional services, including customized software which is designed to harvest data about customers specifically to be used in marketing and advertising.[47]

176.   In fact, TFL directly runs advertising campaigns for its customers. TFL's marketing director, Jelani Hunte, states on his LinkedIn profile that his duties include "Run and monitor marketing campaigns" and "Identify, recruit, and activate affiliates."[48]

177.   The TFL Defendants specifically target free trial scammers as their customers at various conferences, including the Affiliate Summit and the Panama Global Banking

---

[45] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/the-fulfillment-lab-inc-0653-90142042/details
[46] https://gfs.thefulfillmentlab.com/client/16794/inventory/packing-slip/558.
[47] https://www.thefulfillmentlab.com/blog/the-fulfillment-lab-is-a-fulfillment-solutions-business.
[48] https://www.linkedin.com/in/jelani-hunte-89a58aba/.

Summit, which describes itself as a conference for "high risk" verticals such as "nutra," or nutraceuticals. Defendant Nelson attended this conference in Panama as a "top sponsor" on behalf of The Fulfillment Lab, and he did so with the specific intention of recruiting scammers as customers for the company.

178.   The TFL Defendants' knowledge that victims were complaining is itself an intentional act of deception designed to hide their role in the fraud: the TFL Defendants falsely told victims and the BBB that it is not involved with processing orders, billing, or refunds when its website, presentations, and software make clear that it provides much more.

179.   The TFL Defendants knew about these complaints as far back as July 2017 when the BBB contacted the company as part of its investigation into the company's business practices, and as recently as December 2019, when the Tampa news channel investigator visited its office asking questions about their business practices.  Despite these investigations and consumer complaints, the TFL Defendants have continued to do business with these scammers and have successfully assisted the scammers in perpetrating the fraud against Plaintiffs and the Class Members.

180.   On information and belief, the TFL Defendants were acting as consultants to assist the scammers in operating their scams in order to generate shipping business, and they did so from at least February 2018 through the present. And on information and belief, the TFL Defendants acted as consultants to assist the Keto Doe Defendants in defrauding consumers, they knew that the fraud was occurring, and intentionally continued to aid and support the Keto Doe Defendants in their fraud despite this knowledge.

181.   Defendant Richard Nelson is TFL's President, as well as the President of TFL's predecessor, Skinutra Inc. ("Skinutra").  Both companies have the same principal office address at 5136 West Clifton Street, Tampa, Florida, 33634.

182.   Mr. Nelson is no stranger to perpetrating affiliate marketing schemes. Although Skinutra's website at https://www.skinutra.com has no content, its previous webpages have been archived, and the site was active at least through 2019.  In 2015,

Skinutra's website made it clear that it was more than just a fulfillment center and proudly boasted it can actively assist its clients with "straight sale" scams:

> We utilize our industry knowledge, strategic partnerships, and global expertise to realistically make available product and service solutions designed to streamline implementation, diversification, and expansion of their sales campaign on a domestic and global level.
>
> **Whether your campaign consists of Trails (sic), Continuity, and or Straight Sale; SKINUTRA's has a solution for you.**
> (emphasis added.)

183.  Skinutra's foregoing statements demonstrate Skinutra clearly understands the different scams pervading the industry, including "trials," "continuity," and "straight sale" models.  This is exactly the "industry knowledge" that Mr. Patel acknowledged during his keynote speech at the *Affiliate Summit West*: "Some of you guys do straight sells, so when they click from that Oprah landing page, they go into a straight sell instead of forced continuity."

184.  Skinutra's website also boasts its ability to provide "service solutions" to expand its clients' sales. This is another code phrase meaning Skinutra will actively assist scammers in maximizing their sales and making as much money as possible before their victims discover the fraud.

185.  By 2019, the Skinutra website had been updated to make it clear that TFL and Skinutra are related.  The bottom of Skinutra's home page showed "Copyright 2017 THE FULLFILLMENT LAB. All Rights Reserved."  In addition, Skinutra's information page was updated with a different style, but the same message that "We'll brand any product we carry with your corporate identity and you're all set. And of course, when it comes to time to handle all those orders, visit THE FULFILLMENT LAB."

186.   Skinutra further bragged that: "Unlike other small business, it does not take much time to start selling Nutraceuticals from the comfort of your home. And to top it off, **we do most of the work**."[49]

187.   Mr. Nelson specifically directs TFL's activities with respect to Internet scammers, and he personally led efforts to customize software that would enable their customers (the scammers) to more effectively market their products: "After researching some of the CRM software already on the market, and being unimpressed by it, he decided to create his own, which would give online retailers more visibility about consumer buying habits, as well as the ability to fully customize orders and get better insight into their inventories."[50]

188.   On information and belief, and based on public data on number of complaints to the BBB and elsewhere, the Keto Doe Defendants were one of the largest affiliate marketing scams nationwide in the last year, and were such a high-volume customer for TFL that Mr. Nelson was necessarily personally involved in recruiting them as customers and managing their account. Given this volume, on information and belief Mr. Nelson personally assisted the Keto Doe Defendants in advising on their scam, and given his comments to reporters indicating knowledge of the fraud which occurred prior to the named Plaintiffs being injured, Mr. Nelson personally intended to injure the Plaintiffs and the Class.

189.   The TFL Defendants purposely directed their activities towards California by shipping products to California residents, accepting and processing returns and complaints from California residents, consulting with the Keto Doe Defendants on sales that they knew would be made to California residents, and otherwise providing the services listed on their website in connection with California customers.

---

[49] https://web.archive.org/web/20190611002235/http://skinutra.com/nutraceuticals/.
[50] https://gritdaily.com/the-fulfillment-lab-customizes-packaging-to-enhance-the-ecommerce-experience/.

190.   These intentional acts were expressly aimed at California residents. The TFL Defendants targeted their conduct at California residents, including the Plaintiffs, and knew they were California residents by virtue of their shipping addresses and other contact information. On information and belief, these acts involved ongoing, systemic, and continuous contact with California because the shipment of Keto Products has been ongoing since at least February 2018, and consumers continue to complain even as of filing. The acts were entirely commercial in nature, as the TFL Defendants marketed themselves as providing services specifically to scammers they knew would sell nationwide via the Internet.

191.   The TFL Defendants generated substantial profits from their acts aimed at California residents. They intentionally assisted the Keto Doe Defendants in placing the Keto Products into the stream of commerce, knowing and intending that they would be advertised over the Internet to and purchased by California consumers.

192.   The TFL Defendants knew or should have foreseen that their actions would cause harm in California. As described above, they intentionally assisted the scammers over a lengthy period of time. They have provided various services to the Keto Doe Defendants knowing that California consumers are being harmed by the scam, and specifically interacting with those consumers when they attempted to obtain refunds from the fraudulent charges. Had they not provided these services, the California consumers would not have been harmed because the Keto Products would not have been shipped to them and the Keto Doe Defendants would not have benefitted from the experience of the TFL Defendants in helping other scammers design their business processes.

193.   Because of these facts, personal jurisdiction is appropriate in California over the TFL Defendants.

## CLASS ACTION ALLEGATIONS

194.   Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

195.   Plaintiffs bring this class action pursuant to Fed. R. Civ. P. Rule 23, seeking certification of Plaintiffs' claims and certain issues in this action on the Class, consisting of:

**Nationwide Class:** All consumers in the United States who, within the applicable statute of limitations period until the date notice is disseminated, were billed for the Keto Products.

196.   Plaintiffs seek certification of the following subclass:

**California Class:** All consumers in the United States who, within the applicable statute of limitations period until the date notice is disseminated, were billed for the Keto Products.

197.   "Keto Products" means "Instant Keto," "InstaKeto," and "Ultra Fast Keto Boost."  Plaintiffs expect that this definition will be modified in discovery as information is obtained from the John Doe Defendants. In particular, Plaintiffs expect that there may be other products sold by the same Defendants with the exact same formulation, similar or identical injuries, but different labels or names. Plaintiffs further expect that the conduct of the affiliates, the Defendants, or the "crooked processors" may be subject to a different and much broader class that encompasses identical injuries that go beyond this specific product line.

198.   Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

199.   Plaintiffs reserve the right to amend or modify the class descriptions by making it more specific or dividing the class members into subclasses or limiting the issues.

200.   NUMEROSITY: Plaintiffs are informed and believe, and on that basis allege, that the Plaintiffs Class is so numerous that individual joinder of all members would be impracticable. It is apparent that the number of consumers of injured by similar or identical Products by the Defendants would be so large as to make joinder impracticable as the Class (or Classes) would be comprised of thousands of consumers geographically dispersed throughout the United States. While the exact number of Class members is currently unknown, such information can be ascertained through appropriate discovery.

201.   COMMONALITY: Defendants' practices and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class. All members of the putative Classes were and are similarly affected by having purchased and used the Keto Products, and the relief sought herein is for the benefit of Plaintiffs and members of the putative Class.

202.   PREDOMINANCE: Questions of law and fact common to the Class exist that predominate over questions affecting only individual members, including but not limited to:

a) whether Defendants' representations discussed above are misleading, or objectively reasonably likely to deceive;

b) whether Defendants' omissions discussed above involve facts the Defendants were obliged to disclose or facts contrary to representations by the Defendants;

c) whether the Defendants' owed consumers a duty to disclose the omitted material facts;

d) whether Defendants' alleged conduct is unlawful;

e) whether the alleged conduct constitutes violations of the laws asserted;

f) whether the Defendants' wrongful conduct was intentional or knowing;

g) whether the Defendants' wrongful conduct warrants punitive damages;

h) whether Defendants engaged in false or misleading advertising; and

        i)  whether Plaintiffs and Class members are entitled to appropriate remedies, including restitution, damages, and injunctive relief.

203.  <u>TYPICALITY</u>: The claims asserted by Plaintiffs in this action are typical of the claims of the members of the Class, as the claims arise from the same course of conduct by Defendants, all members of the Class have been similarly affected by Defendants' course of conduct, and the relief sought is common.

204.  <u>ADEQUACY</u>: Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have no interest adverse to the interests of the other Class members. Plaintiffs have retained competent counsel with substantial experience in complex litigation and litigation involving scientific and technical issues, who are committed to vigorously prosecuting this action on behalf of the Class.

205.  <u>SUPERIORITY</u>: A class action is superior to other available methods for the fair and efficient adjudication of the present controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that individual actions would engender. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, are far superior than any difficulties that might be argued with regard to the management of this class action. This superiority makes class litigation superior to any other method available for the fair and efficient adjudication of these claims. Absent a class action, it would be highly unlikely that the representative Plaintiffs or any other members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

206.  Certification of this class action is appropriate because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. Certification also is appropriate because Defendants acted, or refused to act, on grounds generally applicable to the Class, thereby

making appropriate the relief sought on behalf of the Class as a whole. Further, given the large number of potentially injured consumers, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications. Certification of Plaintiffs' claims for class-wide treatment is also appropriate because Plaintiffs can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

207.   Notice to the members of the Class may be accomplished inexpensively, efficiently, and in a manner best designed to protect the rights of all Class members. Class notice can likely be directly sent to individual members of the Class because Defendants' own records and documents will likely identify all members of the Class and contain their contact information.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of the Consumer Legal Remedies Act

### Cal. Civ. Code § 1750, *et seq.*

208.   Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

209.   Plaintiffs bring this claim individually and on behalf of the Class.

210.   The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

211.   Defendants' false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of Defendants' Keto Products for personal, family, or household purposes by Plaintiffs and Class Members, and violated and continue to violate the following sections of the CLRA:

    a.   § 1770(a)(2): misrepresenting the source, sponsorship, approval, or certification of goods or services, in particular through the false

celebrity endorsements and false presentation of websites as news articles described herein;

b.  § 1770(a)(3): misrepresenting the affiliation, connection, or association with, or certification by, another, in particular through the false celebrity endorsements and false presentation of websites as news articles described herein;

c.  § 1770(a)(5): representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, in particular through the false celebrity endorsements, the "false front" websites, the representations regarding limited supply, and the false presentation of websites as news articles described herein;

d.  § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another, in particular the false celebrity endorsements as described herein;

e.  § 1770(a)(9): advertising goods with intent not to sell them as advertised, in particular in representing that additional bottles of the Keto Products would be sold at no cost to consumers who purchased two or more bottles of the Keto Products, when the Defendants in fact intended to charge – and did charge - the consumers full price for every single bottle delivered to the consumers;

f.  § 1770(a)(13): making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions, in particular the false representations of additional "free" bottles with the purchase of two or more bottles, the false representations that the additional bottles would cost $0.00, and the false representations regarding limited supply as described herein.

212.  Defendants profited from their sales of the falsely, deceptively, and unlawfully advertised Product to unwary consumers.

213.   Plaintiffs and members of the Class purchased the Products for personal use, in reliance on Defendants' false and misleading material claims as described herein.

214.   Pursuant to Cal. Civ. Code § 1780(d), Plaintiffs have attached its affidavit of venue hereto as Exhibit 2.

215.   As a result of Defendants' violations of the CLRA, Plaintiffs and the Class have suffered irreparable harm and seek injunctive relief prohibiting further violations of the CLRA. Plaintiffs and the Class also seek to recover their attorneys' fees and costs.

216.   Ms. Sihler and Ms. Bavencoff have standing to seek injunctive relief because they may be injured by the Defendants' conduct in the future. Defendants appear to be cycling through product names and product types, and on information and belief, have been running other "straight sale" scams. Defendants may present other offers that result in fraudulent billing and which would be difficult to detect or identify as coming from them. Defendants also have Ms. Sihler's and Ms. Bavencoff's personal information and could try to use their personal information for nefarious purposes without their consent, just as they did in the past.

217.   Under Cal. Civ. Code § 1782(d), Plaintiffs may without prior notification file a complaint alleging violations of the CLRA that seeks injunctive relief only. If the Plaintiffs later send a CLRA notification letter and the defendant does not remedy the CLRA violations within 30 days of notification, the Plaintiffs may amend their CLRA causes of action without leave of court to add claims for damages.

218.   Pursuant to §1782 of the CLRA and concurrently with the filing/service of this complaint, Plaintiffs will notify Defendants in writing of the particular violations of §1770 of the CLRA and demand Defendants rectify the actions described above by providing complete monetary relief, agreeing to be bound by their legal obligations and to give notice to all affected customers of their intent to do so.

219.   If Defendants fail to adequately respond to Plaintiffs' demand within 30 days of the letter pursuant to §1782 of the CLRA, Plaintiffs will then amend this claim to add additional claims for relief, including claims for compensatory and punitive damages.

## SECOND CAUSE OF ACTION

### Violation of the California False Advertising Law

### Cal. Bus. & Prof. Code §§ 17500, *et seq.*

220.   Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

221.   Plaintiffs bring this claim individually and on behalf of the Class.

222.   Pursuant to California Business and Professions Code § 17500, *et seq.*, it is unlawful to engage in advertising "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . [or] to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised."

223.   Defendants have violated § 17500, *et seq.*, in particular as described herein through the false celebrity endorsements, the false advertised prices of the products, the omissions regarding their "false front" websites, their presentation of the "false front" websites to banks and credit card companies, the representations regarding limited supply, their efforts to make it difficult to obtain refunds, the "free" bottles representations, the false representation that the additional bottles of product would cost $0.00 with the purchase of two or more bottles, and the false presentation of websites as news articles described herein.

224.   Pursuant to California Business and Professions Code § 17505, "No person shall state, in an advertisement of his goods, that he is a producer, manufacturer, processor, wholesaler, or importer, or that he owns or controls a factory or other source of supply of goods, when such is not the fact, and no person shall in any other manner misrepresent the character, extent, volume, or type of his business."

225.   Defendants have violated § 17505, in particular through their representations of limited supply, the "false front" website, the false celebrity endorsements, and the false presentation of websites as news articles described herein.

226.   Defendants misled consumers by making misrepresentations and untrue statements about their products as described herein.

227.   Defendants misled consumers by omitting material information which they were under a duty to disclose as described herein. Defendants were under a duty to disclose this material information to Plaintiffs and the Class Members.

228.   Defendants knew, or by the exercise of reasonable care should have known, that their representations and omissions were untrue and misleading, and deliberately made the aforementioned representations and omissions in order to deceive reasonable consumers like Plaintiffs and other Class Members. In particular and *inter alia*, this is evidenced by the numerous negative reviews online regarding these products and others which were specifically directed at the Defendants or their companies by name, by customer complaints which, on information and belief, were communicated directly to the Defendants by victims, by the outlandishness of the conduct described and of the stories the Defendants concocted regarding celebrity endorsements, including the judging panel on Shark Tank, Jennifer Hudson, Wendy Williams, Drew Carey, and others, the significant publicity these illegal schemes have received, prior FTC actions and criminal prosecutions against similar enterprises, and the fact that the prevalence and illegality of these activities is well known in the affiliate marketing and direct marketing industries.

229.   As a direct and proximate result of Defendants' misleading and false advertising, Plaintiffs and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. Plaintiffs reasonably relied upon Defendants' representations regarding their products. In reasonable reliance on Defendants' false representations, Plaintiffs and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that Defendants' representations were false. Plaintiffs and other Class Members ended up with Products that

were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiffs and other Class Members have suffered injury in fact.

230.   Defendants' representations were material to the decision of Plaintiffs and the Class Members to purchase Defendants' products, and a reasonable person would have attached importance to the truth or falsity of the representations made by the Defendants in determining whether to purchase the Defendants' products. The suggestion that the products were endorsed by celebrities and magazines was a factor in Ms. Sihler's and Ms. Bavencoff's purchases and tended to lend credibility to the Keto products, and a reasonable consumer who knew this was false would not have purchased the products.  With respect to the omissions by Defendants as described herein, those omissions were material and Plaintiffs and the Class Members would have behaved differently if the information had been disclosed. Had Defendants disclosed the omitted information, that the consumers would be overcharged for bottles they never ordered nor consented to purchasing, that there was not a limited supply, and that Defendants intended to use the "false front" websites to defraud the consumers' banks and credit card companies if they attempted a chargeback, Plaintiffs and the Class Members would have been aware of these facts and would not have purchased the products from Defendants or would not have paid the same price for those products.

231.   Defendants advertised to Plaintiffs and other Class Members, through written representations and omissions made by Defendants and their employees that the Keto Products would be of a particular nature and quality.

232.   The misleading and false advertising described herein presents a continuing threat to Plaintiffs and the Class Members in that Defendants persist and continue to engage in these practices, and they will not cease doing so unless and until forced to do so by this Court. Defendants' conduct will continue to cause irreparable injury to consumers unless enjoined or restrained. Plaintiffs are entitled to injunctive relief ordering Defendants to cease their false advertising, and Plaintiffs and all Class Members are entitled to restitution

of the entirety of the Defendants' revenues associated with their false advertising, or such portion of those revenues as the Court may find equitable.

## THIRD CAUSE OF ACTION

### Violation of the Unfair and Fraudulent Prongs
### of the California Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

233.   Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

234.   Plaintiffs bring this claim individually and on behalf of the Class under the "unfair" and "fraudulent" prongs of California's Unfair Competition Law, Business and Professions Code section 17200, *et seq.*, on behalf of themselves and the Classes against Defendants.

235.   As alleged herein, Plaintiffs have suffered injury in fact and lost money or property as a result of Defendants' conduct because Ms. Sihler and Ms. Bavencoff were billed, without their permission, significantly more money than the advertised prices for the Keto Bottles. Plaintiffs suffered their injuries at the time of purchase when Plaintiffs bought the Keto Products that did not deliver the benefits Defendants promised, as well as on the dates their debit and credit cards were billed, without their permission, for additional bottles of product that were supposed to be free.

236.   The Unfair Competition Law, Business & Professions Code §17200, *et seq.* ("UCL") prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

237.   Defendants committed "unfair" business acts or practices by, among other things: (1) engaging in conduct where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiffs and members of the Classes; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to

Plaintiffs and members of the Classes; and (3) engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws alleged in this Class Action Complaint.

238.   The utility of the conduct committed by Defendants and as described herein is nonexistent. There is no utility to falsely suggest to customers that the product has been endorsed by celebrities; to falsely claim that the "media is in a frenzy" about the product; to falsely attribute use of the product to "before" and "after" photographs of individuals with extreme weight loss; to post fake customer reviews about the benefits of the product; to falsely claim there is a limited supply of the product and that the special offers will expire soon; to falsely claim that the formula is patented; and to run a "false front" website that deceives banks and regulators, or to any of the other conduct by Defendants. The harm to consumers caused by this conduct, by contrast, is significant. Defendants' conduct described herein not only deprived the consumers of the value they were expecting to receive, it also caused them to treat themselves with ineffective products rather than alternative options, deprived them of money, and interfered with their lawful efforts to convince their banks and credit card companies that a fraudulent transaction had occurred.

239.   Defendants' conduct as described in this Complaint offends established public policies. Defendants' conduct violated numerous civil and criminal statutes, as described further herein and in detail in the Fourth Cause of Action. Those statutes exist for a reason: to protect consumers from unfair marketing practices, and in many cases to protect consumers' health. It is a particularly important public policy issue to avoid these kinds of violations in products that relate to health care or that are ingested into the human body given the risks of such violations.

240.   Defendants' conduct as described in this Complaint is immoral, unethical, oppressive, and unscrupulous, as well as substantially injurious to Plaintiffs and the Class. In particular and *inter alia*, this is evidenced by the outlandishness of the conduct described and of the story Defendants concocted regarding celebrity endorsements, including the judging panel on Shark Tank, Jennifer Hudson, Wendy Williams, Drew Carey, and other

celebrities, the significant publicity these illegal free trial schemes have received, prior FTC actions against similar criminal enterprises, and the fact that the illegality of these activities is well known in the affiliate marketing and direct marketing industries, and by the widespread dishonesty present in Defendants' marketing materials.

241.   Defendants' conduct as described in this Complaint violates the letter, spirit, and intent of the consumer protection laws. Their products are marketed dishonestly and in violation of various consumer protection laws, as described herein and in the Causes of Action of this Complaint.

242.   As detailed herein, Defendants' unfair and/or fraudulent practices include disseminating false and/or misleading representations, through their marketing and advertising.

243.   Defendants are aware that the claims or omissions they have made about the Keto Products were and continue to be false and misleading.

244.   Defendants had an improper motive—profit before accurate marketing—in their practices related to their deceptive practices, as set forth herein.

245.   There were reasonably available alternatives to further Defendants' legitimate business interests other than the conduct described herein. For example, Defendants could have removed the false and misleading representations from their advertisements, provided omitted information to Plaintiffs and the other Class Members to avoid any deception, and could have complied with the law rather than violating the statutes as described in Plaintiff's Fourth Cause of Action.

246.   As a direct and proximate result of Defendants' unfair or fraudulent business acts and practices and misleading and false advertising, Plaintiffs and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. Plaintiffs reasonably relied upon Defendants' representations regarding their products. In reasonable reliance on Defendants' false representations, Plaintiffs and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that Defendants' representations were false. Plaintiffs and other

1  Class Members ended up with the Keto Products that were overpriced, inaccurately
2  marketed, and did not have the characteristics, qualities, or value promised by Defendants,
3  and therefore Plaintiffs and other Class Members have suffered injury in fact.

4      247.   Defendant's representations were material to the decision of Plaintiffs and the
5  Class Members to purchase Defendant's products, and a reasonable person would have
6  attached importance to the truth or falsity of the representations made by Defendant in
7  determining whether to purchase Defendant's products, as described in detail herein. With
8  respect to the omissions by Defendant as described herein, those omissions were material
9  and Plaintiffs and the Class Members would have behaved differently if the information
10  had been disclosed. Had Defendants disclosed the omitted information, Plaintiffs and the
11  Class Members would have been aware of it and would not have purchased the products
12  from Defendant or would not have paid the same price for those products. Similarly, had
13  Defendants not engaged in the unfair and fraudulent business acts or practices described in
14  this Complaint, Plaintiffs and the Class Members would not have purchased the products
15  from Defendant or would not have paid the same price for those products.

16      248.   As purchasers and consumers of Defendants' Products, and as members of the
17  general public who purchased and used the Products and have suffered injury in fact and
18  lost money and property as a result of this unfair competition and unlawful conduct,
19  Plaintiffs and the Class are entitled to and bring this class action seeking all available
20  remedies under the UCL.

21      249.   The unfair and unlawful competitive practices described herein presents a
22  continuing threat to Plaintiffs and the Class Members in that Defendants persist and
23  continue to engage in these practices, and will not cease doing so unless and until forced
24  to do so by this Court. Defendants' conduct will continue to cause irreparable injury to
25  consumers unless enjoined or restrained. Under Business & Professions Code **§** 17203,
26  Plaintiffs are entitled to injunctive relief ordering Defendants to cease their unfair
27  competitive practices, and Plaintiffs and all Class Members are entitled to restitution of the

28

entirety of the Defendants' revenues associated with their unlawful acts and practices, or such portion of those revenues as the Court may find equitable.

## **FOURTH CAUSE OF ACTION**

### **Violation of the Unlawful Prong**
### **of the California Unfair Competition Law**
### **Cal. Bus. & Prof. Code §§ 17200, *et seq.***

250.   Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

251.   Plaintiffs bring this claim under the "unlawful" prong of California's Unfair Competition Law, Business and Professions Code section 17200, *et seq.*, individually and on behalf of the Class against the Defendants.

252.   The Unfair Competition Law, Business & Professions Code §17200, *et seq.* ("UCL") prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

253.   As detailed in Plaintiffs' First Cause of Action, the Defendants' acts and practices are unlawful because they violate the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*

254.   As detailed in Plaintiffs' Second Cause of Action, the Defendants' acts and practices are unlawful because they violate the California False Advertising Law, Business & Professions Code §§ 17500, et seq.

255.   As detailed in Plaintiffs' Third Cause of Action, the Defendants' acts and practices are unlawful because they violate the prongs of California's Unfair Competition Law,  Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibit any "unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising...."

### **Bank Fraud**
### **In Violation Of 18 U.S. Code § 1344**

256.   The Defendants' conduct as described herein is unlawful because they have committed bank fraud and conspired to commit multiple counts of bank fraud in violation of 18 U.S. Code § 1344.

257.   Pursuant to 18 U.S. Code § 1344, "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises" is in violation of the statute.

258.   Pursuant to 18 U.S. Code § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

259.   The Defendants conspired to commit bank fraud and to receive money obtained from bank fraud in violation of federal law.

260.   The money obtained by the Defendants through https://ultrafastketoboost.com and https://instaketo.com/ websites was obtained through credit cards or debit cards and was thus under the custody or control of financial institutions (Ms. Sihler's bank, Bank of America, and Ms. Bavencoff's credit card company, San Diego County Credit Union). That money was obtained fraudulently. As described in this Complaint, Defendants intentionally used fake news stories and fake endorsements from celebrities, with the intent that Plaintiffs and other Class Members rely upon them, in order to obtain their debit and credit card numbers for the purpose of fraudulently bill them for bottles of the Keto Products, to which they did not agree to purchase.  Defendants intentionally created a "false front" website for the purpose of defrauding banks and credit card companies into believing that customers consented to these charges, when in fact the customers were expressly informed that they would pay the advertised price for Keto Products.

261.   Moreover, Defendants further "churned" the merchant accounts of various shell companies to deceive banking institutions and prevent them from identifying the

billings as fraudulent, which would have enabled the banks to prevent Defendants from continuing to charge their customers. On information and belief, Defendants utilized specialized software to provide them with automated "load balancing," which enabled Defendants to charge their victims' credit cards and debit cards using merchant accounts that were not detected by the fraud detection systems.

262.  Defendants knowingly conspired together to commit these violations and to benefit financially from this illegal scheme.

263.  Defendants' actions with respect to the Keto Products as described above are in violation of 18 U.S. Code § 1344 and thus constitute unlawful business acts or practices under the UCL.

## Wire Fraud
### In Violation Of 18 U.S. Code § 1343

264.  Defendants' conduct as described herein is unlawful because they have committed wire fraud and conspired to commit multiple counts of wire fraud in violation of 18 U.S. Code § 1343.

265.  Pursuant to 18 U.S. Code § 1343, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice" is in violation of the statute.

266.  Pursuant to 18 U.S. Code § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

267.  The Defendants conspired to commit wire fraud and to receive money obtained from wire fraud in violation of federal law.

268.   The Defendants transmitted written communications by means of wire as part of their scheme to defraud, in particular through Internet advertisements, their websites, through telephone communications with consumers which were intended to prevent them from exercising their lawful right to obtain a refund of their money, and through telephone or Internet communications to banks and credit card companies asserting that their charges had been agreed to by customers or that their "false front" websites were the website consumers visited. Those transmissions crossed state lines, at least from Florida to California and other states.

269.   The money obtained by the Defendants through the https://ultrafastketoboost.com and https://instaketo.com/ websites was obtained fraudulently. As described in this Complaint, the Defendants intentionally used fake news stories and fake endorsements from celebrities, with the intent that Plaintiffs and the other Class Members rely upon them, in order to obtain their debit and credit card numbers for the purpose of fraudulently billing them for bottles of the Keto Products, to which they did not agree.   Defendants intentionally created a "false front" website for the purpose of defrauding banks and credit card companies into believing that customers consented to these charges, when in fact the customers were expressly informed that they would pay the advertised price for Keto Products. Defendants knowingly conspired together to commit these violations and to benefit financially from this illegal scheme.

270.   Defendants' actions with respect to its products as described above are in violation of 18 U.S. Code § 1343 and thus constitute unlawful business acts or practices under the UCL.

## Mail Fraud

## In Violation Of 18 U.S. Code § 1341

271.   Defendants' conduct as described herein is unlawful because they have committed mail fraud and conspired to commit multiple counts of mail fraud in violation of 18 U.S. Code § 1341.

272.   Pursuant to 18 U.S. Code § 1341, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing" is in violation of the statute.

273.   Pursuant to 18 U.S. Code § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

274.   The Defendants here conspired to commit mail fraud and to receive money obtained from mail fraud in violation of federal law.

275.   The TFL Defendants transmitted matter or things and took or received matter or things via the Postal Service or private or commercial interstate carriers as part of their scheme to defraud, in particular by shipping products through the mail system to unwitting victims of the scheme with the intent to fraudulently bill them for those products that were not intentionally purchased by their victims, and accepting return packages at their Post Office address in Tampa, Florida, which were shipped across state lines from other states, including from the State of California.

276.   The money obtained by the Defendants through the through the https://ultrafastketoboost.com and https://instaketo.com/ websites was obtained fraudulently. As described in this Complaint, the Defendants intentionally used fake news stories and fake endorsements from celebrities, with the intent that Plaintiffs and the Class rely upon them, in order to obtain their debit and credit card numbers for the purpose of fraudulently billing them for additional bottles of the Keto Products, to which they did not agree to purchase.  Defendants intentionally created a "false front" website for the purpose of defrauding banks and credit card companies into believing that customers consented to these charges, when in fact the customers were expressly informed that they would pay the advertised price for Keto Products. The Defendants knowingly conspired together to commit these violations and to benefit financially from this illegal scheme.

277.   Defendants' actions with respect to their products as described above are in violation of 18 U.S. Code § 1341 and thus constitute unlawful business acts or practices under the UCL.

**Unlawful Violations of Federal Trade Commission Regulations**
**Concerning Use of Endorsements and Testimonials in Advertising**
**16 C.F.R. pt. 255, *et seq.***

278.   The Defendants' acts and practices are unlawful under the California UCL because they violate Federal regulations governing the use of endorsements and testimonials in advertising.

279.   Pursuant to 16 C.F.R. pt. 255.1(a), "an endorsement may not convey any express or implied representation that would be deceptive if made directly by the advertiser." Under 16 C.F.R. pt. 255(1)(c), "[a]dvertisers are subject to liability for false or unsubstantiated statements made through endorsements...."

280.   The term "endorsement" means "any advertising message (including verbal statements, demonstrations, or depictions of the name, signature, likeness or other identifying personal characteristics of an individual or the name or seal of an organization) that consumers are likely to believe reflects the opinions, beliefs, findings, or experiences

of a party other than the sponsoring advertiser, even if the views expressed by that party are identical to those of the sponsoring advertiser." 16 C.F.R. pt. 255(b). "Endorsement" as used by the regulation means both endorsements and testimonials. *Id.* at 255(c).

281. Endorsers include consumers who receive free products from advertisers through their marketing programs. 16 C.F.R. pt. 255, Example 8. Endorsers also include third party bloggers who are compensated in any way by advertisers, and advertisers are subject to liability for misleading or unsubstantiated representations made by paid endorsers on their websites. 16 C.F.R. pt. 255.1, Example 5.

282. Under the regulations, advertisers have a duty to train endorsers and to monitor their statements, and to take necessary steps to halt continued publication of deceptive representations by endorsers: "In order to limit its potential liability, the advertiser should ensure that the advertising service provides guidance and training to its bloggers concerning the need to ensure that statements they make are truthful and substantiated. The advertiser should also monitor bloggers who are being paid to promote its products and take steps necessary to halt the continued publication of deceptive representations when they are discovered." 16 C.F.R. pt. 255.1, Example 5.

283. Plaintiffs incorporate by reference the Factual Allegations section of this Complaint.

284. As that section describes, the Defendants faked various endorsements from celebrities and other third parties, who in fact have no connection to the product, have not used it, and did not make the statements and endorsements the Defendants attributed to them.

285. Under 16 C.F.R. pt. 255.2(c), "[a]dvertisements presenting endorsements by what are represented, directly or by implication, to be "actual consumers" should utilize actual consumers in both the audio and video, or clearly and conspicuously disclose that the persons in such advertisements are not actual consumers of the advertised product."

286. The Defendants falsely presented endorsements from celebrities as if those celebrities were actual consumers, including photographs of those purported celebrity

consumers, as well as fake reviews from other third parties claiming they had significant weight loss as a result of using the Keto Products, including their "before" and "after" photographs.

287.   Members of the Class were injured by this unlawful conduct and the violations of these regulations, in that Ms. Sihler, Ms. Bavencoff, and the other Class Members would not have purchased the products but for the fake endorsements from celebrities and other third parties, which made the Keto Products seem credible.

288.   Defendants' actions with respect to its endorsers as described above are in violation of 16 C.F.R. pt. 255, *et seq.* and thus constitute unlawful business acts or practices under the UCL.

<div align="center">

**Unlawful Violations of the**

**Sherman Food, Drug, & Cosmetic Law**

**Cal. Health & Safety Code, §§ 109875, *et seq.***

</div>

289.   Defendants' acts and practices are unlawful under the California UCL because they violate the Sherman Food, Drug, & Cosmetic Law.

290.   Defendants' products constitute cosmetics under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109900, a "cosmetic" is "any article, or its components, intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to, the human body, or any part of the human body, for cleansing, beautifying, promoting attractiveness, or altering the appearance." Defendants' products are cosmetics under this definition because they are ingested into the human body in some form, and the products sold by them are designed to beautify, promote the attractiveness of, and alter the human body's weight.

291.   Defendants' products also constitute drugs under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109925, a "drug" includes "[a]n article used or intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in human beings or any other animal" and "[a]n article other than food, that is used or intended to affect the structure or any function of the body of human beings or any

other animal." The Defendants' products are drugs under this definition because they are not food and because they are intended to affect the structure or function of the human body and its cells, and claim to affect such structure or function.

292.   Defendants' products also constitute new drugs under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109980, a "new drug" includes "[a]ny drug the composition of which is such that the drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling or advertising thereof," or one that "has become so recognized, but that has not, otherwise than in the investigations, been used to a material extent or for a material time under the conditions." The Defendants' products are not generally recognized among experts as being safe and effective for the conditions they are advertised to treat.

293.   Defendants' representations as described in this Complaint constitute advertisements under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109885, an "advertisement" means "any representations, including, but not limited to, statements upon the products, its packages, cartons, and any other container, disseminated in any manner or by any means, for the purpose of inducing, or that is likely to induce, directly or indirectly, the purchase or use of any food, drug, device, or cosmetic." The representations as described herein were likely to induce, directly or indirectly, the purchase of the Defendants' products, which constitute drugs and cosmetics, and they did in fact induce such purchases as described in this Complaint. The representations were disseminated to the Plaintiffs and the Class using various means, including fake online advertisements and on the Defendants' landing pages.

294.   Pursuant to Cal. Health & Safety Code § 110390, "[i]t is unlawful for any person to disseminate any false advertisement of any food, drug, device, or cosmetic. An advertisement is false if it is false or misleading in any particular."

295.   Pursuant to Cal. Health & Safety Code § 110395, "[i]t is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food, drug, device, or cosmetic that is falsely advertised."

296.   Defendants violated Cal. Health & Safety Code § 110390 and § 110395 by disseminating false and misleading advertisements, as described in detail throughout this Complaint, and by selling, delivering, and offering for sale their products which were falsely advertised.

297.   As stated above, Defendants' products are new drugs under the Sherman Food, Drug, & Cosmetic Law. *See* Cal. Health & Safety Code § 109980. New drugs are subject to specific approval requirements, and "[n]o person shall sell, deliver, or give away any new drug" unless the statutory requirements are satisfied. Cal. Health & Safety Code § 111550. One way to satisfy the requirements is that the product is a "new drug, and a new drug application has been approved for it and that approval has not been withdrawn, terminated, or suspended under Section 505 of the federal act (21 U.S.C. Sec. 355)." Cal. Health & Safety Code § 111550(a)(1). Another is that "[t]he department has approved a new drug or device application for that new drug or new device and that approval has not been withdrawn, terminated, or suspended." Cal. Health & Safety Code § 111550(b). The remaining methods are inapplicable to the Defendants' products, and on information and belief, Defendants have failed to satisfy the approval requirements for a new drug under the Sherman Food, Drug, & Cosmetic Law.

298.   In addition to the various forms of harm alleged throughout this Complaint, which Plaintiffs incorporate here by reference, this particular violation specifically harmed Plaintiffs and the Class by depriving them of the important and valuable protections of this statutory scheme, by causing them to purchase products whose efficacy and safety had not been verified, and by causing them to purchase the products at issue and pay more for those products than they were worth in the absence of statutory compliance.

299.   Defendants' actions with respect to its products as described above are in violation of Cal. Health & Safety Code, §§ 109875, *et seq*. and thus constitute unlawful business acts or practices under the UCL.

<div align="center">

**Unlawful Violations of the**

**Federal Food, Drug, and Cosmetic Act**

**21 U.S.C. § 301, *et seq*.**

</div>

300.   Defendants' acts and practices are unlawful under the California UCL because they violate the Federal Food, Drug, and Cosmetic Act.

301.   Defendants' products constitute drugs under the Federal Food, Drug, and Cosmetic Act. Pursuant to 21 U.S.C. § 321(g)(1), a "drug" includes "(C) articles (other than food) intended to affect the structure or any function of the body of man or other animals...."

302.   Defendants' products are advertised as affecting the structure or function of the human body and are intended to affect the structure or function of the human body. Defendants advertise that their products are the "Easiest Way to Burn Fat" and "Ultra Fast Keto Boost is a dynamic and powerful ketosis dietary supplement that will assist weight loss, promote abdominal fat burn, and support better digestion and sleep."[51] They claim their products contain "a powerful fat burning ketone, BHB" which has been "modified to produce a [sic] instant fat burning solution the natural way."[52]  They further advertise that their Keto Products alter the functionality of the metabolic state in the human body, claiming: "Beta-hydroxybutyrate is the first substrate that kicks the metabolic state of ketosis into action.  If you take it, BHB is able to start processing in your body resulting in energy and greatly speed up weight loss by putting your body into ketosis. . . . Ultra Fast Keto Boost with BHB is here to say because of the insurmountable success people are having losing up to 1 lb. of fat per day!"[53]

---

[51] https://www.ultrafastketoboost.com
[52] *Id.*
[53] *Id.*

303.   Defendants' products constitute new drugs under the Federal Food, Drug, and Cosmetic Act. Pursuant to 21 U.S.C. § 321(p)(1), a "new drug" includes "[a]ny drug (except a new animal drug or an animal feed bearing or containing a new animal drug) the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof, except that such a drug not so recognized shall not be deemed to be a "new drug" if at any time prior to June 25, 1938, it was subject to the Food and Drugs Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use...."

304.   Defendants' products are not generally recognized among experts as being safe and effective for the conditions they are advertised to treat.

305.   Pursuant to 21 U.S.C. § 355(a), "No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) is effective with respect to such drug."

306.   On information and belief, Defendants have not filed a new drug application or obtained approval of any of their products from the Food and Drug Administration. As such, it was unlawful for them to introduce or deliver their products into interstate commerce, and **all** sales or deliveries of their products in the United States were unlawful.

307.   In addition to the various forms of harm alleged throughout this Complaint, which Plaintiffs incorporate here by reference, this particular violation specifically harmed Plaintiffs and the Class by depriving them of the important and valuable protections of this statutory scheme, by causing them to purchase products whose efficacy and safety had not been verified, and by causing them to purchase the products at issue and pay more for those products than they were worth in the absence of statutory compliance.

308.   Defendants' actions with respect to its products as described above are in violation of 21 U.S.C. § 301, *et seq*. and thus constitute unlawful business acts or practices under the UCL.

## Unlawful Violations of the
## Federal Trade Commission Act
## 15 U.S.C. § 41, *et seq.*

309.   Pursuant to 15 U.S.C. § 45(a)(1), "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."

310.   Pursuant to 15 U.S.C. § 52(a), "[i]t shall be unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement—(1) By United States mails, or in or having an effect upon commerce, by any means, for the purpose of inducing, or which is likely to induce, directly or indirectly the purchase of food, drugs, devices, services, or cosmetics; or (2) By any means, for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase in or having an effect upon commerce, of food, drugs, devices, services, or cosmetics."

311.   Defendant's products are both drugs and cosmetics.

312.   As described throughout this Complaint and in the First, Second, and Third Causes of Action, Defendants engaged in unfair methods of competition in or affecting commerce, as well as unfair or deceptive acts or practices in or affecting commerce. The act of selling their products online satisfies the requirement of "in or affecting commerce."

313.   As described throughout this Complaint and in the First, Second, and Third Causes of Action, Defendants disseminated false advertisements online and sold their products online, which satisfies the requirement of "in or affecting commerce." Those advertisements were intended to induce and did in fact induce the purchase of Defendants' products.

314.   Defendants' actions with respect to its products as described above are in violation of the Federal Trade Commission Act, 15 U.S.C. § 41, *et seq.* and thus constitute unlawful business acts or practices under the UCL.

**Unlawful Violations of Federal Trade Commission Regulations**

**Concerning Use of the Word "Free" and Other Similar Representations**

**16 C.F.R. pt. 251,** *et seq.*

315.   Defendants' acts and practices are unlawful under the California UCL because they violate Federal regulations governing the use of the word "free" and other similar representations in advertising.

316.   Pursuant to 16 C.F.R. pt. 251.1(a)(2), "[b]ecause the purchasing public continually searches for the best buy, and regards the offer of 'Free' merchandise or service to be a special bargain, all such offers must be made with extreme care so as to avoid any possibility that consumers will be misled or deceived."

317.   "[A] purchaser has a right to believe that the merchant will not directly and immediately recover, in whole or in part, the cost of the free merchandise or service by marking up the price of the article which must be purchased, by the substitution of inferior merchandise or service, or otherwise." 16 C.F.R. pt. 251.1(b).

318.   Because of this right, Federal regulations strictly limit the duration of any 'free' offers in any given trade area: "So that a 'Free' offer will be special and meaningful, a single size of a product or a single kind of service should not be advertised with a 'Free' offer in a trade area for more than 6 months in any 12-month period. At least 30 days should elapse before another such offer is promoted in the same trade area. No more than three such offers should be made in the same area in any 12-month period. In such period, the offeror's sale in that area of the product in the size promoted with a 'Free' offer should not exceed 50 percent of the total volume of his sales of the product, in the same size, in the area."

319.   On information and belief, Defendants advertised false promotional offers of "Buy 3 Bottles, Get 2 Free" and "Buy 2 Bottles, Get 1 Free" for more than six months from at least February 2018 through the present time, and 100% of the sales were promoted with a "free" offer.

320.   Offers labeled as "free" must comply with strict Federal disclosure regulations: "When making 'Free' or similar offers all the terms, conditions and obligations upon which receipt and retention of the 'Free' item are contingent should be set forth clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood. Stated differently, all of the terms, conditions and obligations should appear in close conjunction with the offer of 'Free' merchandise or service. For example, disclosure of the terms of the offer set forth in a footnote of an advertisement to which reference is made by an asterisk or other symbol placed next to the offer, is not regarded as making disclosure at the outset." 16 C.F.R. pt. 251.1(c).

321.   Defendants failed to comply with these requirements to clearly and conspicuously disclose all terms, conditions, and obligations at the outset because on the https://ultrafastketoboost.com and https://instaketo.com/ landing pages, the terms were not disclosed, false representations were made about the actual prices of the Keto Products, and no disclosures were made to the consumers that they would be billed for five bottles, even though they did not order them nor consented to purchase them.

322.   Defendants' actions with respect to their use of the word "free" as described above are in violation of 16 C.F.R. pt. 251, *et seq.* and thus constitute unlawful business acts or practices under the UCL.

## **FIFTH CAUSE OF ACTION**

### **Violation of the Racketeer Influenced and**

### **Corrupt Organizations Act ("RICO")**

### **18 U.S.C. §§ 1961, *et seq.***

### **(All Defendants)**

323.   Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

324.   Plaintiffs bring this claim individually and on behalf of the Class under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.  §§ 1961, *et*

*seq.*, on behalf of themselves and the Classes against all Defendants.

325.   18 U.S.C. § 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

326.   18 U.S.C. § 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

327.   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3), which defines a person as "any individual or entity capable of holding a legal or beneficial interest in property."

328.   The overall Keto scam constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4), which defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  As described herein, all of the Defendants are individuals and legal entities who associated in fact to comprise and operate the Keto scam (the "Keto Enterprise"). The Keto Enterprise consists of The Fulfillment Lab Inc., Richard Nelson, Beyond Global Inc., and the currently unknown John Does / Keto Doe Defendants.

329.   Defendants agreed to—and did—operate the Keto Enterprise through a pattern of racketeering activity. Defendants conducted the Keto Enterprise's affairs through illegal acts, specifically, multiple related acts of mail fraud, wire fraud, and bank fraud, as described in the Fourth Cause of Action herein.

330.   TFL constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4) because it is a corporation ("the TFL enterprise").

331.   TFL's President, Defendant Nelson, a person, conducted TFL's affairs through illegal acts, specifically multiple related acts of mail fraud, wire fraud, and bank fraud.

332.   Defendants conspired to commit and agreed to the commission of at least two predicate acts.

333.   18 U.S.C. § 1961(1) defines racketeering activity to include "any act which is indictable under any of the following provisions of title 18, United States Code... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to bank fraud)...."

334.   18 U.S.C. § 1961(1) defines a pattern of racketeering activity as "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

335.   The Keto Doe Defendants committed numerous acts of mail fraud, wire fraud, and bank fraud from at least February 2018 to the present, as alleged in the Fourth Cause of Action herein. On information and belief, they continue to do so, and customers have continued to file complaints on the BBB website as recently as July 15, 2020 (indicating that the racketeering activity is still ongoing).

336.   On information and belief, Keto Doe Defendants first registered the Ultra Fast Keto Boost  website - https://ultrafastketoboost.com - on July 3, 2019, and first registered Instant Keto's website - https://instaketo.com/ - on August 8, 2018, with a last update on September 20, 2019.[54]  This is consistent with the earliest negative customer review for Ultra Fast Keto Boost on the BBB's website, where the victim reported purchasing a Keto Product on September 10, 2019.   Moreover, on information and belief, Defendants registered the "false front" website used to defraud the banks and credit card companies on or about February 20, 2018.[55]

337.   The predicate acts of mail fraud and wire fraud as described herein all had a common purpose to defraud victims purchasing the Keto Products, specifically, that the

---

[54] http://whois.domaintools.com/instaketo.com and
http://whois.domaintools.com/ultrafastketoboost.com
[55] https://whois.domaintools.com/thesuperbooster.com

victims were directed to the landing pages, which advertised prices for promotional offers such as "Buy 3 Bottles, Get 2 Free" and "Buy 2 Bottles, Get 1 Free," that they did not disclose that every victims would be charged for five bottles of the Keto Products – regardless of the number of bottles they consented to purchasing - and that the victims would not be able to obtain a full refund.

338.   The predicate acts of bank fraud consisted of the Keto Doe Defendants presenting "false front" websites to financial institutions when confronted with chargebacks. By falsely claiming that consumers purchased from a website where the terms were clearly disclosed and agreed to, the Keto Doe Defendants prevented banks from issuing lawful chargebacks to the Class. This false front was first registered on February 20, 2018, and on information and belief has been used to defraud banks on an ongoing basis since then.

339.   On information and belief, many of the misrepresentations are actively being made to new customers and the deceptive websites are still operative.  On information and belief, additional predicate acts may have occurred far earlier and may be uncovered in discovery, particularly through the Keto Doe Defendants' sales of earlier products and their current sales of the Keto products.

340.   The TFL Defendants have committed numerous acts of mail fraud and wire fraud since the time of TFL's precursor company, Skinutra, and have continued to assist the Keto Doe Defendants in perpetrating the Keto Enterprise's scam since its inception at least as of February 2018.  On information and belief, and based on the evidence described herein, the TFL Defendants were aware of the predicate acts and conspired to commit and agreed to the commission of at least two predicate acts. The TFL Defendants directly committed mail and wire fraud by shipping the Keto Products to victims through the mail, despite knowing that those shipments were being made in support of a fraudulent scheme, and by processing customer returns through mail and wire.

341.   The Keto Doe Defendants have committed similar numerous acts of wire fraud because they developed and managed the various landing pages for the Keto

Products, as well as the fake news stories and fake endorsements from celebrities, including the "Shark Tank" advertisements, to lure unwitting victims into purchasing the Keto Products. The money obtained by the Keto Doe Defendants through advertisements was obtained fraudulently.

342.   On information and belief, the Keto Doe Defendants consulted with the TFL Defendants on a routine basis, and the TFL Defendants provided a menu of services enabling the Keto Doe Defendants to further commit the predicate acts. On information and belief, these activities also occurred as early as February 2018 and continue through the present.

343.   Defendants' acts of wire fraud, mail fraud, and bank fraud were committed willfully and intentionally as described herein, and were made in furtherance of the scheme and common course of conduct in that they were designed to defraud customers of the Keto Products of money and property.

344.   The predicate acts by the Defendants affected interstate commerce, in that the shipments crossed state lines and the advertisements were transmitted via wire across the country, resulting in purchases of the Keto Products through interstate commerce which were sent via United States mail and private shipping carriers.

345.   The RICO violations alleged here have caused harm to a specific business or property interest. In particular, as a result of the misrepresentations and omissions described herein, Plaintiffs reasonably relied upon Defendants' representations regarding their products. In reasonable reliance on Defendants' false representations, and as a result of the RICO violations, Plaintiffs and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that Defendants' representations were false or had the Defendants not engaged in the unlawful conduct described herein. Plaintiffs and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiffs and other Class Members have suffered specific harm to a property interest, the money they paid to the Defendants.

Plaintiff's banks were further harmed through the "false front" websites and the churning of merchant accounts.

346.   The RICO violations here have caused concrete financial loss. In particular, as described above, money was paid by Plaintiffs and members of the Classes to the Defendants in reliance on their misrepresentations and omissions. Plaintiffs and the Class Members were overcharged for those products relative to their actual value, and the value was substantially inflated by the various misrepresentations and omissions as described further herein.

347.   The RICO violations were both the but-for cause and the proximate cause of these injuries. But for the violations, as described herein, Plaintiffs and the Class Members would not have purchased the products or would not have paid an inflated price for them. But for the bank fraud, the scheme would have been shut down by the banks or credit card companies. The violations were the proximate cause of these injuries because the violations led directly to the injuries—the fraudulent representations and omissions were designed to induce customers to purchase the Keto Products, and it was because of these representations and omissions that the customers made their purchases.

348.   Because of these violations and pursuant to 18 U.S.C. § 1964(c) and 1964(d), Defendants are liable to Plaintiffs and the Class Members for three times the damages Plaintiffs and the Class Members have sustained, plus the cost of this suit, including reasonable attorneys' fees.

<div align="center">

**SIXTH CAUSE OF ACTION**

**Violation of Various State Consumer Protection Laws**

**On Behalf of the Nationwide Class**

</div>

349.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

350.   Plaintiff brings this claim for deceptive acts and practices in violation of various states' consumer protection statutes against the Defendants on behalf of the Nationwide Class.

351.  The Defendants have engaged in deceptive acts and unfair practices that have caused actual damages to Plaintiff and the Nationwide Class, as described herein, including the misrepresentations and omissions described with respect to the marketing, advertising, promotion, packaging, and sale of the Keto Products.

352.  The Defendants' deceptive and unfair trade practices have been carried out in the course of conducting the Defendants' business, trade, and commerce.

353.  The Defendants' acts—including their intentional efforts to mislead consumers regarding the benefits and effectiveness of the Keto Products—are willful, unfair, unconscionable, deceptive, contrary to public policy and injurious to consumers.

354.  The Defendants' false, deceptive and misleading statements and omissions would be material to any reasonable consumer's decision whether to buy a Keto product.

355.  Any objectively reasonable consumer acting reasonably in the circumstances would have been deceived by the Defendants' acts and practices.

356.  The Defendants' acts are unconscionable and actuated by bad faith, lack of fair dealing, actual malice, are accompanied by a wanton and willful disregard for consumers' well-being, and are motivated solely by the desire for financial gain.

357.  As a direct and proximate result of the Defendants' deceptive practices, Plaintiff and the Nationwide Class have sustained actual damages.

358.  Plaintiff and the Nationwide Class demand damages, attorneys' fees and costs, and any other relief to which they may be entitled.

359.  Plaintiff's claims are representative of similar claims available to non-California Nationwide Class members under the laws of other states, which also are amenable to further subclass treatment. Such laws may include, but are not limited to: Ala. Code § 8-19-1 *et seq.*; Alaska Stat. § 45.50.471 *et seq.*; Ariz. Rev. Stat. Ann. § 44-1521 *et seq.*; Ark. Code Ann. § 4-88-101 *et seq.*; Cal. Civil Code § 1750 *et seq.* and Cal. Bus. & Prof. Code § 17200 *et seq. & 17500 et seq.*; Colo. Rev. Stat. § 6-1-101 *et seq.*; Conn. Gen. Stat. § 42-110a *et seq.*; Del. Code Ann. tit. 6 § 2511 *et seq. & 2580 et seq.*; D.C. Code Ann. § 28-3901 *et seq.*; Fla. Stat. § 501.201 *et seq.*; Ga. Code Ann. § 10-1-390 *et seq.*; Haw. Rev.

Stat. § 480-1 *et seq.*; Idaho Code Ann. § 48-601 *et seq.*; 815 Ill. Comp. Stat. 505/1 *et seq.*; Ind. Code Ann. § 24-5-0.5-1 *et seq.*; Iowa Code § 714.16 *et seq.*; Kan. Stat. Ann. § 50-623 *et seq.*; Ky. Rev. Stat. Ann. § 367.110 *et seq.*; La. Rev. Stat. Ann. § 51:1401 *et seq.*; Me. Rev. Stat. Ann tit. 5, § 205-A *et seq.*; Md. Code Ann., Com. Law § 13-101 *et seq.*; Mass. Gen. Laws ch. 93A, § 1 *et seq.*; Mich. Comp. Laws § 445.901 *et seq.*; Minn. Stat. § 831 and § 325F.67 *et seq.*; Miss. Code Ann. § 75-24-1 *et seq.*; Mo. Ann. Stat. § 407.010 *et seq.*; Mont. Code Ann. § 30-14-101 *et seq.*; Neb. Rev. Stat. Ann. § 59-1601 *et seq.*; Nev. Rev. Stat. Ann. § 598.0903 *et seq.*; N.H. Rev. Stat. Ann. § 358-A:1 *et seq.*; N.J. Stat. Ann. § 56:8-1 *et seq.*; N.M. Stat. § 57-12-1 *et seq.*; N.Y. Gen. Bus. Law § 349 *et seq.* and § 350 *et seq.*; N.C. Gen. Stat. § 75-1.1 *et seq.*; N.D. Cent. Code § 51-12-01 *et seq.* and § 51-15-01 *et seq.*; Ohio Rev. Code Ann. § 1345.01 *et seq.*; Okla. Stat. tit. 15, § 751 *et seq.*; Or. Rev. Stat. § 646.605 *et seq.*; 73 Pa. Stat. Ann. §§ 201-1 *et seq.*; R.I. Gen. Laws §§ 6-13.1-1 *et seq.*; S.C. Code Ann. § 39-5-10 *et seq.*; S.D. Codified Laws § 37-24-1 *et seq.*; Tenn. Code Ann. § 47-18-1091 *et seq.*; Tex. Bus. & Com. Code Ann. § 17.41 *et seq.*; Utah Code Ann. § 13-11-1 *et seq.*; Vt. Stat. Ann. tit. 9, § 2451 *et seq.*; Va. Code Ann. §§ 59.1-196 *et seq.*; Wash Rev. Code § 19.86.010 *et seq.*; W. Va. Code § 46A-6-101 *et seq.*; Wis. Stat. § 100.18 *et seq.*; and Wyo. Stat. Ann. §§ 40-12-101 *et seq.*

## SEVENTH CAUSE OF ACTION

### Aiding and Abetting

360.   Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

361.   On information and belief, the TFL Defendants and the Keto Doe Defendants (including Beyond Global Inc.) knew that the tortious conduct alleged in this Complaint was occurring and that it constituted a breach of duties to Plaintiffs. The TFL Defendants and the Keto Doe Defendants had actual knowledge of the wrongful conduct described herein. It is widely known among these scammers and among the various companies that provide them aid and assistance that the FTC has branded these schemes illegal and is aggressively pursuing them.

362. The TFL Defendants gave substantial assistance or encouragement to the Keto Doe Defendants as described further herein.

363. The TFL Defendants participated in this conduct for personal gain or in furtherance of their own financial advantage.

364. The TFL Defendants are thus jointly and severally liable for the conduct alleged herein by all of the other Defendants.

365. Similarly, Beyond Global Inc. gave substantial assistance to the Keto Doe Defendants as described further herein by creating and marketing the fraudulent products which the TFL Defendants shipped. Beyond Global Inc. participated in this conduct for personal gain or in furtherance of their own financial advantage. Beyond Global Inc. is thus jointly and severally liable for the conduct alleged herein by the TFL Defendants.

366. Plaintiffs expects that there will be multiple John Doe Defendants ultimately discovered to have participated in this scheme, and based on the BBB report, that they will be separate companies or individuals conspiring together. To the extent the tortious conduct alleged was not personally committed by them, the Defendants aided and abetted the tortious conduct alleged in this complaint by working together as a group (including affiliates, affiliate networks, and "crooked processors" who help evade fraud detection efforts by banks and credit card companies) to defraud consumers as described in the BBB report. *See* Ex. 1.

367. On information and belief, the John Doe Defendants knew that the tortious conduct alleged in this complaint constituted a breach of duties to Plaintiffs. The John Doe Defendants had actual knowledge of the wrongful conduct described herein.

368. The John Defendants participated in this conduct for personal gain or in furtherance of their own financial advantage.

369. Each of the John Doe Defendants is thus jointly and severally liable for the conduct alleged herein by all of the other Defendants, including the TFL Defendants.

## **EIGHTH CAUSE OF ACTION**

### **Civil Conspiracy**

370.   Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

371.   All of the Defendants (collectively, "the Conspirators") formed a conspiracy to commit the tortious and unlawful conduct described herein.

372.   On information and belief, there was an agreement among the Conspirators to commit those wrongful acts and to cooperate in furtherance of the commission of those wrongful acts. This agreement is implied by the conduct of the conspirators because of the common knowledge among these scammers that their conduct is illegal, because of their contracts with one another, because the fulfillment companies and "crooked processors" target this kind of scammer specifically to be their customers, and because of the nature of their close interaction as an economic unit.

373.   The Conspirators were aware of the conduct of each other, and specifically of its unlawful nature. The Conspirators agreed with one another that this conduct would be committed and intended that it be committed. It was in the Conspirators' interests that this conduct be committed because they were specifically financially compensated for their participation. The Conspirators' acted in furtherance of their own financial gain as evidenced by this compensation.

374.   Plaintiffs and the Class were harmed by the wrongful conducted committed by the Conspirators as part of the conspiracy, as described throughout this Complaint in the Causes of Action underlying the Conspiracy claim. As a direct and proximate result of the Conspirators' wrongful conduct, Plaintiffs and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. In reasonable reliance on the Conspirators' misrepresentations, Plaintiffs and other Class Members purchased the products at issue and paid more for those products than they otherwise would have. In turn, Plaintiffs and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by

Defendants, and therefore Plaintiffs and other Class Members have suffered injury in fact. Defendant's representations were material to the decision of Plaintiffs and the Class Members to purchase Defendant's products, and a reasonable person would have attached importance to the truth or falsity of the representations made by Defendant in determining whether to purchase Defendant's products.

375.   Each of the Defendants listed in this Cause of Action is thus jointly and severally liable for the conduct committed by the conspiracy.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs demand judgment as follows:

A.   An order declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying this case as a class action, appointing Plaintiffs as representative of the Class, and designating their attorneys as Class Counsel;

B.   Declaratory judgment that Defendants' actions are unfair and unlawful;

C.   An award of injunctive relief as permitted by law or equity including an order prohibiting Defendants from engaging in the unlawful and tortious acts described above;

D.   A finding that such injunction constitutes public injunctive relief, has resulted in the enforcement of an important right affecting the public interest and otherwise meets the requirements of California Code of Civil Procedure § 1021.5, and an award of attorney's fees and costs pursuant to § 1021.5;

E.   For judgment for Plaintiffs and the Class on their claims in an amount to be proven at trial, for economic, monetary, consequential, compensatory or statutory damages caused by Defendants' practices, along with punitive damages;

F.   For restitution and/or other equitable relief, including without limitation disgorgement of all revenues, profits, and unjust enrichment that Defendants obtained from Plaintiffs and the Class as a result of its unlawful, unfair, and deceptive business practices described herein;

G.     For damages of three times the damages Plaintiffs and the Class Members have sustained, plus the cost of this suit, including reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c) and (d);

H.     An award of attorney's fees and costs;

I.     For pre-judgment and post-judgment interest as provided for by law or allowed in equity; and

J.     Such other and further relief as is necessary and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. Proc. 38(b), Plaintiffs demand a trial by jury on all issues so triable.

DATED: August 6, 2020                                 Respectfully submitted,


**KNEUPPER & COVEY, PC**


/s/Kevin M. Kneupper

Kevin M. Kneupper, Esq.

*Attorneys for Plaintiffs Janet Sihler and Charlene Bavencoff and the putative Class*