1
2
3
4
5
6
7
8
9          **UNITED STATES DISTRICT COURT**

10         **SOUTHERN DISTRICT OF CALIFORNIA**

11

12  JANET SIHLER, individually and on          Case No.: 3:20-cv-01528-H-MSB
    behalf of all others similarly situated;
13  CHARLENE BAVENCOFF,                          **ORDER:**
    individually and on behalf of all
14  others similarly situated,                   **(1) DENYING DEFENDANT**
15                              Plaintiffs,       **RICHARD NELSON'S MOTION TO**
                                                  **DISMISS FOR LACK OF**
16  v.                                            **PERSONAL JURISDICTION**
17  THE FULFILLMENT LAB, INC;
    RICHARD NELSON; BEYOND                        [Doc. No. 13.]
18  GLOBAL INC.; and DOES 1-10,
19                              Defendants.       **(2) GRANTING IN PART AND**
                                                  **DENYING IN PART DEFENDANT**
20                                                **THE FULFILLMENT LAB, INC.'S**
                                                  **MOTION TO DISMISS; AND**
21
22                                                [Doc. No. 14.]
23
24                                                **(3) GRANTING IN PART AND**
25                                                **DENYING IN PART DEFENDANT**
                                                  **BEYOND GLOBAL INC.'S MOTION**
26                                                **TO DISMISS AND MOTION TO**
                                                  **STRIKE**
27
28                                                [Doc. No. 15.]

1

On August 6, 2020, Plaintiffs Janet Sihler and Charlene Bavencoff filed a class action complaint alleging Defendants The Fulfillment Lab, Inc., Richard Nelson, and Beyond Global Inc. had violated numerous consumer protection laws. (Doc. No. 1, Compl.) On October 9, 2020, Defendant Richard Nelson filed a motion to dismiss for lack of personal jurisdiction, and Defendant The Fulfillment Lab, Inc. ("TFL") filed a motion to dismiss for failure to state a claim. (Doc. Nos. 13–14.) On October 16, 2020, Defendant Beyond Global Inc. filed a motion to dismiss and to strike Plaintiffs' claims. (Doc. No. 15.) On October 22, 2020, Defendants TFL and Nelson joined Defendant Beyond Global's motions to dismiss and to strike Plaintiffs' complaint. (Doc. Nos. 19–20.) Plaintiffs filed their oppositions on November 2, 2020. (Doc. Nos. 22–24.) Defendant TFL and Defendant Beyond Global filed their respective replies on November 9, 2020. (Doc. Nos. 25, 27.) Defendant Nelson filed his reply on November 12, 2020. (Doc. No. 29.)

On November 13, 2020, the Court took the matter under submission. (Doc. No. 30.) For the reasons that follow, the Court (1) denies Defendant Nelson's motion to dismiss for lack of personal jurisdiction, (2) grants in part and denies in part Defendant TFL's motion to dismiss for failure to state a claim, and (3) grants in part and denies in part Defendant Beyond Global's motion to dismiss and motion to strike.

## Background

The following facts are taken from Plaintiffs' class action complaint. This lawsuit involves an alleged fraudulent scheme in which the Defendants allegedly use fake celebrity endorsements and reviews and misrepresentations about price and limited availability, to induce consumers into purchasing weight-loss pills branded "Ultra Fast Keto Boost" and "Instant Keto" (collectively, "Keto Products"). (Doc. No. 1 ¶¶ 8–12.) The Defendants allegedly subsequently charge consumers more than they originally agreed to pay, make it difficult or impossible to return the products or receive a refund, and operate "false front" websites to mislead banks and credit card companies investigating chargebacks. (Id.)

///

///

## I.     Plaintiffs' Experiences With The Keto Products

In December 2019, Plaintiff Janet Sihler, a California resident, saw an advertisement for a weight loss product called "InstaKeto" as she was browsing the Internet. (Id. ¶ 49.) The advertisement claimed the product was featured on Shark Tank. (Id.) She clicked on the advertisement, which took her to a website (which Plaintiffs refer to as a "hidden" landing page). (Id.) She selected the "Buy 3 bottles, Get 2 free" promotion with the expectation that she would be billed for three bottles of the product at $39.74 each, and receive two additional bottles for free, for a total purchase price of $119.22. (Id. ¶ 18.) Instead, her debit card was charged for $198.70, the price of all five bottles. (Id.) She received five bottles branded "Instant Keto" a few days later. (Id. ¶ 52.) Plaintiff Sihler called the customer service telephone number to request a refund. (Id. ¶ 54.) The representative told her she would have to ship the bottles back at her own expense to obtain a partial refund; Plaintiff Sihler did not receive any money back. (Id.) Plaintiff Sihler's debit card was charged by the merchant account "VYA*KETOBOOST 8889700695 Port Orange FL." (Id. ¶ 51.) The "Instant Keto" bottles stated they were distributed by "Instant Keto Boost" and listed "www.instantketoboost.com" as the product's website. (Id. ¶ 169.)

In October 2019, Plaintiff Charlene Bavencoff, a California resident, saw an advertisement on Facebook for a weight-loss product called "Ultra Fast Keto Boost." (Id. ¶ 55.) She clicked the advertisement, which brought her to a page that claimed the product was endorsed on Shark Tank. (Id.) She also selected the "Buy 3 bottles, Get 2 free" promotion with the expectation that she would be billed for three bottles of the product at $39.74 each, and receive two additional bottles for free, for a total purchase price of $119.22. (Id. ¶ 19.) Instead, her credit card was charged for $198.70, the price of all five bottles. (Id.) After receiving the product and deciding it did not work, Plaintiff Bavencoff called the customer service number listed on the packing slip, but the number was disconnected. (Id. ¶¶ 20, 58.) She also has not recovered any money. (Id.) Plaintiff Bavencoff's credit card was charged by the merchant account "UltraFast Keto Boost 8444-7041211NV." (Id. ¶ 56.)

## II.     The Alleged Fraudulent Scheme

Plaintiffs allege Defendants' fraudulent scheme operates as follows. False claims about the effectiveness of the Keto Products, as well as fake celebrity or TV show endorsements, are allegedly used to induce consumers into clicking onto product advertisements. (Id. ¶¶ 62–78, 98.) The advertisement "funnels" consumers to a landing page for the product, where they are presented with several purchase options, including the "Buy 3, Get 2 Free" option selected by Plaintiffs Sihler and Bavencroft. (Id. ¶¶ 82, 89–92, 99–101.) These landing pages are allegedly inaccessible to anyone who does not view the advertisements or are deleted after a few weeks or months to avoid detection. (Id. ¶¶ 63, 80.) Plaintiffs allege that the terms and conditions of purchases, including the Refund/Return Policy, are hidden or buried on the landing page; consumers do not need to read or acknowledge the terms in order to complete their purchase. (Id. ¶¶ 85–88, 90.)

After providing their credit card information and completing their purchase, the consumers are allegedly overcharged for the full price of all five bottles of product, rather than the discounted "Buy 3, Get 2 Free" price. (Id. ¶¶ 93–96, 102.) When consumers seek to dispute the overcharge with their bank or credit card company, the Defendants allegedly present the investigators with a second website, which Plaintiffs term a "false front" website. (Id. ¶¶ 103–114.) These "false front" websites are visually similar to the landing pages consumers used to make their purchase, but the terms and conditions are clearly stated, the false advertisements are removed, and the actual purchase prices of the different options are listed, thus deceiving the investigators into believing consumers agreed to the full terms of sale. (Id.) Additionally, the Defendants create multiple shell companies, each of whom signs up for a unique merchant account; these accounts are then rotated through customer billings with a "load balancing" software to prevent any individual account from being flagged for fraud due to high levels of chargebacks. (Id.)

Plaintiffs allege the named Defendants are involved in this scheme as follows. The "Keto Doe Defendants," which includes Defendant Beyond Global, are the marketers and/or branders of the Keto Products who allegedly operate the hidden landing pages

4

viewed by consumers as well as the false front websites provided to banks and credit card companies. (Id. ¶ 11.) Defendant Beyond Global is incorporated in Wyoming. (Id. ¶ 24.) The "Ultra Fast Keto Boost" bottles purchased by Plaintiff Bavencoff stated they were distributed by "Beyond Global Inc." and listed "www.thesuperbooster.com" as the product's website. (Id. ¶¶ 149, 169.) Defendant TFL, owned by Defendant Nelson, is a fulfillment company that allegedly provides generic "white label" products to the Keto Doe Defendants, assists them with marketing and advertising, distributes the products to consumers, and handles returns when customers complain. (Id. ¶¶ 11, 169–80.) Defendant TFL is incorporated in Florida, with its principal place of business in Tampa, Florida. (Id. ¶ 21.) Defendant Nelson is a resident of and domiciled in Florida. (Id. ¶ 5.) Plaintiffs allege Defendant TFL is the fulfillment company for both the "Instant Keto" and "Ultra Fast Keto Boost" products, and that both products are the same white-labeled products offered by Defendant TFL. (Id. ¶¶ 169–71.) The packing slip accompanying the five bottles shipped to Plaintiff Sihler described the product as "KetoBoost" and identified the shipper as "Ultra Fast Instant Keto" with an office located at 3201 Hillsborough Avenue 153201-1378, Tampa, Florida, 33684. (Id. ¶ 53.) The packing slip accompanying the five bottles shipped to Plaintiff Bavencoff described the product as "Ultra Fast Keto Boost" and identified the shipper as "Ultra Fast Instant Keto" with an office located at 3201 Hillsborough Avenue 153201-1378, Tampa, Florida, 33684. (Id. ¶ 57.) Plaintiffs allege the Hillsborough address is for a United States Post Office that is close to the TFL headquarters. (Id. ¶ 171.)

## III. Procedural History

On August 6, 2020, Plaintiffs filed a complaint alleging the following causes of action: (1) violation of California's Consumer Legal Remedies Act ("CLRA"); (2) violation of California's False Advertising Law ("FAL"); (3) violation of the unfair and fraudulent prongs of California's Unfair Competition Law ("UCL"); (4) violation of the unlawful prong of California's Unfair Competition Law; (5) civil Racketeer Influenced and Corrupt Organizations ("RICO") Act violations; (6) violation of various state's consumer protection laws; (7) aiding and abetting; and (8) conspiracy. (Doc. No. 1.)

1    Defendant Nelson moves to dismiss pursuant to Federal Rule of Civil Procedure
2  12(b)(2) for lack of personal jurisdiction. (Doc. No. 13 at 1.)[1] Defendant TFL moves to
3  dismiss pursuant to: (1) Rules 8(a)(2) and 12(b)(6) for failure to state claims upon which
4  relief can be granted, and (2) Rule 9(b) for failure to plead claims with particularity. (Doc.
5  No. 14 at 1.) Defendant Beyond Global moves (1) to dismiss Plaintiffs' complaint pursuant
6  to Rule 12(b)(6) for failure to state claims upon which relief can be granted, (2) to dismiss
7  pursuant to Rule 9(b) for failure to plead claims with particularity, and (3) to strike
8  allegations in Plaintiffs' complaint pursuant to Rule 12(f). (Doc. No. 15 at 2.)

9                                    **Discussion**

10 **I.    Whether The Court Has Personal Jurisdiction Over Defendant Nelson**

11    Defendant Nelson moves to dismiss Plaintiffs' complaint on the ground that on the
12 ground that this Court does not have personal jurisdiction over him. (Doc. No. 13-1.)
13 Plaintiffs do not contend that the Court has general jurisdiction over Defendant Nelson,
14 thus, the Court limits its analysis to specific personal jurisdiction. (See Doc. No. 23.)

15    Under Rule 12(b)(2), a plaintiff bears the burden of establishing personal
16 jurisdiction. Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800 (9th Cir. 2004).
17 "This demonstration requires that the plaintiff 'make only a prima facie showing of
18 jurisdictional facts to withstand the motion to dismiss.'" Pebble Beach Co. v. Caddy, 453
19 F.3d 1151, 1154 (9th Cir. 2006) (quoting Doe v. Unocal Corp., 248 F.3d 915, 922 (9th Cir.
20 2001)). "The parties may submit, and the court may consider, declarations and other
21 evidence outside the pleadings in determining whether it has personal jurisdiction."
22 Kellman v. Whole Foods Mkt., Inc., 313 F. Supp. 3d 1031, 1042 (N.D. Cal. 2018) (citing
23 Unocal Corp., 248 F.3d at 922). "Where not directly controverted, plaintiff's version of the
24 facts is taken as true for the purposes of a 12(b)(2) motion." Unocal Corp., 248 F.3d at 922
25 (quoting AT&T Co. v. Compagnie Bruxelles Lambert, 94 F.3d 586, 588 (9th Cir. 1996)).

26
27 _____
28 [1]    Should the Court deny Defendant Nelson's motion to dismiss for lack of personal jurisdiction, he
conditionally joins Defendant TFL's motion to dismiss. (Id.)

"If the defendant adduces evidence controverting the allegations in the complaint, however, the plaintiff must 'come forward with facts, by affidavit or otherwise, supporting personal jurisdiction.'" Platypus Wear, Inc. v. Bad Boy Europe Ltd., No. 16-CV-02751-BAS-DHB, 2018 WL 3706876, at *4 (S.D. Cal. Aug. 2, 2018) (citing Scott v. Breeland, 792 F.2d 925, 927 (9th Cir. 1986)); see Mavrix Photo, Inc. v. Brand Techs., Inc., 647 F.3d 1218, 1223 (9th Cir. 2011). "Conflicts between [the] parties over statements contained in the affidavits must be resolved in the plaintiff's favor." Schwarzenegger, 374 F.3d at 800; see Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd., 328 F.3d 1122, 1129 (9th Cir. 2003) ("[C]onflicts between the facts contained in the parties' affidavits must be resolved in [plaintiff's] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists.").

 "Personal jurisdiction over a nonresident defendant is tested by a two-part analysis. First, the exercise of jurisdiction must satisfy the requirements of the applicable state long-arm statute. Second, the exercise of jurisdiction must comport with federal due process." Dow Chemical Co. v. Calderon, 422 F.3d 827, 830 (9th Cir. 2005) (quoting Chan v. Society Expeditions, 39 F.3d 1398, 1404–05 (9th Cir. 1994)). Because no federal statute authorizes personal jurisdiction in this case, the Court applies the law of the state in which it sits to determine whether it has personal jurisdiction over Defendant. Fed. R. Civ. P. 4(k)(1)(A). "California's long-arm statute, Cal. Civ. Proc. Code § 410.10, is coextensive with federal due process requirements, so the jurisdictional analyses under state law and federal due process are the same." Mavrix Photo, 647 F.3d at 1223 (quoting Schwarzenegger, 374 F.3d at 800–01). "Due process, in turn, requires that each party 'have certain minimum contacts' with the forum state 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" In re Boon Glob. Ltd., 923 F.3d 643, 650 (9th Cir. 2019) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

Specific jurisdiction exists when all three elements of the following test are satisfied:

(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform

some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

Picot v. Weston, 780 F.3d 1206, 1211 (9th Cir. 2015) (citations omitted). The plaintiff bears the burden of satisfying the first two prongs; the burden then shifts to the defendant to demonstrate that the third prong is not satisfied. CollegeSource, Inc. v. AcademyOne, Inc., 653 F.3d 1066, 1076 (9th Cir. 2011).

### A.    The Fiduciary Shield Doctrine

"Under the fiduciary shield doctrine, a person's mere association with a corporation that causes injury in the forum state is not sufficient in itself to permit that forum to assert jurisdiction over the person." Davis v. Metro Prod., 885 F.2d 515, 520 (9th Cir. 1989). This means that "[t]he fact that a corporation is subject to jurisdiction in the forum state . . . does not necessarily confer jurisdiction over its individual officers." Brown v. Gen. Steel Domestic Sales, LLC, No. CV08-00779 MMM (SHX), 2008 WL 2128057, at *10 (C.D. Cal. May 19, 2008) (citing Davis, 885 F.2d at 520); see Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A., 972 F.3d 1101, 1109 (9th Cir. 2020) ("We do not impute a corporation's forum contacts to each of the corporation's employees."); Moser v. Lifewatch Inc., No. 19-CV-831-WQH-BLM, 2020 WL 1849664, at *5 (S.D. Cal. Apr. 13, 2020) ("Personal jurisdiction over individual corporate officers may not be based on the court's jurisdiction over the corporation itself."); Tangiers Inv'rs, L.P. v. Americhip Int'l, Inc., No. 11CV339 JLS BGS, 2011 WL 3299099, at *2 (S.D. Cal. Aug. 1, 2011) ("Under the fiduciary shield doctrine, this Court's jurisdiction over Americhip, the corporation, does not directly translate into jurisdiction over Mouton, Americhip's one-time CEO and board member.").

However, "the fact that actions constituting sufficient contacts with the state were taken on behalf of the corporate employer will not shield the individual from being subjected to jurisdiction." Brown, 2008 WL 2128057, at *10; see Calder v. Jones, 465 U.S.

783, 789–90 (1984) ("Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there. On the other hand, their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually."); Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781 n.13 (1984) ("[W]e today reject the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity."). "The Ninth Circuit has clearly stated that the fiduciary shield doctrine may not serve as 'jurisdictional limit' where sufficient contacts would otherwise exist to establish personal jurisdiction." Arcona, Inc. v. Farmacy Beauty, LLC, No. 2:17-CV-07058-ODW-JPR, 2018 WL 1441155, at *3 n.3 (C.D. Cal. Mar. 22, 2018) (citing Davis, 885 F.2d at 522); see Glob. Commodities Trading Grp., 972 F.3d at 1109 (rejecting contention that "a court may consider only the actions [defendants] took in an individual capacity on their own behalf" for purposes of personal jurisdiction); Kukui Gardens Corp. v. Holco Capital Grp., Inc., 664 F. Supp. 2d 1103, 1112 (D. Haw. 2008) ("Calder established that the corporation's contacts as a whole may not be projected onto an individual employee as that individual's own contacts; instead, the individual employee's contacts with the forum state should be the focus of the examination. However . . . it is irrelevant whether those individual contacts were personal in nature, or while acting in an official capacity.").

It is evident from Supreme Court and Ninth Circuit precedent that under the fiduciary shield doctrine, courts cannot impute a corporation's contacts to its employees, but nor can employees hide behind their official positions to avoid personal jurisdiction for their own actions. Both principles are consistent with Calder's mandate that "[e]ach defendant's contacts with the forum State must be assessed individually." 465 U.S. at 789–90. There are two recognized exceptions to the fiduciary shield doctrine. "Because the corporate form serves as a shield for the individuals involved for purposes of liability as well as jurisdiction, many courts search for reasons to 'pierce the corporate veil' in jurisdictional contexts parallel to those used in liability contexts." Davis, 885 F.2d at 520. Thus, the fiduciary shield doctrine may be ignored in circumstances that give rise to grounds for

piercing the corporate veil: "(1) where the corporation is the agent or alter ego of the individual defendant; or (2) by virtue of the individual's control of, and direct participation in the alleged activities." <u>Mulato v. Wells Fargo Bank, N.A.</u>, 76 F. Supp. 3d 929, 945 (N.D. Cal. 2014); <u>see</u> <u>Transgo, Inc. v. AJAC Transmission Parts Corp.</u>, 768 F.2d 1001, 1021 (9th Cir. 1985); <u>Platypus Wear, Inc.</u>, 2018 WL 3706876, at *7.

Under the first exception, "[i]f a corporation is an alter ego of an individual or another corporation, then the district court may disregard the corporate form and exercise personal jurisdiction over the other individual or entity." <u>ADO Fin., AG v. McDonnell Douglas Corp.</u>, 931 F. Supp. 711, 715 (C.D. Cal. 1996) (citing <u>Certified Building Products, Inc. v. NLRB</u>, 528 F.2d 968, 969 (9th Cir. 1976)); <u>see</u> <u>Apple Inc. v. Allan & Assocs. Ltd.</u>, 445 F. Supp. 3d 42, 51–52 (N.D. Cal. 2020). In other words, "where a corporation is the alter ego of the stockholders so as to justify disregard of the corporate entity[,] jurisdiction over the corporation will support jurisdiction over the stockholders." <u>Flynt Distrib. Co. v. Harvey</u>, 734 F.2d 1389, 1393 (9th Cir. 1984) (quoting <u>Sheard v. Superior Court</u>, 114 Cal. Rptr. 743, 745 (Cal. Ct. App. 1974)); <u>see</u> <u>Platypus Wear, Inc.</u>, 2018 WL 3706876, at *8.

Under the second exception, "a court may assert personal jurisdiction over an individual based upon 'the individual's control of, and direct participation in the alleged activities' of the corporation." <u>Tangiers Inv'rs</u>, 2011 WL 3299099, at *2 (quoting <u>Wolf Designs, Inc. v. DHR & Co.</u>, 322 F. Supp. 2d 1065 (C.D. Cal. 2004)). "[A] corporate officer can be subject to jurisdiction based on his own sufficient individual contacts with the forum." <u>Moser</u>, 2020 WL 1849664, at *5 (quoting <u>In re Boon Glob. Ltd.</u>, 923 F.3d at 652); <u>see</u> <u>Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.</u>, 173 F.3d 725, 734 (9th Cir. 1999) ("A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf."); <u>Roberts v. Obelisk</u>, No. 18cv2898-LAB (BGS), 2019 WL 1902605, at *4 (S.D. Cal. Apr. 29, 2019) ("Individual [d]efendants cannot take advantage of the so-called 'fiduciary-shield doctrine' if their contacts with California would otherwise give rise to jurisdiction."). This results in a straightforward

application of the specific personal jurisdiction analysis; an individual's contacts with a forum are assessed, without regard to whether the contacts arose out of the individual's personal or professional capacity. See Lewis v. Travertine, Inc., No. 2:17-cv-00016-CAS (JCx), 2017 WL 1511292, at *6 (C.D. Cal. Apr. 24, 2017) ("Accordingly, for purposes of specific jurisdiction, the Court's analysis is little altered by the fiduciary shield doctrine."); Leroy-Garcia v. Brave Arts Licensing, No. C 13-01181 LB, 2013 WL 4013869, at *7 (N.D. Cal. Aug. 5, 2013) ("[T]he proper inquiry is to look specifically at the minimum contacts of the individual regardless of whether that individual was acting within his or her official capacity.").[2]

With these principles in mind, Plaintiffs' claim that "TFL's contacts should be imputed to Nelson" is incorrect under the fiduciary shield doctrine. (Doc. No. 23 at 4.) Although Plaintiffs allege that Defendants TFL and Nelson are "alter egos" of one another in their complaint, that sole conclusory allegation is factually unsupported. (Doc. No. 1 ¶ 23.) Indeed, Plaintiffs appear to abandon that position in their opposition, and instead contend that Defendant Nelson directly controlled and participated in the alleged misconduct directed at California. (Doc. No. 23 at 4.) Under this second "exception" to the fiduciary shield doctrine, Defendant TFL's contacts are not imputed to Defendant Nelson; rather, the Court examines Defendant Nelson's own individual contacts with California,

---

[2] For the sake of clarity, the Court refers to these as exceptions to the fiduciary shield doctrine, but notes that this seems to be a misnomer. Neither "exception" represents a deviation from Calder's core holding, and neither allows the type of jurisdictional overreaching the fiduciary shield doctrine aims to prevent, namely, haling an employee into court solely by virtue of his or her position in a company. Under the "alter ego" exception, if an individual and corporation are found to be alter egos, then they are no longer considered to be two legally separate entities, but rather a "consolidated entity." See Ranza v. Nike, Inc., 793 F.3d 1059, 1072 (9th Cir. 2015). Thus, the shield need not be pierced, because for purposes of personal jurisdiction, the individual and the company are one and the same. Under the "control and participate" exception, an employee's own actions are assessed for minimum contacts with the forum state. This is simply the typical specific personal jurisdiction test; if an individual participated in conduct giving rise to jurisdiction in a forum state, the first two prongs (purposeful direction and "arising out of") are met. Whether that conduct was undertaken in a personal or official capacity is irrelevant. Again, the fiduciary shield need not be pierced, as jurisdiction is being exercised on the basis of the individual's own contacts with the forum, not the contacts of his or her corporation.

whether conducted in a personal or official capacity, to determine if they are sufficient to warrant the exercise of jurisdiction over him in connection with forum-related claims. See Brown, 2008 WL 2128057, at *10 (citing Davis, 885 F.2d at 520). The Court turns to Defendant Nelson's analysis now.

### B.   Purposeful Direction

The form of the inquiry into the first prong of the specific jurisdiction test "depends on the nature of the claim at issue," and whether it sounds in contract or tort. Picot, 780 F.3d at 1212. Actions sounding in tort are assessed under the purposeful direction analysis. See id. Whether a defendant has purposefully directed his or her activities at the forum state requires application of another three-part test: "The defendant must have '(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.'" Axiom Foods, Inc. v. Acerchem Int'l, Inc., 874 F.3d 1064, 1069 (9th Cir. 2017) (quoting Washington Shoe Co. v. A-Z Sporting Goods Inc., 704 F.3d 668, 673 (9th Cir. 2012)). The primary inquiry of purposeful direction is "whether defendants have voluntarily derived some benefit from their interstate activities such that they 'will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts.'" Glob. Commodities Trading Grp., 972 F.3d at 1107 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474–75 (1985)).

Plaintiffs allege that Defendant TFL – who has not challenged this Court's jurisdiction over it – purposefully directed its activities toward California by shipping products to California residents, accepting and processing returns and complaints from California residents, and using proprietary technology to gather data on shipments to California residents in order to enhance the marketing efforts of its clients, such as the Keto Doe Defendants. (Doc. Nos. 1 ¶¶ 172–76, 189–92; 23 at 4, 6–7.) They allege Defendants TFL and Nelson knew or should have foreseen their actions would potentially cause harm in California by virtue of the California shipping addresses. (Doc. No. 1 ¶¶ 190–92.) They allege that because Defendant Nelson was personally involved in this conduct, his actions

also constitute purposeful direction toward California. Defendants TFL and Nelson do not deny Plaintiffs' contention that TFL was the fulfillment company that shipped the Keto Products to them. (Doc. No. 14-1 at 12 ("The TFL Defendants provided a product, handled returns, and offered marketing advice if requested.")) The Court agrees that shipping products to consumers with California addresses is sufficient to constitute purposeful direction; the issue remaining is the extent to which Defendant Nelson was personally involved in TFL's shipping and fulfillment services. Plaintiffs allege that Defendant Nelson directs TFL's activities with respect to Internet sellers, recruits clients for TFL at various conferences, and led efforts to customize software that would enable TFL's clients to more effectively market their products. (Doc. No. 1 ¶¶ 177, 187–88.)

Defendant Nelson denies several of the allegations in Plaintiffs' complaint and argues that Plaintiffs' claims against him arise from allegations regarding TFL, and not from any activity by him personally. (Doc. No. 13-1 at 5.) Defendant Nelson states in his declaration that he does not individually ship products to California. (Doc. No. 13-2 Nelson Decl. ¶ 18.) He states he does not individually process returns or handle customer complaints. (Id. ¶¶ 15–16, 18.) He states that he has not individually assisted any marketers/branders with affiliate marketing and advertising and has not "personally assisted any alleged 'Keto Doe Defendants' in advising them on their 'scam.'" (Id. ¶¶ 17, 19.) He states he does not individually provide any white label products for wholesale purchase, or "provide any fulfillment services consisting of labeling, packaging, product returns, or other services related to the 'Keto Doe Defendants' or otherwise." (Id. ¶ 15.) He also makes conclusory statements that he has not "expressly aimed" any activities to California or "individually availed" himself of the California market. (Id. ¶¶ 14, 20.) Some of these statements are in conflict with Plaintiffs' allegations, such as that Defendant Nelson "specifically directs TFL's activities with respect to Internet scammers." (Doc. No. 1 ¶ 187.) As Plaintiffs point out in their opposition, these denials are solely limited to Defendant Nelson's individual actions (i.e., "I have not and do not, individually, ship any products to California"), (Doc. No. 13-2 Nelson Decl. ¶ 18), and do not wholly contradict

13

Plaintiffs' allegations that he directed and/or otherwise participated in the alleged activities. (Doc. No. 23 at 4.) However, it is unnecessary to parse the exact phrasing of Defendant Nelson's denials, as he does not deny his involvement in developing TFL's proprietary software, and the Court concludes this is a sufficient basis on which to conclude he personally participated and/or controlled TFL's fulfillment and shipping services. See Coastal Abstract Serv., 173 F.3d at 734.

Defendant Nelson does not deny Plaintiffs' contention that he was involved in developing TFL's fulfillment website and software. He argues that creating a website is insufficient to establish purposeful direction. (Doc. No. 13-1 at 5.) Plaintiffs allege Defendant Nelson is personally responsible for developing TFL's specialized software designed to harvest data about the customers it ships products to, which is then used to improve the ordering, marketing, and advertising initiatives of TFL's clients. (Doc. No. 1 ¶ 175; 23 at 2–3.) Defendant Nelson's LinkedIn profile states that "[TFL] is more than a shipping company. We are a technology company that happens to have global fulfillment capabilities . . . [which] help the advertiser grow their business by leveraging state of the art software, global real time inventory, backorder prevention tools, and customized integrations." (Doc. No. 23-2 Ex. 1.) "Rick Nelson . . . has developed technology that helps ecommerce sellers present a more complete package to their customers." (Id. Ex. 2.) Among other capabilities, TFL's software "take[s] the address information [and] any marketing information they have collected about the buyer – their state, their age, their birthday, if they are repeat buyers — and [] can set up shipping profiles and [] make specific decisions about the packaging to better relate to that end consumer." (Id.) The software – referred to in an article on TFL's website as Defendant Nelson's "own proprietary software, Global Fulfillment Software" – "take[s] data from the front end of the sales funnel to gain more data on end-consumer purchases." (Id. Ex. 4.) Through the software "create[d]" by Defendant Nelson, TFL can "customize packaging based on the profile of their consumer . . . based on the state from which they're purchasing, [] etc." for their clients (Id. Ex. 5.) "Instead of every consumer getting the same brown box regardless of

what they're buying, The Fulfillment Lab can . . . tailor the shipment based on the criteria their client has laid out." (Id.)

Given the above, and taking the allegations in Plaintiffs' complaint as true, the Court concludes that Plaintiffs have made a prima facie showing that Defendant Nelson committed intentional acts, that the acts were targeted at Plaintiffs and other consumers in California, and that Nelson knew that economic loss could be suffered in California. See Dole Food Co. v. Watts, 303 F.3d 1104, 1111 (9th Cir. 2002). Plaintiffs have alleged that the software developed by Defendant Nelson gathered data on TFL's shipping and fulfillment services and used that data to improve subsequent shipments and fulfillment activities, such as by customizing and targeting packaging and other product attributes based on a consumer's state. This is sufficient for a prima facie showing of Defendant Nelson's personal involvement in TFL's shipping and other fulfillment services. Though Defendant Nelson may not have "individually shipp[ed] any products to California," he directly controlled and participated in other aspects of TFL's shipping and fulfillment services, namely, developing the software that allows TFL's clients to customize their products based on attributes of consumers, including based on where they live. His declaration does not contradict Plaintiffs' allegations regarding his extensive involvement with the development of software that is central to TFL's shipment and fulfillment services.

Because the Court assumes the truth of Plaintiffs' allegations and resolves factual conflicts in Plaintiffs' favor at this stage of the proceedings, the Court concludes Plaintiffs have alleged sufficient facts and offered sufficient evidence to make a prima facie showing that Defendant Nelson directly participated in the alleged misconduct purposefully directed at California.

### C.  Arising Out of Forum-Related Activities

To demonstrate that its claims "arise out" of forum-related activities, a "Plaintiff[] must show that [it] would not have suffered an injury 'but for' [the Defendant's] forum related conduct." Myers v. Bennett Law Offices, 238 F.3d 1068, 1075 (9th Cir. 2001); see also Menken v. Emm, 503 F.3d 1050, 1058 (9th Cir. 2007). The Court concludes this

requirement is satisfied. Plaintiffs' injuries arise out of their experiences with products that were shipped to them by Defendant TFL. Defendant Nelson developed software to enable fulfillment services customized to and targeted at California consumers; as a result of these services, Plaintiffs – California consumers – suffered injuries. The Court concludes that Plaintiffs have met their burden to establish the first two elements of the test for specific personal jurisdiction. The Court next considers whether Defendant Nelson has met his burden of establishing that exercising jurisdiction in this case would be unreasonable.

### D. Reasonableness

Once a plaintiff has established the first two elements, the burden shifts to the defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King, 471 U.S. at 477. The Ninth Circuit applies a seven-part balancing test to determine whether a case satisfies the "fair play and substantial justice" element:

> (1) the extent of the defendants' purposeful injection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

Dole Food Co., 303 F.3d at 1114. On these factors, Defendant Nelson argues that the burden on him to defend a suit in California is substantial, as he is a Florida resident, and did not purposefully interject himself into California. (Doc. No. 13-1 at 6–7.) After reviewing the above factors, the Court concludes Defendant Nelson has not met his burden to present a compelling case that exercising personal jurisdiction in this case would be unreasonable. In sum, the Court denies Defendant Nelson's motion to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction.[3]

---

[3]   Because the Court concludes that it has specific personal jurisdiction over Defendant Nelson, the Court declines to analyze Plaintiffs' argument that RICO's nationwide service provision provides a separate basis for personal jurisdiction.

## II.   Whether Plaintiffs' Class Action Allegations Should Be Stricken Under Rule 12(f)

Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "[T]he function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." Sidney–Vinstein v. A.H. Robins Co., 697 F.2d 880, 885 (9th Cir. 1983). Motions to strike are "generally regarded with disfavor because of the limited importance of pleading in federal practice, and because they are often used as a delaying tactic." Kohler v. Islands Restaurants, LP, 280 F.R.D. 560, 563–64 (S.D. Cal. 2012). In reviewing a motion to strike, the court must view the pleadings in the light most favorable to the non-moving party. See Wailua Assocs. v. Aetna Cas. & Sur. Co., 183 F.R.D. 550, 554 (D. Haw. 1998); PHL Variable Ins. Co. v. Clifton Wright Family Ins. Trust, No. 09CV2344 BTM (POR), 2010 WL 1445186, at *1 (S.D. Cal. Apr. 12, 2010).

Plaintiffs seek to certify a nationwide class and a California subclass for all consumers who "were billed for the Keto Products." (Doc. No. 1 ¶¶ 195–96.) Defendant Beyond Global contends that Plaintiffs' class action allegations should be stricken on two grounds: (1) the material differences in the putative class members' respective state laws make it impossible under Mazza v. American Honda Motor Co., Inc., 666 F.3d 581 (9th Cir. 2012) for Plaintiffs to certify a nationwide class for their non-RICO claims, and (2) both of Plaintiffs' class definitions improperly include individuals who did not see or rely on the allegedly misleading advertisements or representations at issue, and therefore are not ascertainable. (Doc. No. 15-1 at 1, 8–15.) The Court rejects both of these arguments.

"California's choice-of-law rules require a case-by-case analysis of whether there are material differences between the laws of the relevant states and, if so, which state's interest would be most impaired by application of the other state's law." Kanfer v. Pharmacare US, Inc., 142 F. Supp. 3d 1091, 1107–08 (S.D. Cal. 2015) (citing Mazza, 666 F.3d at 590). "Numerous courts have rejected the argument that Mazza (which did not

address a motion to dismiss) requires dismissal of nationwide-class claims at the pleading stage, particularly where, as here, the defendants do not engage in a full analysis of the differences between various states' laws or of various states' competing interests." Kellman v. WFM Private Label, L.P., No. 17-CV-06584-LB, 2019 WL 1429576, at *10 (N.D. Cal. Mar. 29, 2019); see, e.g., Hofmann v. Fifth Generation, Inc., No. 14-cv-2569 JM (JLB), 2015 WL 5440330, at *10 (S.D. Cal. Mar. 18, 2015); Czuchaj v. Conair Corp., No. 13-CV-1901-BEN (RBB), 2014 WL 1664235, at *9 (S.D. Cal. Apr. 18, 2014); Bruton v. Gerber Prods. Co., No. 12-CV-02412-LHK, 2014 WL 172111, at *13 (N.D. Cal. Jan. 15, 2014). The Court similarly concludes Defendant Beyond Global's motion to strike or dismiss the putative nationwide class claims under Mazza is premature at the pleading stage.

The cases cited by Defendant Beyond Global, where courts did conduct a complete choice-of-law analysis at the pleading stage, are inapposite, as they involved non-California residents asserting that California law should be applied nationwide. See Davison v. Kia Motors Am., Inc., No. SACV 15-00239-CJC, 2015 WL 3970502, at *3 (C.D. Cal. June 29, 2015) (holding it was evident that "every state would be impaired in its ability to protect the consumers within its borders if California law were applied to all claims of the nationwide class" as plaintiff was a Washington resident and did not allege she was wronged in California); Frezza v. Google Inc., No. 5:12-CV-00237-RMW, 2013 WL 1736788, at *5 (N.D. Cal. Apr. 22, 2013) (holding it was "readily apparent" that plaintiffs' UCL claims were precluded under Mazza because the transactions at issue occurred in the plaintiffs' state of North Carolina). Here, both Plaintiffs are residents of California and allege their injuries happened in California. (Doc. No. 1 ¶¶ 17, 19.) Thus, for now, the Court declines to strike or dismiss Plaintiffs' claims on this basis. See Kanfer, 142 F. Supp. 3d at 1107–08 ("[W]hether the differences in law are truly material is better suited for resolution at class certification or on a motion for summary judgment, when the Court will have the benefit of a more developed factual record."); Kellman, 2019 WL 1429576, at *10.

Defendant Beyond Global's second contention is that Plaintiffs have not alleged an ascertainable class because the class definition allegedly includes individuals who would lack standing. The Court again concludes this argument is premature. Numerous courts have determined that motions to strike class allegations "are disfavored because a motion for class certification is a more appropriate vehicle for arguments about class propriety." Mason v. Ashbritt, Inc., No. 18-CV-07181-DMR, 2020 WL 789570, at *8 (N.D. Cal. Feb. 17, 2020) (quoting Covillo v. Specialtys Café, No. 11-cv-00594-DMR, 2011 WL 6748514, at *6 (N.D. Cal. Dec. 22, 2011)); see, e.g., Dittmar v. Costco Wholesale Corp., No. 14CV1156-LAB (JLB), 2016 WL 3387464, at *1 (S.D. Cal. June 20, 2016) ("In the absence of discovery and the presentation of specific arguments from both parties concerning class certification, the Court lacks sufficient information to rule on the propriety of the class allegations. The allegations in the complaint are sufficient to survive [the] motion to dismiss."); Cholakyan v. Mercedes–Benz USA, LLC, 796 F. Supp. 2d 1220, 1246 (C.D. Cal. 2011) (finding that a motion to strike class allegations was premature where defendant had not filed an answer and discovery had not begun). "Courts that have permitted such motions 'have held that a motion to strike class claims based only on the pleadings is proper only if the court is convinced that any questions of law are clear and not in dispute, and that under no set of circumstances could the claim or defense succeed.'" Mason, 2020 WL 789570, at *8 (quoting Parducci v. Overland Sols., Inc., No. 18-cv-07162-WHO, 2019 WL 3220282, at *4 (N.D. Cal. July 17, 2019) (internal quotations omitted)). That is not the case here.[4] Accordingly, the Court denies Defendant Beyond Global's motion to strike Plaintiffs' class allegations.

---

[4] Indeed, although this is not the proper time to raise the issue, the Court notes that Defendant Beyond Global's standing argument is based upon Second Circuit caselaw that does not appear to be good law in the Ninth Circuit. See Ramirez v. TransUnion LLC, 951 F.3d 1008, 1023 (9th Cir. 2020) ("[O]nly the representative plaintiff need allege standing at the motion to dismiss and class certification stages."); Mays v. Wal-Mart Stores, Inc., 804 F. App'x 641, 643 (9th Cir. 2020) ("At the class certification stage, our standing analysis focuses solely on the class representative.").

**III.    Whether Plaintiffs' Complaint Satisfies Rule 12(b)(6)**

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Rule 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." Manzarek v. St. Paul Fire & Marine Ins. Co., 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." In re Gilead Scis. Secs. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001)). The Court also need not accept as true allegations that contradict matters properly subject to judicial notice or allegations contradicting the exhibits attached to the complaint. Sprewell, 266 F.3d at 988.

Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" DeSoto v. Yellow Freight Sys., Inc., 957 F.2d 655, 658 (9th Cir. 1992) (quoting Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986)). In other words, where leave to amend would be futile, the Court may deny leave to amend. See DeSoto, 957 F.2d at 658; Schreiber, 806 F.2d at 1401.

**A.    Whether the Complaint States Claims For Aiding and Abetting and Civil Conspiracy**

For their seventh and eighth causes of action, Plaintiffs allege claims for aiding and abetting and civil conspiracy, respectively, against all Defendants. (Doc. No. 1 ¶¶ 360–75.) But "[u]nder California law, there is no separate and distinct tort cause of action for civil conspiracy" or aiding and abetting. Nat. Alternatives Int'l, Inc. v. Allmax Nutrition, Inc., 258 F. Supp. 3d 1170, 1187 (S.D. Cal. 2017) (quoting Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc., 122 F.3d 1211, 1228 (9th Cir. 1997)); see Montoya v. Countrywide Bank, F.S.B., No. C09-00641JW, 2009 WL 1813973, at *12 (N.D. Cal. June 25, 2009) ("Civil conspiracy, aiding and abetting, . . . are not independent claims."). Rather, they are legal doctrines that impose indirect liability on individuals who may not have actually committed the underlying tort themselves. See Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 869 P.2d 454, 457 (Cal. 1994); Newton v. Am. Debt Servs., Inc., No. C-11-3228 EMC, 2013 WL 5592620, at *4 (N.D. Cal. Oct. 10, 2013).

Plaintiffs' current complaint pleads aiding and abetting and conspiracy as independent causes of action, not as theories of liability, and thus those "claims" must be dismissed. Allegations regarding the manner in which Defendants aided and abetted and/or conspired to engage in unfair competition, false advertising, and the other alleged misconduct should be pled with respect to each substantive cause of action, not in a conclusory manner as a standalone cause of action. (See Doc. No. 1 ¶ 371 ("All of the Defendants (collectively, 'the Conspirators') formed a conspiracy to commit the tortious and unlawful conduct described herein.".) As the complaint is currently pled, it would be inappropriate for the Court to engage in a comprehensive analysis of whether conspiracy or aiding and abetting has been sufficiently alleged as a theory of liability. Should Plaintiffs amend their complaint to allege the manner in which Defendants are directly liable, aided and abetted, and/or conspired to commit each of the underlying torts, an analysis of their

respective liabilities would be appropriate.[5] In sum, the Court concludes that civil conspiracy and aiding and abetting cannot be pled as individual, standalone causes of action, and to that extent, grants the motions to dismiss Plaintiffs' seventh and eighth causes of action with prejudice. The Court also grants Plaintiffs leave to amend their complaint to replead civil conspiracy and aiding and abetting as theories by which any or all of the Defendants may be held indirectly liable for violations of the substantive causes of action.

### B.    Whether the Complaint States a Claim Under RICO

As their fifth cause of action, Plaintiffs allege all Defendants have violated RICO, and conspired to commit RICO violations. (Doc. No. 1 ¶¶ 323–48 (citing 18 U.S.C. §§ 1962(c), 1962(d)).) To maintain a civil RICO claim, a plaintiff must allege that the defendant engaged in: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity and, additionally, must establish that (5) the defendant caused injury to plaintiff's business or property." Black v. Corvel Enter. Comp Inc., 756 F. App'x 706, 708 (9th Cir. 2018) (citing 18 U.S.C. §§ 1962(c), 1964(c)). Defendant Beyond Global argues Plaintiffs have failed to sufficiently allege they engaged in a pattern of racketeering activity. (Doc. No. 15-1 at 15.) It argues Plaintiffs have not adequately alleged the existence of an enterprise, its common purpose, or Defendant Beyond Global's role in the alleged enterprise. (Doc. No. 27 at 5–6.) Defendant TFL argues Plaintiffs have failed to plausibly plead that the TFL Defendants engaged in predicate acts or other racketeering activity. (Doc. No. 14-1 at 15.) It argues Plaintiffs' allegations show no more than typical business conduct. (Doc. No. 25 at 9.) The Court agrees with Defendants that Plaintiffs have not plausibly pled their RICO claims.

---

[5]     "[I]n a situation . . . with different actors playing different parts, it is not enough to 'lump' together the dissimilar defendants and assert that 'everyone did everything.'" United States ex rel. Anita Silingo v. WellPoint, Inc., 904 F.3d 667, 677 (9th Cir. 2018) (quoting Destfino v. Reiswig, 630 F.3d 952, 958 (9th Cir. 2011)).

For purposes of a civil RICO claim, an "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). To adequately plead an associated-in-fact RICO enterprise, a plaintiff must: (1) "describe a group of persons associated together for a common purpose of engaging in a course of conduct," (2) provide "evidence of an ongoing organization, formal or informal," and (3) provide "evidence that the various associates function as a continuing unit." Odom v. Microsoft Corp., 486 F.3d 541, 549 (9th Cir. 2007) (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)); see Boyle v. United States, 556 U.S. 938, 946 (2009) ("[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."). "[A]n associated-in-fact enterprise under RICO does not require any particular organizational structure." Odom, 486 F.3d at 551 (overruling Chang v. Chen, 80 F.3d 1293 (9th Cir. 1996)); see Boyle, 556 U.S. at 948 ("Such a group need not have a hierarchical structure or a 'chain of command.'"). However, "[s]imply characterizing routine commercial dealing as a RICO enterprise is not enough." Gardner v. Starkist Co., 418 F. Supp. 3d 443, 461 (N.D. Cal. 2019); see Shaw v. Nissan N. Amer., Inc., 220 F. Supp. 3d 1046, 1054 (C.D. Cal. 2016) ("[C]ourts have overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises."); Gomez v. Guthy–Renker, LLC, No. 14-cv-01425-JGB, 2015 WL 4270042, at *11 (C.D. Cal. Jul. 13, 2015) ("RICO liability must be predicated on a relationship more substantial than a routine contract between a service provider and its client."). Plaintiffs must "do '[s]omething more' to 'render [their] allegations plausible within the meaning of Iqbal and Twombly.'" Eclectic Properties East, LLC v. Marcus & Millichap Co., 751 F.3d 990, 999 (9th Cir. 2014) (quoting In re Century Aluminum Co. Sec. Litig., 729 F.3d 1104, 1108 (9th Cir. 2013)).

"'Racketeering activity, the fourth element, requires predicate acts,' often – as here – mail and wire fraud." Monterey Bay Military Hous., LLC v. Ambac Assurance Corp.,

No. 17-CV-04992-BLF, 2019 WL 4888693, at *12 (N.D. Cal. Oct. 3, 2019) (quoting Eclectic Properties, 751 F.3d at 997). "Where, as here, the racketeering activity alleged is fraud, . . . the heightened pleading requirements of Rule 9(b) apply to the predicate acts." Shaw, 220 F. Supp. 3d at 1053; see Doan v. Singh, 617 F. App'x 684, 685 (9th Cir. 2015) ("RICO fraud allegations are subject to the heightened pleading standard of Rule 9(b)."). "In the RICO context, a Plaintiff must 'detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme.'" Shaw, 220 F. Supp. 3d at 1053 (citing Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist., 940 F.2d 397, 405 (9th Cir. 1991)). "The mail and wire fraud statutes are identical except for the particular method used to disseminate the fraud, and contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud." Monterey Bay, 2019 WL 4888693, at *12 (quoting Eclectic Properties, 751 F.3d at 997). "The intent to defraud may be inferred from a defendant's statements and conduct." Eclectic Properties, 751 F.3d at 997 (quoting United States v. Peters, 962 F.2d 1410, 1414 (9th Cir. 1992)). "In the absence of direct evidence of intent, the party asserting fraud must first prove 'the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension,' and then, 'by examining the scheme itself' the court may infer a defendant's specific intent to defraud." Id. (quoting United States v. Green, 745 F.2d 1205, 1207 (9th Cir. 1984)). "When companies engage in [] transactions that are facially legitimate . . . a significant level of factual specificity is required to allow a court to infer reasonably that such conduct is plausibly part of a fraudulent scheme." Id. at 997–98.

Plaintiffs allege the existence of: (1) an associated-in-fact "Keto Enterprise," made up of "all the Defendants . . . including The Fulfillment Lab Inc., Richard Nelson, Beyond Global Inc., and the currently unknown John Does / Keto Doe Defendants," (Doc. No. 1 ¶ 328), and (2) the "TFL Enterprise," made up of Defendant TFL and directed by Defendant Nelson, (id. ¶¶ 330–31). Defendants allegedly operated the Keto Enterprise through multiple related acts of mail fraud, wire fraud, and bank fraud, and Defendant

Nelson conducted Defendant TFL's affairs through multiple related acts of mail fraud, wire fraud, and bank fraud. (Id. ¶¶ 329, 331.) The predicate acts of mail and wire fraud had a "common purpose to defraud victims purchasing the Keto Products." (Id. ¶ 337.) The predicate acts of mail fraud were allegedly committed when the TFL Defendants "shipp[ed] products through the mail system to unwitting victims of the scheme with the intent to fraudulently bill them for those products . . . and accepting return packages." (Id. ¶¶ 275, 337, 340.) The predicate acts of wire fraud were allegedly committed when the "Defendants transmitted written communications by means of wire as part of their scheme to defraud, in particular through Internet advertisements, their websites, through telephone communications with consumers . . . and through telephone or Internet communications to banks and credit card companies." (Id. ¶¶ 268, 337.) Finally, the predicate acts of bank fraud were allegedly committed when Defendants fraudulently obtained money that was under the custody or control of Plaintiffs' respective financial institutions through the use of "false front" websites. (Id. ¶¶ 260, 338.) Plaintiffs allege the TFL Defendants had knowledge of the Keto Doe Defendants' fraudulent advertising by virtue of investigations by the Better Business Bureau and local news authorities, the numerous returns and complaints from customers who purchased Keto Products, and TFL's assistance with its clients' advertising campaigns. (Id. ¶¶ 159–61, 172–80.) Plaintiffs allege "the Keto Doe Defendants committed [predicate acts] from at least February 2018 to the present," and that "[o]n information and belief, the Keto Doe Defendants consulted with the TFL Defendants on a routine basis, and the TFL Defendants provided a menu of services enabling the Keto Doe Defendants to further commit the predicate acts." (Id. ¶¶ 335, 342.) They allege the predicate acts affected interstate commerce, and that the Defendants' RICO violations were the but-for cause and proximate cause of their concrete financial injuries. (Id. ¶¶ 344–47.)

The Court concludes Plaintiffs have not pled sufficient specific facts that move their RICO allegations from the realm of the possible to the plausible. See Shaw, 220 F. Supp. 3d at 1057; see also Doan, 617 F. App'x at 686 (rejecting RICO claim because it was not clear from plaintiffs' allegations "what exactly each individual did, when they did it, or

how they functioned together as a continuing unit."). This case is similar to <u>Gardner v.</u> <u>Starkist Co.</u>, where the court found plaintiffs had sufficiently stated claims for violations of California's consumer protection and false advertising laws but had failed to state a civil RICO claim. 418 F. Supp. 3d at 460. The plaintiffs alleged the enterprise was made up of entities "that ha[d] all conducted business with StarKist," and that "the purpose of the enterprise was to fraudulently market, advertise, and label StarKist tuna products as sustainably sourced and dolphin-safe in order to deceive consumers and retailers." <u>Id.</u> They alleged that Starkist and its co-conspirators "concocted a scheme . . . to falsely represent [to the public], in various pieces of mail, through wires, and on the Internet, that StarKist tuna products were dolphin-safe." <u>Id.</u> The court agreed with defendants that plaintiffs had "merely identif[ied] a number of entities StarKist allegedly engage[d] in business with and conclusorily state[d] that each of them 'knew' StarKist would falsely label its tuna as dolphin-safe." <u>Id.</u> at 461. The court noted that "describ[ing] the business interactions between StarKist and RICO Co-conspirators and then assert[ing] that these business interactions were done fraudulently and that the co-conspirators knew that StarKist was fraudulently advertising its tuna as dolphin-safe" was insufficient to plausibly allege the existence of a RICO enterprise. <u>Id.</u> at 461–62.

Other courts have dismissed complaints containing allegations of ordinary business transactions for failing to plausibly allege RICO violations. In <u>Shaw</u>, the court held that plaintiffs' complaint "only demonstrate[d] that the parties 'are associated in a manner directly related to their own primary business activities.'" 220 F. Supp. 3d at 1057 (citing <u>In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab.</u> <u>Litig.</u>, 826 F. Supp. 2d 1180, 1202 (C.D. Cal. 2011)). The court distinguished plaintiff's complaint from other cases where complaints "include[] pages of references to specific communications [that] show[] the defendants acting as an enterprise and engag[ing] in a collaborative scheme to defraud." <u>Id.</u> at 1056. Similarly, in <u>In re Jamster Mktg. Litig.</u>, the court held the plaintiffs "f[e]ll short of providing the particularized allegations required by Rule 9(b)." No. 05CV0819 JM(CAB), 2009 WL 1456632, at *6 (S.D. Cal. May 22, 2009).

The court concluded that unlike prior cases involving allegations that defendants "actively worked together in an indispensable and integrated manner to mutually engage in wrongful acts," plaintiffs' complaint "fail[ed] to establish that Wireless Providers and Content Providers acted with a common purpose to accomplish the alleged fraudulent scheme." Id. (citing Odom, 486 F.3d 541). It noted that "[t]he challenge for Plaintiffs is to set forth sufficient allegations to distinguish ordinary business conduct from fraudulent conduct." Id. at *5. Generally, whether a RICO claim survives a motion to dismiss depends in part on if it is supported by specific factual allegations that enable courts to rule out the innocent explanation in favor of plaintiff's fraudulent scheme hypothesis. See Eclectic Properties, 751 F.3d at 998–99 (rejecting RICO claim when "[a]ll of the facts Plaintiffs have presented are consistent with both their theory of liability and this innocent alternative"); In re Outlaw Lab., LP Litig.., No. 18-CV-840-GPC-BGS, 2020 WL 5552558, at *15 (S.D. Cal. Sept. 16, 2020) (distinguishing case at hand – which involved demand letters sent solely for fraudulent purposes – from cases in which "allegations or facts did not provide a basis from which to find the RICO members acted in concert to do anything more than perform routine commercial activities"); In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig., 295 F. Supp. 3d 927, 981 (N.D. Cal. 2018) (noting that the device identified by plaintiffs as fraudulent "plausibly had only a deceitful purpose" and thus was "not developed by accident or as part of routine business dealings").

Here, Plaintiffs' allegations are conclusory and insufficient to plausibly establish a RICO claim. Plaintiffs identify business transactions between the Defendants which, if carried out with a common purpose and as part of a continuing unit, could constitute a RICO enterprise. They identify actions taken by the Defendants which, if carried out with the requisite fraudulent intent, could constitute predicate acts. But Plaintiffs fail to plead sufficient allegations, much less with the requisite particularity, that Defendants possessed the knowledge, intent, coordination, longevity, etc. to allow the Court to reasonably infer that their facially legitimate conduct constitutes a RICO violation. See Eclectic Properties, 751 F.3d at 997–98; In re Jamster Mktg. Litig., 2009 WL 1456632, at *5. Because Plaintiffs

have failed to state a claim for a violation of RICO under § 1962(c), the Court concludes that their RICO conspiracy claim must also fail.[6] In sum, the Court grants the Defendants' motions to dismiss Plaintiffs' RICO cause of action.

## C. Whether the Complaint States Claims Under California's CLRA, FAL, and UCL

As their first, second, third, and fourth causes of action, Plaintiffs bring claims under several of California's consumer protection laws. (Doc. No. 1 ¶¶ 208–322.) The Consumer Legal Remedies Act provides a cause of action to consumers who suffer any damage as a result of "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code §§ 1770(a), 1780(a). The CLRA is intended to "be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices." Cal. Civ. Code § 1760. California's False Advertising Law makes it unlawful to engage in "untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17500. California's Unfair Competition Law generally prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. "[A] plaintiff may proceed under the UCL on three possible theories. First, 'unlawful' conduct that violates another law is independently actionable under Section 17200. Alternatively, a plaintiff may plead the defendants' conduct is 'unfair' within the meaning of the several standards developed by the courts. Finally, a plaintiff may challenge 'fraudulent' conduct by showing that 'members of the public are likely to be deceived' by the challenged business acts or practices." Stewart v. Screen Gems-EMI Music, Inc., 81 F. Supp. 3d 938, 967 (N.D. Cal. 2015) (internal citations omitted).[7]

---

[6]   See Religious Tech. Ctr. v. Wollersheim, 971 F.2d 364, 367 n.8 (9th Cir. 1992) ("Because we find that [plaintiff] has failed to allege the requisite substantive elements of RICO, the conspiracy cause of action cannot stand.").

[7]   Plaintiffs bring claims under all three prongs of the UCL. In its motion, Defendant Beyond Global does not make an argument specific to the "unlawful" prong. (Doc. No. 15-1 at 17–18.) Defendant TFL only briefly addresses Plaintiffs' allegation that Defendants violated the federal Food, Drug, and Cosmetic

"[C]laims under these California statutes [CLRA, FAL, and UCL] are governed by the 'reasonable consumer' test." <u>Williams v. Gerber Prod. Co.</u>, 552 F.3d 934, 938 (9th Cir. 2008) (citing <u>Freeman v. Time, Inc.</u>, 68 F.3d 285, 289 (9th Cir. 1995)). Under this test, "conduct is deceptive or misleading if it is likely to deceive an ordinary consumer." <u>Peviani v. Nat. Balance, Inc.</u>, 774 F. Supp. 2d 1066, 1070 (S.D. Cal. 2011) (citing <u>Gerber Prod.</u>, 552 F.3d at 938). "The California Supreme Court has recognized 'that these laws prohibit not only advertising which is false, but also advertising which . . . is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" <u>Gerber Prod.</u>, 552 F.3d at 938 (quoting <u>Kasky v. Nike, Inc.</u>, 45 P.3d 243, 250 (Cal. 2002) (internal quotations omitted)). Additionally, actual reliance is required to have standing to sue under the CLRA, FAL, and UCL. <u>See</u> <u>Peviani</u>, 774 F. Supp. 2d at 1070 (citing <u>Kwikset Corp. v. Sup. Ct.</u>, 246 P.3d 877, 888 (Cal. 2011)); <u>In re Ferrero Litig.</u>, 794 F. Supp. 2d 1107, 1111 (S.D. Cal. 2011).

Rule 9(b)'s heightened pleading standard applies to UCL, FAL, and CLRA causes of actions where, as here, they are "grounded in fraud" or "sound in fraud." <u>See</u> <u>Kearns v. Ford Motor Co.</u>, 567 F.3d 1120, 1125 (9th Cir. 2009); <u>Elias v. Hewlett-Packard Co.</u>, 903 F. Supp. 2d 843, 853 (N.D. Cal. 2012). "Rule 9(b) demands that the circumstances constituting the alleged fraud 'be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.'" <u>Kearns</u>, 567 F.3d at 1124 (citing <u>Bly–Magee v. California</u>, 236 F.3d 1014, 1019 (9th Cir. 2001)). "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." <u>Vess v. Ciba-Geigy Corp. USA</u>, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting <u>Cooper v. Pickett</u>, 137 F.3d 616, 627 (9th Cir. 1997)). "[A] plaintiff must set forth more than the neutral facts necessary to identify

---

Act. (Doc. No. 14-1 at 13 n.5.) To survive a motion to dismiss an "unlawful" UCL claim, Plaintiffs need only plead sufficient facts to support another substantive violation. <u>See</u> <u>Aleksick v. 7–Eleven, Inc.</u>, 140 Cal. Rptr. 3d 796, 801 (Cal. Ct. App. 2012). The Court declines to dismiss Plaintiffs' CLRA and FAL claims, and thus declines to dismiss the "unlawful" prong of Plaintiffs' UCL claim as well.

the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." <u>Peviani</u>, 774 F. Supp. 2d at 1071 (quoting <u>Vess</u>, 317 F.3d at 1106). "Plaintiff must state the 'time, place, and specific content of the false representations.'" <u>Millennium Dental Techs. Inc. v. Terry</u>, No. SA CV 18-0348-DOC (KESx), 2018 WL 5094965, at *8 (C.D. Cal. July 16, 2018) (quoting <u>Schreiber</u>, 806 F.2d at 140). For claims involving omissions, "plaintiff must describe the content of the omission and where the omitted information should or could have been revealed, as well as provide representative samples of advertisements, offers, or other representations that plaintiff relied on to make her purchase and that failed to include the allegedly omitted information." <u>Marolda v. Symantec Corp.</u>, 672 F. Supp. 2d 992, 1002 (N.D. Cal. 2009).

The Court concludes that Plaintiffs' allegations satisfy Rule 9(b)'s heightened pleading requirements. Plaintiffs allege that in October and December of 2019, they viewed and clicked on advertisements for Keto Products that stated the products had been featured on Shark Tank. (Doc. No. 1 ¶¶ 49, 55, 62.) They allege that when they completed their orders, in reliance on statements published on Defendants' advertisements and website, they believed they would be receiving five bottles but only billed for three. (<u>Id.</u> ¶¶ 18–19.) Instead, they were both charged the full price of five bottles. (<u>Id.</u>) Plaintiffs assert that Defendants misled customers through misrepresentations and omissions regarding reviews and endorsements of the Keto Products, (<u>id.</u> ¶¶ 125–26), the limited supply of the products, (<u>id.</u> ¶¶ 134–36), the actual price consumers are charged for the products, (<u>id.</u> ¶¶ 127–33), and the existence of "false front" websites, (<u>id.</u> ¶¶ 137–46). Plaintiffs explain how the statements found in advertisements and on the landing pages are false or misleading: the pictured and quoted celebrities have not in fact endorsed the Keto Products in question, (<u>id.</u> ¶¶ 65–66, 68, 72), there is not actually a limited supply of Keto Products remaining, (<u>id.</u> ¶¶ 77, 84, 91), and contrary to the claim that consumers will "Buy 3 Get 2 Free," they actually are charged the full price of five products, (<u>id.</u> ¶¶ 51, 56, 93, 96). They provide numerous screenshots of the advertisements and websites displaying the alleged misrepresentations. (<u>Id.</u> ¶¶ 64–77, 82, 84, 89, 91–93, 97–100.) They allege that all

consumers who purchased Keto Products – including them – were subjected to similar or identical representations, and reasonably relied on them in making their purchase decisions. (Id. ¶¶ 62, 78, 125, 128, 133, 136.) These allegations are sufficient to place Defendants on notice of the circumstances constituting the alleged fraudulent scheme. See Loomis v. Slendertone Distribution, Inc., 420 F. Supp. 3d 1046, 1079 (S.D. Cal. 2019); Peviani, 774 F. Supp. 2d at 1071.

Defendant Beyond Global makes much of the fact that Plaintiffs admitted the specific web pages they viewed are unknown. (Doc. No. 15-1 at 1, 4, 5, 16.) It is true that Plaintiffs do not specify the exact landing pages or advertisements that they viewed, however they provide multiple examples of Keto Product advertisements and websites containing the alleged misrepresentations and omissions regarding reviews, endorsements, effectiveness, limited supply, price, etc. (Doc. No. 1 ¶¶ 64–77, 82, 84, 89, 91–93, 97–100.) They allege the advertisements and websites they viewed when making their purchases made similar or identical misrepresentations and omissions, and that other consumers purchasing Keto Products must have been exposed to them as well. (Doc. No. 1 ¶¶ 62, 78, 125, 128, 133, 136.) That is sufficient to satisfy Rule 9(b). See, e.g., In re Oreck Corp. Halo Vacuum & Air Purifiers Mktg. & Sales Practices Litig., No. ML 12-2317 CAS JEMX, 2012 WL 6062047, at *15 (C.D. Cal. Dec. 3, 2012) ("It suffices for plaintiffs to provide examples of advertisements similar to those they saw as long as all the advertisements convey the core allegedly fraudulent message."); Marolda, 672 F. Supp. 2d at 1002. Unlike the plaintiffs in the case cited by Defendant Beyond Global, who did "not specify what the exact false or misleading statements are, why the statements are false or misleading, where exactly the statements are located, or which statements plaintiffs relied on," Janney v. Mills, 944 F. Supp. 2d 806, 818 (N.D. Cal. 2013), Plaintiffs in the present case have pled all of those things. Additionally, and importantly, Plaintiffs allege that their inability to provide the exact URL and advertisements they viewed is by Defendants' design. (Doc. No. 1 ¶¶ 63, 80.) They allege Defendants deliberately delete or otherwise make the landing pages inaccessible to avoid detection (and as part of their alleged fraudulent scheme to

mislead banks and credit card companies). (Id. ¶¶ 9–10, 103–109.) It would be unfair to allow Defendants to avoid liability for false advertising by simply eliminating any trace of the false advertisements from view after successfully inducing consumers into purchasing products.

Defendant Beyond Global also argues that "Plaintiffs have failed to state with particularity any underlying wrongful conduct by Beyond Global." (Doc. No. 15-1 at 17.) This argument is conclusory and objectively incorrect.[8] Plaintiff Bavencoff alleges she purchased bottles of "Ultra Fast Keto Boost" based on advertisements and websites stating that the product was endorsed on Shark Tank, and that she would only be charged for three bottles and receive two more for free. (Doc. No. 1 ¶ 55.) The bottles of "Ultra Fast Keto Boost" she subsequently received stated they were "distributed by" Beyond Global Inc. (Id. ¶¶ 149, 169.) She was also charged $198.70, the price of all five bottles, rather than $119.22, the price of three bottles. (Id. 19.) Plaintiff Bavencoff has now brought a lawsuit against Beyond Global Inc. – the company listed on the product sent to her after she placed an order on a website containing false and misleading statements – along with the other Keto Doe Defendants, and is alleging that Beyond Global made the misrepresentations and omissions regarding reviews and endorsements of the Keto Products, (id. ¶¶ 125–26), the limited supply of the products, (id. ¶¶ 134–36), and the actual price consumers are charged for the products, (id. ¶¶ 127–33). She alleges Defendant Beyond Global told her that she would only be charged a certain amount for the products, and then actually charged her an amount 67% higher than she expected to pay. (Id. ¶ 127.) These specific allegations of wrongful conduct by Defendant Beyond Global are more than sufficient to satisfy Plaintiffs' pleading burden.

---

[8] The fact that Plaintiffs include Defendant Beyond Global as part of the Keto Doe Defendants is also not fatal to their complaint. "There is no flaw in a pleading . . . where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." United States v. United Healthcare Ins. Co., 848 F.3d 1161, 1184 (9th Cir. 2016); see WellPoint, Inc., 904 F.3d at 677 ("A good claim against one defendant did not become inadequate simply because a co-defendant was alleged to have committed the same wrongful acts.").

The Court also concludes that Plaintiffs have sufficiently alleged reliance and injury in fact. In the complaint, Plaintiffs allege that they suffered economic injuries because they would not have completed their purchases absent the misrepresentations about the endorsements, effectiveness, price, etc. (Doc. No. 1 ¶¶ 60, 229, 235, 246.) This economic injury for lost money is "a classic form of injury in fact." Kwikset, 246 P.3d at 886. Plaintiffs further allege that they suffered these injuries in fact when they purchased the Keto Products after reading and reasonably relying on the false and misleading statements contained in the advertisements and on the landing sites. (Doc. No. 1 ¶¶ 133, 136, 229, 246.) These allegations are sufficient to properly plead reliance. See Laster v. T–Mobile USA, Inc., 407 F. Supp. 2d 1181, 1194 (S.D. Cal. 2005) (stating that reliance requires that the plaintiff allege that she actually saw and read the deceptive statements). Finally, Defendant TFL argues Plaintiffs fail to plausibly allege that they relied on or suffered any injury as a result of any misrepresentation made by Defendant TFL personally. (Doc. No. 14-1 at 11–14.) As explained above, the Court has already granted Plaintiffs leave to amend their complaint to address and plead theories of indirect liability. In sum, the Court declines to dismiss Plaintiffs' CLRA, FAL, and UCL claims.

> **D.    Whether the Complaint States Claims Under Other States' Consumer Protection Laws**

Plaintiffs' sixth cause of action is brought on behalf of the nationwide class for deceptive acts and practices in violation of various states' consumer protection statutes. (Doc. No. 1 ¶ 350.) Defendant TFL asserts that this cause of action should be dismissed as "obviously deficient" and "scattershot." (Doc. No. 14-1 at 16.) The Court agrees the cause of action should be dismissed, but for a different reason. "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." D'Lil v. Best W. Encina Lodge & Suites, 538 F.3d 1031, 1035 (9th Cir. 2008) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). "For that reason, both the Supreme Court and this court have held that whether or not the parties raise the issue, '[f]ederal courts are required sua sponte to examine jurisdictional issues such as standing.'" Id. (citing Bernhardt v.

County of Los Angeles, 279 F.3d 862, 868 (9th Cir. 2001)); see The Women's Res. Network v. Gourley, 305 F. Supp. 2d 1145, 1149 (E.D. Cal. 2004) ("The Court is obligated to ensure that standing exists and to raise the issue sua sponte, if necessary."). The Court raises the issue of standing sua sponte and concludes Plaintiffs do not have standing to assert claims under the laws of states in which they do not reside.[9]

"The overwhelming majority of courts have held that Article III standing for state law claims is necessarily lacking when no plaintiff is alleged to have purchased a product within the relevant state." In re Packaged Seafood Prod. Antitrust Litig., 242 F. Supp. 3d 1033, 1095 (S.D. Cal. 2017); see, e.g., Jones v. Micron Tech. Inc., 400 F. Supp. 3d 897, 910 (N.D. Cal. 2019); Pardini v. Unilever United States, Inc., 961 F. Supp. 2d 1048, 1061 (N.D. Cal. 2013); Granfield v. NVIDIA Corp., No. C 11-05403 JW, 2012 WL 2847575, at *4 (N.D. Cal. July 11, 2012). "This is because injury in fact is not established." In re Packaged Seafood Prod., 242 F. Supp. 3d at 1095. "In the absence of a named Plaintiff who has purchased a product within the relevant state—even if there are sufficient allegations of injury under other States' or federal law—there can be no determination that an interest was harmed that was legally protected under the relevant state's laws." Id. "Thus, '[w]here . . . a representative plaintiff is lacking for a particular state, all claims based on that state's laws are subject to dismissal.'" Pardini, 961 F. Supp. 2d at 1061 (quoting Granfield, 2012 WL 2847575, at *4); see Mazza, 666 F.3d at 594 ("[E]ach class member's consumer protection claim should be governed by the consumer protection laws of the jurisdiction in which the transaction took place.")

---

[9]    Although Defendant TFL and Defendant Beyond Global do not raise the issue of Article III standing for Plaintiffs' sixth cause of action in their motions, Plaintiffs address it in their opposition to Defendant TFL's motion to dismiss, (see Doc. No. 22 at 13), perhaps because the argument was raised by the defendants in a similar case being brought by Plaintiffs' counsel that is also pending before this Court. See Tan v. QuickBox, LLC et al., No. 3:20-cv-01082-H-WVG (S.D. Cal.). Thus, the Court believes it can appropriately raise and decide this issue sua sponte without needing additional briefing from Plaintiffs. Additionally, as the Court is giving Plaintiffs leave to amend their complaint, they will have an opportunity to redress the Court's standing concerns.

Plaintiffs argue that the adoption of the "class certification" approach in <u>Melendres</u> <u>v. Arpaio</u>, 784 F.3d 1254, 1261–62 (9th Cir. 2015), means that this "is a class certification issue, not a standing issue." (Doc. No. 22 at 13.)[10] <u>Melendres</u> does not stand for the broad proposition Plaintiffs assert, nor does it dictate the outcome of this issue. The class certification approach adopted in <u>Melendres</u> "holds that once the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met." <u>Melendres</u>, 784 F.3d at 1262. "Under the class certification approach, therefore, 'any issues regarding the relationship between the class representative and the passive class members—such as dissimilarity in injuries suffered—are relevant only to class certification, not to standing.'" <u>Id.</u> Importantly, this analysis requires that a named plaintiff first have Article III standing for the relevant claims. See <u>In re Packaged Seafood Prod.</u>, 242 F. Supp. 3d at 1096; <u>see also</u> <u>DaimlerChrysler Corp. v. Cuno</u>, 547 U.S. 332, 352 (2006) (Article III must be measured claim-by-claim); <u>Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.</u>, No. 13-CV-01180-BLF, 2014 WL 4774611, at *4 (N.D. Cal. Sept. 22, 2014) ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim."). Thus, <u>Melendres</u> does not stand for the proposition that this Court must delay its consideration of standing until the class certification stage. See <u>Goldstein v. Gen. Motors LLC</u>, 445 F. Supp. 3d 1000, 1020–21 (S.D. Cal. 2020); <u>Micron Tech. Inc.</u>, 400 F. Supp. 3d at 910 ("In <u>Melendres's</u> wake, multiple opinions issuing from district courts in the Ninth Circuit, at the pleading stage of a putative class action, have dismissed sister state claims based on the named plaintiff's standing."). Additionally, <u>Melendres</u> is factually distinct from the present case,

---

[10]    Plaintiffs also argue that the threshold question is "whether California law can be applied nationwide" and charges that Defendants have failed to meet their threshold burden of conducting a choice-of-law analysis. (Doc. No. 22 at 12.) Plaintiffs are incorrect. The threshold question is whether they have standing to assert claims under the laws of states where they do not reside. The potential application of California's laws to a nationwide class under a subsequent choice-of-law analysis is relevant to a different issue that was already addressed by this Order. See <u>supra</u> Section II.

as it "did not confront a situation where named plaintiffs brought claims under the laws of multiple states where they did not reside and where they were not injured." <u>Micron Tech. Inc.</u>, 400 F. Supp. 3d at 909.

The Court has an obligation to raise standing issues sua sponte, and Plaintiffs must show they have standing for each claim they raise. Plaintiffs are residents of California, and do not allege they engaged in the transactions at issue or were injured in any state other than California. (Doc. No. 1 ¶¶ 17, 19.) Plaintiffs do not have standing to bring claims under the laws of states where they have alleged no injury, residence, or other pertinent connection. <u>See</u> <u>Pardini</u>, 961 F. Supp. 2d at 1061; <u>see also</u> <u>In re Packaged Seafood Prod.</u>, 242 F. Supp. 3d at 1096–97. Therefore, the Court dismisses Plaintiffs' claims under non-California state laws for lack of standing.

<u>**Conclusion**</u>

For the reasons above, the Court **DENIES** Defendant Nelson's 12(b)(2) motion to dismiss for lack of personal jurisdiction. The Court **GRANTS IN PART AND DENIES IN PART** Defendant TFL's motion to dismiss, and **GRANTS IN PART AND DENIES IN PART** Defendant Beyond Global's motion to dismiss. The Court **DENIES** Defendant Beyond Global's 12(f) motion to strike Plaintiffs' class action allegations. The Court declines to dismiss Plaintiffs' CLRA, FAL, and UCL claims. The Court dismisses Plaintiffs' civil conspiracy, aiding and abetting, RICO, and non-California state consumer protection law claims. Dismissal is with leave to amend, except as otherwise stated above, but only if the Amended Complaint cures the defects identified by the Court in this Order. Plaintiffs may file an Amended Complaint consistent with the above analysis within thirty (30) days of the date on which this Order is electronically docketed.

**IT IS SO ORDERED.**

DATED: December 8, 2020

_____
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT