1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

JANET SIHLER, individually and on
behalf of all others similarly situated;
CHARLENE BAVENCOFF,
individually and on behalf of all
others similarly situated,

                              Plaintiffs,

v.

THE FULFILLMENT LAB, INC;
RICHARD NELSON; BEYOND
GLOBAL INC.; and DOES 1-10,

                              Defendants.

Case No.: 3:20-cv-01528-H-MSB

**ORDER DENYING DEFENDANTS'
MOTION TO DISMISS
PLAINTIFFS' CLRA, FAL, UCL,
AND RICO CLAIMS AND
GRANTING DEFENDANTS'
MOTION TO DISMISS
PLAINTIFFS' NON-CALIFORNIA
CONSUMER PROTECTION STATE
LAW CLAIMS**

[Doc. No. 38.]

On January 7, 2021, Plaintiffs Janet Sihler and Charlene Bavencoff filed their First Amended Complaint ("FAC") alleging Defendants The Fulfillment Lab, Inc. ("TFL"), Richard Nelson, and Beyond Global Inc. had violated numerous consumer protection laws. (Doc. No. 32.) On February 22, 2021, Defendants TFL, Richard Nelson, and Beyond Global Inc. filed a motion to dismiss Plaintiffs' FAC for failure to state a claim. (Doc. No. 38.) Plaintiffs filed their opposition on March 22, 2021. (Doc. No. 41.) Defendants filed their reply on March 29, 2021. (Doc. No. 43.) On March 29, 2021, the Court took the matter under submission. (Doc. No. 44.) For the reasons that follow, the Court denies in part and grants in part Defendants' motion to dismiss.

**Background**

The following facts are taken from Plaintiffs' class action complaint. This lawsuit involves an alleged fraudulent scheme in which the Defendants allegedly use fake celebrity endorsements and reviews and misrepresentations about price and limited availability to induce consumers into purchasing weight-loss pills branded "Ultra Fast Keto Boost" and "Instant Keto" (collectively, "Keto Products"). (Doc. No. 32 ¶¶ 8–12.) The Defendants allegedly subsequently charge consumers more than they originally agreed to pay, make it difficult or impossible to return the products or receive a refund, and operate "false front" websites to mislead banks and credit card companies investigating chargebacks. (Id.)

## I. Plaintiffs' Experiences With The Keto Products

In December 2019, Plaintiff Janet Sihler, a California resident, saw an advertisement for a weight loss product called "InstaKeto" as she was browsing the Internet. (Id. ¶ 48.) The advertisement claimed the product was featured on Shark Tank. (Id.) She clicked on the advertisement, which took her to a website (which Plaintiffs refer to as a "hidden" landing page). (Id.) She selected the "Buy 3 bottles, Get 2 free" promotion with the expectation that she would be billed for three bottles of the product at $39.74 each, and receive two additional bottles for free, for a total purchase price of $119.22. (Id. ¶ 17.) Instead, her debit card was charged for $198.70, the price of all five bottles. (Id.) She received five bottles branded "Instant Keto" a few days later. (Id. ¶ 51.) Plaintiff Sihler called the customer service telephone number to request a refund. (Id. ¶ 53.) The representative told her she would have to ship the bottles back at her own expense to obtain a partial refund; Plaintiff Sihler did not receive any money back. (Id.) Plaintiff Sihler's debit card was charged by the merchant account "VYA*KETOBOOST 8889700695 Port Orange FL." (Id. ¶ 50.) The "Instant Keto" bottles stated they were distributed by "Instant Keto Boost" and listed "www.instantketoboost.com" as the product's website. (Id. ¶ 168.)

In October 2019, Plaintiff Charlene Bavencoff, a California resident, saw an advertisement on Facebook for a weight-loss product called "Ultra Fast Keto Boost." (Id. ¶ 54.) She clicked the advertisement, which brought her to a page that claimed the product

was endorsed on Shark Tank. (Id.) She also selected the "Buy 3 bottles, Get 2 free" promotion with the expectation that she would be billed for three bottles of the product at $39.74 each, and receive two additional bottles for free, for a total purchase price of $119.22. (Id. ¶ 18.) Instead, her credit card was charged for $198.70, the price of all five bottles. (Id.) After receiving the product and deciding it did not work, Plaintiff Bavencoff called the customer service number listed on the packing slip, but the number was disconnected. (Id. ¶¶ 19, 57.) She also has not recovered any money. (Id.) Plaintiff Bavencoff's credit card was charged by the merchant account "UltraFast Keto Boost 8444-7041211NV." (Id. ¶ 55.)

## II.   The Alleged Fraudulent Scheme

Plaintiffs allege Defendants' fraudulent scheme operates as follows. False claims about the effectiveness of the Keto Products, as well as fake celebrity or TV show endorsements, are allegedly used to induce consumers into clicking onto product advertisements. (Id. ¶¶ 61–77, 97.) The advertisement "funnels" consumers to a landing page for the product, where they are presented with several purchase options, including the "Buy 3, Get 2 Free" option selected by Plaintiffs Sihler and Bavencoff. (Id. ¶¶ 81, 88–91, 98–100.) These landing pages are allegedly inaccessible to anyone who does not view the advertisements or are deleted after a few weeks or months to avoid detection. (Id. ¶¶ 62, 79.) Plaintiffs allege that the terms and conditions of purchases, including the refund and return policy, are hidden or buried on the landing page; consumers do not need to read or acknowledge the terms in order to complete their purchase. (Id. ¶¶ 84–87, 89.)

After providing their credit card information and completing their purchase, the consumers are allegedly overcharged for the full price of all five bottles of product, rather than the discounted "Buy 3, Get 2 Free" price. (Id. ¶¶ 92–95, 101.) When consumers seek to dispute the overcharge with their bank or credit card company, the Defendants allegedly present the investigators with a second website, which Plaintiffs term a "false front" website. (Id. ¶¶ 102–13.) These "false front" websites are visually similar to the landing pages consumers used to make their purchase, but the terms and conditions are clearly

stated, the false advertisements are removed, and the actual purchase prices of the different options are listed, thus deceiving the investigators into believing consumers agreed to the full terms of sale. (Id.) Additionally, the Defendants create multiple shell companies, each of whom signs up for a unique merchant account; these accounts are then rotated through customer billings to prevent any individual account from being flagged for fraud due to high levels of chargebacks. (Id.)

Plaintiffs allege the named Defendants are involved in this scheme as follows. The "Keto Doe Defendants," which includes Defendant Beyond Global, are the marketers and/or branders of the Keto Products who allegedly operate the hidden landing pages viewed by consumers as well as the false front websites provided to banks and credit card companies. (Id. ¶ 11.) The "Ultra Fast Keto Boost" bottles purchased by Plaintiff Bavencoff stated they were distributed by "Beyond Global Inc." and listed "www.thesuperbooster.com" as the product's website. (Id. ¶¶ 148, 168.) Defendant TFL, owned by Defendant Nelson, is a fulfillment company that allegedly provides generic "white label" products to the Keto Doe Defendants, assists them with marketing and advertising, distributes the products to consumers, and handles returns when customers complain. (Id. ¶¶ 11, 168–79.) Plaintiffs allege Defendant TFL is the fulfillment company for both the "Instant Keto" and "Ultra Fast Keto Boost" products, and that both products are the same white-labeled products offered by Defendant TFL. (Id. ¶¶ 168–70.) The packing slip accompanying the five bottles shipped to Plaintiff Sihler described the product as "KetoBoost" and identified the shipper as "Ultra Fast Instant Keto" with an office located at 3201 Hillsborough Avenue 153201-1378, Tampa, Florida, 33684. (Id. ¶ 52.) The packing slip accompanying the five bottles shipped to Plaintiff Bavencoff described the product as "Ultra Fast Keto Boost" and identified the shipper as "Ultra Fast Instant Keto" with an office located at 3201 Hillsborough Avenue 153201-1378, Tampa, Florida, 33684. (Id. ¶ 56.) Plaintiffs allege the Hillsborough address is for a United States Post Office that is close to the TFL headquarters. (Id. ¶ 170.)

1  ### III.  Procedural History

2       The Court's previous Order regarding Plaintiffs' original complaint granted in part

3  and denied in part the Defendants' motions to dismiss, and granted Plaintiffs leave to

4  amend most of their claims. (Doc. No. 31.) Plaintiffs' FAC seeks certification of a

5  nationwide class and a California subclass. (Doc. No. 32 ¶¶ 194–95.) They allege the

6  following causes of action: (1) violation of California's Consumer Legal Remedies Act

7  ("CLRA"); (2) violation of California's False Advertising Law ("FAL"); (3) violation of

8  the unfair and fraudulent prongs of California's Unfair Competition Law ("UCL"); (4)

9  violation of the unlawful prong of California's Unfair Competition Law; (5) civil Racketeer

10 Influenced and Corrupt Organizations ("RICO") Act violations; and (6) violation of

11 various state's consumer protection laws. (Id. ¶¶ 207–458.) By the present motion,

12 Defendants move to dismiss Plaintiffs' FAC pursuant to Rule 12(b)(6) for failure to state

13 claims upon which relief can be granted. (Doc. No. 38 at 2–3.)

14                                        **Discussion**

15 ### I.  Legal Standards

16       Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and

17 plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P.

18 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon

19 which relief can be granted under Rule 12(b)(6). "Dismissal under Rule 12(b)(6) is

20 appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to

21 support a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d

22 1097, 1104 (9th Cir. 2008). To survive a 12(b)(6) motion, a plaintiff must plead "enough

23 facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550

24 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content

25 that allows the court to draw the reasonable inference that the defendant is liable for the

26 misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

27       In reviewing the plausibility of a complaint, courts "accept factual allegations in the

28 complaint as true and construe the pleadings in the light most favorable to the nonmoving

party." <u>Manzarek v. St. Paul Fire & Marine Ins. Co.</u>, 519 F.3d 1025, 1031 (9th Cir. 2008); <u>see</u> <u>Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.</u>, 911 F.2d 242, 245 (9th Cir. 1990) ("It is well-established that questions of fact cannot be resolved or determined on a motion to dismiss for failure to state a claim upon which relief can be granted."). "The standard at this stage of the litigation is not that plaintiff's explanation must be true or even probable. The factual allegations of the complaint need only 'plausibly suggest an entitlement to relief.'" <u>Starr v. Baca</u>, 652 F.3d 1202, 1216–17 (9th Cir. 2011) (citing <u>Iqbal</u>, 556 U.S. at 681.) Nonetheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." <u>In re Gilead Scis. Secs. Litig.</u>, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting <u>Sprewell v. Golden State Warriors</u>, 266 F.3d 979, 988 (9th Cir. 2001)).

Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" <u>DeSoto v. Yellow Freight Sys., Inc.</u>, 957 F.2d 655, 658 (9th Cir. 1992) (quoting <u>Schreiber Distrib. Co. v. Serv-Well Furniture Co.</u>, 806 F.2d 1393, 1401 (9th Cir. 1986)). In other words, where leave to amend would be futile, the Court may deny leave to amend. <u>See</u> <u>DeSoto</u>, 957 F.2d at 658.

## II.   Analysis

### A.   Plaintiffs' CLRA, FAL, and UCL Claims

The Consumer Legal Remedies Act provides a cause of action to consumers who suffer "any damage" as a result of "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code §§ 1770(a), 1780(a).[1] The CLRA is intended to "be

---

[1]   Plaintiffs allege Defendants violated several CLRA provisions: § 1770(a)(2) ("Misrepresenting the source, sponsorship, approval, or certification of goods or services."); § 1770(a)(3) ("Misrepresenting the affiliation, connection, or association with, or certification by, another."); § 1770(a)(5) ("Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have.); § 1770(a)(7) ("Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."); § 1770(a)(9) ("Advertising goods or services with intent not to sell them as advertised."); § 1770(a)(13) ("Making false

liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices." Cal. Civ. Code § 1760. California's False Advertising Law prohibits any "unfair, deceptive, untrue or misleading advertising." Williams v. Gerber Prod. Co., 552 F.3d 934, 938 (9th Cir. 2008) (quoting Cal. Bus. & Prof. Code § 17500). California's Unfair Competition Law generally prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. "[A] plaintiff may proceed under the UCL on three possible theories. First, 'unlawful' conduct that violates another law is independently actionable under Section 17200. Alternatively, a plaintiff may plead the defendants' conduct is 'unfair' within the meaning of the several standards developed by the courts. Finally, a plaintiff may challenge 'fraudulent' conduct by showing that 'members of the public are likely to be deceived' by the challenged business acts or practices." Stewart v. Screen Gems-EMI Music, Inc., 81 F. Supp. 3d 938, 967 (N.D. Cal. 2015) (internal citations omitted). "Because the statute is written in the disjunctive, it is violated where a defendant's act or practice violates any of the foregoing prongs." Davis v. HSBC Bank Nevada, N.A., 691 F.3d 1152, 1168 (9th Cir. 2012). Additionally, "[a]ny violation of the [FAL] . . . necessarily violates the [UCL]." Moore v. Mars Petcare US, Inc., 966 F.3d 1007, 1016 (9th Cir. 2020) (internal quotation marks omitted) (citing Gerber Prod., 552 F.3d at 938).

"Whether a business practice is deceptive or misleading 'under these California statutes [CLRA, FAL, and UCL] [is] governed by the 'reasonable consumer' test.'" Moore, 966 F.3d at 1017 (citing Gerber Prod., 552 F.3d at 938). Under this test, "conduct is deceptive or misleading if it is likely to deceive an ordinary consumer." Peviani v. Nat. Balance, Inc., 774 F. Supp. 2d 1066, 1070 (S.D. Cal. 2011) (citing Gerber Prod., 552 F.3d at 938). "The California Supreme Court has recognized 'that these laws prohibit not only

---

or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions."). (Doc. No. 32 ¶ 210.)

advertising which is false, but also advertising which . . . is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" <u>Gerber Prod.</u>, 552 F.3d at 938 (quoting <u>Kasky v. Nike, Inc.</u>, 45 P.3d 243, 250 (Cal. 2002)).

To satisfy the standing requirements of the UCL and FAL, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that that economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." <u>Van Patten v. Vertical Fitness Grp., LLC</u>, 847 F.3d 1037, 1048 (9th Cir. 2017) (quoting <u>Kwikset Corp. v. Superior Court</u>, 246 P.3d 877, 885 (Cal. 2011)). Accordingly, "a plaintiff must allege actual reliance in order to have standing to pursue UCL and FAL claims." <u>Moore</u>, 966 F.3d at 1020 (citing <u>Hinojos v. Kohl's Corp.</u>, 718 F.3d 1098, 1103–04 (9th Cir. 2013)); <u>see</u> <u>Peviani</u>, 774 F. Supp. 2d at 1070; <u>In re Ferrero Litig.</u>, 794 F. Supp. 2d 1107, 1111 (S.D. Cal. 2011). "[A]ny plaintiff who has standing under the UCL's and FAL's 'lost money or property' requirement will, <u>a fortiori</u>, have suffered 'any damage' for purposes of establishing CLRA standing." <u>Moore</u>, 966 F.3d at 1020 (citing <u>Hinojos</u>, 718 F.3d at 1108).

Finally, Rule 9(b)'s heightened pleading standard applies to UCL, FAL, and CLRA causes of actions where, as here, they are "grounded in fraud" or "sound in fraud." <u>See</u> <u>Kearns v. Ford Motor Co.</u>, 567 F.3d 1120, 1125 (9th Cir. 2009); <u>Elias v. Hewlett-Packard Co.</u>, 903 F. Supp. 2d 843, 853 (N.D. Cal. 2012). "Rule 9(b) demands that the circumstances constituting the alleged fraud 'be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.'" <u>Kearns</u>, 567 F.3d at 1124 (citing <u>Bly–Magee v. California</u>, 236 F.3d 1014, 1019 (9th Cir. 2001)). There is substantial overlap in the requirements of the CLRA, UCL, and FAL; as such, when the cause of action under each is premised on the same allegedly misleading acts, a plaintiff who plausibly and with sufficient particularity pleads (1) misleading or deceptive advertising, as judged by the reasonable consumer test,

(2) actual reliance, and (3) economic injury has likely stated a claim under all three statutes, assuming other statute-specific requirements are met. See Moore, 966 F.3d at 1016 n.7.

In its prior Order, the Court concluded Plaintiffs' complaint had stated claims for violations of the CLRA, FAL, and the unfair, fraudulent, and unlawful prongs of the UCL. (Doc. No. 31 at 30–33.) Plaintiffs provided multiple examples of the misleading and deceptive advertising they viewed throughout their experience with the Keto Products. (Id.; see Doc. No. 32 ¶¶ 63–74.) They identified misrepresentations and omissions regarding reviews and endorsements of the Keto Products, the results consumers can expect by using the products, the limited supply of the products, the actual price of the products, and the existence of "false front" websites. (Id.; see Doc. No. 32 ¶¶ 124–45.) Plaintiffs alleged how the statements found in advertisements and on the landing pages would be false or misleading to a reasonable consumer: the pictured and quoted celebrities have not in fact endorsed the Keto Products in question, there is not actually a limited supply of Keto Products remaining, and contrary to the claim to the claim that consumers will "Buy 3 Get 2 Free," they actually are charged the full price of five products. (Id.; see Doc. No. 32 ¶¶ 50, 55, 64–68, 70, 76, 83, 90, 92, 95.) Plaintiffs also alleged how the failure to disclose to customers that they are viewing a different website than the one that would be shown to their financial institution should they seek a chargeback or investigation would be misleading and deceptive to a reasonable consumer. (Id.; see Doc. No. 32 ¶¶ 102–13.) They alleged that they provided their financial information and completed their orders for a "Buy 3 Get 2 Free" offer of Keto Products in reliance on the statements published on these advertisements and website. (Id.; see Doc. No. 32 ¶¶ 17–18, 132, 135, 245, 278.) They alleged they suffered economic injuries in that they were overcharged for the products, never received a full refund, and would not have completed their purchases in the first place if not for the misrepresentations about the endorsements, effectiveness, price, etc. of the products, and the omissions about the false front websites and other details of the fraudulent scheme. (Id.; see Doc. No. 32 ¶¶ 59, 132, 135, 245, 278.) They alleged that all consumers who purchased Keto Products – including them – were subjected to similar or identical

representations, and reasonably relied on them in making their purchase decisions. (Id.; see Doc. No. 32 ¶¶ 61, 77, 124, 127, 132, 135.) The Court concluded these allegations were sufficient to place Defendants on notice of the circumstances constituting the alleged fraudulent scheme, and to plausibly state claims under the CLRA, FAL, and UCL. (Id.) The Court declined to dismiss Plaintiffs' CLRA, FAL, and UCL claims, and gave Plaintiffs leave to amend their complaint to re-plead their theories of indirect liability (aiding and abetting and conspiracy). (Id. at 22, 33.) Thus, the issue of whether Plaintiffs' allegations are sufficient to state claims under the CLRA, FAL, and UCL and to meet Rule 9(b)'s standard has already been decided by this Court. The remaining issue for the Court to decide is whether, under a direct or indirect theory of liability, Plaintiffs' FAC states a claim for violations of the CLRA, FAL, and UCL against any or all of the Defendants.

First, Plaintiffs allege Defendant Beyond Global is directly liable for violations of the CLRA, FAL, and UCL. (Doc. No. 32 ¶¶ 213, 247, 281, 370.) Plaintiffs allege Defendant Beyond Global created the advertisements containing the false statements about the price, endorsements, limited supply, effectiveness, and "Buy 3 Get 2 Free" nature of the Keto Products. (Id. ¶¶ 124–47.) They allege they created and operated both the landing pages viewed by consumers, such as ultrafastketoboost.com and instaketo.com, as well as the "false fronts" shown to financial institutions. (Id. ¶¶ 11, 62, 102, 108–09, 136–45.) They allege they have opened hundreds of merchant accounts and spread charges to different consumers across the merchant accounts in order to avoid detection by financial institutions. (Id. ¶¶ 112–13.) They allege Defendant Beyond Global charged Plaintiff Bavencoff's credit cards for $198.70, the price of all five bottles, rather than $119.22, the price of three bottles, despite the representation that she would only be charged for three bottles and receive two more for free. (Id. ¶¶ 18, 126.) These allegations are sufficient to state a plausible claim for relief against Defendant Beyond Global for directly violating the CLRA, FAL, and UCL.

Next, Plaintiffs allege Defendants TFL and Nelson aided and abetted Defendant Beyond Global's violations of the CLRA, FAL, and UCL, (id. ¶¶ 214–21, 248–54, 282–

88, 372–78), and conspired with Defendant Beyond Global to violate the CLRA, FAL, and UCL, (id. ¶¶ 222–29, 255–63, 289–96, 379–86). Defendants TFL and Nelson argue Plaintiffs have not stated a claim against either of them, under any of the theories, under any of the statutes. (Doc. No. 38 at 2.) For the reasons below, the Court concludes that Plaintiffs have stated plausible claims for relief under the CLRA, FAL, and UCL against Defendants TFL and Nelson under an aiding and abetting theory of liability.

In order to plead a claim for aiding and abetting an intentional tort, a plaintiff "must plead facts that make it plausible that defendants either '(a) [knew] the other's conduct constitute[d] a breach of duty and [gave] substantial assistance or encouragement to the other to so act or (b) [gave] substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitute[d] a breach of duty to the third person.'" Bradshaw v. SLM Corp., 652 F. App'x 593, 594 (9th Cir. 2016) (citing Casey v. U.S. Bank Nat'l Ass'n, 26 Cal. Rptr. 3d 401, 405 (Cal. Ct. App. 2005)); see Decarlo v. Costco Wholesale Corp., No. 14cv00202 JAH-BLM, 2020 WL 1332539, at *5 (S.D. Cal. Mar. 23, 2020) ("Liability may be imposed on those who aid and abet another's violation of the UCL if the individual knows the other's conduct constitutes a violation and gives substantial assistance or encouragement to the other to so act."). Plaintiffs plead both theories of aiding and abetting against Defendants TFL and Nelson; the Court focuses its analysis on the first theory.

The first element, knowledge, requires a plaintiff to "plead sufficient facts to permit a 'reasonable inference' that [the defendant] knew of the 'specific wrongful act[s]' of fraud by the [principal(s)] at the relevant time." Bradshaw, 652 F. App'x at 594; see Casey, 26 Cal. Rptr. 3d at 407, 411 (holding that the complaint must allege the defendant's "actual knowledge of the specific primary wrong the defendant substantially assisted" to adequately plead aiding and abetting fraud). "General allegations that [a defendant] knew that [the principal] engaged 'in a criminal and wrongful enterprise' are 'too generic to satisfy the requirements of actual knowledge of a specific primary violation' under California law, nor do conclusory allegations of 'actual knowledge' suffice." Id. (citing

<u>Casey</u>, 26 Cal. Rptr. 3d at 412). Under Rule 9(b), while fraud must be pled with specificity, "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. Pro. 9(b). But while "this obviates the necessity of pleading detailed facts supporting allegations of knowledge, it does not relieve a pleader of the burden of alleging the nature of the knowledge a defendant purportedly possessed. In the case of an aider and abettor under California law, this must be actual knowledge of the primary violation." <u>Neilson v. Union Bank of California, N.A.</u>, 290 F. Supp. 2d 1101, 1119 (C.D. Cal. 2003) (citing <u>Howard v. Superior Court</u>, 3 Cal. Rptr. 2d 575, 576–77 (Cal. Ct. App. 1992)). Courts have found that a defendant's "decision to ignore suspicious activity or red flags is sufficient to demonstrate actual knowledge" for aiding and abetting liability. <u>In re Woodbridge Invs. Litig.</u>, No. CV 18-103-DMG (MRWX), 2020 WL 4529739, at *7 (C.D. Cal. Aug. 5, 2020); <u>see</u> <u>In re First All. Mortg. Co.</u>, 471 F.3d 977, 999 (9th Cir. 2006) (noting that coming "upon red flags which were seemingly ignored was enough to establish actual knowledge under the California aiding and abetting standard"). Courts have also considered allegations concerning a defendant's knowledge and familiarity with the structure and operation of an alleged fraudulent scheme to be relevant to the actual knowledge inquiry. <u>See</u> <u>Gonzales v. Lloyds TSB Bank, PLC</u>, 532 F. Supp. 2d 1200, 1208 (C.D. Cal. 2006) ("In further support of their allegation that Defendant had knowledge of the Ponzi scheme, Plaintiffs allege that Defendant knew the hallmark characteristics of a Ponzi scheme, and identified these characteristics in the Midland Entities' accounts."). The second element, substantial assistance, "requires that the defendant's actions be a 'substantial factor' in causing the plaintiff's injury." <u>Facebook, Inc. v. MaxBounty, Inc.</u>, 274 F.R.D. 279, 285 (N.D. Cal. 2011) (quoting <u>Impac Warehouse Lending Group v. Credit Suisse First Boston LLC</u>, 270 Fed. Appx. 570, 572 (9th Cir. 2008)). "[O]rdinary business transactions" can satisfy the substantial assistance element of an aiding and abetting claim "if the [defendant] actually knew those transactions were assisting the [principal] in committing a specific tort. Knowledge is the crucial element." <u>In re First All. Mortg. Co.</u>, 471 F.3d at 993 (quoting <u>Casey</u>, 26 Cal. Rptr. 3d at 406).

In their motion to dismiss, Defendants TFL and Nelson do not challenge Plaintiffs' allegations regarding the substantial assistance they allegedly provided to Beyond Global. (See Doc. No. 32 ¶¶ 216, 220, 250, 253, 284, 287.)[2] They solely argue that Plaintiffs have failed to sufficiently allege the element of knowledge. (Doc. Nos. 38-1 at 9–11; 43 at 3–7.) Plaintiffs allege Defendants TFL and Nelson had actual knowledge of the CLRA, FAL, and UCL violations involving the Keto Products. (Doc. No. 32 ¶¶ 214–15, 218–19, 249, 252, 283, 286.) They allege Defendants TFL and Nelson knew how the fraudulent scheme worked, that they were shipping products sold using deceptive and unfair advertising, that the contents and representations made in the Keto Products advertisements and on the websites were false and misleading, and the nature of the tortious conduct being committed by Beyond Global and the Keto Doe Defendants. (Id.) Plaintiffs allege Defendants TFL and Nelson directly run advertising campaigns for their clients, including Defendant Beyond Global. (Id. ¶¶ 166, 174–75.) Plaintiffs note that TFL's website provides a variety "Affiliate Marketing Resources," and that its marketing director's LinkedIn profile states that his duties include "Run[ning] and monitor[ing] marketing campaigns." (Id.) Plaintiffs allege that because Defendants TFL and Nelson were involved in Defendant Beyond Global's advertising campaign, they must been aware of the fake celebrity endorsements, claims about price, and other misrepresentations in the Keto Products advertisements and websites. (Id. ¶¶ 215.) Plaintiffs also allege that Defendants TFL and Nelson provided TFL's custom software to Beyond Global and the Keto Doe Defendants, and integrated that software into the Keto Product landing pages; Plaintiffs allege this activity would have necessitated knowledge of the deceptive and misleading content on those websites. (Id.)

Plaintiffs also allege that Defendants TFL and Nelson ignored a significant number of red flags associated with the Keto Doe Defendants' tortious conduct. See In re First All.

---

[2]    Plaintiffs allege the same conduct gives rise to aiding and abetting liability under all three statutes, and as a result plead specific allegations in their CLRA cause of action, and then incorporate those facts and allegations by reference in their FAL and UCL causes of action. (See, e.g., Doc. No. 32 ¶ 249.) As such, when the Court cites to the allegations in the CLRA cause of action, it does so with the understanding they are applicable to the FAL and UCL causes of action as well.

Mortg. Co., 471 F.3d at 999. They allege that Defendants TFL and Nelson received and processed customer returns and complaints regarding the Keto Products, and that these activities necessitated knowledge of the Keto Doe Defendants' tortious conduct, as the complaints would detail the nature of the wrongful activity, i.e., that customers were being overcharged for products after viewing misleading advertisements. (Doc. No. 32 ¶¶ 172–73.) They also allege that Defendants TFL and Nelson were notified of their clients' deceptive and fraudulent advertising tactics via complaints about Keto Products on TFL's Better Business Bureau ("BBB") page. (Id. ¶¶ 214–15.) Plaintiffs point to several complaints posted on TFL's BBB page throughout late 2019 referring to "Ultrafast Keto Boost," "keto diet pill[s]," and "Keto Boost" that detail experiences nearly identical to those of Plaintiffs; one complaint specifically mentioned viewing a false Shark Tank advertisement. (Id. ¶ 214.) Plaintiffs note that Defendants TFL and Nelson responded to several of these comments, demonstrating that they read them and were aware of their contents. (Id.)

Defendants TFL and Nelson argue that the BBB complaint about "Ultra Fast Keto Boost" they responded to post-dated Plaintiff Bavencoff's October 14, 2019 transaction, and therefore could not have put them on notice of the fraudulent conduct associated with the Keto Products. (Doc. No. 38-1 at 9–10.) But Plaintiffs provide examples of comments referencing similar Keto Products made prior to Plaintiff Bavencoff's transaction, and there are several examples of comments referencing similar Keto Products made prior to Plaintiff Sihler's December 2019 transaction. (Doc. No. 32 ¶ 214.) And Plaintiffs pled that Defendants TFL and Nelson responded to other comments on their BBB page during that time period, which supports the reasonable inference that they viewed and were aware of other comments posted during that time, even if they did not directly respond to them. (Id.) Citing Baba v. Hewlett-Packard Co., Defendants TFL and Nelson argue awareness of a few customer complaints is insufficient to establish they had actual knowledge of the deceptive and misleading advertising. No. C 09-05946 RS, 2011 WL 317650, at *3 (N.D. Cal. Jan. 28, 2011). As Plaintiffs note, Baba, which dealt with awareness of a product

defect, not awareness of an ongoing fraudulent scheme, is distinguishable. Furthermore, unlike in <u>Baba</u>, Plaintiffs do not solely rely on allegations of BBB complaints that Defendants TFL and Nelson allegedly ignored; they have pled other specific allegations to support the inference that Defendants TFL and Nelson had actual knowledge of the alleged violations. <u>See</u> <u>In re Woodbridge Invs. Litig.</u>, 2020 WL 4529739, at *7 (holding plaintiff's other detailed allegations, "on top of those relating to the red flags that Comerica allegedly ignored," were sufficient to state a claim for aiding and abetting). Defendants' arguments are better suited to a motion for summary judgment when the record is more fully developed.

Defendants TFL and Nelson contend that providing order fulfillment software does not mean they would have been aware of the website content, or have known that the representations on the website were false. (Doc. No. 38-1 at 10.) They also argue that Plaintiffs' allegation that they run marketing campaigns and assist with advertising for their clients does not plausibly show that they knew misrepresentations and omissions were being used on Defendant Beyond Global's website. (<u>Id.</u> at 11.) The Court disagrees. It is plausible that an entity responsible for integrating order fulfillment software with a client's website would have knowledge of the content, representations, and general nature of the website. And it is very plausible that providing assistance with advertising campaigns for clients would necessitate knowledge of the content of the advertisements and the nature of the campaign. Defendants' arguments are better suited to a motion for summary judgment when the record is more fully developed. In sum, the Court concludes the FAC's allegations are sufficient to state a plausible claim against Defendants TFL and Nelson for violations of the CLRA, FAL, and UCL under an aiding and abetting theory of liability. <u>See</u> <u>Bradshaw</u>, 652 F. App'x at 594. As such, the Court denies Defendants Beyond Global, TFL, and Richard Nelson's motion to dismiss Plaintiffs' CLRA, UCL, and FAL claims.[3]

---

[3]     Plaintiffs allege Defendants violated several state and federal laws and regulations as part of their UCL "unlawful" prong claim. (Doc. No. 32 ¶¶ 297–386.) "An action brought under the 'unlawful' prong of [the UCL] 'borrows' violations of other laws when committed pursuant to business activity." <u>Loomis</u>

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## B.   Plaintiffs' RICO Claim

In its prior Order, the Court dismissed Plaintiffs' RICO claims against Defendants with leave to amend. (Doc. No. 31 at 22–28.) The Court concluded that the allegations in the original complaint were insufficient to plausibly establish a RICO claim, and noted that Plaintiffs had not sufficiently pleaded that Defendants possessed the requisite common purpose, fraudulent intent, knowledge, and other elements to allow the Court to reasonably infer that their facially legitimate conduct constituted a RICO violation. (Id.) In the FAC, Plaintiffs have significantly amended their RICO allegations. They allege Defendants have violated section 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). They also allege Defendants have violated section 1962(d), which makes it unlawful "to conspire to violate any of the provisions of subsection (a), (b), or (c)." Id. § 1962(d).

To maintain a civil RICO claim, a plaintiff must allege that the defendant engaged in: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity and, additionally, must establish that (5) the defendant caused injury to plaintiff's business or property." Black v. Corvel Enter. Comp Inc., 756 F. App'x 706, 708 (9th Cir. 2018) (citing 18 U.S.C. §§ 1962(c), 1964(c)). Plaintiffs allege the existence of an associated-in-fact "Keto Enterprise," made up of all the Defendants. (Doc. No. 32 ¶¶ 401–08.)[4] They allege

---

v. Slendertone Distribution, Inc., 420 F. Supp. 3d 1046, 1085 (S.D. Cal. 2019). "Violation of almost any federal, state, or local law may serve as the basis for a UCL claim," including the CLRA and FAL. Plascencia v. Lending 1st Mortg., 583 F. Supp. 2d 1090, 1098 (N.D. Cal. 2008). Because the Court concludes that Plaintiffs have stated claims under the CLRA and FAL against the Defendants, it does not need to address the other alleged grounds for violations of the "unlawful" prong of the UCL at this time. As such, the Court denies Defendants' request for judicial notice of the fact sheet from the National Institutes of Health, as it is only relevant to their argument regarding the alleged Sherman Act violations. (Doc. No. 38-1 at 15.)

4      Plaintiffs also allege the existence of an additional sub-enterprise, the TFL Enterprise. (Doc. No. 32 ¶¶ 393–400.) Because the Court concludes that Plaintiffs have sufficiently pled a RICO claim based on the Keto Enterprise, it need not address the other alleged enterprise at this time.

that Defendants operated the Keto Enterprise through multiple related predicate acts of mail fraud, wire fraud, and bank fraud over a period of several years. (Id. ¶¶ 402, 409–38.) They allege the predicate acts affected interstate commerce, and that the Defendants' RICO violations were the but-for cause and proximate cause of their concrete financial injuries. (Id. ¶¶ 439, 442–44.) Defendants Beyond Global, TFL, and Nelson argue Plaintiffs have failed to plausibly allege the existence of an enterprise or a pattern of racketeering activity. (Doc. No. 38-1 at 15–21.) The Court addresses each requirement in turn.

### 1. Enterprise

For purposes of a civil RICO claim, an "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." Boyle v. U.S., 556 U.S. 938, 946 (2009); see Odom v. Microsoft Corp., 486 F.3d 541, 549 (9th Cir. 2007). "Such an enterprise . . . is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." Id. at 945. "An association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Id. "[A]n associated-in-fact enterprise under RICO does not require any particular organizational structure." Odom, 486 F.3d at 551; see Boyle, 556 U.S. at 948 ("Such a group need not have a hierarchical structure or a 'chain of command.'"). However, "[s]imply characterizing routine commercial dealing as a RICO enterprise is not enough." Gardner v. Starkist Co., 418 F. Supp. 3d 443, 461 (N.D. Cal. 2019); see Shaw v. Nissan N. Amer., Inc., 220 F. Supp. 3d 1046, 1054 (C.D. Cal. 2016) ("[C]ourts have overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises."). Plaintiffs must "do '[s]omething more' to 'render [their] allegations plausible within the meaning of Iqbal and Twombly.'" Eclectic

Properties East, LLC v. Marcus & Millichap Co., 751 F.3d 990, 999 (9th Cir. 2014) (quoting In re Century Aluminum Co. Sec. Litig., 729 F.3d 1104, 1108 (9th Cir. 2013)).

Plaintiffs allege the common purpose of the Keto Enterprise was to defraud victims purchasing Keto Products, and that each member benefited financially from doing so. (Doc. No. 32 ¶ 403.) They allege the enterprise has been in existence since at least February 2018, when the first "false front" website was registered for Ultra Fast Keto Boost, and functioned as a continuing unit until at least the date the original complaint was filed in June 2020. (Id. ¶¶ 401, 407.) They allege that all the members worked together in an indispensable and integrated manner to carry out the fraudulent scheme: the Keto Doe Defendants, including Defendant Beyond Global, created the landing pages, advertisements, false fronts, and other aspects of the "sales funnel" containing the deceptive and misleading advertising; and Defendants TFL and Nelson labeled and shipped the products, assisted with advertising and marketing, received returns and complaints from customers, and provided specialized software for monitoring and tracking shipments and customers. (Id. ¶¶ 124–47, 171–75, 404.) They allege their coordinated activities were necessary to successfully complete the fraudulent consumer transactions and generally carry out the fraudulent scheme. (Id. ¶ 404.) They allege the Keto Doe Defendants contracted with Defendants TFL and Nelson to provide these services, and that each member aided the others in carrying out their roles. (Id. ¶¶ 404, 406.) They allege each member of the Keto Enterprise knew that the enterprise extended beyond their individual roles and carried out their activities and operations with the intent to further the fraudulent scheme. (Id.)

Defendants Beyond Global, TFL and Nelson contend that Plaintiffs' allegations demonstrate nothing more than commercial relationships pursuant to routine business contracts between them, and that they have failed to plausibly plead the existence of an enterprise. (Doc. No. 38-1 at 15–18.) The Court disagrees. The FAC sets forth sufficient allegations that tend to rule out an innocent explanation for Defendants' conduct. See Eclectic Properties, 751 F.3d at 998–99. Plaintiffs have alleged that the nature of the

services provided by Defendants TFL and Nelson necessitated knowledge of and direct participation in the fraudulent aspects of the scheme, meaning their conduct could not be that of a routine service provider. (Doc. No. 32 ¶ 397.) They have explained how the nature of the fraudulent scheme necessitated coordination, integration, and shared purpose between all of the enterprise members, making it less plausible that each member was independently carrying out its own business activities. See Shaw, 220 F. Supp. 3d at 1057 (rejecting RICO claim and noting the instances where each party appeared to act an independent manner, such as by reaching independent conclusions). And significantly, they allege that all of the Defendants' activities were undertaken with common fraudulent intent: to mislead, deceive, and overcharge customers purchasing Keto Products, on a repeated and continuous basis. (Doc. No. 32 ¶¶ 214–15, 218–19.) These allegations and others in the FAC go beyond connecting Defendants to each other by way of normal commercial dealings. At the motion to dismiss stage, "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives." Starr, 652 F.3d at 1216. The Court concludes Plaintiffs have plausibly pled the existence of an association-in-fact enterprise among the Defendants.

### 2.     Predicate Acts and Pattern of Racketeering Activity

"'[R]acketeering activity' is any act indictable under several provisions of Title 18 of the United States Code." Turner v. Cook, 362 F.3d 1219, 1229 (9th Cir. 2004) (citing 18 U.S.C. § 1961(1)). "In order to establish a pattern of racketeering activity, a plaintiff must allege at least two related predicate acts occurring within a ten-year time period that 'amount to or pose a threat of continued criminal activity.'" Campos v. Failla, No. 15-cv-790-BAS(JLB), 2016 WL 1241545, at *7 (S.D. Cal. Mar. 30, 2016) (citing H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239–40 (1989)). "Where, as here, the racketeering activity alleged is fraud, . . . the heightened pleading requirements of Rule 9(b) apply to the predicate acts." Shaw, 220 F. Supp. 3d at 1053; see Doan v. Singh, 617 F. App'x 684, 685 (9th Cir. 2015) ("RICO fraud allegations are subject to the heightened pleading standard

of Rule 9(b).”). “In the RICO context, a Plaintiff must 'detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme.'” Shaw, 220 F. Supp. 3d at 1053 (citing Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist., 940 F.2d 397, 405 (9th Cir. 1991)). Further, where a plaintiff alleges RICO claims against multiple defendants, the “plaintiff must allege at least two predicate acts by each defendant.” In re WellPoint, Inc. Out-of-Network UCR Rates Litig., 865 F. Supp. 2d 1002, 1035 (C.D. Cal. 2011).

Plaintiffs allege Defendant Beyond Global and the Keto Doe Defendants committed predicate acts of wire fraud, (Doc. No. 32 ¶¶ 413, 417), and mail fraud, (id. ¶¶ 414, 418). They allege Defendants TFL and Nelson committed predicate acts of mail fraud, (id. ¶¶ 414, 418), and conspired to commit wire fraud, (id. ¶¶ 413, 417). “The mail and wire fraud statutes are identical except for the particular method used to disseminate the fraud, and contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud.” Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp., No. 17-cv-04992-BLF, 2019 WL 4888693, at *12 (N.D. Cal. Oct. 3, 2019) (quoting Eclectic Properties, 751 F.3d at 997). “The gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element,' even if the mailing itself 'contain[s] no false information.'” In re Outlaw Lab'y, LP Litig., No. 18-cv-840-GPC-BGS, 2020 WL 1953584, at *6 (S.D. Cal. Apr. 23, 2020) (citation and internal quotation marks omitted) (quoting Schmuck v. United States, 489 U.S. 705, 712, 715 (1989)). Additionally, a defendant “need not personally have mailed the letter or made the telephone call; the offense [of mail or wire fraud] may be established where one acts with the knowledge that the prohibited actions will follow in the ordinary course of business or where the prohibited acts can reasonably be foreseen.” Shinde v. Nithyananda Found., No. EDCV 13-363, 2015 WL 12732434, at *9 (C.D. Cal. Feb. 23, 2015) (citing United States v. Lothian, 976 F.2d 1257, 1262 (9th Cir. 1992)). “The intent to defraud may be inferred from a defendant's statements and conduct.” Eclectic Properties, 751 F.3d at 997 (quoting

United States v. Peters, 962 F.2d 1410, 1414 (9th Cir. 1992)). "In the absence of direct evidence of intent, the party asserting fraud must first prove 'the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension,' and then, 'by examining the scheme itself' the court may infer a defendant's specific intent to defraud." Id. (quoting United States v. Green, 745 F.2d 1205, 1207 (9th Cir. 1984)). "When companies engage in [] transactions that are facially legitimate . . . a significant level of factual specificity is required to allow a court to infer reasonably that such conduct is plausibly part of a fraudulent scheme." Id. at 997–98.

Plaintiffs allege that the sale and shipment of Keto Products to them involved the commission of several predicate acts by each Defendant. They allege the Defendants formed a scheme to defraud consumers using deceptive and misleading advertising in order to bill them for the full price of products. (Doc. No. 32 ¶¶ 412, 415, 419.) They allege each Defendant had the specific intent to defraud consumers to earn a continuous stream of money from the full price billings, and that each Defendant was a knowing participant in the fraudulent scheme. (Id. ¶¶ 413, 414, 417, 419.) They allege the Defendants used the United States mails and wires in furtherance of the fraudulent scheme in several ways. Plaintiff Sihler alleges the (1) advertisement she viewed, which falsely claimed that the Keto Products had been endorsed on Shark Tank, and (2) the InstaKeto landing page website she was then taken to, which contained numerous false statements about the products' endorsements, limited supply, effectiveness, actual price, etc. were both transmitted via United States wire and thus each constitute a separate predicate act of wire fraud. (Id. ¶¶ 412–13.) Plaintiff Bavencoff similarly alleges the (1) false Shark Tank advertisement she viewed, and (2) the Ultra Fast Keto Boost landing page website she was then taken to, which contained similar numerous false statements, were both transmitted via United States wire and thus each constitute a separate predicate act of wire fraud. (Id. ¶¶ 416–17.) They allege the shipments of Keto Products to them from TFL's Tampa fulfillment center constitute predicate acts of mail fraud. (Id. ¶¶ 414, 418.)

In addition to the predicate acts involved in their Keto Products transactions, Plaintiffs also allege that their experiences were part of a pattern of related transactions and shipments to other consumers that occurred from at least early 2018. (Id. ¶¶ 420–37.) They state that they are unable to fully plead details of those predicate acts because the facts are largely within the possession of Defendants, but provide several representative examples of customers describing their experience with Keto Products in BBB complaints, and allege those experiences each involved the commission of several predicate acts by the Defendants. (Id.) For example, in a complaint posted on January 14, 2020, a customer stated that in October 2019 they viewed a Facebook advertisement, which included members of Shark Tank, for an offer to purchase three bottles of Ultra Fast Keto Boost and get two free. (Id. ¶¶ 424–25.) After providing their credit card information, they were charged for the full price of all five bottles, and received products that were not the item depicted in the advertisement. (Id.) Plaintiffs allege this transaction involved predicate acts substantially identical to those committed against them: wire fraud (the Facebook advertisement and the Ultra Fast Keto Boost website), and mail fraud (shipment of the Ultra Fast Keto Boost product). (Id.) Plaintiffs provide similar details for six other BBB complaints posted about Keto Products and allege there are likely many more instances. (Id. ¶¶ 420–37.) They allege all of these predicate acts, including those involved in their own transactions, are related, in that they have the same participants, purpose, structure, and method of commission, and they were all done in furtherance of the same scheme to defraud. (Id. ¶ 440.) They allege the predicate acts are not isolated or sporadic and pose a threat of continued racketeering activity. (Id. ¶¶ 408, 420, 440.)

The Court concludes the FAC sufficiently and plausibly pleads a pattern of racketeering activity by the Defendants. Plaintiffs have pled the time, place, and manner of each predicate act, plus the role of each Defendant in the scheme, with sufficient particularity to give Defendants "notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007). They have pled that the predicate acts are related

and amount to or pose a threat of continued criminal activity, and thus constitute a pattern of racketeering activity. See Turner, 362 F.3d at 1229. Defendants TFL and Nelson contend Plaintiffs have not plausibly alleged that they shipped products to Plaintiffs with knowledge of the alleged fraud, and therefore cannot plead that their actions constitute predicate acts. (Doc. No. 38-1 at 19–20.) The Court has already concluded Plaintiffs have sufficiently and plausibly pled that Defendants TFL and Nelson had actual knowledge of the Keto Product fraudulent scheme, and therefore rejects this argument.

Defendant Beyond Global argues that Plaintiffs have failed to establish that its alleged predicate acts of wire fraud or mail fraud are part of a pattern of racketeering activity. (Doc. No. 38-1 at 20–21.) They argue Plaintiffs have failed to plead that the predicate acts amount to or pose a threat of continued criminal activity. (Id.) The continuity requirement may be satisfied by alleging either "close-ended" or "open-ended" continuity. Close-ended continuity involves "a series of related predicates extending over a substantial period of time." H.J. Inc., 492 U.S. at 242; see also Religious Tech. Ctr. v. Wollersheim, 971 F.2d 364, 366–67 (9th Cir. 1992). Open-ended continuity involves "a specific threat of repetition extending indefinitely into the future," or predicate acts that "are part of an ongoing entity's regular way of doing business." H.J. Inc., 492 U.S. at 242; Ticor Title Ins. Co. v. Florida, 937 F.2d 447, 450 (9th Cir. 1991). Plaintiffs allege that the Keto Enterprise qualifies as both. (Doc. No. 32 ¶ 408.) They allege it is a close-ended enterprise because the predicate acts allegedly occurred over a period exceeding a year and a half (from February 20, 2018 to the date the lawsuit was filed). (Id.) They allege it is an open-ended enterprise because it was actively continuing to commit predicate acts as of the date of the filing of this lawsuit, and it has continued to receive BBB complaints of fraudulent billing post-suit. (Id.) They allege the past conduct poses a threat of repetition because the conduct has continued post-suit, and because the Defendants' businesses have been structured around defrauding customers. (Id.) The Court concludes these allegations are sufficient to satisfy the continuity requirement for a pattern of racketeering activity. Defendants' arguments are better suited to a motion for summary judgment when the record is more

fully developed. In sum, the Court concludes Plaintiffs have plausibly and sufficiently alleged the predicate acts and pattern of racketeering elements of her RICO claim. Accordingly, it denies Defendants Beyond Global, TFL, and Nelson's motion to dismiss Plaintiffs' RICO claims.

### C.    Plaintiffs' Non-California Consumer Protection State Law Claims

Finally, Defendants move to dismiss Plaintiffs' sixth cause of action, which asserts Defendants have violated various states' consumer protection statutes. (Doc. No. 32 ¶¶ 448–58.) Defendants correctly point out that the Court dismissed this cause of action in Plaintiffs' original complaint, and that Plaintiffs have not fixed the defect with this claim – that they are residents of California and were injured in California, and therefore have no standing to bring claims under the laws of other states – in their FAC. (Doc. No. 38-1 at 21.) Plaintiffs state the claim is only included in the FAC to preserve error and avoid waiver of their original arguments. (Doc. No. 41 at 25.) As such, for the reasons outlined in its prior Order, (Doc. No. 31 at 33–36), the Court grants the Defendants' motion to dismiss Plaintiffs' claims under non-California state laws.

### <u>Conclusion</u>

For the reasons above, the Court  denies Defendants Beyond Global, TFL, and Richard Nelson's motion to dismiss Plaintiffs' first amended complaint for failure to state claims under the CLRA, FAL, UCL, and RICO. The Court grants Defendants' motion to dismiss Plaintiffs' non-California state consumer protection law claims.

**IT IS SO ORDERED.**

DATED: April 7, 2021

_____
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT