1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**KNEUPPER & COVEY, PC**
Kevin Kneupper, Esq. (CA SBN 325413)
Kevin@kneuppercovey.com
17011 Beach Blvd., Suite 900
Huntington Beach, CA 92647
Tel: (512) 420-8407

*Attorneys for Plaintiffs Janet Sihler,*
*Charlene Bavencoff, and the putative Class*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JANET SIHLER, Individually and On Behalf of All Others Similarly Situated; CHARLENE BAVENCOFF, Individually and On Behalf of All Others Similarly Situated,,

Plaintiffs,

v.

THE FULFILLMENT LAB, INC; RICHARD NELSON; BEYOND GLOBAL INC.; BRIGHTREE HOLDINGS CORP.; BMOR GLOBAL LLC; DAVID FLYNN; RICKIE JOE JAMES; and JOHN DOES 1-10,

Defendants.

Case No.:  3:20-cv-01528-LL-MSB

**SECOND AMENDED CLASS ACTION COMPLAINT FOR:**

(1) Violation of California's Consumer Legal Remedies Act;
(2) Violation of California's False Advertising Law;
(3) Violation of the Unfair and Fraudulent Prongs of California's Unfair Competition Law;
(4) Violation of the Unlawful Prong California's Unfair Competition Law;
(5) Civil RICO.

**DEMAND FOR JURY TRIAL**

    Plaintiffs Janet Sihler ("Ms. Sihler") and Charlene Bavencoff ("Ms. Bavencoff"), individually and on behalf of all others similarly situated nationwide and in the State of

California, by and through the undersigned counsel, hereby file this Class Action Complaint against Defendants THE FULFILLMENT LAB, INC. and RICHARD NELSON (collectively, the "TFL Defendants"), BEYOND GLOBAL INC., BRIGHTREE HOLDINGS CORP.; BMOR GLOBAL LLC; DAVID FLYNN; RICKIE JOE JAMES (collectively, the "Keto Defendants"); and JOHN DOES 1 THROUGH 10, and allege as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter because this is a class action in which, on information and belief, the damages exceed $5 million, exclusive of interest and costs, the number of class members exceeds 100, and as demonstrated below, the parties are diverse pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The believed scope of the damages and number of class members are based on Plaintiffs' investigation and the BBB report attached as Exhibit 1.

2.      This court also has jurisdiction because Plaintiffs' Racketeer Influenced and Corrupt Organizations Act ("RICO") claim, 18 U.S.C. §§ 1961, *et seq.*, arises under federal law.

3.      This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367.

4.      This Court has personal jurisdiction over the TFL Defendants because they conduct business in California, including this District. Specifically, the TFL Defendants offer numerous "white label" products for wholesale purchase to its business clients, including the scammers who created the Keto Products at issue and who are named as Keto Defendants herein, for e-commerce and internet marketing brand. On information and belief, the TFL Defendants also provide fulfillment services consisting of labeling, packaging, product returns, and other services for its clients, including the Keto Defendants. Indeed, the packing slips for the Keto Products are identical to the packing slips generated by the TFL Defendants' specialized software, which is shown to potential clients on its website, and the return address listed on the packing slips for the Keto

Products is the Post Office closest to the TFL Defendants' office in Tampa, Florida.

5. The TFL Defendants have sufficient minimum contacts with this State and/or sufficiently availed themselves of the markets in this State through their return processing of the Keto Products to consumers in this State, including this District, to render the exercise of jurisdiction by this Court permissible. As the return processor, the TFL Defendants are aware of the locations of dissatisfied customers who submit the products for return, including those customers residing in this District. As described in further detail herein, each Defendant purposely directed their conduct towards California residents.

6. Defendants Beyond Global Inc., Brightree Holdings Corp., and BMOR Global LLC sold the Keto Products and are subject to personal jurisdiction because it purposely directed their advertising and sales to California residents as described herein. Defendants Flynn and James controlled their activities and were "guiding spirits" behind them.

7. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b) because a substantial part of the events giving rise to Plaintiffs' claims occurred while they resided in this judicial district, including purchasing the Keto Products at issue.

## NATURE OF THE ACTION

8. This action involves a form of fraud and cybercrime that has become increasingly common –and lucrative—across the Internet. This particular scam is designed to lure consumers into purchasing worthless weight-loss pills branded "Ultra Fast Keto Boost" and "Instant Keto" (collectively, "Keto Products") by using fake celebrity and magazine endorsements and claiming that well-known celebrities have endorsed the Keto Products. The operators of this scam deceive consumers by falsely advertising that the purchase prices of the Keto Products are significantly lower than the amounts actually charged to the victims' debit or credit cards.

9. The scammers' only goal is to fraudulently obtain the victims' credit card and bank account information. Once they have it, they send their victims five bottles of bogus Keto Products (more than what they actually agreed to purchase), and then charge their

victims the exorbitant price for all five bottles, a fact to which the victims never agreed and were never properly informed. Simply put, the scammers brazenly overcharge their victims for Keto Products that they never intended, nor consented, to purchase.

10.     Using multiple websites, the scammers present one face to the consumer—a "landing page" website offering consumers to "Buy 3 Bottles, Get 2 Free" and "Buy 2 Bottles, Get 1 Free" with advertised prices around $120 or less, without any upfront disclosure that, in truth, the consumer will be sent five bottles of pills – regardless of the number of bottles the consumer chose to purchase - and will be billed for all five bottles at a price around $200. They present a completely different face to the banks and credit card companies investigating complaints and requests for chargebacks, which is a second website appearing to fully comply with the law and fully disclose the actual prices of the bottles. However, the second website—the "false front"—is never viewed by the consumer. Instead, the consumer purchases the product from one of the landing pages on a completely different website. Consequently, consumers are left with no recourse because the scammers have defrauded their banks and credit card companies into believing the consumers consented to be billed the actual prices that are listed on the "false front" website, when in fact they did not.

11.     These scammers operate in rings, as described in Exhibit 1. Those rings generally include: (1) the marketers/branders of the products, including Beyond Global Inc., Brightree Holdings Corp., BMOR Global LLC, Flynn, and James, who create the landing pages to lure unwitting victims to purchase the Keto Products and also operate a "false front" website to avoid detection by the banks and credit card companies, (2) the fulfillment companies, including the TFL Defendants, who provide generic "white label" products to the marketers/branders, assist the marketers/branders with affiliate marketing and advertising, distribute the products to unwitting consumers nationwide, and handle returns when customers complain, (3) the affiliate networks, who offer generic landing pages for the marketers/branders to simply add the name of their product and logo on the bottle and connect the marketers/branders to individual affiliates who are paid to advertise

the fake celebrity and magazine endorsements, (4) the companies who provide specialized software for the scammers to create their landing pages and "false front" websites and to utilize multiple merchant accounts and chargeback/re-billing screening in order to avoid fraud detection by banks and credit card companies, and (5) the "crooked processors" who assist the scammers in avoiding detection by bank and credit card companies.

12.     These rings of scammers are structured in this way in the mistaken belief that the members of the ring will avoid liability by pretending to be legitimate businesses and pretending to have no knowledge of the actions of the others. But every member knows full well what they are doing—the marketers/branders intentionally seek out affiliates to do their dirty work under the pretense of "independent contractor" agreements and operate different websites to avoid fraud detection by banks and credit card companies, the fulfillment companies, including the TFL Defendants, handle numerous consumer complaints for the unauthorized billing of products the consumers did not purchase, the affiliate networks offer generic landing pages for the marketers/branders to simply add the name of their product and logo on the bottle and connect the marketers/branders to individual affiliates who are paid to advertise the fake celebrity and magazine endorsements, as well as  the "crooked processors" who openly pitch themselves as being able to help their clients avoid fraud detection and chargebacks.

13.     The marketers/branders of the Keto Products are a set of corporations controlled by Defendants Flynn and James, including at least Beyond Global Inc., Brightree Holdings Corp. and BMOR Global LLC (collectively the "Keto Defendants"), with any others unknown at this time and, therefore, referred to as John Doe Defendants herein, the TFL Defendants should be held jointly and severally liable for the fraud perpetrated by the Keto Defendants. The TFL Defendants knowingly enabled the Keto Defendants to operate the Keto scam—and similar scams—and perpetrated the fraud against consumers.

14.     Indeed, as described in detail herein, all of the Defendants together created a lucrative enterprise selling the Keto Products and they have defrauded countless

consumers, including Ms. Sihler and Ms. Bavencoff.

15.     This lawsuit seeks to hold accountable the members of the Keto scam that defrauded Ms. Sihler and Ms. Bavencoff, defrauded their banks and credit card companies, and defrauded many other consumers as well.

## THE PARTIES

### Plaintiffs

16.     Plaintiffs Janet Sihler is a citizen of the State of California and resides in the city of Coronado, County of San Diego, California, where she resided at the time of her purchase of the "InstaKeto" product.

17.     On or around December 11, 2019, Ms. Sihler signed up for a "Buy 3 bottles, Get 2 free" promotion of the InstaKeto product with the expectation that she would be billed for three bottles of the product at $39.74 each bottle, and she would receive two additional "free" bottles, for a total purchase price of $119.22.  Without her knowledge or authorization, Ms. Sihler's debit card was overcharged $198.70, which represents the total price for five bottles at $39.74 each.  A few days later, she received five bottles branded "Instant Keto."  Ms. Sihler called the Customer Service number listed on the packing slip to dispute the charge, but she was unable to obtain a refund. In fact, the customer service representative informed Ms. Sihler that she would have to ship the bottles back at her own expense to obtain even a partial refund. Ultimately, Ms. Sihler never recovered any of the money taken from her by Defendants.

18.     Plaintiffs Charlene Bavencoff is a citizen of the State of California and resides in the city of Santee, County of San Diego, California, where she resided at the time of her purchase of the product. On or around October 14, 2019, Ms. Bavencoff saw a Facebook advertisement for "Ultra Fast Keto Boost" and clicked through to a fake news article claiming the product was endorsed unanimously by all six celebrity sharks on the hit series, "Shark Tank."  Ms. Bavencoff reviewed the purchase options and chose one of the options where she would receive additional bottles at no cost.  Like Ms. Sihler, Ms. Bavencoff had

the same expectation—that she would not be billed for the additional "free" bottles. Several days later, she received five bottles of "Ultra Fast Keto Boost." However, without her knowledge or authorization, Ms. Bavencoff's credit card was overcharged $198.70, which represents the full price of $39.74 for each bottle.

19.    After Ms. Bavencoff tried one bottle and decided it did not work, she called the Customer Service number listed on the packing slip, but the telephone number was disconnected.   Ms. Bavencoff never recovered any of the money taken from her by Defendants.

### **The Defendants**

20.    Plaintiffs are informed and believe Defendant THE FULFILLMENT LAB, INC. ("TFL") is, and at all times herein mentioned was, a corporation organized and existing under the laws of the State of Florida, with its principal place of business located at 5136 West Clifton Street, Tampa, Florida, 33634.

21.    Plaintiffs are informed and believe Defendant RICHARD NELSON ("Nelson") is, and at all times herein mentioned was, a resident of the State of Florida, residing at 16506 Amberwind Lane, Apartment #108, Lutz, Florida 33558-4976. Defendant Nelson is TFL's current President.

22.    Plaintiffs are informed and believe, and based thereon allege, that at all times mentioned herein, each of the TFL Defendants was and now is the agent, servant, employee, representative, and/or alter ego of each of the remaining TFL Defendants, and in so doing the acts alleged herein, was acting within the scope of the authority of such agency, service, employment, representation, and/or alter-ego relationship with permission and consent of each of the remaining TFL Defendants, and is jointly and severally liable for the damages asserted herein.

23.    Plaintiffs are informed and believe Defendant BEYOND GLOBAL INC. is a corporation organized and existing under the laws of Wyoming, who lists its address as 2232 Dell Range Blvd., Suite 245, Cheyenne, WY 82009 (a virtual office with many other companies listed there), but whose actual principle place of business is in Nevada.

24.     Plaintiffs are informed and believe Defendant BRIGHTREE HOLDINGS CORP is a corporation organized and existing under the laws of Wyoming, who lists its address as 2232 Dell Range Blvd., Suite 245, Cheyenne, WY 82009 (a virtual office with many other companies listed there), but whose actual principle place of business is in Nevada.

25.     Plaintiffs are informed and believe Defendant BMOR GLOBAL LLC is a corporation organized and existing under the laws of Nevada, whose address is 7455 Arroyo Crossing #220, Las Vegas, NV 89113, and whose principle place of business is in Nevada.

26.     Plaintiffs are informed and believe Defendant DAVID FLYNN is an individual residing at 7762 Roaring Springs Circle, Las Vegas NV 89113. Mr. Flynn is a Manager of BMOR Global LLC, is the Vice President of Brightree Holdings Corp and a partner/owner of that company, and on information and belief, has a management position at Beyond Global, Inc.

27.     Plaintiffs are informed and believe Defendant RICKIE JOE JAMES is an individual residing at 6335 Paria Ct, Port Orange, FL 32128. Mr. James is a "Master Distributor" at BMOR Global LLC, is the CEO of Brightree Holdings Corp and a partner/owner of that company, and on information and belief, has a management position at Beyond Global, Inc.

28.     Plaintiffs are informed and believe DEFENDANTS JOHN DOE 1 THROUGH 10 are any other individuals, corporations, or entities responsible for marketing, branding, and/or selling the Keto Products, and any individuals, corporations, or entities providing the capacity to evade fraud detection through services relating to credit card or debit card processing (collectively, the "Doe Defendants"). The true names and capacities of the Doe Defendants sued herein as JOHN DOE 1 through 10, inclusive, are currently unknown to Plaintiffs, who therefore sue such Defendants by fictitious names. Each of the Doe Defendants designated as a JOHN DOE is legally responsible for the unlawful acts alleged herein. Plaintiffs will seek leave of Court to amend this Complaint to

reflect the true names and capacities of the JOHN DOE Defendants when such identities become known.

29.     Plaintiffs are informed and believe, and based thereon allege, that each of the Defendants aided and abetted one another by providing substantial encouragement and/or assistance in doing the acts alleged herein, with knowledge of the wrongful nature of the conduct and the harm to Plaintiffs that would result therefrom. There is, and was, a substantial causal connection between the conduct of the aider and abettor and the harm to Plaintiffs, and the encouragement and/or assistance was a substantial factor in causing the resulting harm. As a result, Defendants are not only liable for their direct torts and tortious conduct but are secondarily liable to Plaintiffs as a result of their aiding and abetting.

## FACTUAL ALLEGATIONS

### Background on the Scam

30.     The Internet has been plagued in recent years by a flood of scams enticing consumers into purchasing worthless weight-loss products by using fake news articles, fake celebrity endorsements, and fake customer reviews that boast miraculous results and benefits of the products—none of which are true.  The scammers advertise their products for a certain price, including promotional offers such as "Buy 3 Bottles, Get 2 Free," then send all of their victims five bottles of the product, regardless of the number of bottles they actually purchased. The customers soon discover that their debit or credit cards are overcharged for all five bottles that they did not order and never intended to purchase—a "straight sale" scam that is anything but straight.

31.     The scammers make the refund and return process virtually impossible, and as a result, most customers are unable to recover their money, including Ms. Sihler and Ms. Bavencoff.  This has become a lucrative business as the scammers churn out the same bottles of bogus weight-loss products with different names and labels to continue perpetrating their scheme.  The efforts by the Federal Trade Commission ("FTC") and other regulators to shut down these scams has created a virtual "whack-a-mole" in that scammers can close up shop with one bogus product, then quickly and easily start selling

another product using the same fraudulent techniques.

32.    These scams are not just deceptive—they are criminal. This lawsuit seeks to shut down the ring of scammers who defrauded an unknown number of people, including the named plaintiffs, Janet Sihler and Charlene Bavencoff.

33.    The Better Business Bureau ("BBB") issued a study in December 2018 titled "Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements." *See* Exhibit 1 attached hereto. Written by C. Steven Baker, an International Investigations Specialist for the BBB and former Director for the Midwest Region of the FTC, the report explains in detail the tactics used by scammers to exploit customers who are unaware of their fraudulent techniques.

34.    According to the report, these scams have "infested the internet and social media." Ex. 1, at p. 1. Although the report focuses on "free trial" scams, the same fraudulent techniques used by those scammers are used by the Defendants here, and in fact, the scam here is an evolution of the "free trial scam" designed to avoid FTC scrutiny by billing for a group of unordered bottles all at once, rather than through a continuity subscription. The similarities are clear. For example, all of these scams start out the same way: "You've seen them on the internet: ads or links leading to pictures of celebrities and products that sound intriguing. The ads claim these 'miracle' products will help you lose weight easily, combat wrinkles or whiten teeth. Often, fraudulent operations involved with these types of ads employ the latest internet marketing techniques and professional looking websites."

35.    While victims of the traditional "free trial scam" are enticed to purchase products through a "risk-free" trial, victims of this "straight sale" scam like Ms. Sihler and Ms. Bavencoff are enticed by the promise of "free bottles." They are subjected to fake celebrity endorsements and fake customer reviews showing extreme weight loss, as well as the promotional offers to receive "free" bottles of the product. Later, they are shocked to discover that their debit or credit cards have been charged almost $200.  The report continues: "There may be a risk that the product doesn't work as claimed, but it costs next to nothing to find out. Just enter your name, address and credit card number and act quickly;

supplies are limited. Better Business Bureau's (BBB's) in-depth investigative study found that many of these free trial offers are not free. They do not just send free product samples to try. If you can locate and read the fine print on the order page, or the terms and conditions buried by a link, you'll discover that you may have only 14 days to receive, evaluate and return the product to avoid being charged $100 or more. In addition, the same hidden information may state that by accepting the offer, you've also signed up for monthly shipments of the products. Those also will be charged to your credit card and become subscription traps. Many people find it difficult to contact the seller to stop recurring charges, halt shipments and get a refund." Ex. 1, at p. 1.

36.     The Defendants used similar fraudulent techniques to perpetrate their illegal scam here—indeed, they learned them through a long history of perpetrating "free trial scam" prior to changing their methods to offering "free bottles." And as the BBB recognized in its study, the sellers of these products are not the only active participants in these scams: "The fraud involves a variety of players, from those who obtain the products to advertisers, shippers and credit card processors." Ex. 1 at 1.

37.     For example, the companies involved often hire "affiliates" to place advertisements for them or to create fake celebrity ads, paying them commissions. Ex. 1 at 3. Those affiliates are often hired or paid through a separate "affiliate network." *Id.*

38.     The BBB describes the role of affiliates and affiliate networks as follows: "Many fake free trial offers use affiliate networks to advertise their products. Someone who wants to drive traffic to their website hires an affiliate network, which in turn hires individual affiliates to place advertising. The affiliates often buy space for ads or sponsored content on popular websites. Clicking on one of these ads will take people to a website where products are sold, or to a 'landing page' that then refers users to the main site for the product. Commissions are paid to the affiliate network, which in turn pays the affiliates. Affiliates can either be paid per click or per order placed. Commissions for these misleading 'free trial' offers can be $30 to $50 for every person who signs up." Ex. 1 at 6.

39.     Another typical player in the scam operations is the "fulfillment company"—which is a company that manufactures and ships the products to consumers, but in fact plays a much greater role in the scam, acting as consultants and creating turn-key scam products knowing full well how they are being sold. The BBB study makes clear that these fulfillment companies are active participants: "The free trial offer operations also have to get the product shipped to victims. Often, fraudulent free trial operations use fulfillment companies to ship the products and, presumably, accept returns." Ex. 1, at p. 9.

40.     A final type of participant in these scams are third party companies which assist in preventing the scammers from losing their merchant accounts with credit card companies or otherwise being flagged for their fraud: "Using a crooked processor. Banks that offer credit card processing hire Independent Sales Organizations (ISO's) to solicit and sign up merchants for them. The banks require that these agents comply with detailed rules before opening accounts to determine if they are legitimate and to monitor their activity for signs of fraud, such as reviewing chargeback rates and other suspicious activity. But what if those providing processing services are in on the fraud? The FTC has sued a number of these ISOs over the years, often alleging that these third parties were aware of the fraud or actively assisted in helping a fraudulent company evade the rules of the credit card system. For example, in one FTC case an ISO spread the credit card charges over 26 merchant accounts to disguise the fraud activity." Ex. 1 at 11.

41.     The fact that "affiliate marketing" is rife with illegal scam operations is well known in the industry. At the *Affiliate Summit West* in 2019, the preeminent conference for affiliate marketers, the keynote speaker, Neil Patel, repeatedly acknowledged in frank language how widespread such scams are among Internet marketers and among attendees of the conference:[1]

---

[1] Neil Patel, *The Future of Affiliate Marketing: It's Not What You Think*, https://www.youtube.com/watch?v=2hUdbztKLY4 at 0:20 (last visited Jan. 3, 2019) (emphasis added).

The sad reality is, at least for a lot of affiliates, the way affiliate marketing was a few years ago isn't gonna exist anymore and it's gonna get tougher and tougher. You know, I remember years ago in San Diego I was meeting some friends and they're like, yeah, we're selling some skin care product, we got to zero to $100 million dollars a year in revenue in twelve months with a brand new company. Those days are long gone. **As you can guess some of those guys probably got hit by the FTC as well.**

42.     Mr. Patel continued:[2]

I've got a marketing blog. I see what a lot of affiliate marketers think 'cause a shit load of 'em hit me up every single day, I think I'm number one on Google for affiliate marketing. I could be wrong, maybe number two. Either way I just get a ton of affiliate marketing traffic. So, let's go over fact number one: how affiliates currently make money. And hopefully you guys don't get offended, I'm just gonna be stating the facts. Churn and burn model with Facebook accounts. You guys know what I'm talking about, you used to pay people fifty bucks, it used to be crazy back in the day, people were paying hundreds of dollars for Facebook accounts and then they would churn and burn 'em. You guys familiar with this? No? I love it, you have the biggest smile and you're like, no, and now you're turning away, you're like don't look at me, hopefully no camera's on me. (LAUGHTER). That's okay. Everyone has to make a livin'. Hopefully you crushed it while you can. **The next model: fake news landing pages. "The Shocking Reason Why Joy Behar Is Quitting The View." Well it's because she took this new wrinkle cream.** (LAUGHTER). She looked ten years younger and now this is what she's selling. And you know what? Joy's story is so amazing, on that landing page is also a testimonial from her friend Oprah. (LAUGHTER). On how this wrinkle cream also made Oprah look twenty years younger. And you know what? Oprah also lost ten pounds while taking this wrinkle cream. (LAUGHTER). She was so addicted to it she was taking it at night, but luckily when her power went off she had one of those flashlights, the survival ones. (LAUGHTER). Right?

**That's how affiliate marketers make money. And again, I've seen it, there's nothing wrong with it. Some of you guys do straight sells, so when they click from that Oprah landing page, they go into a straight sell instead of forced continuity.** And that's fine as well. And again this is forced continuity, you tell 'em it's a free trial, but they don't really see in the fine

---

[2] *Id.* at 5:41.

print that they're gonna get billed every single month. And then you target the older demographics who have no idea why they're continually getting rebilled. **And then some of you guys have what's called a quote-unquote hell room that just deals with the calls. And the refunds. Or the credit card processors where you guys rotate up the chargebacks so then that way, then you guys can keep processing the money.**

43.     Mr. Patel acknowledged that a widespread FTC crackdown was occurring:[3]

The FTC has been cracking down on certain companies and industries, hence you're seeing a lot less forced continuity. You guys, many of you have issues with credit card processing, so you'll do things like, I forgot what the saying is but they rotate up the MIGS or the MIDS, I don't know what the saying is but it's more so they're controlling where the chargebacks are going.

44.     Mr. Patel described the FTC efforts to target not just affiliate marketers but companies such as Facebook:[4]

But they get pressure. 'Cause those old grandmas are like, hey! Facebook screwed me over! They sold me this wrinkle cream! One, I still have my wrinkles. Two, they keep advertising these false products. So they get pressure. The government doesn't just want to stop the companies, they go to the source and say, stop them from advertising.

45.     At a Keynote Panel that followed Mr. Patel's speech, several panelists who operate affiliate networks addressed the same issue. An audience member who was inexperienced in the industry posed the following question about the fake news articles used by many affiliate marketers:[5]

**Ok, I'm relatively new to the affiliate game myself.** Uh, I started my business at home, and I have to say that I'm very pleased with the industry

---

[3] *Id.* at 10:10.
[4] *Id.* at 16:16.
[5] Affiliate Summit West 2019 Keynote Panel, https://www.youtube.com/watch?v=6KRA8fL6hp0&t=281s, at 50:02 (last visited Feb. 9, 2020) (emphasis added).

3:20-cv-01528-LL-MSB

coming out of 25 years of health care. So, my question is, what are the regulations from the Federal Trade Commission that publishers are gonna have to deal with that's gonna impact our revenue? And is the fed—you guy's dealing with the Federal Trade Commission, would that impact us? You guys. If there was something that you guys had—you had to deal with, that, would that impact the way we do business with you? .... What is the government looking at as far as publishers, you know, I mean, what do we, what, in the next five years, is gonna be the regulations for us in content? **Like the fake news stuff. Everybody talk about the fake news, but nobody even, like, call people who put fake news out. Nobody calls 'em on it. You know, they continue to do it. If I wanted to put something up about one'a you guys, fake news, what would stop that? You know? What type'a federal laws are gonna be put in place to keep that from happening?**

46.     The inexperienced audience member may not have understood why these illegal practices were being tolerated by the industry, but the panel knew perfectly well. And their response gave away the game. Todd Crawford, the Vice President of Strategic Initiatives at Impact Radius, a company that connects affiliates to advertisers, responded as follows:[6]

> Well, you know, the FTC requires you to disclose that you're earning money from your links, that you may be earning money for referring sales. **You know, if you're promoting fake news, I think that's more of a brand decision or maybe a network decision on their policy of what they accept.** I mean, we even have criteria that, in our marketplace environment, you have to, you know, you can't do certain things that maybe a brand would work with you direct through. So, it, I think there's no simple answer there but the big picture is the disclosures by the FTC, because they're going to come after you.

47.     Earlier in the panel, Mr. Crawford commented on a question about what affiliate networks do when fraud is detected on their networks:[7]

> Well, for example, this is years ago. I helped found Commission Junction. So when I was working there, a very large publisher violated the agreed upon terms that everybody else in here had agreed to, and we kicked 'em out for over a year, and no other network did anything.... [I]n the U.S., it's so spread out, and it is kinda this every man or woman for themselves. And they're

---

[6] *Id.* (emphasis added).
[7] *Id.* at 21:44.

gonna run their business how they want. I'm all for it, but...

48.     Mr. Crawford's statements make clear that the companies that are supporting the scammers are making a policy decision to allow that conduct to occur on their networks. And he further makes clear that some businesses have chosen not to work with these scammers, and that they are perfectly capable of doing so. The companies that work with the scammers are making voluntary, intentional, and knowing decisions to do so—and they are making that choice because it is an extremely profitable one.

49.     Tellingly, representatives for the TFL Defendants attended both the *Affiliate Summit West* in Las Vegas, where Mr. Patel and Mr. Crawford were the keynote speakers, and the *Affiliate Summit East* in New York.   Upon information and belief, these representatives attended the conferences specifically for the purpose of finding scammers to be their clients.

50.     The attitude of Mr. Patel and others in the affiliate marketing "industry" that "there's nothing wrong with" this behavior is deeply disturbing: there is in fact something quite wrong with targeting the unwitting consumer, the poor,  and the elderly with fake news advertisements and fake "free bottle" promotions for the purpose of defrauding their debit and credit cards before the victim notices. It is little more than outright theft conducted under the barest fig leaf of a "business"—and it is precisely what the Defendants were doing here.

51.     These scams generally involve more than one individual or companies conspiring together and generally playing the roles described above. Believing that they can pretend that their affiliates are independent contractors, or that they can pretend to see no evil and hear no evil and thus escape legal liability, the conspirators work together as a group to profit from the fraud. But they are quite wrong to believe that they are safe—every member of these conspiracies knows full well what they are doing, and every member is jointly and severally liable for the conduct of the others.

1

2

**<u>Plaintiffs Janet Sihler and Charlene Bavencoff are Two of</u>**

**<u>Many Victims of the Keto Scheme</u>**

3       52.     On or about December 11, 2019, Plaintiffs Janet Sihler saw an advertisement

4    for a weight loss product called "InstaKeto" as she was browsing the Internet.   The

5    advertisement stated the product was featured on the well-known television show, "Shark

6    Tank."  She clicked on the advertisement, which took her to the InstaKeto landing page,

7    where she purchased the bottles.

8       53.     Ms. Sihler entered her credit card information and expected to be taken to a

9    final review and submit page that would show her the total purchase price.  Instead, the

10   next page stated: "Your order has been submitted."

11      54.     Ms. Sihler subsequently received a charge on her debit card for $198.70.  The

12   charge on her debit card showed the merchant account as "VYA*KETOBOOST

13   8889700695 Port Orange FL."

14      55.     A few days later, she received five bottles branded "Instant Keto" with a

15   packing slip. The packing slip did not show any prices.[8]

16

17

18

19

20    

21

22

23

24

25

26

27

28

---

[8] Image redacted to remove Ms. Sihler's address.

56.     Although the five bottles were labeled "Instant Keto," the packing slip described the bottles as "KetoBoost" and identified the shipper as "Ultra Fast Instant Keto" with an office located at 3201 Hillsborough Avenue 153201-1378, Tampa, Florida, 33684.

57.     Ms. Sihler called the Customer Service telephone number to request a refund. The Customer Service representative flatly refused and informed Ms. Sihler that she would have to ship the bottles back at her own expense to obtain even a partial refund. Ms. Sihler was never able to recover her money.

58.     Similarly, on or about October 14, 2019, Plaintiff Charlene Bavencoff saw an advertisement on Facebook for a weight-loss product called "Ultra Fast Keto Boost." She clicked on the advertisement, which took her to a fake news article claiming the product was featured on "Shark Tank."  She clicked on the advertisement, which took her to the Ultra Fast Keto Boost's landing page, where she purchased the bottles.

59.     Ms. Bavencoff subsequently received a charge on her card for $198.70.  The charge on her credit card showed the merchant account as "UltraFast Keto Boost 8444-7041211NV."

60.    A few days later, she received five bottles branded "Ultra Fast Keto Boost" with a packing slip. The packing slip does not show any prices.[9]



61.    Ms. Bavencoff tried one bottle for a few weeks; however, she decided the product did not work so she did not use it any further.  When she tried contacting Customer Service to obtain a refund, the phone number was disconnected. Like Ms. Sihler, Ms. Bavencoff has not been able to recover her money from Defendants.

62.    Although Ms. Sihler and Ms. Bavencoff purchased different products, their packing slips for "InstaKeto" and "Ultra Fast Keto Boost" are virtually identical.  Both packing slips have the same layout with the same fields, label size, and font.  The shipper's name and return address are identical as Ultra Fast Instant Keto, 3201 Hillsborough Avenue 153201-1378, Tampa, Florida, 33684.

---

[9] Image redacted to remove Ms. Bavencoff's address.

63.     Both Ms. Sihler and Ms. Bavencoff were injured by Defendants' misrepresentations and unfair and unlawful business practices. They suffered a loss of time, inconvenience, and a loss of money. They paid more for the products than they would have had they been aware that Defendants' representations were false, and ended up with products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore suffered injury in fact.

### The Keto Scam:

### A Victim Encounters the Product Advertisement through a "Sales Funnel"

64.     The "sales funnel" for the Keto Products - the series of websites which leads a victim to sign up for a fraudulent purchase—is typical of the scams about which the FTC and BBB have issued repeated warnings to consumers.

65.     The victim initially encounters an advertisement for the product through a third-party site, such as Facebook, which takes the victim to one of the product's landing pages.  Both Ms. Sihler and Ms. Bavencoff viewed online advertisements claiming that the "InstaKeto" and "Ultra Fast Keto Boost" products were unanimously endorsed by all six celebrity "sharks" on Shark Tank.

66.     Many of these landing pages are hidden from search engines, they are made inaccessible to anyone who does not view an advertisement, or they are deleted after a few weeks or months to avoid detection. While the specific pages Ms. Sihler and Ms. Bavencoff viewed are unknown, there are two known landing pages for the Keto Products.[10]

67.     One of the known "Ultra Fast Keto Boost" affiliate pages is titled "Weight Loss Supplement That Naturally Burns Fat Gets Biggest Deal in Shark Tank History."[11]

---

[10] For Ultra Fast Keto Boost, the landing page is https://ultrafastketoboost.com. For InstaKeto, the landing page is http://instaketo.com.

[11] Although the webpage is designed to look legitimate, the actual URL is: https://santa-claus.clientsshopping.com/?Flow=6915668891661758&uid= e20839cde0417e819ec6e97d0cfac59e&access_token=E2gaoH9- zGoFuJ4UuAJGbzrKbDdqeJrKIOD5sF36h=4JuENPNzjMeyrNVUuNXCZ5iWIDdycyr

The webpage is designed to mimic the format of a legitimate news article with a "Vane Local" logo at the top.  A banner running under the title claims that Ultra Fast Keto Boost has been featured in a variety of legitimate publications and beauty websites: Us, New You, Shape, HauteLook, Time, Health & Fitness. The advertisement urges victims to "CLICK HERE to Claim Your Special Offer of Ultra Fast Keto Boost."

AHugAysXC96b2wOvHNuyGndtJ48w8mpl (last accessed Jan. 20, 2020). This webpage is no longer accessible.

**VL** VANE LOCAL    LOVE    CELEBS    BEAUTY    GIFT IDEAS

# Weight Loss Supplement That Naturally Burns Fat Gets Biggest Deal In Shark Tank History

*— featured in —*

US   NEW YOU   SHAPE   HAUTELOOK   TIME   health&fitness



EXCLUSIVE

*(Wednesday, March 11, 2020Thursday, September 5, 2019) - It was the most watched episode in Shark Tank history when sisters Anna and Samantha Martin won over the Shark Tank panel.*

Never before had the judging panel unanimously decided to each invest over 1.3 million dollars into a potential company.

After buying a staggering 25% share in the sisters company, the Shark Tank panel have personally mentored the pair, helping them undergo re-branding and re-packing of their miracle product.

Touting their discovery as "a great step forward in weight loss history, the panel were quick to offer up their hard earned cash to back the entrepreneurial pair. "We were shocked. The most we were hoping for was some advice...we weren't even sure that we would manage to get any investors," explained Samantha. After outstanding offers from each panel member, the sisters burst into tears.

The judges were amazed that one product was able to do all of the following:

- Increase Resting Metabolism More Than 130%
- Flush Out Harmful Toxins
- Lose weight more easily
- Block Excess Fat Production By 110%
- Curb appetite and feel fuller longer
- Improve mood and sense of well-being
- Improve Sleep By 80%
- Lower blood pressure
- Reduce cholesterol
- Decrease body fat
- Regulate blood sugar levels

"It didn't feel real. The fact that all these successful, business-minded people wanted to be apart of *Ultra Fast Keto Boost* and what we were doing was very emotional!" explained Anna.

The pair are the first contestants in the show's long duration to ever receive a standing ovation and offers of investment from all five panel members. The sisters said they celebrated the success with champagne and cake when the episode wrapped.



**READER RESULTS**



Lacey Brown, age 53 submitted this photo of her results with Ultra Fast Keto Boost. You look great, Lacey!

"*Ultra Fast Keto Boost* is the absolute best weight loss product I've ever used. I thought my days of looking young and thin were long gone. I can't thank you enough for this!"

*Lacey Brown,*
*Cronulla*

**BEFORE & AFTER**



"I've been trying to lose the same 10 lbs for what feels like forever now. *Ultra Fast Keto Boost* got rid of it in only 2 weeks! Thanks so much!"

*Andrea Taylor,*
*Gold Coast*

**BEFORE & AFTER**



"For the first time in forever I am finally happy when I look in the mirror every morning. I haven't felt this confident in a long time!"

*Kelly Smith,*
*Melbourne CBD*



*The sisters were the first contestants in Shark Tank history to receive investment offers from all five panel members.*

Since filming their episode, the sisters have been hard at work putting the advice of their mentors into play.

*"We completely re-branded our company and came up with new packaging,"* said Anna.

The pair recently unveiled the product that netted them millions of dollars in investments and made it for sale across Australia and soon to be worldwide.

*"The two products we displayed on the show have been rebranded into the Ultra Fast Keto Boost. It's the original formula, all we've done is change the name and the packaging,"* explained Samantha.

The sisters first launched the products for sale through their company website and say they sold out within 5 minutes.

*"We even made sure we had more product than we thought we could sell, but all of it sold out within five minutes!"* exclaimed Samantha.

While the Shark Tank investors are toasting to their smart business move, women across Australia are flocking online to purchase Ultra Fast Keto Boost and say the results have been life-changing.

Clinical trials of the Ultra Fast Keto Boost have uncovered that women who used the Ultra Fast Keto Boost Dietary Supplement were able to lose an average of 21 lbs in 1 month and with continued use keep the weight off.

*"Ultra Fast Keto Boost is revolutionizing weight loss methods,"* explained Barbara Corcoran from Shark Tank.

# WOMEN AND MEN LOVE Ultra Fast Keto Boost

*"For the first time in forever I am finally happy when I look in the mirror every morning. I haven't felt this confident in a long time!"*

**Kelly Smith,**
**Melbourne CBD**

## Special Offer

☑ **Step 1:**

**CLICK HERE to Claim Your Special Offer of Ultra Fast Keto Boost**



Special Offer Are Limited.
Expires: Wednesday, March 11, 2020

**GET YOUR BOTTLE >>**

**BEFORE & AFTER**



68.     The fake news article claims that the Shark Tank judging panel "unanimously decided to each invest over 1.3 million dollars" in the Ultra Fast Keto Boost product, which was purportedly a company run by two sisters named Anna and Samantha Martin. In fact, there are no such sisters: the women pictured are Shelly Hyde and Kara Haught of Raising Wild Swimwear, who appeared on Shark Tank in Season 8, but who have no affiliation

with Ultra Fast Keto Boost.[12]

69.     The fake news article claims the Shark Tank judges were "amazed" that the Ultra Fast Keto Boost product could do all of the following—"increase resting metabolism more than 130%, flush out harmful toxins, lose weight more easily, block excess fat production by 110%, curb appetite and feel fuller longer, improve mood and sense of well-being, improve sleep by 80%, lower blood pressure, reduce cholesterol, decrease body fat, and regulate blood sugar levels"—a complete falsity. The article features a photograph of all six "sharks"—Mark Cuban, Kevin O'Leary, Daymond John, Barbara Corcoran, Lori Greiner, and Robert Herjavec. The "sharks" are pictured toasting with champagne, presumably to their new investment in Ultra Fast Keto Boost.

70.     The webpage also provides numerous "before and after" photographs of people who have apparently experienced extreme weight loss, all of which is attributed to the Ultra Fast Keto Boost pills.

**WOMEN AND MEN LOVE** Ultra Fast Keto Boost





"*Ultra Fast Keto Boost is ground-breaking. 14 kilo in just 3 weeks! I finally have my figure back! They are the only company in the world who are effectively helping women lose weight in a safe, natural and healthy manner.*" -

"*Thank God I didn't go through with that surgery... I got the same weight loss results, for less than a cup of coffee! I'm so happy!!!*"
**Christina Butler,**
**Hobart**





"*I've been using Ultra Fast Keto Boost for 3 months, during that time I've lost 97 lbs! It's been a life-changer for me, it's unbelievable! I haven't felt this healthy since my 20's!*"

"*Ive only been using the Ultra Fast Keto Boost for 1 month, and I love it!!!!!!! I have seen a visible change in my weight, and best of all my friends are noticing!*"
**Carol Keeton,**
**Auckland**

BEFORE & AFTER

---

[12] *Raising Wild: What Happened To Bathing Suit Sisters After Shark Tank*, 2Paragraphs, https://2paragraphs.com/2017/10/raising-wild-bathing-suit-sisters-schooled-by-corcoran-after-shark-tank-as-founders-learn-to-prioritize-launch-sunglasses/

71.   The bottom of the page contains fake Facebook comments touting the beneficial effects of the product.



☑ **Step 1:** Special Offer of Ultra Fast Keto Boost

**(2094)** Viewing The Special Offer

**GET YOUR BOTTLE >>**

This special offer expires: Thursday, September 5, 2019



---

**Recent # Comments**                                    **Add a comment**

**Tohloria Lewis**
Never even thought about combining the products. I am very much pleased after using this product.
Reply . 13 . Like . 12 minutes ago

**Tanya Porquez**
I saw Anna and Trevor presentingShakra Keto on CNN a while ago and am still using the pill. I've been using the products for about 6 wks. Honestly, this is unbelievable, all I have to say is WOW.
Reply . 6 . Like . 13 minutes ago

**Jennifer Jackson Mercer**
A friend of mine used and recommended it to me 3 weeks ago. I ordered the product and received it within 3 days. The results have been incredible and I can't wait to see what weeks 3 and 4 bring.
Reply . 19 . Like . 25 minutes ago

**Kristy Cash**
I wish I knew about this product before I had liposuction! It would have saved a heck of a lot of money!
Reply . Like . 46 minutes ago

**Katy Barrott**
I can't believe this really worked! I am very much pleased after using this product.
Reply . 43 . Like . about an hour ago

**Amanda Gibson**
I saw this on the news. How lucky is Kim to have been given this opportunity!?!?! Thank you for sharing this article! I just ordered mine.
Reply . 3 . Like . 1 hour ago

**Julie Keyse**
probably I'm a bit more overweight than most of you folks. butShakra Keto worked for me too! LOL! I can't say anything more exciting. Thanks for the inspiration!
Reply . Like . 2 hours ago

---

72.     The affiliate page repeatedly claims that there is a limited supply of Ultra Fast Keto Boost remaining and urges victims to act quickly before supplies run out. Victims are told that the "Special Offer" will expire in 15 minutes and the timer then counts down—but that timer itself is a misrepresentation. There is in fact no limited supply. The website's code automatically starts a new 15-minute timer every time a user visits the page.

*(Thursday, September 5, 2019) - It was the most watched episode in Shark Tank history when sisters Anna and Samantha Martin won over the Shark Tank panel.*

Never before had the judging panel unanimously decided to each invest over 1.3 million dollars into a potential company.

After buying a staggering **25% share in the sisters company,** the Shark Tank panel have personally mentored the pair, helping them undergo re-branding and re-packing of their miracle product.

Touting their discovery as "a great step forward in weight loss history, the panel were quick to offer up their hard earned cash to back the entrepreneurial pair. "We were shocked. The most we were hoping for was some advice…we weren't even sure that we would manage to get any investors," explained Samantha. After outstanding offers from each panel member, the sisters burst into tears.

The judges were amazed that one product was able to do all of the following:

- Increase Resting Metabolism More Than 130%
- Flush Out Harmful Toxins
- Lose weight more easily
- Block Excess Fat Production By 110%
- Curb appetite and feel fuller longer
- Improve mood and sense of well-being
- Improve Sleep By 80%
- Lower blood pressure
- Reduce cholesterol
- Decrease body fat
- Regulate blood sugar levels

*"It didn't feel real. The fact that all these successful, business-minded people wanted to be apart of Ultra Fast Keto Boost and what we were doing was very emotional!"* explained Anna.

The pair are the first contestants in the show's long duration to ever receive a standing ovation and offers of investment from all five panel members. The sisters said they celebrated the success with champagne and cake when the episode wrapped.



**BEFORE & AFTER**

*"I've been trying to lose the same 10 lbs for what feels like forever now. Ultra Fast Keto Boost got rid of it in only 2 weeks! Thanks so much!"*

**Andrea Taylor,**
**Gold Coast**



**BEFORE & AFTER**



2 Special Offer Slim Down Bottles Left
14 mins 26 secs      Claim Yours!

73.     There is a second known affiliate page for Ultra Fast Keto Boost entitled "28+ lbs in 4 Weeks: New No-Exercise 'Skinny Pill' Melts Belly Fat. Why Every Judge On Shark Tank Backed This Product!"[13]  The webpage is designed to mimic the format of a legitimate news article from Fox News Channel.  A banner running under the title claims that Ultra Fast Keto Boost has been featured in a variety of legitimate publications and beauty websites: The New York Times, Today, The Oprah Network, StyleWatch, and Redbook. As the consumer scrolls the page, a constant banner provides a minute-by-minute countdown as to when the purported "Offer" expires, thereby creating an extreme sense of urgency to click through and purchase the product.



_____

[13] The URL is https://www.duoduojianqian.com (last accessed October 6, 2019). This website is no longer accessible.

74.     The fake Fox News Channel article makes the same false claims as the landing page on the so-called "Vane Local" website, and posts the same photo of all six "sharks" - Mark Cuban, Kevin O'Leary, Daymond John, Barbara Corcoran, Lori Greiner, and Robert Herjavec - toasting with champagne, presumably to their new investment in Ultra Fast Keto Boost.

75.     The website goes on to claim that "Celebrities Love Ultra Fast Keto" and provides fake endorsements from a number of other celebrities, not just the Shark Tank cast. For example, American Idol star, Jennifer Hudson, is pictured with "before" and "after" photos calling Ultra Fast Keto Boost "her only choice" and that she "had lost a total of 80 pounds and had gone from a size 16 to a size 6."



*It's been six months since the American Idol alum started her weight-loss journey. Among many slimming pills, Ultra Fast Keto is her only choice. In a October 2018 interview with Redbook, she revealed that she had lost a total of 80 pounds and had gone from a size 16 to a size 6. - Jennifer Hudson*

76.     Other celebrities are pictured as endorsers as well. Celebrity talk-show host Wendy Williams supposedly exclaims about Ultra Fast Keto Boost: "I feel amazing…and I finally said, 'Oh, for God's sake, stop worrying about my weight,' and it may be the best thing I've ever done!"



*"I feel amazing...and I finally said, 'Oh, for God's sake, stop worrying about my weight,' and it may be the best thing I've ever done!"* - **Wendy Williams**

77.     Celebrity comedian Drew Carey is quoted as being in "love" with Ultra Fast Keto because "I have a hectic schedule and I don't have a lot of time to devote to workout routines. That's why I love Ultra Fast Keto! Taking just one per day helped me get my body where I really felt comfortable."

1
2
3
4
5
6
7
8
9
10
11
12
13



*"I have a hectic schedule and I don't have a lot of time to devote to workout routines. That's why I love Ultra Fast Keto! Taking just one per day helped me get my body where I really felt comfortable " - Drew Carey*

14      78.     The affiliate page continues with endorsements from "Us Today's" offices—
15  presumably a fake combination of well-known publications USA Today and/or US
16  Weekly, and from Fox News that "Fox News is happy to officially recommend it!" The
17  page continues with fake "before" and "after" photos and fake customer reviews—all of
18  which attribute their extreme weight loss to Ultra Fast Keto Boost.

19      79.     The affiliate page also claims that consumers will not find a bigger discount
20  "anywhere else on the internet!" and urges consumers to claim the "biggest discount" of
21  "buy 4 get 3 free and buy 3 get 2 free and buy 2 get 1 free."

22      80.     The affiliate page goes on to urge consumers to act quickly because there is a
23  limited supply of Ultra Fast Keto Boost.   Victims are told that "Only 4 Bottles Still
24  Available" and that the "Special Offer" will end on a specific date—but, again, that date
25  itself is a misrepresentation. There is in fact no end date. The website code simply starts a
26  timer each time someone visits the page, but it has no actual effect.

27
28
            FOX          Offer expires                    Claim >                    ×
            NEWS         in 14 : 56

81.     On information and belief, victims of the Keto scam were all subjected to similar or identical representations and were funneled from affiliate pages similar or identical to the two affiliate pages described herein to the landing pages for the Keto Products.

82.     The "Shark Tank" affiliate pages are no longer linked to the websites for these Keto Products, but the URLs for these pages included at least https://ultrafastketoboost.com and http://instaketo.com, two websites pages operated by the Keto Defendants.

83.     The existence of these websites would not be apparent to anyone other than the victims, and anyone who did not view the "Shark Tank" affiliate pages would be unable to find the websites for the Keto Products.  This is because the Keto Defendants configured their robots.txt files in a way to prevent search engines like Google or Bing from indexing their pages.   Therefore the URLs above— https://ultrafastketoboost.com and http://instaketo.com—would never show up in a search on these or other search engines. The only way to discover these websites would be via a direct link from a page or advertisement set up by the Keto Defendants.

84.     The Doe Defendants who are affiliates or affiliate networks clearly know about these landing pages because they link directly to these pages.

85.     A partial image of one of the landing pages for "Ultra Fast Keto Boost" appears below:[14]

---

[14] https://ultrafastketoboost.com

86.    There are no terms of service or disclaimers visible at all on the landing page. Instead, the victims are bombarded by false claims about the beneficial effects of the product, including that it is a "Revolutionary Break-Through" that has "Scientists, Doctors and Celebrities Buzzing" and has helped "thousands who are already losing up to 1 lb. per day."[15]

87.    On the landing page, victims are repeatedly told they should rush their order because the supply of Ultra Fast Keto Boost is limited. A pop-up banner at the top warns: "WARNING: Due to extremely high social media demand for our offers with free bottles, there is limited supply of Ultra Fast Keto Boost in stock as of September 24th!  Offer expires in …."[16]  Like on the affiliate page, the timer is just a countdown that resets for each user when they visit the page and is not tied to the existence of any real timed offer.

---

[15] https://ultrafastketoboost.com
[16] *Id.*

88.     At the very bottom of the page, there is a "Terms" hyperlink, which a consumer must click and scroll through in order to read a lengthy disclaimer.[17]   This disclaimer is only visible to customers who click on the hyperlink at the bottom of the shipping page.  The websites do not require the customer to read or acknowledge the Terms to complete a checkout.



89.     Buried in the lengthy disclaimer is a section entitled "Refund/Return Policy," which provides the disclosure that, in order to obtain a full refund, the consumer must contact Customer Service by telephone—not by email—and obtain a RMA ("Return Merchandise Authorization") number to place on the package, then must ship the product back at the consumer's own expense within 30 days of the date the consumer ordered the product.  The disclaimer also states the product "must NOT be opened or used" and the consumer must pay a $5.00 restocking fee.  The disclaimer instructs the consumer to send the returned product to Ultra Fast Keto Boost, 9205 W. Russell Road, Suite 240, Las Vegas, Nevada 89148.

90.     The so-called Refund/Return Policy is impossible to follow because it requires the consumer to call—not email—the Customer Service department to obtain the RMA number, but the Customer Service number was not a working number, as it was not working in Ms. Bavencoff's case.  The return policy also requires the consumer to return the item within 30 days of purchase and it must not be opened or used.  This makes no sense when the advertisements emphasize that the product must be used every day for 30 days in order to see results.  The consumer cannot even try it for one day before the refund

---

[17] https://ultrafastketoboost.com/terms-and-conditions

policy is void.

91.    At the bottom of the landing page, there also is a "Refund" hyperlink, which a consumer must click to read a shorter, conflicting policy that all orders are "secured with a 30-day Money Back Guarantee" and that a customer may request a refund by "simply" contacting support@ultrafastketoboost.com or 888-970-0686 to obtain an RMA number.[18]

Refund/Return Policy
In order to obtain your full refund, contact customer service by phone and obtain an RMA (Return Merchandise Authorization) number to place on your package. Write this number on the outside of the shipping package and send the product back to our warehouse at the address provided to you, and within thirty (30) days of the date you originally ordered the product. In order for your full refund to be processed the product must arrive at our fulfillment facility within thirty (30) days of the original purchase date and NOT be opened or used. You pay for return shipping. There is a $5.00 restocking fee per unit you are returning. This fee will be taken out of the refund issued. Once our warehouse has received the returned package, you will be issued a refund. Your refund will be credited back to the same credit card used to make the purchase. Refunds are issues within 48 hours and may take up to 3-5 business days to show in your statement, depending on the speed of the processing bank.
You may request a refund by calling 1-888-970-0686 (Support Line) Monday to Friday 8AM to 5PM PST.
Returns must be sent with your RMA number written on the packaging to:

RMA Returns
Ultra Fast Keto Boost
9205 W. Russell Road, Suite 240
Las Vegas, NV 89148

The Refund will show on your Credit Card statement as KETO BOOST, and you will receive a confirmation email from our warehouse at the time when your refund has been issued.

92.    After the victims enter their personal information on the landing page, including their full name, email address, telephone number, and shipping address, they click "Rush My Order" where they are taken to a check-out page. An image of the top of Ultra Fast Keto Boost's check-out page appears below.[19]

---

[18] https://ultrafastketoboost.com/terms-and-conditions/refunds
[19] https://ultrafastketoboost.com/checkout





93.     Notably, there is no requirement that users click a box or take any other action to agree to any terms of service. Once again, the link to the "Terms" is located at the very bottom of the screen next to several other links, in small text, and it requires users to scroll down to locate it. On the phone or tablet, the design for this page similarly requires no assent to the terms of service in any way, and again requires scrolling to a small link at the bottom to even view the terms.

94.     The check-out page presents victims with a graphic supposedly describing the product's current availability as "Low Stock" and urging them to "HURRY!" because the "Special Discount" will expire in only a few minutes. Victims are also told that they have received a "Special Offer Just For You!" and that a "Limited Time Promo Code" has been applied to their cart. On information and belief, the graphic purporting to be a representation of "Current Availability" is simply a static image that does not reflect the current supply of Ultra Fast Keto Boost at all. And these representations have been constant for the duration of the scam—when there is no shortage of Ultra Fast Keto Boost, and on information and belief, there never has been.

95.     The check-out page provides graphics for three different purchase options: (1) "Buy 3, Get 2 Free" for $39.74 each bottle; (2) "Buy 2, Get 1 Free" for $49.97 each bottle; and (3) "Buy 1 Bottle" for $69.99. The first option is pre-checked so victims need to deselect that option if they do not want to purchase three bottles. The victims then enter their credit card information and click "Complete Order."

96.     Victims who purchase the Ultra Fast Keto Boost bottles through this landing page are subjected to a number of false or misleading representations. Most reprehensible is the fact victims are never told they will be charged for a total price of $198.70.  In fact, the check-out page unambiguously states the opposite: that the consumer will pay a significantly lower purchase price for the bottles.

97.     On information and belief, every victim is charged the full amount of $198.70, regardless of the option the victim selects at the check-out page.

3:20-cv-01528-LL-MSB

1   98.   A few days later, victims who expected to be charged the advertised amount

2   for their bottles are understandably shocked to see their debit or credit card billed for nearly

3   $200, to which they did not agree.   Even if they are lucky enough to get through to

4   Customer Service by telephone, they are told they cannot obtain a full refund.

5   99.   This is nothing more than credit card fraud—lying to customers about what

6   they will pay, taking their credit card information, and billing them for something to which

7   they never agreed.

8   100.   Like the consumers who purchased the Ultra Fast Keto Boost product, the

9   consumers who purchased "InstaKeto" bottles were subjected to similar misrepresentations

10   throughout the purchasing process.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

101.   The same "shark tank" style affiliate pages existed for "InstaKeto" such as the one shown below.[20]

  

ENTERTAINMENT TODAY · INSIDERNEWS   LOVE   CELEBS   BEAUTY   GIFT IDEAS

## Weight Loss Pill That Naturally Burns Fat Gets Biggest Deal In Shark Tank History

AS SEEN IN

The New York Times · TODAY · O The Oprah · StyleWatch · redbook



*(Wednesday, February 12, 2020) - It was the most watched episode in Shark Tank history when sisters Anna and Samantha Martin won over the Shark Tank panel.*

N ever before had the judging panel unanimously decided to each invest over a million dollars into a potential company.

After buying a staggering 25% share in the sisters company, the Shark Tank panel have personally mentored the pair, helping them undergo re-branding and re-packing of their miracle product.

Touting their discovery as *"a great step forward in weight loss history,"* the judges were quick to offer up their hard earned cash to back the entrepreneurial pair. "We were shocked. The most we were hoping for was some advice…we weren't even sure that we would manage to get any investors," explained Samantha. After outstanding offers from each panel member, the sisters burst into tears.

**The judges were amazed that one product was able to do all of the following:**

**Special Offer**



☑ **Step 1:**

**CLICK HERE to Claim Your Bottle of InstaKeto**



Bottles are limited.
Expires on Wednesday, February 12, 2020

**GET YOUR BOTTLE >>**

**READER RESULTS**

**BEFORE & AFTER**



*"I've been trying to lose the same 10 lbs for what feels like forever now. InstaKeto got rid of it in only 2 weeks! Thanks so much!"*

*Andrea Taylor,*
*Portland, Maine*

---

[20] http://diet001.club/ (last accessed February 12, 2020).

1    102.   And users who click the links in these InstaKeto pages are taken to a website,

2    https://instaketo.com, which looks identical, except the brand on the bottle shows "Instant

3    Keto" instead of "Ultra Fast Keto Boost."



103.   At the check-out page, the victims are presented with the same three purchase options, including the option to receive two "free" bottles with the purchase of three bottles.



104.   Again, there are no disclaimers on any of the webpages for the "InstaKeto" product (or "Instant Keto" as it is also referred to in the sales process). The same disclaimer regarding the so-called "Refund/Return Policy" is only visible to customers who scroll to the bottom of the landing page, click on the "Terms" hyperlink in the footer of the page, and scroll through the lengthy disclaimer.

105.   Once again, consumers purchasing bottles of the "InstaKeto" product with the understanding they will pay a certain price for the bottles through this landing page are subjected to a number of false or misleading representations, including that they will pay a lower price, when, in truth, their debit or credit cards are charged for bottles that they never ordered nor agreed to purchase.

**The Keto Defendants Use a "False Front" Website to Deceive**

**Banks and Credit Card Companies When a Victim Complains**

106.   Just as an old-time speakeasy would maintain a false front of a legitimate business operation to distract law enforcement from their criminal activities, the Keto Defendants also operate a second website for the Ultra Fast Keto Boost product—https://thesuperbooster.com/—whose sole purpose is to trick anyone conducting an investigation into the validity of these purchases, including a bank or credit card company deciding whether to grant a chargeback to a consumer who complains.[21] On information and belief, the InstaKeto product maintained a similar or identical false front.

---

[21] For Instant Keto, the URL for the "false front" website is unknown. The Instant Keto bottle references http://www.instantketoboost.com/; however, that website is not accessible.

107.   If a user types in the URL, www.thesuperbooster.com, an entirely different website appears—a "false front" that is designed to be shown to banks if a victim complains. A partial image of this website appears below:



108.   This "false front" website is designed to appear legitimate. Unlike the landing pages where consumers must scroll through pages of advertisements, "before" and "after" photos, and fake customer reviews in order to locate the "Terms and Conditions" hyperlink, the false front website makes the "Terms and Conditions" hyperlink visible on the second page.

109.   Unlike the check-out page shown to consumers, the check-out page on the "false front" website provides the actual purchase prices for each offer. Specifically, the first option to "Buy 3 Bottles, Get 2 Free" lists the actual purchase price of $198.70, instead of $39.74 for each bottle, and the second option to "Buy 2 Bottles, Get 3 Free" lists the actual purchase price of  $149.97, instead of $49.97 for each bottle.[22]  These actual prices

---

[22] The third option - to purchase one bottle for $69.99 – is the same price shown to consumers.

are never shown to consumers on the landing pages, and they only discover the inflated charges when they review their debit and credit cards.



110.   Notably, there are no false claims of "limited availability" or pop-up banners urging consumers to act immediately while supplies last.  In all respects, the "false front" website is designed to look like a legitimate company and not a scam.

111.   On information and belief, Plaintiffs and other victims of this scam were directed to the landing pages to complete their purchases, rather than to the "false front" website.

112.   On information and belief, the Keto Defendants are using the "false front" websites to fraudulently convince bank and credit card representatives that victims had purchased the Keto Products from those websites, as opposed to the landing pages to which affiliates and advertisers actually directed their traffic.

113.   The maintenance of these "false front" websites is itself an act of deception, intended not just to hide from law enforcement, but to prevent consumers from exercising their lawful right to a chargeback by their bank or credit card company for charges to which they never agreed. Presented only with the false front, banks and credit card companies cannot know that there is fraud being conducted behind it.

114.   The FTC has recognized this tactic as a common one used by this kind of scammer: "The defendants sometimes hosted multiple versions of the same promotion. If consumers navigated from an embedded link on another site – the much more likely way people would learn about a product – they were taken to pages where products were offered for sale with what the FTC says were undisclosed automatic shipment programs. But a funny thing happened if you just typed in the URL – for example, rippedmusclex.com. That took you to an entirely different site that included more visible disclosures of the trial offer. Why would a company create those different versions? The complaint suggests that it could have been done in an attempt to have a 'clean' version for banks, payment processors, and law enforcers."[23]

115.   This is exactly the deception Defendants have committed here. On information and belief, the Keto Defendants operate a host of shell companies, which run

---

[23] Leslie Fair, *Fauxmats, false claims, phony celebrity endorsements, and unauthorized charges*, Federal Trade Commission Business Blog (2017), https://www.ftc.gov/news-events/blogs/business-blog/2017/11/fauxmats-false-claims-phony-celebrity-endorsements (last visited Sept. 6, 2019).

websites promoting the Keto Products.  This is a common tactic in such scams: every shell company creates a separate website, and every shell company signs up for its own unique merchant account. All of the merchant accounts are rotated through the customer billings to prevent any individual one from being flagged for fraud due to high levels of chargebacks. Each "false front" website for these shell companies presents itself to visitors as if it is the official website of the Keto Products; however, this makes no sense because there is no business reason to sell the same products from different shell companies, with near-identical websites. The true reason scammers create such websites is to make it more difficult for banks to identify the Keto operation as a fraud by separating out and controlling which merchant accounts and which shell companies the chargebacks are attributed to, and thus preventing or delaying any one merchant account from being identified as conducting a fraud.

116.   On information and belief, the Keto Defendants present the "false front" website to customers' banks and credit card companies whenever a chargeback is being investigated, fraudulently representing to the bank that it was the website the customer used to purchase the Keto Products. As the BBB report stated: "in one FTC case an ISO spread the credit card charges over 26 merchant accounts to disguise the fraud activity." Ex. 1, at p. 11.

117.   On information and belief, the Keto Defendants have spread their charges over multiple shell corporations as reflected by multiple merchant accounts to avoid accumulating too many chargebacks on any one account and being flagged for the fraud they are conducting. Each of these shell corporations, while currently unknown, is a John Doe Defendant.

118.   Ms. Sihler and Mr. Bavencoff received almost identical packing slips from the same shipper with the same address, but they were billed from two different merchant accounts—referred to as Merchant Identification Numbers ("MIDs")—for the Keto Products.

119.    This is not a ploy to confuse consumers, but to defraud their banks. The Keto Defendants designed their scam exactly in accordance with the scam Neil Patel described in his keynote speech to a roomful of scammers: "Or the credit card processors where you guys rotate up the chargebacks so then that way, then you guys can keep processing the money.... You guys, many of you have issues with credit card processing, so you'll do things like, I forgot what the saying is but they rotate up the MIGs or the MIDs, I don't know what the saying is but it's more so they're controlling where the chargebacks are going."[24]

120.    As recently as April 11, 2020, victims of the Keto scam have explained in detail their experiences in complaints posted on the BBB website, which were similar or identical to that of Ms. Sihler and Ms. Bavencoff.[25]  Ultra Fast Keto Boost has received the lowest possible "F" rating on the BBB website and has 564 customer complaints in the last three years, all of which make the same basic complaints regarding advertising/sales, billing/collections, delivery issues, guarantee/warranty, and problems with the product. Ultra Fast Keto Boost and Instant Keto Boost are listed as alternate business names, both of which have the same fulfillment and return address of the United States Post Office located at 3201 W. Hillsborough Avenue, #153201-1378, Tampa, Florida, 33684-9001.[26]

121.    Indeed, the BBB's website has a red banner at the top of Ultra Fast Keto Boost's profile stating: "Current Alerts For This Business" that show Ultra Fast Keto Boost products "have a pattern of complaints concerning unauthorized and unexpected charges and unresolved refund disputes" and the business is "using fake celebrity endorsements in

---

[24] Neil Patel, *The Future of Affiliate Marketing: It's Not What You Think*, https://www.youtube.com/watch?v=2hUdbztKLY4 (last visited Jan. 3, 2019) (emphasis added).

[25] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/ultra-fast-keto-boost-0653-90369793/customer-reviews; https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/ultra-fast-keto-boost-0653-90369793/complaints

[26] The BBB website lists a second address for Ultra Fast Keto, which is 153301 Hillsborough Avenue, Tampa, Florida 33684.

its advertising."[27]

122.   On January 1, 2020, a victim of the Keto scam identified as Beth E. posted a similar experience to the Plaintiffs: "Their advertising is completely misleading. I thought I was paying $39.74 per bottle for 3 bottles and then getting 2 free. When they confirmed the order there was no invoice attached which I thought was strange so I had no idea they were going to charge $198.70 until I saw my charge card bill. By the time I had realized all of this plus the fact that I had been traveling, the 30 day period for returns had closed. I tried to put in a claim through my credit card company, but the company is providing my authorized charge and explaining that I was getting 2 bottles free by paying $39.74 per bottle for 5 bottles, even though the shipping address that they have associated with the charge is completely bogus. My credit card company refuses to do anything because they are providing there "evidence" and I can't fight it. Plus now it is a product that I decided that I didn't even want to use in the first place. Do not order from them! (I'm leaving a 1 star rating because I am forced to enter something but, in reality, I would not give it any stars.)"[28]

123.   Another victim identified as Carol B. posted on December 11, 2019: "Complete scam. Charged more than advertised, never received an itemized bill, was told I'd get a refund minus a $25 restocking fee, so I mailed it back with return receipt and then never got reimbursed. I called this morning again and was told they do not give refunds. Star rating is '0.'"[29]

124.   And yet another victim identified as David B. posted on November 27, 2019: "My wife ordered ONE BOTTLE of tablets to be dissolved in water for $37.70. We were charged $198 for FIVE bottles and when they arrived, they were CAPSULES to be

---

[27] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/ultra-fast-keto-boost-0653-90369793

[28] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/ultra-fast-keto-boost-0653-90369793/customer-reviews.

[29] *Id.*

swallowed. Dealing with customer service was a nightmare. The best resolution we received was to return the 5 bottles at OUR expense and they would credit us $178. So we paid $20 plus shipping for a falsely advertised item that we did not want and returned. DO NOT ORDER FROM THESE SCAM ARTISTS!"[30]

125.   These are just a sample of the 564 complaints posted on the BBB website.  It is not a coincidence that so many victims are reporting the exact same thing: that the scammers falsely advertised the purchase prices for the Keto Products, which the consumers relied upon to make their purchases, the consumers later discovered they were overcharged and billed for bottles they did not order and did not agree to purchase, and that when the consumers tried to cancel their unauthorized charges, they were unable to obtain refunds from the company.  This is how Defendants treat all of their victims—and the Keto Products were just a thin excuse to commit rampant credit card fraud.

126.   The Keto Defendants purport to post a "company response" to some complaints by apologizing for "any misunderstanding" and claiming the customers placed orders for the promotional offers  such as "Buy 3, Get 2 Free" that showed the accurate price of $198.70[31] The Keto Defendants' response is just one more part of their deceptive strategy designed to thwart discovery of their fraud because they are referring to the "false front" website, which provides accurate prices.  But this website is only shown to regulators, banks, and credit card companies, not to consumers who are directed to the landing pages.  The consumers never see the "false front" website, and therefore, they never see accurate prices.

---

[30] *Id.*

[31] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/ultra-fast-keto-boost-0653-90369793/complaints

127.   The BBB's website states that in October 2019, the BBB contacted the company regarding its false advertising and false claims about the Keto Products. To date, the company has not responded.[32]

### The Keto Defendants' Misrepresentations Regarding
### Reviews and Endorsements

128.   The Keto Defendants marketed the Keto Products exclusively through affiliate marketing networks, including networks and pages run by other Doe Defendants such that every customer who purchases a product from them will be exposed to and view the fake celebrity and magazine endorsements described herein.  Ms. Sihler and Ms. Bavencoff specifically recall viewing advertisements stating that the products had been endorsed by the six celebrity "Sharks" and well-known magazines and relied on these endorsements in purchasing the products.

129.   These celebrity and magazine reviews are material to the customers' decisions to purchase the Keto Products.  Because these celebrities are well-known with well-guarded reputations, their positive, yet fraudulent, "reviews" of the products misleads customers into believing that the Keto Defendants are a credible, well-established company. These celebrities are generally beautiful with desirable appearances, so their fake quotes suggesting they obtained their beauty by using the Keto Products misleads customers about the type of results they may expect from using the products.

### The Keto Defendants' Misrepresentations and Omissions
### Regarding the Actual Prices that Consumers Are Charged

130.   A second way the Keto Defendants deceive consumers on their landing pages is to claim that the consumers will pay the advertised price for a certain number of bottles of the Keto Products, when in fact all of the consumers will receive five bottles and will be charged for all five bottles, which they never agreed to purchase because they were told

---

[32] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/ultra-fast-keto-boost-0653-90369793/details

that some of the bottles would be "free."  The first page a victim views is an affiliate page, such as the fake "Shark" Tank article, which is run by one or more of the Doe Defendants. These pages urge consumers to click on the product to receive a "special offer." The second page a victim views is a website controlled by the Keto Defendants - https://ultrafastketoboost.com or https://instaketo.com/ - both falsely representing that the consumers will receive "free bottles" and encouraging them to "Get Your Risk Free Bottle."  When a victim views the final check-out page, the victim is presented with several offers, including promotional offers such as "Buy 3 Bottles, Get 2 Free" for $39.74 per bottle, which should result in a total price of $119.22.  On information and belief, every consumer who clicks on "Complete Order" receives five bottles of the Keto Products - regardless of the specific offer selected and the number of bottles the consumer agreed to purchase—and every customer is billed for all five bottles, in an amount nearly $200.

131.  On information and belief and based on the sales funnel structure, every consumer who purchased Keto Products was exposed to these misrepresentations about the actual prices of the bottles.

132.  The Keto Defendants made material omissions regarding the actual prices of the bottles on their websites by omitting material information, which they were under a duty to disclose relating to the actual prices of the bottles. The Keto Defendants failed to disclose to consumers who viewed the landing pages that the actual prices charged for the bottles would be significantly higher than the advertised prices, and, in fact, that the consumers would be billed for five bottles of Keto Products, even though they never agreed to purchase five bottles. These terms were never disclosed to the consumers.

133.  The Keto Defendants were under a duty to Plaintiffs and the Class Members because they made partial representations—that consumers would pay the advertised price of the promotional offers—but also suppressed, concealed, or did not disclose material facts that qualify those representations, namely, that they would be charged for all five bottles delivered to them, in an amount totaling almost $200, regardless of the number of bottles they ordered and agreed to purchase, and that none of the bottles were actually

"free."

134.   The Keto Defendants knew, or by the exercise of reasonable care should have known, that their omissions were untrue and misleading, and deliberately made the aforementioned omissions in order to deceive reasonable consumers like Plaintiffs and other Class Members. Those omissions could have been corrected by including the true total price of the Keto Products on the check-out page and in any other place where references to "free" bottles occurred.

135.   The Keto Defendants' omissions regarding the actual prices were material to consumers. A reasonable consumer would attach importance to the truth or falsity of these omissions in deciding whether to purchase the products because if consumers had known they were paying a higher price for the bottles they ordered – and they would be billed for bottles they did not order - they would not have agreed to the offer.

136.   Ms. Sihler and Ms. Bavencoff were damaged by these misrepresentations and omissions individually as described herein, and they relied on them in that they would not have signed up for the offers had they been informed of the actual terms of the offers.

## The Keto Defendants' Misrepresentations
## Regarding Limited Supply

137.   Both the affiliate websites and the Keto Defendants' websites also include representations of limited supply, as described herein. But on information and belief, those purported limitations and the representations that there was "low stock," "limited quantities available," or that the "promotional pricing" or "special offer" was expiring soon were false.

138.   These misrepresentations are designed to induce consumers to purchase the bottles and to create a false sense of urgency. As a result of these misrepresentations, consumers purchase products they would not have purchased and they pay more for the products than they otherwise would have and are damaged by discovering later that they have been billed for products to which they did not agree.

139.   The Keto Defendants' misrepresentations regarding their purported limited

supply are material to consumers. A reasonable consumer would attach importance to the truth or falsity of these misrepresentations in deciding whether to purchase the products because if they knew that the products were not limited in supply and could be purchased at any time, consumers would not feel the need to purchase on impulse and under time pressure that did not exist based on these representations. Plaintiffs and the Class Members reasonably relied upon these representations in making their purchase decisions.

### The Keto Defendants' Misrepresentations and Omissions
### Regarding the "False Front" Website

140.   The Keto Defendants also deceived the consumers' banks and credit card companies by maintaining a "false front" website at the URL described herein. This website was created intentionally to make it appear to outsiders that the victims of the scheme had been informed of the actual purchase price of the bottles and had consented to the price. The Keto Defendants were under a duty to disclose to Plaintiffs and the Class Members that they maintained this "false front" websites and to disclose that they routinely used that website to deceive banks and credit card companies to prevent consumers from exercising their right to a chargeback.

141.   Plaintiffs and the Class Members were damaged by these misrepresentations and omissions. All members of the class were damaged because had the banks and credit card companies not been unlawfully deceived, the scheme would have been shut down and none of the Class Members would have been billed. The Keto Defendants further owed duties to all of the Class Members to inform them that there was a "false front" website, and the failure to do so injured every member of the Class.

142.   The Keto Defendants made material omissions regarding the "false front" websites by omitting material information which they were under a duty to disclose relating to those sites. The Keto Defendants failed to disclose to consumers who viewed the landing pages at https://ultrafastketoboost.com and https://instaketo.com that there was another website, which the Keto Defendants designed to intentionally deceive the consumers' banks and credit card companies if they attempted a chargeback, and that they were not

bound by any of the terms or other disclosures on the scam websites.

143.   The Keto Defendants were under a duty to disclose this information to Plaintiffs and the Class Members because the Keto Defendants had exclusive knowledge of material facts not known to them, namely that there was another website being used as a "false front."

144.   Plaintiffs and the Class Members did not know this, and it was difficult to discover because that information was not located on the website where they purchased the products because the landing pages were designed to be inaccessible and unsearchable from any search engine, and because the "false front" website was placed on an entirely separate URL, which was not linked to the landing pages.

145.   The Keto Defendants were under a duty to disclose this information to Plaintiffs and the Class Members because the Keto Defendants engaged in active concealment, and they have engaged in affirmative acts of hiding, concealing, and covering up this matter. The Keto Defendants made efforts to hide their landing pages from view as described above, to make the landing pages difficult to find, to delete various advertisements so customers could not find them again, and by creating the "false front" website to conceal from their victims and others the actual landing pages that the victims visited.

146.   The Keto Defendants were further under a duty to Plaintiffs and the Class Members because they made partial representations to the banks and credit card companies—that they had sold the Keto Products to their victims—but also suppressed, concealed, and did not disclose material facts that qualify those representations, namely that none of the victims had actually purchased the products on the "false front" website that was shown to banks and credit card companies. The Keto Defendants further made partial representations to Plaintiffs and the Class Members—that they would pay the advertised price —without disclosing that if they attempted a chargeback, the Keto Defendants intended to lie about the terms of the agreement to the consumers' banks and credit card companies.

147.   The Keto Defendants knew, or by the exercise of reasonable care should have known, that their omissions were untrue and misleading, and deliberately made the aforementioned omissions in order to deceive reasonable consumers like Plaintiffs and other Class Members. Those omissions could have been corrected by including the omitted information in proximity to the offers contained on the landing pages, or on the packing slips delivered to their victims, or in proximity to their representations to banks and credit card companies.

148.   The Keto Defendants' misrepresentations and omissions regarding the "false front" website were material to consumers. A reasonable consumer would attach importance to the truth or falsity of these omissions in deciding whether to purchase the products because if consumers had known that the Keto Defendants were maintaining a fake website for the purpose of defrauding their banks and credit card companies, they would not have purchased the Keto Products with the understanding they were receiving the products at the advertised price.

149.   Ms. Sihler and Ms. Bavencoff were damaged by these misrepresentations and omissions individually as described herein, and relied on them in that they would not have signed up for the offers had they been informed of this information.

## The Keto Defendants

150.   The "Keto Defendants" are a group of Defendants who created, sold, advertised, and otherwise were involved in the creation, sale, and advertising of the Ultra Fast Keto and Instant Keto products. These Defendants include Defendants David Flynn, Rickie Joe James, Beyond Global Inc., Brightree Holdings Corp. and BMOR Global LLC.

151.   Beyond Global Inc. is a Wyoming corporation which is listed on the bottle for Ultra Fast Keto, which states that the product is "distributed by" Beyond Global Inc.

152.   Its address is listed on the bottle as being 9205 W. Russell Rd., Suite 240, Las Vegas, NV 89148.

153.   Wyoming shell corporations are commonly used by Internet scammers because it enables them to hide their identities.

154.   On information and belief, Beyond Global Inc. is a shell company being used to mask its owners' identities, and the company and its owners were involved not only in the distribution of the products but in their creation and marketing. The company's name does not appear on any of the contacts signed with vendors in relation to the Keto Products.

155.   Brightree Holdings Corp is a Wyoming Corporation which contracted with various vendors to create, distribute, ship, and market the Keto Products. Brightree Holdings Corp is the entity which nominally contracted with TFL. Brightree Holdings Corp further is the entity which nominally contracted with various affiliate networks to purchase the advertising to promote the Ultra Fast Keto Boost and Instant Keto / InstaKeto products.

156.   Defendant BMOR Global LLC is a Nevada corporation located at 9121 West Russell Road, Suite 116, Las Vegas, Nevada 89148. Defendant BMOR Global LLC contracted with an affiliate network called NAM Offers on July 12, 2019 to advertise the Ultra Fast Keto Boost product. It used the same website as Brightree Holdings and Beyond Global, www.ultrafastketoboost.com. David Flynn signed the contract using a BMOR Global e-mail address. Brightree Holdings Corp listed its contact information in a contract with a company called DeluxeAds for advertising for the Keto Products as a BMOR Global LLC e-mail address.

157.   Defendant Rickie Joe James is the CEO of Brightree Holdings Corp. He was listed as a "business leader" of Brightree Holdings Corp. on a contract with an affiliate network called Yeahmobi. He helped manage the relationship with various affiliate networks to advertise the Ultra Fast Keto Boost and Instant Keto / InstaKeto products, and specifically did so with respect to an affiliate network called SmashLoud. Mr. James described himself to SmashLoud as a "partner" of Mr. Flynn. Mr. James is a 50% owner of both Brightree Holdings Corp. and Beyond Global Inc., based on the testimony of Mr. Flynn at the 341 meeting for the company's Chapter 7 bankruptcy.

158.   Defendant David Flynn is the Vice President of Brightree Holdings Corp. He was listed as a "business leader" of Brightree Holdings Corp. on a contract with an affiliate network called Yeahmobi. He has described himself as an "owner" or "partner" in various

contracts with third parties, and on information and belief, does in fact have an ownership interest in the company. Mr. Flynn contracted with various affiliate networks on behalf of Brightree Holdings Corp. to advertise the Ultra Fast Keto Boost and Instant Keto / InstaKeto products. Mr. Flynn further signed an agreement between Brightree Holdings Corp and The Fulfillment Lab, Inc. on behalf of Brightree. Mr. Flynn is a Director of Beyond Global, Inc. and a 50% owner of both Beyond Global, Inc. and Brightree Holdings Corp., based on his testimony at the 341 meeting for the company's Chapter 7 bankruptcy.

159.   Mr. James and Mr. Flynn met with Nate Thomas, an employee of The Fulfillment Lab, Inc., at the Affiliate Summit East 2019 in August 2019. Both Mr. James and Mr. Flynn followed up and met with employees of The Fulfillment Lab, Inc. to negotiate the arrangement between it and Brightree Holdings Corp., and repeatedly communicated with the company regarding the sales of Ultra Fast Keto Boost and Instant Keto / InstaKeto. The arrangement was formalized in September 2019. Both of them worked with The Fulfillment Lab, Inc. to coordinate the shipping of the Ultra Fast Keto Boost and Instant Keto / InstaKeto products and the other services TFL and Nelson provided. They communicated via at least text, Skype, and e-mail, and TFL was aware from those discussions that multiple corporations were in fact involved and not just Brightree Holdings Corp. Mr. Flynn was described to TFL as the contact for "contracts and billing," another individual named Mike Campbell was described to TFL as the contact for "integration," and Mr. James was described to TFL as the contact for "anything else." Brightree Holdings Corp was one of the top clients for TFL by volume and was given "VIP" service at the specific direction of Richard Nelson. They were such a high volume client that their onboarding created a "buzz" around the offices of TFL among its employees about the account, implying that TFL would have been intimately familiar with the activities and marketing of the Keto Defendants.

160.   Mr. Flynn and Mr. James specifically directed and controlled the marketing and advertising activities of Beyond Global Inc., Brightree Holdings Corp. and BMOR Global LLC, including purchasing advertising, creating the products, and creating and

running the websites. They hired various vendors to assist in these activities on behalf of Beyond Global Inc., Brightree Holdings Corp. and BMOR Global LLC. Beyond Global was the "marketing partner" of Brightree Holdings Corp. based on the testimony of Mr. Flynn at the 341 meeting for the company's Chapter 7 bankruptcy.

161.   Mr. Flynn and Mr. James caused the Ultra Fast Keto Boost and Instant Keto / InstaKeto products to be sold using multiple MIDs, or merchant account ID's, as part of a "credit card factoring" scheme. Mr. Flynn specifically referenced this scheme in communications with a company called SmashLoud, stating: "We're updating some mids right now." Those discussions made clear that there was a "mid situation" in December 2019, that all the mids were "down" until January 2020, and that Mr. Flynn was seeking money from the merchant reserve accounts for some group of mids. On information and belief, and based on testimony from Mr. Flynn at the 341 meeting for Beyond Global's Chapter 7 bankruptcy, this is because the MIDs that the Keto Defendants were using to bill for the Keto Products were flagged for fraud and frozen.

162.   In December 2019, there was a dramatic drop in the volume of products shipped by TFL on behalf of Brightree Holdings Corp., which went from up to 17,000 shipments a week in December 2019 with TFL to between 60 and 157 shipments a week in January. TFL employees were aware that dramatic drops in shipping volume meant that a client had "lost their MIDs." Losing MIDs occurs when those merchant accounts are flagged for fraud and frozen.

163.   TFL was specifically informed of this by Mr. Flynn, who told TFL employees Nathan Thomas and Mark Holmes in a January 16, 2020 e-mail: "FYI we have some processing back in place. Should start seeing traffic again today or tomorrow. Probably a few hundred orders a day ramping to 500-1000 by next week. Will take a month or so to get back to where we were." Mr. Flynn told the same TFL employees in a Skype chat on January 23, 2020: "So we were turning orders back on last Friday and hit a snag with that processor. I'm finalizing a new processor today. Will probably take them a few days to finalize and approve but that will get us over $500k in volume. We'll test conversions early

next week. As long as the processor approval rates are close to what they promised, we can ramp that up really fast and we are talking with our advertisers and there is traffic that can be had. We're almost through this." Despite being aware of this, TFL kept shipping the Keto Products for Brightree Holdings Corp. and did so for nearly a year after this lawsuit was filed as well. TFL was indisputably aware of the exact nature of the scheme as of the service of this lawsuit, and the fact that it continued shipping the Keto Products for such a long period afterwards is evidence of its intent.

164.   Mr. Flynn conspired with TFL employees to specifically defraud a financial institution, VyaPay, regarding the MIDs used to bill for the Keto Products. VyaPay was one of the payment processors being used to process payments for the products. On November 4, 2019, the same day the Instant Keto / Insta Keto products were first sold through TFL, David Flynn messaged TFL employees Nate Thomas and Mark Holmes stating: "guys is there a way to move the nistaketo sales into a different account. We're not processing them with same bank and don't want the current bank to see those sales?" Mr. Holmes responded by offering to separately bill Brightree Holdings Corp from a different account at TFL to enable it to hide its sales from the bank: "David - guessing you would need separate billing too? we could set up a new account."

165.   Instead of creating separate accounts in the TFL software and setting up separate billing, TFL and the Keto Defendants renamed the Instant Keto product to "KetoBoost" in the TFL account, and Instant Keto / InstaKeto sales were tracked under that name.

166.   On November 13, 2019, Mike Campbell, who worked on behalf of the Keto Defendants, messaged TFL employee Nate Thomas requesting access to the TFL shipping software for Wain Swapp and Vanisha Shimmel, two employees of VyaPay. On information and belief, this request was made in connection with VyaPay's verification and fraud detection procedures. Mr. Flynn worked with TFL employees to ensure that VyaPay would not be able to see in the TFL software that other products were being shipped besides Ultra Fast Keto Boost. This is because card brand rules require that a

processor such as VyaPay consolidate the chargebacks for any products being sold by the same company for purposes of fraud detection. For example, VISA Rule 10.4.3.3 requires that multiple merchant accounts be consolidated for fraud detection purposes and for the purposes of its chargeback thresholds. MasterCard Rule 5.2 similarly prohibits distributing transactions across multiple merchant accounts as an improper means of avoiding fraud detection.

167.   Instant Keto / InstaKeto sales were tracked under the name "KetoBoost" in the TFL software until August 20, 2020. Shortly after the Defendants were served with this lawsuit, they began shipping the products under the correct name "Instant Keto" in the software again. On that same day, Mr. Flynn confirmed to TFL employee Morgan Keenan in a Skype conversation that the name change had been made to defraud a merchant processor: "Instant keto is listed as keto boost or better boost keto in your system. That was related to when we had a processor with access to check shipments. We can just change it to instant keto in your system now."

168.   The Keto Defendants purposely directed their activities towards California by shipping products to California residents, accepting and processing returns and complaints from California residents, and consulting with the TFL Defendants on sales that they knew would be made to California residents.

169.   These intentional acts were expressly aimed at California residents. The Keto Defendants targeted their conduct at California residents, including the Plaintiffs, and knew they were California residents by virtue of their shipping addresses and other contact information. On information and belief, these acts involved ongoing, systemic, and continuous contact with California because the shipment of Keto Products has been ongoing since at least February 2018, and consumers continue to complain even as of filing. The shipping continued post-suit, at least through July 2021. At least 100,009 bottles of Ultra Fast Keto Boost were shipped to California. This represents a total of at least $3,974,357.66 in gross revenue attributable to sales into the state of California. At least 46,473 bottles of Instant Keto / InstaKeto were shipped to California. This represents a

total of at least $1,845,837.02 in sales to the state of California. The acts were entirely commercial in nature, as the Keto Defendants profited by billing consumers for unordered bottles of Keto products. The sales were made through interactive websites which collected geographic information about consumers.

170.   The Keto Defendants generated substantial profits from their acts aimed at California residents. They intentionally placed the Keto Products into the stream of commerce, knowing and intending that they would be advertised over the Internet to and purchased by California consumers, and conducting and directing such advertising (which was identical or substantially similar to the examples shown herein).

171.   The Keto Defendants knew or should have foreseen that their actions would cause harm in California. As described above, they intentionally assisted the scammers over a lengthy period of time. They did so knowing that California consumers are being harmed by the scam, and specifically interacting with those consumers when they attempted to obtain refunds from the fraudulent charges. Had they not provided these services, the California consumers would not have been harmed because the Keto Products would not have been shipped to them and their accounts would not have been improperly billed.

172.   Defendants Flynn and James were guiding spirits behind the sales to California and both knew that they were occurring. They created the products, controlled the business, and orchestrated the advertising campaigns which they knew were targeting California customers. Both had access to and did access The Fulfillment Lab's GFS software, which provided them with details about the geographic location of consumers, and they thus both knew that they were targeting California consumers through their interactive websites.

173.    Because of these facts, personal jurisdiction is appropriate in California over the Keto Defendants.

174.   Defendants David Flynn, Rickie Joe James, Beyond Global Inc., Brightree Holdings Corp. and BMOR Global LLC are alter egos of one another. They operated

together as a single economic entity, as described below.

175.   Each of the three corporate entities, Beyond Global Inc., Brightree Holdings Corp. and BMOR Global LLC, sold the same products without regard to corporate formalities. Defendant BMOR Global LLC contracted with an affiliate network named NAM Offers to sell Ultra Fast Keto Boost using the same website, ultrafastketoboost.com, as the other two entities did to sell that product. Brightree Holdings repeatedly used BMOR Global e-mail addresses as its contract information in its contracts.

176.   BMOR Global LLC and Brightree Holdings Corp. shared the same office space, each listing 9121 West Russell Road, Suite 116, Las Vegas, Nevada 89148 as their address on contracts and invoices. For example, BMOR Global LLC used this address in its contract with NAM Offers, and Brightree Holdings used it with a company called Equinox Nutraceuticals.

177.   There is an overlap of employees between the companies. Defendants David Flynn and Rickie Joe James are in management roles of each of the three entities. An employee of BMOR Global LLC, Kamesha Warmack, acted on behalf of Beyond Global Inc. and Brightree Holdings Corp., logging into TFL's fulfillment software using an e-mail account associated with BMOR Global LLC.

178.   At the 341 meeting for the Chapter 7 bankruptcy, Mr. Flynn testified that the sales of Beyond Global Inc. were "passing through" to Brightree Holdings Corp. Whenever Beyond Global got money, it would always pass it through to Brightree, which then used it to pay its own bills. This is despite the fact that Brightree Holdings Corp. did not own any shares in Beyond Global—instead, Beyond Global's shares were owned 50/50 between Mr. James and Mr. Flynn. Financials were not broken out separately for Beyond Global. Beyond Global did not file its own tax reports, but instead it was "treated as a wholly owned subsidiary" of Brightree Holdings and its revenues were included in Brightree's tax returns—even though it was not in fact owned by Brightree at all, meaning Mr. Flynn and Mr. James were commingling their own assets across corporate lines. Mr. Flynn and Mr. James further commingled their assets with Beyond Global by directly paying for fees with

their own money associated with Beyond Global's bankruptcy. Both Brightree Holdings Corp. and Beyond Global Inc. sold Ultra Fast Keto Boost and Instant Keto, even though Brightree Holdings Corp. owned the intellectual property for those products. Brightree Holdings Corp. further paid all of the advertising expenses for Beyond Global's sales. Beyond Global's sales were processed using a custom coded CRM system proprietary to Brightree Holdings Corp., and Beyond Global's sales data is contained within that CRM and controlled by Brightree Holdings Corp.

179.   Defendant David Flynn repeatedly used his home address, 7729 Spanish Bay Drive, Las Vegas, NV 89113, as the shipping address for products and materials relating to the Keto Products sold by Brightree Holdings Corp.

180.   Defendant Rick James used his personal credit card to pay for expenses associated with Brightree Holdings Corp., and in particular paid for its fees associated with an affiliate network named Smart Adv.

181.   Both Mr. Flynn and Mr. James exercised control over the companies without regard for formalities and treated them as a single entity with no differentiation between the entities and their personal assets or interests.

182.   BMOR Global LLC, Beyond Global Inc., and Brightree Holdings Corp. shared assets without regard for formalities, namely the use of the same websites, product brand names and intellectual property, and services from the same vendors including call center services.

183.   It would be inequitable not to treat these entities/individuals as alter egos of one another because the corporate structure is a sham designed to avoid liability, frustrate creditors, and avoid document discovery requests. As described herein, this corporate structure was further designed to perpetrate a fraud and protect its perpetrators from liability. Beyond Global Inc. itself was created as a means to hide the identity of the individuals and companies behind the scam, and the multiple corporations were used to gain access to multiple merchant accounts to bill for the same products on the same websites.

**The TFL Defendants' Participation in the Keto Scam**

184.   Essential to the Keto scheme are the TFL Defendants, who are familiar players in affiliate marketing schemes, including the "straight sale" scam that is the subject of this Complaint. The "TFL Defendants" includes defendants The Fulfillment Lab, Inc. and Richard Nelson.

185.   TFL was the target of a Florida news channel investigation in December 2019 where a Tampa resident, Norman Harris, reported that he was "shocked" to receive five bottles of Instant Keto pills, which he never ordered and did not know the product at all, and he was even more shocked when his credit card was charged $200 for the bottles.[33] The news channel investigator matched the address on the bottle label, 3201 Hillsborough Avenue, Tampa, Florida, with TFL's shipping address on the BBB's website.  When the investigator personally visited TFL's office in Tampa, no one from the company would appear on camera.  The company's COO, Ray Schlecter, told the investigator off camera that the company "ships for companies across the country and is not responsible for their clients' billing practices." The investigator later received a call from TFL's CEO, Defendant Rick Nelson, who told her the same thing, that TFL ships millions of products for companies across the country, and that he "severs relationships with companies that have a high volume of complaints."

186.   The BBB conducted its own investigation into TFL's business practices as far back as July 2017.  The BBB's website posts a red "Current Alerts For This Business" banner across the top of TFL's profile stating that in July 2017, BBB contacted TFL because "BBB had received significant complaint activity involving a large number of products using addresses owned, operated, and/or affiliated with the business."[34] The

---

[33] https://www.wfla.com/8-on-your-side/better-call-behnken/man-receives-keto-pills-he-never-ordered-charged-nearly-200/ (posted on December 16, 2019, updated on December 17, 2019).

[34] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/the-fulfillment-lab-inc-0653-90142042

company did not respond to BBB's request for information.[35]

187.   Based on its investigation, the BBB identified more than 400 product lines having their orders fulfilled and shipped by TFL.[36]  The BBB concluded:

> The Fulfillment Lab appears to be *a hub* for problematic online sellers to conduct business.  The Fulfillment Lab *has knowledge* that it has, as customers, many online sellers using deceptive practices to enroll consumers in continuity programs.  *The Fulfillment Lab chooses to continue to do business with these customers, profiting off their financial successes that are born from these deceptive practices.*[37]

188.   Moreover, the BBB determined that a product line is marketed, with TFL's knowledge and assistance, "until it generates significant complaint activity, at which time that product line is discontinued."[38]

189.   Consumers have posted numerous complaints regarding TFL on the BBB's website.[39]  The complaints make the same general allegations that the products that TFL ships have prices that are falsely advertised, the consumers are billed substantially more than the advertised prices, and the consumers are unable to obtain refunds.

190.   The company purports to post a "company response" to some of the complaints by stating there is nothing it can do to assist the consumers because it is "not the manufacturer of any products and does not care for customer billing or advertising for

---

[35] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/the-fulfillment-lab-inc-0653-90142042/details
[36] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/the-fulfillment-lab-inc-0653-90142042/details#all-alerts
[37] *Id.*
[38] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/the-fulfillment-lab-inc-0653-90142042/details
[39] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/the-fulfillment-lab-inc-0653-90142042/complaints

any companies. TFL cares only for warehousing, packaging, and shipping as an entirely separate company altogether....TFL cannot control how another company chooses to handle customer billing issues or monitor how they advertise to consumers."[40]

191.   But, TFL's website shows it is much more than a simple fulfillment center. The company's marketing and advertising materials to its clients—including scammers—boast TFL's assistance with, and active participation in, its clients' businesses. The company's website provides detailed offers to attract clients with "On-demand products," "Affiliates," "Proprietary Software," and "Dynamic Integration."

192.   TFL provides its own white-label product line called "Global On-Demand Fulfillment Portal" for clients to simply affix their own design and logo and sell as scams.[41] TFL boasts that its clients will "be able to create an initial product offering, instantly add complementary on-demand products, create a customized label, and start selling without having to purchase the products yourself or make an upfront investment.  These on-demand products can be white-labeled or private-labeled with customization that aligns with your brand and meets the needs of your customers. With our on-demand fulfillment solutions, the opportunities for complementary product combinations and upsells that drive additional revenue are nearly endless!" [42]

193.   In addition to offering white-label products, TFL also offers its clients an Affiliate Program and provides "Affiliate Marketing Resources" that include articles entitled "3 Reasons to Start an Affiliate Partnership with the Fulfillment Lab"; "How an Affiliate Program Creates New Wholesale Revenue Streams"; "The Best Affiliate Programs for eCommerce Businesses"; and "5 Affiliate Partnership Factors You Need to Consider."[43]

---

[40] *Id.*

[41] A white-label product is considered a product or service produced by one company that marketers rebrand to make it appear as if they had made it.

[42] https://www.thefulfillmentlab.com/on-demand

[43] https://www.thefulfillmentlab.com/affiliates

194.   TFL's website states: "By signing up, you'll receive a unique code so you can quickly and easily share it with your contacts. We'll even send you resources to market and sell TFL with ease that can be directly passed along.  Once one of your contacts creates an account using your affiliate code and begins shipping, you'll get credit and start earning commissions immediately. So sit back, relax, and watch the residual income start rolling in! It's one of the most simple, speedy, and streamlined ways to increase revenue without increasing the amount of time and effort you have to put in."

195.   Plaintiffs are informed and believe that TFL is the fulfillment company for both "Instant Keto" and "Ultra Fast Keto Boost" products, and both products are the same white-labeled products offered by TFL.  Photographs of the two products side-by-side demonstrate there is no significant distinction between them.  The bottles are the same size, the ingredients and supplement information are identical, the suggested use and caution statements are identical, and the certification labels are the same.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19   196.   Similarly, the packing slips sent with the "Instant Keto" bottles to Ms. Sihler

20  and with the "Ultra Fast Keto Boost" bottles to Ms. Bavencoff are the same, and they follow

21  the exact template of the generic packing slip that is part of TFL's software presented to

22  potential clients in online demonstration videos regarding their "Proprietary Software."[44]

23  Compare the Keto packing slip (top) to the TFL generic packing slip (bottom):

24
25
26
27
28

[44] https://www.thefulfillmentlab.com/proprietary-software

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





197.   The packing slips for both "Instant Keto" and "Ultra Fast Keto Boost" list the same return address as 3201 Hillsborough Avenue 153201-1378, Tampa, Florida 33684. This address is a United States Post Office, which is the closest post office from the TFL office located only 2.4 miles away at 5136 W. Clifton Street, Tampa, Florida 33634. Tellingly, the BBB website lists the TFL office as the same Post Office on Hillsborough Avenue.[45]

---

[45] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/the-fulfillment-lab-inc-0653-90142042/details

198.   On information and belief, the TFL Defendants not only provide the white-label products to the Keto Defendants perpetrating the Keto scheme, the TFL Defendants also handle the returns from unhappy customers.  The packing slips for the Keto Products follow the exact same template of the packing slip in TFL's software, which is shown in TFL's online demonstration videos.[46]

199.   On information and belief, as Ultra Fast Keto Boost and Instant Keto's return processor, TFL is aware of the numerous customers who submit the products for return. Along with these returns, TFL is notified by unhappy victims that they are being scammed with false advertisements and fake celebrity endorsements.

200.   The TFL Defendants' role in handling product returns means that they necessarily would have had knowledge of customer complaints about the Keto Products. On information and belief, they would have received numerous complaints similar to the ones flooding various Internet pages regarding the Keto Products.

201.   TFL is not a mere fulfillment company—in fact, they are a scam consulting operation masquerading as one. They provide numerous additional services, including customized software which is designed to harvest data about customers specifically to be used in marketing and advertising.[47]

202.   In fact, TFL directly runs advertising campaigns for its customers. TFL's marketing director, Jelani Hunte, states on his LinkedIn profile that his duties include "Run and monitor marketing campaigns" and "Identify, recruit, and activate affiliates."[48]

203.   The TFL Defendants specifically target free trial scammers as their customers at various conferences, including the Affiliate Summit and the Panama Global Banking Summit, which describes itself as a conference for "high risk" verticals such as "nutra," or nutraceuticals. Defendant Nelson attended this conference in Panama as a "top sponsor"

---

[46] https://gfs.thefulfillmentlab.com/client/16794/inventory/packing-slip/558.
[47] https://www.thefulfillmentlab.com/blog/the-fulfillment-lab-is-a-fulfillment-solutions-business.
[48] https://www.linkedin.com/in/jelani-hunte-89a58aba/.

on behalf of The Fulfillment Lab, and he did so with the specific intention of recruiting scammers as customers for the company.

204.   The TFL Defendants' knowledge that victims were complaining is itself an intentional act of deception designed to hide their role in the fraud: the TFL Defendants falsely told victims and the BBB that it is not involved with processing orders, billing, or refunds when its website, presentations, and software make clear that it provides much more.

205.   The TFL Defendants knew about these complaints as far back as July 2017 when the BBB contacted the company as part of its investigation into the company's business practices, and as recently as December 2019, when the Tampa news channel investigator visited its office asking questions about their business practices.  Despite these investigations and consumer complaints, the TFL Defendants have continued to do business with these scammers and have successfully assisted the scammers in perpetrating the fraud against Plaintiffs and the Class Members.

206.   On information and belief, the TFL Defendants were acting as consultants to assist the scammers in operating their scams in order to generate shipping business, and they did so from at least February 2018 through the present. And on information and belief, the TFL Defendants acted as consultants to assist the Keto Defendants in defrauding consumers, they knew that the fraud was occurring, and intentionally continued to aid and support the Keto Defendants in their fraud despite this knowledge.

207.   Defendant Richard Nelson is TFL's President, as well as the President of TFL's predecessor, Skinutra Inc. ("Skinutra").  Both companies have the same principal office address at 5136 West Clifton Street, Tampa, Florida, 33634.

208.   Mr. Nelson is no stranger to perpetrating affiliate marketing schemes. Although Skinutra's website at https://www.skinutra.com has no content, its previous webpages have been archived, and the site was active at least through 2019.  In 2015, Skinutra's website made it clear that it was more than just a fulfillment center and proudly boasted it can actively assist its clients with "straight sale" scams:

We utilize our industry knowledge, strategic partnerships, and global expertise to realistically make available product and service solutions designed to streamline implementation, diversification, and expansion of their sales campaign on a domestic and global level.

**Whether your campaign consists of Trails (sic), Continuity, and or Straight Sale; SKINUTRA's has a solution for you.**
(emphasis added.)

209.   Skinutra's foregoing statements demonstrate Skinutra clearly understands the different scams pervading the industry, including "trials," "continuity," and "straight sale" models.  This is exactly the "industry knowledge" that Mr. Patel acknowledged during his keynote speech at the *Affiliate Summit West*: "Some of you guys do straight sells, so when they click from that Oprah landing page, they go into a straight sell instead of forced continuity."

210.   Skinutra's website also boasts its ability to provide "service solutions" to expand its clients' sales. This is another code phrase meaning Skinutra will actively assist scammers in maximizing their sales and making as much money as possible before their victims discover the fraud.

211.   By 2019, the Skinutra website had been updated to make it clear that TFL and Skinutra are related.  The bottom of Skinutra's home page showed "Copyright 2017 THE FULLFILLMENT LAB. All Rights Reserved."  In addition, Skinutra's information page was updated with a different style, but the same message that "We'll brand any product we carry with your corporate identity and you're all set. And of course, when it comes to time to handle all those orders, visit THE FULFILLMENT LAB."

212.   Skinutra further bragged that: "Unlike other small business, it does not take much time to start selling Nutraceuticals from the comfort of your home. And to top it off, **we do most of the work**."[49]

---

[49] https://web.archive.org/web/20190611002235/http://skinutra.com/nutraceuticals/.

213.   Mr. Nelson specifically directs TFL's activities with respect to Internet scammers, and he personally led efforts to customize software that would enable their customers (the scammers) to more effectively market their products: "After researching some of the CRM software already on the market, and being unimpressed by it, he decided to create his own, which would give online retailers more visibility about consumer buying habits, as well as the ability to fully customize orders and get better insight into their inventories."[50]

214.   On information and belief, and based on public data on number of complaints to the BBB and elsewhere, the Keto Defendants were one of the largest affiliate marketing scams nationwide in the last year, and were such a high-volume customer for TFL that Mr. Nelson was necessarily personally involved in recruiting them as customers and managing their account. Given this volume, on information and belief Mr. Nelson personally assisted the Keto Defendants in advising on their scam, and given his comments to reporters indicating knowledge of the fraud which occurred prior to the named Plaintiffs being injured, Mr. Nelson personally intended to injure the Plaintiffs and the Class.

215.   The TFL Defendants purposely directed their activities towards California by shipping products to California residents, accepting and processing returns and complaints from California residents, consulting with the Keto Defendants on sales that they knew would be made to California residents, and otherwise providing the services listed on their website in connection with California customers.

216.   These intentional acts were expressly aimed at California residents. The TFL Defendants targeted their conduct at California residents, including the Plaintiffs, and knew they were California residents by virtue of their shipping addresses and other contact information. On information and belief, these acts involved ongoing, systemic, and continuous contact with California because the shipment of Keto Products has been

---

[50] https://gritdaily.com/the-fulfillment-lab-customizes-packaging-to-enhance-the-ecommerce-experience/.

ongoing since at least February 2018, and consumers continue to complain even as of filing. The acts were entirely commercial in nature, as the TFL Defendants marketed themselves as providing services specifically to scammers they knew would sell nationwide via the Internet.

217.   The TFL Defendants generated substantial profits from their acts aimed at California residents. They intentionally assisted the Keto Defendants in placing the Keto Products into the stream of commerce, knowing and intending that they would be advertised over the Internet to and purchased by California consumers.

218.   The TFL Defendants knew or should have foreseen that their actions would cause harm in California. As described above, they intentionally assisted the scammers over a lengthy period of time. They have provided various services to the Keto Defendants knowing that California consumers are being harmed by the scam, and specifically interacting with those consumers when they attempted to obtain refunds from the fraudulent charges. Had they not provided these services, the California consumers would not have been harmed because the Keto Products would not have been shipped to them and the Keto Defendants would not have benefitted from the experience of the TFL Defendants in helping other scammers design their business processes.

219.   Because of these facts, personal jurisdiction is appropriate in California over the TFL Defendants.

## CLASS ACTION ALLEGATIONS

220.   Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

221.   Plaintiffs bring this class action pursuant to Fed. R. Civ. P. Rule 23, seeking certification of Plaintiffs' claims and certain issues in this action on the Class, consisting of:

> **Nationwide Class:** All consumers in the United States who, within the applicable statute of limitations period until the date notice is disseminated, were billed for the Keto Products.

222.   Plaintiffs seek certification of the following subclass:

**California Class:** All consumers in the United States who, within the applicable statute of limitations period until the date notice is disseminated, were billed for the Keto Products.

223.   "Keto Products" means "Instant Keto," "InstaKeto," and "Ultra Fast Keto Boost." Plaintiffs expect that this definition will be modified in discovery as information is obtained from the John Doe Defendants. In particular, Plaintiffs expect that there may be other products sold by the same Defendants with the exact same formulation, similar or identical injuries, but different labels or names. Plaintiffs further expect that the conduct of the affiliates, the Defendants, or the "crooked processors" may be subject to a different and much broader class that encompasses identical injuries that go beyond this specific product line.

224.   Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

225.   Plaintiffs reserve the right to amend or modify the class descriptions by making it more specific or dividing the class members into subclasses or limiting the issues.

226.   NUMEROSITY: Plaintiffs are informed and believe, and on that basis allege, that the Plaintiffs Class is so numerous that individual joinder of all members would be impracticable. It is apparent that the number of consumers of injured by similar or identical Products by the Defendants would be so large as to make joinder impracticable as the Class (or Classes) would be comprised of thousands of consumers geographically dispersed throughout the United States. While the exact number of Class members is currently unknown, such information can be ascertained through appropriate discovery.

227. <u>COMMONALITY</u>: Defendants' practices and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class. All members of the putative Classes were and are similarly affected by having purchased and used the Keto Products, and the relief sought herein is for the benefit of Plaintiffs and members of the putative Class.

228. <u>PREDOMINANCE</u>: Questions of law and fact common to the Class exist that predominate over questions affecting only individual members, including but not limited to:

    a) whether Defendants' representations discussed above are misleading, or objectively reasonably likely to deceive;

    b) whether Defendants' omissions discussed above involve facts the Defendants were obliged to disclose or facts contrary to representations by the Defendants;

    c) whether the Defendants' owed consumers a duty to disclose the omitted material facts;

    d) whether Defendants' alleged conduct is unlawful;

    e) whether the alleged conduct constitutes violations of the laws asserted;

    f) whether the Defendants' wrongful conduct was intentional or knowing;

    g) whether the Defendants' wrongful conduct warrants punitive damages;

    h) whether Defendants engaged in false or misleading advertising; and

    i) whether Plaintiffs and Class members are entitled to appropriate remedies, including restitution, damages, and injunctive relief.

229. <u>TYPICALITY</u>: The claims asserted by Plaintiffs in this action are typical of the claims of the members of the Class, as the claims arise from the same course of conduct by Defendants, all members of the Class have been similarly affected by Defendants' course of conduct, and the relief sought is common.

230. <u>ADEQUACY</u>: Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have no interest adverse to the interests of

the other Class members. Plaintiffs have retained competent counsel with substantial experience in complex litigation and litigation involving scientific and technical issues, who are committed to vigorously prosecuting this action on behalf of the Class.

231.   <u>SUPERIORITY</u>: A class action is superior to other available methods for the fair and efficient adjudication of the present controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that individual actions would engender. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, are far superior than any difficulties that might be argued with regard to the management of this class action. This superiority makes class litigation superior to any other method available for the fair and efficient adjudication of these claims. Absent a class action, it would be highly unlikely that the representative Plaintiffs or any other members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

232.   Certification of this class action is appropriate because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. Certification also is appropriate because Defendants acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate the relief sought on behalf of the Class as a whole. Further, given the large number of potentially injured consumers, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications. Certification of Plaintiffs' claims for class-wide treatment is also appropriate because Plaintiffs can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

233.   Notice to the members of the Class may be accomplished inexpensively, efficiently, and in a manner best designed to protect the rights of all Class members. Class notice can likely be directly sent to individual members of the Class because Defendants' own records and documents will likely identify all members of the Class and contain their contact information.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of the Consumer Legal Remedies Act

### Cal. Civ. Code § 1750, *et seq.*

234.   Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

235.   Plaintiffs bring this claim individually and on behalf of the Class.

236.   The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

237.   Defendants' false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of Defendants' Keto Products for personal, family, or household purposes by Plaintiffs and Class Members, and violated and continue to violate the following sections of the CLRA:

a. § 1770(a)(2): misrepresenting the source, sponsorship, approval, or certification of goods or services, in particular through the false celebrity endorsements and false presentation of websites as news articles described herein;

b. § 1770(a)(3): misrepresenting the affiliation, connection, or association with, or certification by, another, in particular through the false celebrity endorsements and false presentation of websites as news articles described herein;

c. § 1770(a)(5): representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, in particular through the false celebrity endorsements, the "false front" websites, the representations regarding limited supply, and the false presentation of websites as news articles described herein;

d. § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another, in particular the false celebrity endorsements as described herein;

e. § 1770(a)(9): advertising goods with intent not to sell them as advertised, in particular in representing that additional bottles of the Keto Products would be sold at no cost to consumers who purchased two or more bottles of the Keto Products, when the Defendants in fact intended to charge – and did charge - the consumers full price for every single bottle delivered to the consumers;

f. § 1770(a)(13): making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions, in particular the false representations of additional "free" bottles with the purchase of two or more bottles, the false representations that the additional bottles would cost $0.00, and the false representations regarding limited supply as described herein.

238. Defendants profited from their sales of the falsely, deceptively, and unlawfully advertised Product to unwary consumers.

239. Plaintiffs and members of the Class purchased the Products for personal use, in reliance on Defendants' false and misleading material claims as described herein.

240. Defendants David Flynn, Rickie Joe James, Beyond Global Inc., Brightree Holdings Corp. and BMOR Global LLC, directly violated each of the sections of the CLRA listed above. Those defendants sold and distributed the Keto Products, operated ultrafastketoboost.com and instaketo.com, as well as the "false fronts," and worked with

other John Doe affiliates and affiliate networks to create fake celebrity advertisements. These acts were committed by Beyond Global Inc., Brightree Holdings Corp. and BMOR Global LLC, and supervised and controlled by David Flynn and Rickie Joe James personally.

241. **Aiding and Abetting (TFL):** Defendant The Fulfillment Lab, Inc. aided and abetted Beyond Global Inc., the Keto Defendants, and other John Does, and is thus also responsible for and liable for their conduct under this Cause of Action. The Fulfillment Lab, Inc. knew about these violations of the CLRA and knew that these misrepresentations were being made to Plaintiffs and the Class. On September 30, 2019, TFL received a complaint on its BBB page stating "the ad said buy 3 get 2 free. they chareged me to all 5 bottles overcharging me. it was keto diet pill ad on face book was buy 3 bottle and get 2 free , the charded me for all 5 bottle.... one bottle was $34.95 they chaged me over $200 (sic)."[51] TFL responded to this complaint on October 17, 2019, acknowledging that it shipped the Keto product, disclaiming any responsibility, and offering to put the consumer in touch with the manufacturer. On November 20, 2019, TFL received a complaint on its BBB page regarding Ultrafast Keto Boost stating that "Shark Tank was used to sell product falsely," "Price was incorrect when billed," "Purchase date 9/24/2019 $198.70, Price online was $99.00," and "It was a scam from the get go."[52] TFL responded to this complaint on December 4, 2019 acknowledging that it shipped Ultrafast Keto Boost, disclaiming any responsibility, and offering to put the consumer in touch with the manufacturer. TFL was specifically made aware that Instant Keto was fraudulent (and specifically made aware that consumers were being shipped more bottles than they paid for) in December 2019 when a local news station interviewed various employees there and ran a story about it. Consumers also made several other complaints on TFL's BBB page which TFL did not respond to, but which on information and belief, its employees (including Rick Nelson) read because they

---

[51] https://www.bbb.org/us/fl/tampa/profile/high-risk-free-trial-offers/the-fulfillment-lab-inc-0653-90142042/complaints (last visited Dec. 13, 2020).
[52] *Id.*

repeatedly responded to other complaints on the same page. On October 2, 2019, a consumer complained: "Ultra Fast Keto Boost advertises a 30 day money back guarantee. TFL filled the order.... You try the support site and get more advertising for the product. Call the number they want to give two bottles of ? told them I wanted the full refund as stated. then it was I can give you 25% , I said no full refund. She put me on hold came back and said there would be a $5.00 restocking fee and I would have to pay for return shipping. This advertising a full 30 day refund is fraud not disclosing all details of returns."[53] On November 1, 2019, a consumer complained: "THIS COMPANY ASSOCIATED W/KETOBOOST IS A RIP OFF SCAM. I ORDERED 1 BOTTLE OF KETO BOOST AND THEY CHARGED ME $149.98 THEY SAID THEY WOULD REFUND $79.98 BUT NOT ONLY DID THEY NEVER DO IT THEY WONT ANSWER THE PHONE SO THEY GAVE ME ANOTHER NUMBER TO CALL THEY KEEP SAYING THEY WILL REFUND THE DIFFERENCE BUT NEVER HAVE.AND I AM A DISABLED VET ON A FIXED INCOME WHAT A WAY FOR A COMPANY TO TREAT A VETERAN."[54] On December 19, 2019, a consumer complained: "Ordered keto from tv, returned it on 9-19-19. I am in need of refund $198.70."[55]

242.   TFL knew of the CLRA violations and misrepresentations involving the Keto Products from the very beginning of the wrongful conduct. In addition to the BBB reviews posted on TFL's BBB page specific to the Keto Products and the local news story, other circumstantial evidence about its business practices supports this allegation. As described herein, TFL was contacted by the BBB in July 2017 regarding its' clients business practices, and was specifically made aware that it was shipping products sold using fake celebrity advertisements and "unauthorized and/or unexpected charges." Ultrafast Keto Boost is included on a list of TFL products using these deceptive tactics that the BBB

---

[53] https://www.bbb.org/us/fl/tampa/profile/high-risk-free-trial-offers/the-fulfillment-lab-inc-0653-90142042/customer-reviews (last visited Dec. 13, 2020).
[54] *Id.*
[55] *Id.*

maintains on the TFL complaints page, which TFL and Defendant Nelson have repeatedly accessed to reply to comments on. As described herein, TFL acted as the returns processor for the Keto Products, and it was made aware of the CLRA violations and misrepresentations through customer complaints. TFL provided its custom software to Beyond Global Inc. and the Keto Defendants, integrated that software into ultrafastketoboost.com and instaketo.com, meaning it was aware of all of the misrepresentations on those websites. TFL further directly runs advertising campaigns for its customers and assists in that advertising, including for Beyond Global Inc. and the Keto Defendants, meaning that it was aware of the fake celebrity advertisements and other misrepresentations described herein as being part of the sales funnel. TFL was further familiar with schemes like this generally because it specifically targeted scammers as customers and recruited them as clients at conferences. TFL further acted as consultants for Beyond Global Inc. and the Keto Defendants in their scam, and in that role was necessarily aware of how the scam worked. Because a large number of TFL's customers have been "free trial scammers" since its inception, TFL was aware that on April 12, 2019, Mastercard introduced stricter payment processing rules for subscription billing. Those rules made it far more difficult to run a subscription scam. But these scams are generally billed under a particular code: MCC 5968 (Direct Marketing—Continuity/Subscription Merchants). If the products were shipped as a subscription, they would be subject to rules including regular account reviews by Mastercard, strict disclosure requirements, and a requirement to obtain explicit customer permission to charge the card after a "free trial" ended. TFL knew that by shipping the products in a single batch, instead of a subscription, it was helping its existing "free trial scam" customers continue their scam by allowing them to bill under codes that were not subject to the new rules but to continue to ship unordered products. The BBB reviews on the TFL page reflect that customer complaints regarding TFL began shifting from complaints about free trial scams to primarily complaints about multi-bottle shipments around this time. TFL was further aware of the wrongs being committed because it has a multi-month "onboarding" process for new customers in which

Defendant Nelson guided and advised Beyond Global Inc. and the Keto Defendants, and because Beyond Global Inc. and the Keto Defendants were long-term clients of TFL. TFL further has a policy of signing separate contracts with each shell company used by scammers to sign up for merchant accounts, which was revealed in sworn declarations in a separate lawsuit in *Vanderpool v. Pai*, No. SC129441, filed in Los Angeles County Superior Court. There, TFL was the shipping company for a free trial scammer who was ultimately prosecuted in Puerto Rico. TFL signed separate contracts with the Wyoming shell companies being used to sign up for merchant accounts there. Because of this policy, TFL was aware of the false fronts and merchant accounts scheme here because it was signing contracts with large numbers of companies to ship the same products. The Fulfillment Lab, Inc. knew these violations and misrepresentations were a breach of duty to Plaintiffs and the Class because it knew Beyond Global Inc. and the Keto Defendants were committing fraud, intentional torts, were exposing Plaintiff and the Class to harms TFL could foresee, and TFL knew they were not being treated with due care but instead were being intentionally defrauded.

243.   The Fulfillment Lab, Inc. gave substantial assistance and encouragement to Beyond Global Inc., the Keto Defendants, and other John Does by: shipping the Keto Products, providing access to their fulfillment software and integrating it with the ultrafastketoboost.com and instaketo.com websites, providing white label product services, providing advice and encouragement, including advice on how to market the products and advice on how to structure the shipments to enable the fraud to avoid VISA and Mastercard rules, providing marketing resources and articles, handling returns and complaints, directly running advertising campaigns, acting as general consultants advising on how to run the scam, and using their strategic partnerships to refer them to other service providers. The Fulfillment Lab, Inc.'s conduct was a substantial factor in causing harm to Plaintiffs and the Class. The shipping services and shipping of the unordered products were a necessary fig leaf to avoid detection of the fraud and to enable victims' credit cards and bank accounts to be billed without chargebacks being issued by their banks, and by knowingly shipping

more bottles than consumers actually ordered TFL enabled the other defendants to issue unauthorized charges for more than the consumers agreed to. Without TFL's assistance, Beyond Global Inc., the Keto Defendants, and other John Does' scam could not have operated—they could not have shipped the products, they would not have had products to ship because of the white label services, they would not have been able to target customers using the software data, and they would not have had TFL's advice on how to avoid new card brand rules designed to flag and prevent the scam. The injuries to Plaintiffs and the Class would not have occurred but for The Fulfillment Lab, Inc.'s conduct because the scam would have been quickly flagged as fraud and the merchant accounts cancelled without these shipping services to provide the "fig leaf" of a purported product sale. The Fulfillment Lab's conduct was a proximate cause of the injuries to Plaintiffs and the Class because the injuries were direct and reasonably foreseeable results of the conduct, in that TFL knew how the scam worked and knew about the misrepresentations made on the websites, and it was reasonably foreseeable that providing this assistance would result in customers being billed for products they did not order and which were marketed in violation of the CLRA. The Fulfillment Lab, Inc. had specific intent to facilitate the wrongful conduct by Beyond Global Inc., the Keto Defendants, and other John Does and consciously decided to participate in that tortious conduct, as evidenced by its recruitment of scammers at conferences, its continued participation despite consumer complaints and investigations by the BBB and the media, and the other facts suggesting its knowledge.

244.    Even if it did not have knowledge of the wrongful conduct, The Fulfillment Lab, Inc. is separately responsible for and liable for the CLRA violations and misrepresentations by Beyond Global Inc., the Keto Defendants, and other John Does as an aider and abettor because it gave them substantial assistance in achieving the tortious result and its own conduct, separately considered, constitutes a breach of duty to Plaintiff and the Class. The Fulfillment Lab, Inc. owed duties to Plaintiffs and the Class, including a duty not to commit fraud, a duty not to commit intentional torts, a general duty of due care to avoid exposing Plaintiffs and the Class to foreseeable harms, the duties imposed

under Cal. Civ. Code 1714(a), duties not to injure Plaintiffs and the Class by violating California and Federal laws, and general duties of care arising from its relationship with and interaction with Plaintiffs and the Class. The Fulfillment Lab, Inc.'s own conduct, separately considered, breached these duties because it directly committed torts against Plaintiff and the Class, namely violations of the UCL "unlawful prong" described in the Fourth Cause of Action (specifically, mail fraud, violations of the Sherman Food, Drug, & Cosmetic Law, and violations of the Federal Food, Drug, & Cosmetic Act) and violations of RICO as described in the Fifth Cause of Action. As described above, it gave them substantial assistance in achieving the tortious result.

245. **Aiding and Abetting (Nelson):** Defendant Rick Nelson aided and abetted Beyond Global Inc., the Keto Defendants, and other John Does, and is thus also responsible for and liable for their conduct under this Cause of Action. Mr. Nelson knew about these violations of the CLRA and knew that these misrepresentations were being made to Plaintiffs and the Class. Mr. Nelson was specifically informed of the violations because he was the individual responding on behalf of TFL to the BBB Complaints discussed herein, including the complaints regarding the Keto Products on September 30, 2019 and November 20, 2019. Many of TFL's responses to customer complaints specifically identify Nelson as the author. On August 13, 2018, TFL received a complaint on its BBB page about "weight loss products" that TFL was shipping which the consumer had not ordered and had specifically cancelled. Mr. Nelson responded on August 28, 2018 acknowledging that TFL had shipped the product and claiming the consumer had agreed via the terms and conditions. On June 27, 2018, TFL received a complaint on its BBB page about a skin cream, informing TFL that it was shipping products to the consumer as part of a "fraud" even though the consumer had never ordered them. On July 6, 2018, Mr. Nelson again responded and again claimed that the consumer had agreed via the terms of service. On March 14, 2018, TFL received a complaint on its BBB page that outlined a "free trial scam" and specifically accused TFL of assisting with it: "I looked on the BBB website and there are numerous complaints similar to mine for this company and many others at this same

address. This matter needs to be investigated by your office. This company is scamming people out of hundreds of dollars and is committing fraud." Mr. Nelson responded on March 28, 2018, acknowledging that TFL shipped the product but disclaiming any responsibility and pointing to the terms of service. Notably, all three complaints involved the same company—and yet TFL and Nelson continued shipping products for them. Mr. Nelson had knowledge of the fraud because he was personally contacted by journalists from a local news station about the fraud as described herein. He had knowledge as a result of his personal attendance at conferences where he sought free trial scammers as clients, including the Panama Global Banking Summit. He further had knowledge as a result of his role as CEO of TFL, which through much of this period was a smaller company which Mr. Nelson has described as having a "startup" atmosphere, meaning Nelson was aware of all of its activities.[56] Mr. Nelson further engages in "live chat meetings" with clients, and as a result of these meetings had personal knowledge of the nature of the wrongs being committed by Beyond Global Inc., the Keto Defendants, and other John Does.[57] At a presentation at the Panama Global Banking Summit in 2017, Mr. Nelson stated that he "onboards" customers in a multi-month process and that he "advises" and "guides" them.[58] He further repeatedly stated that TFL avoids short term customers and instead has long-term relationships with them: "We don't want business that's going to be 2 months, 3 months, 4 months. We want to do business with people that are going to be here 12 months, 2 years, 5 years, 10 years. So everyone on the panel, I know you know everyone's clients here, they have very long lasting relationships with their clients."[59] By onboarding Beyond Global Inc. and the Keto Defendants, and by advising and guiding them, Nelson acquired detailed knowledge of the wrongs they were committing.

---

[56] https://gritdaily.com/the-fulfillment-lab-customizes-packaging-to-enhance-the-ecommerce-experience/.
[57] *Id.*
[58] https://panama-gbs.com/rick-del-rio/.
[59] *Id.*

246.   Nelson knew of the CLRA violations and misrepresentations involving the Keto Products from the very beginning of the wrongful conduct. This is supported by the evidence above, in particular his involvement in the "onboarding" process and his detailed involvement in advising and guiding clients. Nelson knew these violations and misrepresentations were a breach of duty to Plaintiffs and the Class because he knew Beyond Global Inc. and the Keto Defendants were committing fraud, intentional torts, were exposing Plaintiff and the Class to harms he could foresee, and he knew they were not being treated with due care but instead were being intentionally defrauded.

247.   Nelson gave substantial assistance and encouragement to Beyond Global Inc., the Keto Defendants, and other John Does by: directing, controlling, and supervising TFL's conduct described herein, including shipping the Keto Products, providing access to their fulfillment software and integrating it with the ultrafastketoboost.com and instaketo.com websites, providing white label product services, providing marketing resources and articles, handling returns and complaints, directly running advertising campaigns, acting as general consultants advising on how to run the scam, and using their strategic partnerships to refer them to other service providers. Nelson personally was involved in providing advice and encouragement, both as part of the onboarding process and in live chat meetings, including advice on how to market the products and advice on how to structure the shipments to enable the fraud to avoid VISA and Mastercard rules. Nelson's conduct was a substantial factor in causing harm to Plaintiffs and the Class. The shipping services and shipping of the unordered products were a necessary fig leaf to avoid detection of the fraud and to enable victims' credit cards and bank accounts to be billed without chargebacks being issued by their banks, and by causing TFL to knowingly ship more bottles than consumers actually ordered Nelson enabled the other defendants to issue unauthorized charges for more than the consumers agreed to. Without Nelson's assistance, Beyond Global Inc., the Keto Defendants, and other John Does' scam could not have operated—they could not have shipped the products, they would not have had products to ship because of the white label services, they would not have been able to target customers

using the software data, and they would not have had Nelson's advice on how to avoid new card brand rules designed to flag and prevent the scam. The injuries to Plaintiffs and the Class would not have occurred but for Nelson's conduct because the scam would have been quickly flagged as fraud and the merchant accounts cancelled without these shipping services to provide the "fig leaf" of a purported product sale. Nelson's conduct was a proximate cause of the injuries to Plaintiffs and the Class because the injuries were direct and reasonably foreseeable results of the conduct, in that Nelson knew how the scam worked and knew about the misrepresentations made on the websites, and it was reasonably foreseeable that providing this assistance would result in customers being billed for products they did not order and which were marketed in violation of the CLRA. Nelson had specific intent to facilitate the wrongful conduct by Beyond Global Inc., the Keto Defendants, and other John Does and consciously decided to participate in that tortious conduct, as evidenced by his recruitment of scammers at conferences, his continued participation despite consumer complaints and investigations by the BBB and the media, and the other facts suggesting his knowledge.

248.   Even if he did not have knowledge of the wrongful conduct, Nelson is separately responsible for and liable for the CLRA violations and misrepresentations by Beyond Global Inc., the Keto Defendants, and other John Does as an aider and abettor because he gave them substantial assistance in achieving the tortious result and his own conduct, separately considered, constitutes a breach of duty to Plaintiff and the Class. Nelson owed duties to Plaintiffs and the Class, including a duty not to commit fraud, a duty not to commit intentional torts, a general duty of due care to avoid exposing Plaintiffs and the Class to foreseeable harms, the duties imposed under Cal. Civ. Code 1714(a), duties not to injure Plaintiffs and the Class by violating California and Federal laws, and general duties of care arising from TFL's relationship with and interaction with Plaintiffs and the Class. Nelson's own conduct, separately considered, breached these duties because he directly committed torts against Plaintiff and the Class, namely violations of the UCL "unlawful prong" described in the Fourth Cause of Action (specifically, mail fraud,

violations of the Sherman Food, Drug, & Cosmetic Law, and violations of the Federal Food, Drug, & Cosmetic Act) and violations of RICO as described in the Fifth Cause of Action. As described above, Nelson gave them substantial assistance in achieving the tortious result.

**249.   Conspiracy (General Allegations):** Defendants were part of a conspiracy to commit tortious conduct in violation of the CLRA. The wrongful CLRA violations were directly committed by Beyond Global Inc., the Keto Defendants, and other John Does. The conspiracy was in existence between The Fulfillment Lab Inc., Rick Nelson, the Keto Defendants, and other John Does at least as of August 2019. The conspiracy operated at a high level as follows: the Keto Defendants created the products in conjunction with TFL and Nelson as part of TFL's white label product program; the Keto Defendants created the websites, false fronts, signed up for merchant accounts with shell companies, and sent false front websites to banks; the Keto Defendants marketed the products with advice and assistance from TFL and Nelson; Nelson personally advised the Defendants on how to run the scam and on their marketing; Nelson directed, controlled, and supervised TFL's conduct; TFL shipped the products and provided other services in support of the scheme; and other John Does were hired by the Keto Defendants to perform other support services and to create "affiliate advertising" sending victims to the websites. Each Defendants' role in the conspiracy is described in further detail in this Complaint in the sections on each Defendant, which are incorporated here by reference.

250.   The conspiracy damaged Plaintiffs and the Class, in that they lost money or property, time, and attention, were billed for products they did not order, and paid more for products than they would have had they been aware that Defendants' representations were false. Plaintiffs and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore suffered injury in fact.

251.   **Conspiracy (TFL):** Defendant The Fulfillment Lab Inc. was part of a conspiracy to commit the CLRA violations described herein. TFL agreed with Beyond

Global Inc., the Keto Defendants, and other John Does to commit these wrongful acts, and intended that these wrongful acts be committed. Such agreement is implied by the conduct of the parties and can be inferred from the nature of the acts done because: (1) TFL did not merely help operate this scam but at least 400 other similar scams; (2) TFL structured the shipments specifically to avoid Mastercard rules on subscription payments; (3) TFL had a close and longstanding business relationship with Beyond Global Inc. and the Keto Defendants in which it advised them on marketing and how to run their scams; (4) TFL nominally had a policy of cancelling business relationships with companies "accused of fraudulent business practices" but repeatedly failed to follow that policy as to its co-conspirators here; (5) TFL signed separate contracts with each shell company to ship the same products from the same website, implying knowledge of and agreement to the merchant account aspect of the fraud; (6) TFL specifically targeted scammers running fake celebrity ads and "free trials" to recruit as its clients at conferences; (7) TFL had a multi-month onboarding process for its co-conspirators in which it worked together with them advising them on their business; (8) TFL refused to cooperate in BBB investigations identifying its clients as committing fraud; (9) TFL continued working with its co-conspirators in this lawsuit even after another of its clients was indicted by federal prosecutors on May 15, 2019 in Puerto Rico for merchant account fraud in a "free trial" scam; and (10) TFL continued working with its co-conspirators even after receiving customer complaints of the fraud as the returns processor that it was shipping unordered products that had been falsely advertised. The agreement can be inferred from the relationship between the parties because of the close consulting relationship, because of the length of the business relationship, and because it was structured such that TFL was contracting with numerous shell companies individually despite knowing it was actually working for other John Doe(s). The agreement can be inferred from the interests of the co-conspirators because TFL received payment according to how many items it shipped, and therefore had incentive to encourage the shipment of as many items as possible regardless of whether they were actually ordered. There was at least a tacit agreement to commit the

wrongful acts because TFL was repeatedly informed of these wrongful acts, and yet it did not quit shipping the products or terminate the business relationship despite telling customers complaining about Ultrafast Keto Boost on the BBB website that "TFL carefully reviews its relationship with any company that has been accused of fraudulent business practices."

252.   TFL agreed to cooperate in the commission of these wrongful acts and committed wrongful conduct in furtherance of the conspiracy. Such cooperation includes all of the activities identified as substantial assistance and encouragement in the aiding and abetting section of the First Cause of Action, which is incorporated by reference here.  TFL acted in concert with its co-conspirators, as explained therein.

253.   TFL was aware that its co-conspirators planned to commit these CLRA violations, and it knew of the unlawful purpose of the conspiracy, as described *supra* in the aiding and abetting section of the First Cause of Action as to TFL, which is incorporated here by reference. TFL acted in furtherance of its own financial gain, in that it was paid for its services by Beyond Global Inc. and the Keto Defendants and made money each time a customer was injured. TFL owed duties to Plaintiffs and the Class, including a duty not to commit fraud, a duty not to commit intentional torts, a general duty of due care to avoid exposing Plaintiffs and the Class to foreseeable harms, the duties imposed under Cal. Civ. Code 1714(a), duties not to injure Plaintiffs and the Class by violating California and Federal laws, and general duties of care arising from its relationship with and interaction with Plaintiffs and the Class.

254.   **Conspiracy (Nelson):** Defendant Nelson was part of a conspiracy to commit the CLRA violations described herein. Nelson agreed with Beyond Global Inc., the Keto Defendants, and other John Does to commit these wrongful acts, and intended that these wrongful acts be committed. Such agreement is implied by the conduct of the parties and can be inferred from the nature of the acts done because: (1) Nelson personally advised the Keto Defendants and Beyond Global Inc. on how to run the scam and on their marketing, in particular in the onboarding process and in live chats; (2) Nelson directed, controlled,

and supervised TFL's conduct, including the ten items listed in the conspiracy claim in the First Cause of Action as to TFL, which are incorporated herein by reference; (3) Nelson personally responded to BBB complaints as to the Keto Products, including by describing TFL's nominal policy of  cancelling business relationships with companies "accused of fraudulent business practices," but then did nothing to investigate or cancel the relationship; (4) Nelson was aware of the BBB investigation since 2017 but continued to cause TFL to work with clients he knew to be committing fraud; (5) Nelson personally recruited clients he knew to be committing fraud at conferences; (6) Nelson was contacted by local media regarding the InstaKeto product but again failed to enforce TFL's nominal policy as to fraudulent business practices; and (7) Nelson advised his co-conspirators on how to structure the shipments to enable the fraud to avoid VISA and Mastercard rules. The agreement can be inferred from the relationship between the parties because of the close consulting relationship, because of the length of the business relationship, because it was structured such that TFL was contracting with numerous shell companies individually despite knowing it was actually working for other John Doe(s), and because of Nelson's role in onboarding clients and in controlling TFL's activities. The agreement can be inferred from the interests of the co-conspirators because Nelson owns TFL, and TFL received payment according to how many items it shipped, and therefore he had incentive to encourage the shipment of as many items as possible regardless of whether they were actually ordered. There was at least a tacit agreement to commit the wrongful acts because Nelson was repeatedly informed of these wrongful acts, and yet he did not quit shipping the products or terminate the business relationship despite telling customers complaining about Ultrafast Keto Boost on the BBB website that "TFL carefully reviews its relationship with any company that has been accused of fraudulent business practices."

255.   Nelson agreed to cooperate in the commission of these wrongful acts and committed wrongful conduct in furtherance of the conspiracy. Such cooperation includes all of the activities identified as substantial assistance and encouragement in the aiding and abetting section of the First Cause of Action, which is incorporated by reference here.

1  Nelson acted in concert with his co-conspirators, as explained therein.

2       256.   Nelson was aware that his co-conspirators planned to commit these CLRA

3  violations, and he knew of the unlawful purpose of the conspiracy, as described *supra* in

4  the aiding and abetting section of the First Cause of Action as to Nelson, which is

5  incorporated here by reference. Nelson acted in furtherance of his own financial gain, in

6  that TFL was paid for its services by Beyond Global Inc. and the Keto Defendants and

7  made money each time a customer was injured, and Nelson further profited by providing

8  other services through other companies he owned such as Skinutra. Nelson owed duties to

9  Plaintiffs and the Class, including a duty not to commit fraud, a duty not to commit

10  intentional torts, a general duty of due care to avoid exposing Plaintiffs and the Class to

11  foreseeable harms, the duties imposed under Cal. Civ. Code 1714(a), duties not to injure

12  Plaintiffs and the Class by violating California and Federal laws, and general duties of care

13  arising from his role in TFL's relationship with and interaction with Plaintiffs and the

14  Class.

15       257.   Pursuant to Cal. Civ. Code § 1780(d), Plaintiffs have attached its affidavit of

16  venue hereto as Exhibit 2.

17       258.   As a result of Defendants' violations of the CLRA, Plaintiffs and the Class

18  have suffered irreparable harm and seek injunctive relief prohibiting further violations of

19  the CLRA. Plaintiffs and the Class also seek to recover their attorneys' fees and costs.

20       259.   Ms. Sihler and Ms. Bavencoff have standing to seek injunctive relief because

21  they may be injured by the Defendants' conduct in the future. Defendants appear to be

22  cycling through product names and product types, and on information and belief, have been

23  running other "straight sale" scams. Defendants may present other offers that result in

24  fraudulent billing and which would be difficult to detect or identify as coming from them.

25  Defendants also have Ms. Sihler's and Ms. Bavencoff's personal information and could try

26  to use their personal information for nefarious purposes without their consent, just as they

27  did in the past.

28

260.   Under Cal. Civ. Code § 1782(d), Plaintiffs may without prior notification file a complaint alleging violations of the CLRA that seeks injunctive relief only. If the Plaintiffs later send a CLRA notification letter and the defendant does not remedy the CLRA violations within 30 days of notification, the Plaintiffs may amend their CLRA causes of action without leave of court to add claims for damages.

261.   Pursuant to §1782 of the CLRA, Plaintiff sent CLRA letters to the named Defendants on September 8, 2020. Defendants failed to adequately respond to Plaintiffs' demands within 30 days of the letters pursuant to §1782 of the CLRA. Plaintiff and the Class therefore also seek actual damages, punitive damages, restitution, and any other relief that the Court deems proper pursuant to the CLRA.

## SECOND CAUSE OF ACTION

### Violation of the California False Advertising Law

### Cal. Bus. & Prof. Code §§ 17500, *et seq.*

262.   Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

263.   Plaintiffs bring this claim individually and on behalf of the Class.

264.   Pursuant to California Business and Professions Code § 17500, *et seq.*, it is unlawful to engage in advertising "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . [or] to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised."

265.   Defendants have violated § 17500, *et seq.*, in particular as described herein through the false celebrity endorsements, the false advertised prices of the products, the omissions regarding their "false front" websites, their presentation of the "false front" websites to banks and credit card companies, the representations regarding limited supply, their efforts to make it difficult to obtain refunds, the "free" bottles representations, the

false representation that the additional bottles of product would cost $0.00 with the purchase of two or more bottles, and the false presentation of websites as news articles described herein.

266.   Pursuant to California Business and Professions Code § 17505, "No person shall state, in an advertisement of his goods, that he is a producer, manufacturer, processor, wholesaler, or importer, or that he owns or controls a factory or other source of supply of goods, when such is not the fact, and no person shall in any other manner misrepresent the character, extent, volume, or type of his business."

267.   Defendants have violated § 17505, in particular through their representations of limited supply, the "false front" website, the false celebrity endorsements, and the false presentation of websites as news articles described herein.

268.   Defendants misled consumers by making misrepresentations and untrue statements about their products as described herein.

269.   Defendants misled consumers by omitting material information which they were under a duty to disclose as described herein. Defendants were under a duty to disclose this material information to Plaintiffs and the Class Members.

270.   Defendants knew, or by the exercise of reasonable care should have known, that their representations and omissions were untrue and misleading, and deliberately made the aforementioned representations and omissions in order to deceive reasonable consumers like Plaintiffs and other Class Members. In particular and *inter alia*, this is evidenced by the numerous negative reviews online regarding these products and others which were specifically directed at the Defendants or their companies by name, by customer complaints which, on information and belief, were communicated directly to the Defendants by victims, by the outlandishness of the conduct described and of the stories the Defendants concocted regarding celebrity endorsements, including the judging panel on Shark Tank, Jennifer Hudson, Wendy Williams, Drew Carey, and others, the significant publicity these illegal schemes have received, prior FTC actions and criminal prosecutions against similar enterprises, and the fact that the prevalence and illegality of these activities

is well known in the affiliate marketing and direct marketing industries.

271.   As a direct and proximate result of Defendants' misleading and false advertising, Plaintiffs and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. Plaintiffs reasonably relied upon Defendants' representations regarding their products. In reasonable reliance on Defendants' false representations, Plaintiffs and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that Defendants' representations were false. Plaintiffs and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiffs and other Class Members have suffered injury in fact.

272.   Defendants' representations were material to the decision of Plaintiffs and the Class Members to purchase Defendants' products, and a reasonable person would have attached importance to the truth or falsity of the representations made by the Defendants in determining whether to purchase the Defendants' products. The suggestion that the products were endorsed by celebrities and magazines was a factor in Ms. Sihler's and Ms. Bavencoff's purchases and tended to lend credibility to the Keto products, and a reasonable consumer who knew this was false would not have purchased the products.  With respect to the omissions by Defendants as described herein, those omissions were material and Plaintiffs and the Class Members would have behaved differently if the information had been disclosed. Had Defendants disclosed the omitted information, that the consumers would be overcharged for bottles they never ordered nor consented to purchasing, that there was not a limited supply, and that Defendants intended to use the "false front" websites to defraud the consumers' banks and credit card companies if they attempted a chargeback, Plaintiffs and the Class Members would have been aware of these facts and would not have purchased the products from Defendants or would not have paid the same price for those products.

273.   Defendants advertised to Plaintiffs and other Class Members, through written representations and omissions made by Defendants and their employees that the Keto Products would be of a particular nature and quality.

274.   Defendants David Flynn, Rickie Joe James, Beyond Global Inc., Brightree Holdings Corp. and BMOR Global LLC directly violated the FAL. Those defendants sold and distributed the Keto Products, operated ultrafastketoboost.com and instaketo.com, as well as the "false fronts," and worked with other John Doe affiliates and affiliate networks to create fake celebrity advertisements. These acts were committed by Beyond Global Inc., Brightree Holdings Corp. and BMOR Global LLC, and supervised and controlled by David Flynn and Rickie Joe James personally.

275.   **Aiding and Abetting (TFL):** Defendant The Fulfillment Lab, Inc. aided and abetted Beyond Global Inc., the Keto Defendants, and other John Does, and is thus also responsible for and liable for their conduct under this Cause of Action. The Fulfillment Lab, Inc. knew about these violations of the FAL and knew that these misrepresentations were being made to Plaintiffs and the Class.

276.   TFL knew of the FAL violations and misrepresentations involving the Keto Products from the very beginning of the wrongful conduct. Plaintiff incorporates by reference the facts and allegations outlined in the Aiding and Abetting portion of the First Cause of Action as to TFL's knowledge. In addition to the BBB reviews specific to the Keto Products and the local news story, other circumstantial evidence about its business practices supports this allegation. As described herein, TFL acted as the returns processor for the Keto Products, and it was made aware of the FAL violations and misrepresentations through customer complaints. TFL provided its custom software to Beyond Global Inc. and the Keto Defendants, integrated that software into ultrafastketoboost.com and instaketo.com, meaning it was aware of all of the misrepresentations on those websites. TFL further directly runs advertising campaigns for its customers and assists in that advertising, including for Beyond Global Inc. and the Keto Defendants, meaning that it was aware of the fake celebrity advertisements and other misrepresentations described

herein as being part of the sales funnel. TFL was further familiar with schemes like this generally because it specifically targeted scammers as customers and recruited them as clients at conferences. TFL further acted as consultants for Beyond Global Inc. and the Keto Defendants in their scam, and in that role was necessarily aware of how the scam worked. Plaintiff incorporates by reference the facts from the First Cause of Action regarding the Mastercard rule changes, which TFL was aware of and intentionally designed its clients' shipments to circumvent. TFL further had an onboarding process and live customer chats resulting in its knowledge of the wrongs. TFL further had a policy of signing separate contracts with each shell company meaning it knew of the merchant account scheme and false fronts. The Fulfillment Lab, Inc. knew these violations and misrepresentations were a breach of duty to Plaintiffs and the Class because it knew Beyond Global Inc. and the Keto Defendants were committing fraud, intentional torts, were exposing Plaintiff and the Class to harms TFL could foresee, and TFL knew they were not being treated with due care but instead were being intentionally defrauded.

277.   The Fulfillment Lab, Inc. gave substantial assistance and encouragement to Beyond Global Inc., the Keto Defendants, and other John Does by: shipping the Keto Products, providing access to their fulfillment software and integrating it with the ultrafastketoboost.com and instaketo.com websites, providing white label product services, providing advice and encouragement, including advice on how to market the products and advice on how to structure the shipments to enable the fraud to avoid VISA and Mastercard rules, providing marketing resources and articles, handling returns and complaints, directly running advertising campaigns, acting as general consultants advising on how to run the scam, and using their strategic partnerships to refer them to other service providers. The Fulfillment Lab, Inc.'s conduct was a substantial factor in causing harm to Plaintiffs and the Class. The shipping services and shipping of the unordered products were a necessary fig leaf to avoid detection of the fraud and to enable victims' credit cards and bank accounts to be billed without chargebacks being issued by their banks, and by knowingly shipping more bottles than consumers actually ordered TFL enabled the other defendants to issue

unauthorized charges for more than the consumers agreed to. Without TFL's assistance, Beyond Global Inc., the Keto Defendants, and other John Does' scam could not have operated—they could not have shipped the products, they would not have had products to ship because of the white label services, they would not have been able to target customers using the software data, and they would not have had TFL's advice on how to avoid new card brand rules designed to flag and prevent the scam. The injuries to Plaintiffs and the Class would not have occurred but for The Fulfillment Lab, Inc.'s conduct because the scam would have been quickly flagged as fraud and the merchant accounts cancelled without these shipping services to provide the "fig leaf" of a purported product sale. The Fulfillment Lab's conduct was a proximate cause of the injuries to Plaintiffs and the Class because the injuries were direct and reasonably foreseeable results of the conduct, in that TFL knew how the scam worked and knew about the misrepresentations made on the websites, and it was reasonably foreseeable that providing this assistance would result in customers being billed for products they did not order and which were deceptively marketed. The Fulfillment Lab, Inc. had specific intent to facilitate the wrongful conduct by Beyond Global Inc., the Keto Defendants, and other John Does and consciously decided to participate in that tortious conduct, as evidenced by its recruitment of scammers at conferences, its continued participation despite consumer complaints and investigations by the BBB and the media, and the other facts suggesting its knowledge.

278.   Even if it did not have knowledge of the wrongful conduct, The Fulfillment Lab, Inc. is separately responsible for and liable for the FAL violations and misrepresentations by Beyond Global Inc., the Keto Defendants, and other John Does as an aider and abettor because it gave them substantial assistance in achieving the tortious result and its own conduct, separately considered, constitutes a breach of duty to Plaintiff and the Class. The Fulfillment Lab, Inc. owed duties to Plaintiffs and the Class, including a duty not to commit fraud, a duty not to commit intentional torts, a general duty of due care to avoid exposing Plaintiffs and the Class to foreseeable harms, the duties imposed under Cal. Civ. Code 1714(a), duties not to injure Plaintiffs and the Class by violating

California and Federal laws, and general duties of care arising from its relationship with and interaction with Plaintiffs and the Class. The Fulfillment Lab, Inc.'s own conduct, separately considered, breached these duties because it directly committed torts against Plaintiff and the Class, namely violations of the UCL "unlawful prong" described in the Fourth Cause of Action (specifically, mail fraud, violations of the Sherman Food, Drug, & Cosmetic Law, and violations of the Federal Food, Drug, & Cosmetic Act) and violations of RICO as described in the Fifth Cause of Action. As described above, it gave them substantial assistance in achieving the tortious result.

279.   **Aiding and Abetting (Nelson):** Defendant Rick Nelson aided and abetted Beyond Global Inc., the Keto Defendants, and other John Does, and is thus also responsible for and liable for their conduct under this Cause of Action. Plaintiff incorporates by reference the facts and allegations outlined in the Aiding and Abetting portion of the First Cause of Action as to Nelson's knowledge. Mr. Nelson knew about these violations of the FAL and knew that these misrepresentations were being made to Plaintiffs and the Class. In particular and as described *supra*, Mr. Nelson knew because of his involvement in responding to BBB complaints, because of being questioned by local media, because of his personal attendance at conferences recruiting scammers as clients, because of his role as CEO, because of his involvement in live chat meetings and onboarding, and because of the length of the business relationship with Beyond Global Inc. and the Keto Defendants. Nelson knew of the FAL violations and misrepresentations involving the Keto Products from the very beginning of the wrongful conduct. Nelson knew these violations and misrepresentations were a breach of duty to Plaintiffs and the Class because he knew Beyond Global Inc. and the Keto Defendants were committing fraud, intentional torts, were exposing Plaintiff and the Class to harms he could foresee, and he knew they were not being treated with due care but instead were being intentionally defrauded.

280.   Nelson gave substantial assistance and encouragement to Beyond Global Inc., the Keto Defendants, and other John Does by: directing, controlling, and supervising TFL's conduct described herein, including shipping the Keto Products, providing access to their

fulfillment software and integrating it with the ultrafastketoboost.com and instaketo.com websites, providing white label product services, providing marketing resources and articles, handling returns and complaints, directly running advertising campaigns, acting as general consultants advising on how to run the scam, and using their strategic partnerships to refer them to other service providers. Nelson personally was involved in providing advice and encouragement, both as part of the onboarding process and in live chat meetings, including advice on how to market the products and advice on how to structure the shipments to enable the fraud to avoid VISA and Mastercard rules. Nelson's conduct was a substantial factor in causing harm to Plaintiffs and the Class. The shipping services and shipping of the unordered products were a necessary fig leaf to avoid detection of the fraud and to enable victims' credit cards and bank accounts to be billed without chargebacks being issued by their banks, and by causing TFL to knowingly ship more bottles than consumers actually ordered Nelson enabled the other defendants to issue unauthorized charges for more than the consumers agreed to. Without Nelson's assistance, Beyond Global Inc., the Keto Defendants, and other John Does' scam could not have operated—they could not have shipped the products, they would not have had products to ship because of the white label services, they would not have been able to target customers using the software data, and they would not have had Nelson's advice on how to avoid new card brand rules designed to flag and prevent the scam. The injuries to Plaintiffs and the Class would not have occurred but for Nelson's conduct because the scam would have been quickly flagged as fraud and the merchant accounts cancelled without these shipping services to provide the "fig leaf" of a purported product sale. Nelson's conduct was a proximate cause of the injuries to Plaintiffs and the Class because the injuries were direct and reasonably foreseeable results of the conduct, in that Nelson knew how the scam worked and knew about the misrepresentations made on the websites, and it was reasonably foreseeable that providing this assistance would result in customers being billed for products they did not order and which were marketed in violation of the FAL. Nelson had specific intent to facilitate the wrongful conduct by Beyond Global Inc., the Keto

Defendants, and other John Does and consciously decided to participate in that tortious conduct, as evidenced by his recruitment of scammers at conferences, his continued participation despite consumer complaints and investigations by the BBB and the media, and the other facts suggesting his knowledge.

281.   Even if he did not have knowledge of the wrongful conduct, Nelson is separately responsible for and liable for the FAL violations and misrepresentations by Beyond Global Inc., the Keto Defendants, and other John Does as an aider and abettor because he gave them substantial assistance in achieving the tortious result and his own conduct, separately considered, constitutes a breach of duty to Plaintiff and the Class. Nelson owed duties to Plaintiffs and the Class, including a duty not to commit fraud, a duty not to commit intentional torts, a general duty of due care to avoid exposing Plaintiffs and the Class to foreseeable harms, the duties imposed under Cal. Civ. Code 1714(a), duties not to injure Plaintiffs and the Class by violating California and Federal laws, and general duties of care arising from TFL's relationship with and interaction with Plaintiffs and the Class. Nelson's own conduct, separately considered, breached these duties because he directly committed torts against Plaintiff and the Class, namely violations of the UCL "unlawful prong" described in the Fourth Cause of Action (specifically, mail fraud, violations of the Sherman Food, Drug, & Cosmetic Law, and violations of the Federal Food, Drug, & Cosmetic Act) and violations of RICO as described in the Fifth Cause of Action. As described above, Nelson gave them substantial assistance in achieving the tortious result.

**282.   Conspiracy (General Allegations):** Defendants were part of a conspiracy to commit tortious conduct in violation of the FAL. The wrongful FAL violations were directly committed by Beyond Global Inc., the Keto Defendants, and other John Does. The conspiracy was in existence between The Fulfillment Lab Inc., Rick Nelson, the Keto Defendants, and other John Does at least as of August 2019. The conspiracy operated at a high level as follows: the Keto Defendants created the products in conjunction with TFL and Nelson as part of TFL's white label product program; the Keto Defendants created the

websites, false fronts, signed up for merchant accounts with shell companies, and sent false front websites to banks; the Keto Defendants marketed the products with advice and assistance from TFL and Nelson; Nelson personally advised the Keto Defendants on how to run the scam and on their marketing; Nelson directed, controlled, and supervised TFL's conduct; TFL shipped the products and provided other services in support of the scheme; and other John Does were hired by the Keto Defendants to perform other support services and to create "affiliate advertising" sending victims to the websites. Each Defendants' role in the conspiracy is described in further detail in this Complaint in the sections on each Defendant, which are incorporated here by reference.

283.   The conspiracy damaged Plaintiffs and the Class, in that they lost money or property, time, and attention, were billed for products they did not order, and paid more for products than they would have had they been aware that Defendants' representations were false. Plaintiffs and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore suffered injury in fact.

284.   **Conspiracy (TFL):** Defendant The Fulfillment Lab Inc. was part of a conspiracy to commit the FAL violations described herein. TFL agreed with Beyond Global Inc., the Keto Defendants, and other John Does to commit these wrongful acts, and intended that these wrongful acts be committed. Such agreement is implied by the conduct of the parties and can be inferred from the nature of the acts done, as explained in the conspiracy section as to TFL in the First Cause of Action, which is incorporated by reference herein. The agreement can be inferred from the relationship between the parties because of the close consulting relationship, because of the length of the business relationship, and because it was structured such that TFL was contracting with numerous shell companies individually despite knowing it was actually working for other John Doe(s). The agreement can be inferred from the interests of the co-conspirators because TFL received payment according to how many items it shipped, and therefore had incentive to encourage the shipment of as many items as possible regardless of whether they were

actually ordered. There was at least a tacit agreement to commit the wrongful acts because TFL was repeatedly informed of these wrongful acts, and yet it did not quit shipping the products or terminate the business relationship despite telling customers complaining about Ultrafast Keto Boost on the BBB website that "TFL carefully reviews its relationship with any company that has been accused of fraudulent business practices."

285. TFL agreed to cooperate in the commission of these wrongful acts and committed wrongful conduct in furtherance of the conspiracy. Such cooperation includes all of the activities identified as substantial assistance and encouragement in the aiding and abetting section of the First Cause of Action, which is incorporated by reference here. TFL acted in concert with its co-conspirators, as explained therein.

286. TFL was aware that its co-conspirators planned to commit these FAL violations, and it knew of the unlawful purpose of the conspiracy, as described *supra* in the aiding and abetting section of the First Cause of Action as to TFL, which is incorporated here by reference. TFL acted in furtherance of its own financial gain, in that it was paid for its services by Beyond Global Inc. and the Keto Defendants and made money each time a customer was injured. TFL owed duties to Plaintiffs and the Class, including a duty not to commit fraud, a duty not to commit intentional torts, a general duty of due care to avoid exposing Plaintiffs and the Class to foreseeable harms, the duties imposed under Cal. Civ. Code 1714(a), duties not to injure Plaintiffs and the Class by violating California and Federal laws, and general duties of care arising from its relationship with and interaction with Plaintiffs and the Class.

287. **Conspiracy (Nelson):** Defendant Nelson was part of a conspiracy to commit the FAL violations described herein. Nelson agreed with Beyond Global Inc., the Keto Defendants, and other John Does to commit these wrongful acts, and intended that these wrongful acts be committed. Such agreement is implied by the conduct of the parties and can be inferred from the nature of the acts done as explained in the conspiracy section as to TFL in the First Cause of Action, which is incorporated by reference herein. The agreement can be inferred from the relationship between the parties because of the close

consulting relationship, because of the length of the business relationship, because it was structured such that TFL was contracting with numerous shell companies individually despite knowing it was actually working for other John Doe(s), and because of Nelson's role in onboarding clients and in controlling TFL's activities. The agreement can be inferred from the interests of the co-conspirators because Nelson owns TFL, and TFL received payment according to how many items it shipped, and therefore he had incentive to encourage the shipment of as many items as possible regardless of whether they were actually ordered. There was at least a tacit agreement to commit the wrongful acts because Nelson was repeatedly informed of these wrongful acts, and yet he did not quit shipping the products or terminate the business relationship despite telling customers complaining about Ultrafast Keto Boost on the BBB website that "TFL carefully reviews its relationship with any company that has been accused of fraudulent business practices."

288.   Nelson agreed to cooperate in the commission of these wrongful acts and committed wrongful conduct in furtherance of the conspiracy. Such cooperation includes all of the activities identified as substantial assistance and encouragement in the aiding and abetting section of the First Cause of Action, which is incorporated by reference here. Nelson acted in concert with his co-conspirators, as explained therein.

289.   Nelson was aware that his co-conspirators planned to commit these FAL violations, and he knew of the unlawful purpose of the conspiracy, as described *supra* in the aiding and abetting section of the First Cause of Action as to Nelson, which is incorporated here by reference. Nelson acted in furtherance of his own financial gain, in that TFL was paid for its services by Beyond Global Inc. and the Keto Defendants and made money each time a customer was injured, and Nelson further profited by providing other services through other companies he owned such as Skinutra. Nelson owed duties to Plaintiffs and the Class, including a duty not to commit fraud, a duty not to commit intentional torts, a general duty of due care to avoid exposing Plaintiffs and the Class to foreseeable harms, the duties imposed under Cal. Civ. Code 1714(a), duties not to injure Plaintiffs and the Class by violating California and Federal laws, and general duties of care

arising from his role in TFL's relationship with and interaction with Plaintiffs and the Class.

290.   The misleading and false advertising described herein presents a continuing threat to Plaintiffs and the Class Members in that Defendants persist and continue to engage in these practices, and they will not cease doing so unless and until forced to do so by this Court. Defendants' conduct will continue to cause irreparable injury to consumers unless enjoined or restrained. Plaintiffs are entitled to injunctive relief ordering Defendants to cease their false advertising, and Plaintiffs and all Class Members are entitled to restitution of the entirety of the Defendants' revenues associated with their false advertising, or such portion of those revenues as the Court may find equitable.

## THIRD CAUSE OF ACTION

### Violation of the Unfair and Fraudulent Prongs
### of the California Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

291.   Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

292.   Plaintiffs bring this claim individually and on behalf of the Class under the "unfair" and "fraudulent" prongs of California's Unfair Competition Law, Business and Professions Code section 17200, *et seq.*, on behalf of themselves and the Classes against Defendants.

293.   As alleged herein, Plaintiffs have suffered injury in fact and lost money or property as a result of Defendants' conduct because Ms. Sihler and Ms. Bavencoff were billed, without their permission, significantly more money than the advertised prices for the Keto Bottles. Plaintiffs suffered their injuries at the time of purchase when Plaintiffs bought the Keto Products that did not deliver the benefits Defendants promised, as well as on the dates their debit and credit cards were billed, without their permission, for additional bottles of product that were supposed to be free.

294.   The Unfair Competition Law, Business & Professions Code §17200, *et seq*. ("UCL") prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

295.   Defendants committed "unfair" business acts or practices by, among other things: (1) engaging in conduct where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiffs and members of the Classes; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs and members of the Classes; and (3) engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws alleged in this Class Action Complaint.

296.   The utility of the conduct committed by Defendants and as described herein is nonexistent. There is no utility to falsely suggest to customers that the product has been endorsed by celebrities; to falsely claim that the "media is in a frenzy" about the product; to falsely attribute use of the product to "before" and "after" photographs of individuals with extreme weight loss; to post fake customer reviews about the benefits of the product; to falsely claim there is a limited supply of the product and that the special offers will expire soon; to falsely claim that the formula is patented; and to run a "false front" website that deceives banks and regulators, or to any of the other conduct by Defendants. The harm to consumers caused by this conduct, by contrast, is significant. Defendants' conduct described herein not only deprived the consumers of the value they were expecting to receive, it also caused them to treat themselves with ineffective products rather than alternative options, deprived them of money, and interfered with their lawful efforts to convince their banks and credit card companies that a fraudulent transaction had occurred.

297.   Defendants' conduct as described in this Complaint offends established public policies. Defendants' conduct violated numerous civil and criminal statutes, as described further herein and in detail in the Fourth Cause of Action. Those statutes exist for a reason:

to protect consumers from unfair marketing practices, and in many cases to protect consumers' health. It is a particularly important public policy issue to avoid these kinds of violations in products that relate to health care or that are ingested into the human body given the risks of such violations.

298.   Defendants' conduct as described in this Complaint is immoral, unethical, oppressive, and unscrupulous, as well as substantially injurious to Plaintiffs and the Class. In particular and *inter alia*, this is evidenced by the outlandishness of the conduct described and of the story Defendants concocted regarding celebrity endorsements, including the judging panel on Shark Tank, Jennifer Hudson, Wendy Williams, Drew Carey, and other celebrities, the significant publicity these illegal free trial schemes have received, prior FTC actions against similar criminal enterprises, and the fact that the illegality of these activities is well known in the affiliate marketing and direct marketing industries, and by the widespread dishonesty present in Defendants' marketing materials.

299.   Defendants' conduct as described in this Complaint violates the letter, spirit, and intent of the consumer protection laws. Their products are marketed dishonestly and in violation of various consumer protection laws, as described herein and in the Causes of Action of this Complaint.

300.   As detailed herein, Defendants' unfair and/or fraudulent practices include disseminating false and/or misleading representations, through their marketing and advertising.

301.   Defendants are aware that the claims or omissions they have made about the Keto Products were and continue to be false and misleading.

302.   Defendants had an improper motive—profit before accurate marketing—in their practices related to their deceptive practices, as set forth herein.

303.   There were reasonably available alternatives to further Defendants' legitimate business interests other than the conduct described herein. For example, Defendants could have removed the false and misleading representations from their advertisements, provided omitted information to Plaintiffs and the other Class Members to avoid any deception, and

could have complied with the law rather than violating the statutes as described in Plaintiff's Fourth Cause of Action.

304.   As a direct and proximate result of Defendants' unfair or fraudulent business acts and practices and misleading and false advertising, Plaintiffs and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. Plaintiffs reasonably relied upon Defendants' representations regarding their products. In reasonable reliance on Defendants' false representations, Plaintiffs and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that Defendants' representations were false. Plaintiffs and other Class Members ended up with the Keto Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiffs and other Class Members have suffered injury in fact.

305.   Defendant's representations were material to the decision of Plaintiffs and the Class Members to purchase Defendant's products, and a reasonable person would have attached importance to the truth or falsity of the representations made by Defendant in determining whether to purchase Defendant's products, as described in detail herein. With respect to the omissions by Defendant as described herein, those omissions were material and Plaintiffs and the Class Members would have behaved differently if the information had been disclosed. Had Defendants disclosed the omitted information, Plaintiffs and the Class Members would have been aware of it and would not have purchased the products from Defendant or would not have paid the same price for those products. Similarly, had Defendants not engaged in the unfair and fraudulent business acts or practices described in this Complaint, Plaintiffs and the Class Members would not have purchased the products from Defendant or would not have paid the same price for those products.

306.   As purchasers and consumers of Defendants' Products, and as members of the general public who purchased and used the Products and have suffered injury in fact and lost money and property as a result of this unfair competition and unlawful conduct, Plaintiffs and the Class are entitled to and bring this class action seeking all available

1  remedies under the UCL.

2  307.   The unfair and unlawful competitive practices described herein presents a

3  continuing threat to Plaintiffs and the Class Members in that Defendants persist and

4  continue to engage in these practices, and will not cease doing so unless and until forced

5  to do so by this Court. Defendants' conduct will continue to cause irreparable injury to

6  consumers unless enjoined or restrained. Under Business & Professions Code § 17203,

7  Plaintiffs are entitled to injunctive relief ordering Defendants to cease their unfair

8  competitive practices, and Plaintiffs and all Class Members are entitled to restitution of the

9  entirety of the Defendants' revenues associated with their unlawful acts and practices, or

10  such portion of those revenues as the Court may find equitable.

11  308.   Defendants David Flynn, Rickie Joe James, Beyond Global Inc., Brightree

12  Holdings Corp. and BMOR Global LLC directly violated the UCL's "unfair" and

13  "fraudulent" prongs. Those defendants sold and distributed the Keto Products, operated

14  ultrafastketoboost.com and instaketo.com, as well as the "false fronts," and worked with

15  other John Doe affiliates and affiliate networks to create fake celebrity advertisements.

16  These acts were committed by Beyond Global Inc., Brightree Holdings Corp. and BMOR

17  Global LLC, and supervised and controlled by David Flynn and Rickie Joe James

18  personally.

19  309.   **Aiding and Abetting (TFL):** Defendant The Fulfillment Lab, Inc. aided and

20  abetted Beyond Global Inc., the Keto Defendants, and other John Does, and is thus also

21  responsible for and liable for their conduct under this Cause of Action. The Fulfillment

22  Lab, Inc. knew about these violations of the UCL and knew that these misrepresentations

23  were being made to Plaintiffs and the Class.

24  310.   TFL knew of the UCL violations and misrepresentations involving the Keto

25  Products from the very beginning of the wrongful conduct. Plaintiff incorporates by

26  reference the facts and allegations outlined in the Aiding and Abetting portion of the First

27  Cause of Action as to TFL's knowledge. In addition to the BBB reviews specific to the

28  Keto Products and the local news story, other circumstantial evidence about its business

practices supports this allegation. As described herein, TFL acted as the returns processor for the Keto Products, and it was made aware of the UCL violations and misrepresentations through customer complaints. TFL provided its custom software to Beyond Global Inc. and the Keto Defendants, integrated that software into ultrafastketoboost.com and instaketo.com, meaning it was aware of all of the misrepresentations on those websites. TFL further directly runs advertising campaigns for its customers and assists in that advertising, including for Beyond Global Inc. and the Keto Defendants, meaning that it was aware of the fake celebrity advertisements and other misrepresentations described herein as being part of the sales funnel. TFL was further familiar with schemes like this generally because it specifically targeted scammers as customers and recruited them as clients at conferences. TFL further acted as consultants for Beyond Global Inc. and the Keto Defendants in their scam, and in that role was necessarily aware of how the scam worked. Plaintiff incorporates by reference the facts from the First Cause of Action regarding the Mastercard rule changes, which TFL was aware of and intentionally designed its clients' shipments to circumvent. TFL further had an onboarding process and live customer chats resulting in its knowledge of the wrongs. TFL further had a policy of signing separate contracts with each shell company meaning it knew of the merchant account scheme and false fronts. The Fulfillment Lab, Inc. knew these violations and misrepresentations were a breach of duty to Plaintiffs and the Class because it knew Beyond Global Inc. and the Keto Defendants were committing fraud, intentional torts, were exposing Plaintiff and the Class to harms TFL could foresee, and TFL knew they were not being treated with due care but instead were being intentionally defrauded.

311. The Fulfillment Lab, Inc. gave substantial assistance and encouragement to Beyond Global Inc., the Keto Defendants, and other John Does by: shipping the Keto Products, providing access to their fulfillment software and integrating it with the ultrafastketoboost.com and instaketo.com websites, providing white label product services, providing advice and encouragement, including advice on how to market the products and advice on how to structure the shipments to enable the fraud to avoid VISA and Mastercard

rules, providing marketing resources and articles, handling returns and complaints, directly running advertising campaigns, acting as general consultants advising on how to run the scam, and using their strategic partnerships to refer them to other service providers. The Fulfillment Lab, Inc.'s conduct was a substantial factor in causing harm to Plaintiffs and the Class. The shipping services and shipping of the unordered products were a necessary fig leaf to avoid detection of the fraud and to enable victims' credit cards and bank accounts to be billed without chargebacks being issued by their banks, and by knowingly shipping more bottles than consumers actually ordered TFL enabled the other defendants to issue unauthorized charges for more than the consumers agreed to. Without TFL's assistance, Beyond Global Inc., the Keto Defendants, and other John Does' scam could not have operated—they could not have shipped the products, they would not have had products to ship because of the white label services, they would not have been able to target customers using the software data, and they would not have had TFL's advice on how to avoid new card brand rules designed to flag and prevent the scam. The injuries to Plaintiffs and the Class would not have occurred but for The Fulfillment Lab, Inc.'s conduct because the scam would have been quickly flagged as fraud and the merchant accounts cancelled without these shipping services to provide the "fig leaf" of a purported product sale. The Fulfillment Lab's conduct was a proximate cause of the injuries to Plaintiffs and the Class because the injuries were direct and reasonably foreseeable results of the conduct, in that TFL knew how the scam worked and knew about the misrepresentations made on the websites, and it was reasonably foreseeable that providing this assistance would result in customers being billed for products they did not order and which were deceptively marketed. The Fulfillment Lab, Inc. had specific intent to facilitate the wrongful conduct by Beyond Global Inc., the Keto Defendants, and other John Does and consciously decided to participate in that tortious conduct, as evidenced by its recruitment of scammers at conferences, its continued participation despite consumer complaints and investigations by the BBB and the media, and the other facts suggesting its knowledge.

312.   Even if it did not have knowledge of the wrongful conduct, The Fulfillment Lab, Inc. is separately responsible for and liable for the UCL violations and misrepresentations by Beyond Global Inc., the Keto Defendants, and other John Does as an aider and abettor because it gave them substantial assistance in achieving the tortious result and its own conduct, separately considered, constitutes a breach of duty to Plaintiff and the Class. The Fulfillment Lab, Inc. owed duties to Plaintiffs and the Class, including a duty not to commit fraud, a duty not to commit intentional torts, a general duty of due care to avoid exposing Plaintiffs and the Class to foreseeable harms, the duties imposed under Cal. Civ. Code 1714(a), duties not to injure Plaintiffs and the Class by violating California and Federal laws, and general duties of care arising from its relationship with and interaction with Plaintiffs and the Class. The Fulfillment Lab, Inc.'s own conduct, separately considered, breached these duties because it directly committed torts against Plaintiff and the Class, namely violations of the UCL "unlawful prong" described in the Fourth Cause of Action (specifically, mail fraud, violations of the Sherman Food, Drug, & Cosmetic Law, and violations of the Federal Food, Drug, & Cosmetic Act) and violations of RICO as described in the Fifth Cause of Action. As described above, it gave them substantial assistance in achieving the tortious result.

313.   **Aiding and Abetting (Nelson):** Defendant Rick Nelson aided and abetted Beyond Global Inc., the Keto Defendants, and other John Does, and is thus also responsible for and liable for their conduct under this Cause of Action. Plaintiff incorporates by reference the facts and allegations outlined in the Aiding and Abetting portion of the First Cause of Action as to Nelson's knowledge. Mr. Nelson knew about these violations of the UCL and knew that these misrepresentations were being made to Plaintiffs and the Class. In particular and as described *supra*, Mr. Nelson knew because of his involvement in responding to BBB complaints, because of being questioned by local media, because of his personal attendance at conferences recruiting scammers as clients, because of his role as CEO, because of his involvement in live chat meetings and onboarding, and because of the length of the business relationship with Beyond Global Inc. and the Keto Defendants.

Nelson knew of the UCL violations and misrepresentations involving the Keto Products from the very beginning of the wrongful conduct. Nelson knew these violations and misrepresentations were a breach of duty to Plaintiffs and the Class because he knew Beyond Global Inc. and the Keto Defendants were committing fraud, intentional torts, were exposing Plaintiff and the Class to harms he could foresee, and he knew they were not being treated with due care but instead were being intentionally defrauded.

314.   Nelson gave substantial assistance and encouragement to Beyond Global Inc., the Keto Defendants, and other John Does by: directing, controlling, and supervising TFL's conduct described herein, including shipping the Keto Products, providing access to their fulfillment software and integrating it with the ultrafastketoboost.com and instaketo.com websites, providing white label product services, providing marketing resources and articles, handling returns and complaints, directly running advertising campaigns, acting as general consultants advising on how to run the scam, and using their strategic partnerships to refer them to other service providers. Nelson personally was involved in providing advice and encouragement, both as part of the onboarding process and in live chat meetings, including advice on how to market the products and advice on how to structure the shipments to enable the fraud to avoid VISA and Mastercard rules. Nelson's conduct was a substantial factor in causing harm to Plaintiffs and the Class. The shipping services and shipping of the unordered products were a necessary fig leaf to avoid detection of the fraud and to enable victims' credit cards and bank accounts to be billed without chargebacks being issued by their banks, and by causing TFL to knowingly ship more bottles than consumers actually ordered Nelson enabled the other defendants to issue unauthorized charges for more than the consumers agreed to. Without Nelson's assistance, Beyond Global Inc., the Keto Defendants, and other John Does' scam could not have operated—they could not have shipped the products, they would not have had products to ship because of the white label services, they would not have been able to target customers using the software data, and they would not have had Nelson's advice on how to avoid new card brand rules designed to flag and prevent the scam. The injuries to Plaintiffs and the

Class would not have occurred but for Nelson's conduct because the scam would have been quickly flagged as fraud and the merchant accounts cancelled without these shipping services to provide the "fig leaf" of a purported product sale. Nelson's conduct was a proximate cause of the injuries to Plaintiffs and the Class because the injuries were direct and reasonably foreseeable results of the conduct, in that Nelson knew how the scam worked and knew about the misrepresentations made on the websites, and it was reasonably foreseeable that providing this assistance would result in customers being billed for products they did not order and which were marketed in violation of the UCL. Nelson had specific intent to facilitate the wrongful conduct by Beyond Global Inc., the Keto Defendants, and other John Does and consciously decided to participate in that tortious conduct, as evidenced by his recruitment of scammers at conferences, his continued participation despite consumer complaints and investigations by the BBB and the media, and the other facts suggesting his knowledge.

315.   Even if he did not have knowledge of the wrongful conduct, Nelson is separately responsible for and liable for the UCL violations and misrepresentations by Beyond Global Inc., the Keto Defendants, and other John Does as an aider and abettor because he gave them substantial assistance in achieving the tortious result and his own conduct, separately considered, constitutes a breach of duty to Plaintiff and the Class. Nelson owed duties to Plaintiffs and the Class, including a duty not to commit fraud, a duty not to commit intentional torts, a general duty of due care to avoid exposing Plaintiffs and the Class to foreseeable harms, the duties imposed under Cal. Civ. Code 1714(a), duties not to injure Plaintiffs and the Class by violating California and Federal laws, and general duties of care arising from TFL's relationship with and interaction with Plaintiffs and the Class. Nelson's own conduct, separately considered, breached these duties because he directly committed torts against Plaintiff and the Class, namely violations of the UCL "unlawful prong" described in the Fourth Cause of Action (specifically, mail fraud, violations of the Sherman Food, Drug, & Cosmetic Law, and violations of the Federal Food, Drug, & Cosmetic Act) and violations of RICO as described in the Fifth Cause of

Action. As described above, Nelson gave them substantial assistance in achieving the tortious result.

**316. Conspiracy (General Allegations):** Defendants were part of a conspiracy to commit tortious conduct in violation of the UCL. The wrongful UCL "unfair" and "fraudulent" prong violations were directly committed by Beyond Global Inc., the Keto Defendants, and other John Does. The conspiracy was in existence between The Fulfillment Lab Inc., Rick Nelson, the Keto Defendants, and other John Does at least as of August 2019. The conspiracy operated at a high level as follows: the Keto Defendants created the products in conjunction with TFL and Nelson as part of TFL's white label product program; the Keto Defendants created the websites, false fronts, signed up for merchant accounts with shell companies, and sent false front websites to banks; the Keto Defendants marketed the products with advice and assistance from TFL and Nelson; Nelson personally advised the Keto Defendants on how to run the scam and on their marketing; Nelson directed, controlled, and supervised TFL's conduct; TFL shipped the products and provided other services in support of the scheme; and other John Does were hired by the Keto Defendants to perform other support services and to create "affiliate advertising" sending victims to the websites. Each Defendants' role in the conspiracy is described in further detail in this Complaint in the sections on each Defendant, which are incorporated here by reference.

317. The conspiracy damaged Plaintiffs and the Class, in that they lost money or property, time, and attention, were billed for products they did not order, and paid more for products than they would have had they been aware that Defendants' representations were false. Plaintiffs and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore suffered injury in fact.

318. **Conspiracy (TFL):** Defendant The Fulfillment Lab Inc. was part of a conspiracy to commit the UCL violations described herein. TFL agreed with Beyond Global Inc., the Keto Defendants, and other John Does to commit these wrongful acts, and

intended that these wrongful acts be committed. Such agreement is implied by the conduct of the parties and can be inferred from the nature of the acts done, as explained in the conspiracy section as to TFL in the First Cause of Action, which is incorporated by reference herein. The agreement can be inferred from the relationship between the parties because of the close consulting relationship, because of the length of the business relationship, and because it was structured such that TFL was contracting with numerous shell companies individually despite knowing it was actually working for other John Doe(s). The agreement can be inferred from the interests of the co-conspirators because TFL received payment according to how many items it shipped, and therefore had incentive to encourage the shipment of as many items as possible regardless of whether they were actually ordered. There was at least a tacit agreement to commit the wrongful acts because TFL was repeatedly informed of these wrongful acts, and yet it did not quit shipping the products or terminate the business relationship despite telling customers complaining about Ultrafast Keto Boost on the BBB website that "TFL carefully reviews its relationship with any company that has been accused of fraudulent business practices."

319.   TFL agreed to cooperate in the commission of these wrongful acts and committed wrongful conduct in furtherance of the conspiracy. Such cooperation includes all of the activities identified as substantial assistance and encouragement in the aiding and abetting section of the First Cause of Action, which is incorporated by reference here.  TFL acted in concert with its co-conspirators, as explained therein.

320.   TFL was aware that its co-conspirators planned to commit these UCL violations, and it knew of the unlawful purpose of the conspiracy, as described *supra* in the aiding and abetting section of the First Cause of Action as to TFL, which is incorporated here by reference. TFL acted in furtherance of its own financial gain, in that it was paid for its services by Beyond Global Inc. and the Keto Defendants and made money each time a customer was injured. TFL owed duties to Plaintiffs and the Class, including a duty not to commit fraud, a duty not to commit intentional torts, a general duty of due care to avoid exposing Plaintiffs and the Class to foreseeable harms, the duties imposed under Cal. Civ.

Code 1714(a), duties not to injure Plaintiffs and the Class by violating California and Federal laws, and general duties of care arising from its relationship with and interaction with Plaintiffs and the Class.

321. **Conspiracy (Nelson):** Defendant Nelson was part of a conspiracy to commit the UCL violations described herein. Nelson agreed with Beyond Global Inc., the Keto Defendants, and other John Does to commit these wrongful acts, and intended that these wrongful acts be committed. Such agreement is implied by the conduct of the parties and can be inferred from the nature of the acts done as explained in the conspiracy section as to TFL in the First Cause of Action, which is incorporated by reference herein. The agreement can be inferred from the relationship between the parties because of the close consulting relationship, because of the length of the business relationship, because it was structured such that TFL was contracting with numerous shell companies individually despite knowing it was actually working for other John Doe(s), and because of Nelson's role in onboarding clients and in controlling TFL's activities. The agreement can be inferred from the interests of the co-conspirators because Nelson owns TFL, and TFL received payment according to how many items it shipped, and therefore he had incentive to encourage the shipment of as many items as possible regardless of whether they were actually ordered. There was at least a tacit agreement to commit the wrongful acts because Nelson was repeatedly informed of these wrongful acts, and yet he did not quit shipping the products or terminate the business relationship despite telling customers complaining about Ultrafast Keto Boost on the BBB website that "TFL carefully reviews its relationship with any company that has been accused of fraudulent business practices."

322. Nelson agreed to cooperate in the commission of these wrongful acts and committed wrongful conduct in furtherance of the conspiracy. Such cooperation includes all of the activities identified as substantial assistance and encouragement in the aiding and abetting section of the First Cause of Action, which is incorporated by reference here. Nelson acted in concert with his co-conspirators, as explained therein.

323.   Nelson was aware that his co-conspirators planned to commit these UCL violations, and he knew of the unlawful purpose of the conspiracy, as described *supra* in the aiding and abetting section of the First Cause of Action as to Nelson, which is incorporated here by reference. Nelson acted in furtherance of his own financial gain, in that TFL was paid for its services by Beyond Global Inc. and the Keto Defendants and made money each time a customer was injured, and Nelson further profited by providing other services through other companies he owned such as Skinutra. Nelson owed duties to Plaintiffs and the Class, including a duty not to commit fraud, a duty not to commit intentional torts, a general duty of due care to avoid exposing Plaintiffs and the Class to foreseeable harms, the duties imposed under Cal. Civ. Code 1714(a), duties not to injure Plaintiffs and the Class by violating California and Federal laws, and general duties of care arising from his role in TFL's relationship with and interaction with Plaintiffs and the Class.

## **FOURTH CAUSE OF ACTION**

### **Violation of the Unlawful Prong**

### **of the California Unfair Competition Law**

### **Cal. Bus. & Prof. Code §§ 17200, *et seq.***

324.   Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

325.   Plaintiffs bring this claim under the "unlawful" prong of California's Unfair Competition Law, Business and Professions Code section 17200, *et seq.*, individually and on behalf of the Class against the Defendants.

326.   The Unfair Competition Law, Business & Professions Code §17200, *et seq.* ("UCL") prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

327.   As detailed in Plaintiffs' First Cause of Action, the Defendants' acts and practices are unlawful because they violate the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*

328.   As detailed in Plaintiffs' Second Cause of Action, the Defendants' acts and practices are unlawful because they violate the California False Advertising Law, Business & Professions Code §§ 17500, et seq.

329.   As detailed in Plaintiffs' Third Cause of Action, the Defendants' acts and practices are unlawful because they violate the prongs of California's Unfair Competition Law,  Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibit any "unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising...."

## Bank Fraud

### In Violation Of 18 U.S. Code § 1344

330.   The Defendants' conduct as described herein is unlawful because they have committed bank fraud and conspired to commit multiple counts of bank fraud in violation of 18 U.S. Code § 1344.

331.   Pursuant to 18 U.S. Code § 1344, "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises" is in violation of the statute.

332.   Pursuant to 18 U.S. Code § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

333.   The Defendants conspired to commit bank fraud and to receive money obtained from bank fraud in violation of federal law.

334.   The money obtained by the Defendants through https://ultrafastketoboost.com and https://instaketo.com/ websites was obtained through credit cards or debit cards and

was thus under the custody or control of financial institutions (Ms. Sihler's bank, Bank of America, and Ms. Bavencoff's credit card company, San Diego County Credit Union). That money was obtained fraudulently. As described in this Complaint, Defendants intentionally used fake news stories and fake endorsements from celebrities, with the intent that Plaintiffs and other Class Members rely upon them, in order to obtain their debit and credit card numbers for the purpose of fraudulently bill them for bottles of the Keto Products, to which they did not agree to purchase. Defendants intentionally created a "false front" website for the purpose of defrauding banks and credit card companies into believing that customers consented to these charges, when in fact the customers were expressly informed that they would pay the advertised price for Keto Products.

335.   Moreover, Defendants further "churned" the merchant accounts of various shell companies to deceive banking institutions and prevent them from identifying the billings as fraudulent, which would have enabled the banks to prevent Defendants from continuing to charge their customers. On information and belief, Defendants utilized specialized software to provide them with automated "load balancing," which enabled Defendants to charge their victims' credit cards and debit cards using merchant accounts that were not detected by the fraud detection systems.

336.   Defendants knowingly conspired together to commit these violations and to benefit financially from this illegal scheme.

337.   Defendants' actions with respect to the Keto Products as described above are in violation of 18 U.S. Code § 1344 and thus constitute unlawful business acts or practices under the UCL.

**Wire Fraud**

**In Violation Of 18 U.S. Code § 1343**

338.   Defendants' conduct as described herein is unlawful because they have committed wire fraud and conspired to commit multiple counts of wire fraud in violation of 18 U.S. Code § 1343.

339.   Pursuant to 18 U.S. Code § 1343, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice" is in violation of the statute.

340.   Pursuant to 18 U.S. Code § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

341.   The Defendants conspired to commit wire fraud and to receive money obtained from wire fraud in violation of federal law.

342.   The Defendants transmitted written communications by means of wire as part of their scheme to defraud, in particular through Internet advertisements, their websites, through telephone communications with consumers which were intended to prevent them from exercising their lawful right to obtain a refund of their money, and through telephone or Internet communications to banks and credit card companies asserting that their charges had been agreed to by customers or that their "false front" websites were the website consumers visited. Those transmissions crossed state lines, at least from Florida to California and other states.

343.   The money obtained by the Defendants through the https://ultrafastketoboost.com and https://instaketo.com/ websites was obtained fraudulently. As described in this Complaint, the Defendants intentionally used fake news stories and fake endorsements from celebrities, with the intent that Plaintiffs and the other Class Members rely upon them, in order to obtain their debit and credit card numbers for the purpose of fraudulently billing them for bottles of the Keto Products, to which they did not agree.  Defendants intentionally created a "false front" website for the purpose of defrauding banks and credit card companies into believing that customers consented to

these charges, when in fact the customers were expressly informed that they would pay the advertised price for Keto Products. Defendants knowingly conspired together to commit these violations and to benefit financially from this illegal scheme.

344. Defendants' actions with respect to its products as described above are in violation of 18 U.S. Code § 1343 and thus constitute unlawful business acts or practices under the UCL.

**Mail Fraud**

**In Violation Of 18 U.S. Code § 1341**

345. Defendants' conduct as described herein is unlawful because they have committed mail fraud and conspired to commit multiple counts of mail fraud in violation of 18 U.S. Code § 1341.

346. Pursuant to 18 U.S. Code § 1341, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing" is in violation of the statute.

347. Pursuant to 18 U.S. Code § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or

conspiracy."

348.   The Defendants here conspired to commit mail fraud and to receive money obtained from mail fraud in violation of federal law.

349.   The TFL Defendants transmitted matter or things and took or received matter or things via the Postal Service or private or commercial interstate carriers as part of their scheme to defraud, in particular by shipping products through the mail system to unwitting victims of the scheme with the intent to fraudulently bill them for those products that were not intentionally purchased by their victims, and accepting return packages at their Post Office address in Tampa, Florida, which were shipped across state lines from other states, including from the State of California.

350.   The money obtained by the Defendants through the through the https://ultrafastketoboost.com and https://instaketo.com/ websites was obtained fraudulently. As described in this Complaint, the Defendants intentionally used fake news stories and fake endorsements from celebrities, with the intent that Plaintiffs and the Class rely upon them, in order to obtain their debit and credit card numbers for the purpose of fraudulently billing them for additional bottles of the Keto Products, to which they did not agree to purchase.  Defendants intentionally created a "false front" website for the purpose of defrauding banks and credit card companies into believing that customers consented to these charges, when in fact the customers were expressly informed that they would pay the advertised price for Keto Products. The Defendants knowingly conspired together to commit these violations and to benefit financially from this illegal scheme.

351.   Defendants' actions with respect to their products as described above are in violation of 18 U.S. Code § 1341 and thus constitute unlawful business acts or practices under the UCL.

**Unlawful Violations of Federal Trade Commission Regulations**
**Concerning Use of Endorsements and Testimonials in Advertising**
**16 C.F.R. pt. 255,** *et seq.*

352.   The Defendants' acts and practices are unlawful under the California UCL

because they violate Federal regulations governing the use of endorsements and testimonials in advertising.

353.   Pursuant to 16 C.F.R. pt. 255.1(a), "an endorsement may not convey any express or implied representation that would be deceptive if made directly by the advertiser." Under 16 C.F.R. pt. 255(1)(c), "[a]dvertisers are subject to liability for false or unsubstantiated statements made through endorsements...."

354.   The term "endorsement" means "any advertising message (including verbal statements, demonstrations, or depictions of the name, signature, likeness or other identifying personal characteristics of an individual or the name or seal of an organization) that consumers are likely to believe reflects the opinions, beliefs, findings, or experiences of a party other than the sponsoring advertiser, even if the views expressed by that party are identical to those of the sponsoring advertiser." 16 C.F.R. pt. 255(b). "Endorsement" as used by the regulation means both endorsements and testimonials. *Id.* at 255(c).

355.   Endorsers include consumers who receive free products from advertisers through their marketing programs. 16 C.F.R. pt. 255, Example 8. Endorsers also include third party bloggers who are compensated in any way by advertisers, and advertisers are subject to liability for misleading or unsubstantiated representations made by paid endorsers on their websites. 16 C.F.R. pt. 255.1, Example 5.

356.   Under the regulations, advertisers have a duty to train endorsers and to monitor their statements, and to take necessary steps to halt continued publication of deceptive representations by endorsers: "In order to limit its potential liability, the advertiser should ensure that the advertising service provides guidance and training to its bloggers concerning the need to ensure that statements they make are truthful and substantiated. The advertiser should also monitor bloggers who are being paid to promote its products and take steps necessary to halt the continued publication of deceptive representations when they are discovered." 16 C.F.R. pt. 255.1, Example 5.

357.   Plaintiffs incorporate by reference the Factual Allegations section of this Complaint.

358.    As that section describes, the Defendants faked various endorsements from celebrities and other third parties, who in fact have no connection to the product, have not used it, and did not make the statements and endorsements the Defendants attributed to them.

359.    Under 16 C.F.R. pt. 255.2(c), "[a]dvertisements presenting endorsements by what are represented, directly or by implication, to be "actual consumers" should utilize actual consumers in both the audio and video, or clearly and conspicuously disclose that the persons in such advertisements are not actual consumers of the advertised product."

360.    The Defendants falsely presented endorsements from celebrities as if those celebrities were actual consumers, including photographs of those purported celebrity consumers, as well as fake reviews from other third parties claiming they had significant weight loss as a result of using the Keto Products, including their "before" and "after" photographs.

361.    Members of the Class were injured by this unlawful conduct and the violations of these regulations, in that Ms. Sihler, Ms. Bavencoff, and the other Class Members would not have purchased the products but for the fake endorsements from celebrities and other third parties, which made the Keto Products seem credible.

362.    Defendants' actions with respect to its endorsers as described above are in violation of 16 C.F.R. pt. 255, *et seq.* and thus constitute unlawful business acts or practices under the UCL.

**Unlawful Violations of the**

**Sherman Food, Drug, & Cosmetic Law**

**Cal. Health & Safety Code, §§ 109875, *et seq.***

363.    Defendants' acts and practices are unlawful under the California UCL because they violate the Sherman Food, Drug, & Cosmetic Law.

364.    Defendants' products constitute cosmetics under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109900, a "cosmetic" is "any article, or its components, intended to be rubbed, poured, sprinkled, or sprayed on,

introduced into, or otherwise applied to, the human body, or any part of the human body, for cleansing, beautifying, promoting attractiveness, or altering the appearance." Defendants' products are cosmetics under this definition because they are ingested into the human body in some form, and the products sold by them are designed to beautify, promote the attractiveness of, and alter the human body's weight.

365.   Defendants' products also constitute drugs under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109925, a "drug" includes "[a]n article used or intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in human beings or any other animal" and "[a]n article other than food, that is used or intended to affect the structure or any function of the body of human beings or any other animal." The Defendants' products are drugs under this definition because they are not food and because they are intended to affect the structure or function of the human body and its cells, and claim to affect such structure or function.

366.   Defendants' products also constitute new drugs under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109980, a "new drug" includes "[a]ny drug the composition of which is such that the drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling or advertising thereof," or one that "has become so recognized, but that has not, otherwise than in the investigations, been used to a material extent or for a material time under the conditions." The Defendants' products are not generally recognized among experts as being safe and effective for the conditions they are advertised to treat.

367.   Defendants' representations as described in this Complaint constitute advertisements under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109885, an "advertisement" means "any representations, including, but not limited to, statements upon the products, its packages, cartons, and any other container, disseminated in any manner or by any means, for the purpose of inducing, or that is likely

to induce, directly or indirectly, the purchase or use of any food, drug, device, or cosmetic." The representations as described herein were likely to induce, directly or indirectly, the purchase of the Defendants' products, which constitute drugs and cosmetics, and they did in fact induce such purchases as described in this Complaint. The representations were disseminated to the Plaintiffs and the Class using various means, including fake online advertisements and on the Defendants' landing pages.

368.   Pursuant to Cal. Health & Safety Code § 110390, "[i]t is unlawful for any person to disseminate any false advertisement of any food, drug, device, or cosmetic. An advertisement is false if it is false or misleading in any particular."

369.   Pursuant to Cal. Health & Safety Code § 110395, "[i]t is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food, drug, device, or cosmetic that is falsely advertised."

370.   Defendants violated Cal. Health & Safety Code § 110390 and § 110395 by disseminating false and misleading advertisements, as described in detail throughout this Complaint, and by selling, delivering, and offering for sale their products which were falsely advertised.

371.   As stated above, Defendants' products are new drugs under the Sherman Food, Drug, & Cosmetic Law. *See* Cal. Health & Safety Code § 109980. New drugs are subject to specific approval requirements, and "[n]o person shall sell, deliver, or give away any new drug" unless the statutory requirements are satisfied. Cal. Health & Safety Code § 111550. One way to satisfy the requirements is that the product is a "new drug, and a new drug application has been approved for it and that approval has not been withdrawn, terminated, or suspended under Section 505 of the federal act (21 U.S.C. Sec. 355)." Cal. Health & Safety Code § 111550(a)(1). Another is that "[t]he department has approved a new drug or device application for that new drug or new device and that approval has not been withdrawn, terminated, or suspended." Cal. Health & Safety Code § 111550(b). The remaining methods are inapplicable to the Defendants' products, and on information and

belief, Defendants have failed to satisfy the approval requirements for a new drug under the Sherman Food, Drug, & Cosmetic Law.

372.   In addition to the various forms of harm alleged throughout this Complaint, which Plaintiffs incorporate here by reference, this particular violation specifically harmed Plaintiffs and the Class by depriving them of the important and valuable protections of this statutory scheme, by causing them to purchase products whose efficacy and safety had not been verified, and by causing them to purchase the products at issue and pay more for those products than they were worth in the absence of statutory compliance.

373.   Defendants' actions with respect to its products as described above are in violation of Cal. Health & Safety Code, §§ 109875, *et seq*. and thus constitute unlawful business acts or practices under the UCL.

**Unlawful Violations of the**

**Federal Food, Drug, and Cosmetic Act**

**21 U.S.C. § 301, *et seq*.**

374.   Defendants' acts and practices are unlawful under the California UCL because they violate the Federal Food, Drug, and Cosmetic Act.

375.   Defendants' products constitute drugs under the Federal Food, Drug, and Cosmetic Act. Pursuant to 21 U.S.C. § 321(g)(1), a "drug" includes "(C) articles (other than food) intended to affect the structure or any function of the body of man or other animals...."

376.   Defendants' products are advertised as affecting the structure or function of the human body and are intended to affect the structure or function of the human body. Defendants advertise that their products are the "Easiest Way to Burn Fat" and "Ultra Fast Keto Boost is a dynamic and powerful ketosis dietary supplement that will assist weight loss, promote abdominal fat burn, and support better digestion and sleep."[60] They claim their products contain "a powerful fat burning ketone, BHB" which has been "modified to

---

[60] https://www.ultrafastketoboost.com

produce a [sic] instant fat burning solution the natural way." [61]  They further advertise that their Keto Products alter the functionality of the metabolic state in the human body, claiming: "Beta-hydroxybutyrate is the first substrate that kicks the metabolic state of ketosis into action.  If you take it, BHB is able to start processing in your body resulting in energy and greatly speed up weight loss by putting your body into ketosis. . . . Ultra Fast Keto Boost with BHB is here to say because of the insurmountable success people are having losing up to 1 lb. of fat per day!"[62]

377.   Defendants' products constitute new drugs under the Federal Food, Drug, and Cosmetic Act. Pursuant to 21 U.S.C. § 321(p)(1), a "new drug" includes "[a]ny drug (except a new animal drug or an animal feed bearing or containing a new animal drug) the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof, except that such a drug not so recognized shall not be deemed to be a "new drug" if at any time prior to June 25, 1938, it was subject to the Food and Drugs Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use...."

378.   Defendants' products are not generally recognized among experts as being safe and effective for the conditions they are advertised to treat.

379.   Pursuant to 21 U.S.C. § 355(a), "No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) is effective with respect to such drug."

380.   On information and belief, Defendants have not filed a new drug application or obtained approval of any of their products from the Food and Drug Administration. As such, it was unlawful for them to introduce or deliver their products into interstate commerce, and **all** sales or deliveries of their products in the United States were unlawful.

---

[61] *Id.*
[62] *Id.*

381.   In addition to the various forms of harm alleged throughout this Complaint, which Plaintiffs incorporate here by reference, this particular violation specifically harmed Plaintiffs and the Class by depriving them of the important and valuable protections of this statutory scheme, by causing them to purchase products whose efficacy and safety had not been verified, and by causing them to purchase the products at issue and pay more for those products than they were worth in the absence of statutory compliance.

382.   Defendants' actions with respect to its products as described above are in violation of 21 U.S.C. § 301, *et seq*. and thus constitute unlawful business acts or practices under the UCL.

## Unlawful Violations of the
## Federal Trade Commission Act
## 15 U.S.C. § 41, *et seq.*

383.   Pursuant to 15 U.S.C. § 45(a)(1), "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."

384.   Pursuant to 15 U.S.C. § 52(a), "[i]t shall be unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement—(1) By United States mails, or in or having an effect upon commerce, by any means, for the purpose of inducing, or which is likely to induce, directly or indirectly the purchase of food, drugs, devices, services, or cosmetics; or (2) By any means, for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase in or having an effect upon commerce, of food, drugs, devices, services, or cosmetics."

385.   Defendant's products are both drugs and cosmetics.

386.   As described throughout this Complaint and in the First, Second, and Third Causes of Action, Defendants engaged in unfair methods of competition in or affecting commerce, as well as unfair or deceptive acts or practices in or affecting commerce. The act of selling their products online satisfies the requirement of "in or affecting commerce."

387.   As described throughout this Complaint and in the First, Second, and Third

Causes of Action, Defendants disseminated false advertisements online and sold their products online, which satisfies the requirement of "in or affecting commerce." Those advertisements were intended to induce and did in fact induce the purchase of Defendants' products.

388.   Defendants' actions with respect to its products as described above are in violation of the Federal Trade Commission Act, 15 U.S.C. § 41, *et seq*. and thus constitute unlawful business acts or practices under the UCL.

### Unlawful Violations of Federal Trade Commission Regulations
### Concerning Use of the Word "Free" and Other Similar Representations
### 16 C.F.R. pt. 251, *et seq.*

389.   Defendants' acts and practices are unlawful under the California UCL because they violate Federal regulations governing the use of the word "free" and other similar representations in advertising.

390.   Pursuant to 16 C.F.R. pt. 251.1(a)(2), "[b]ecause the purchasing public continually searches for the best buy, and regards the offer of 'Free' merchandise or service to be a special bargain, all such offers must be made with extreme care so as to avoid any possibility that consumers will be misled or deceived."

391.   "[A] purchaser has a right to believe that the merchant will not directly and immediately recover, in whole or in part, the cost of the free merchandise or service by marking up the price of the article which must be purchased, by the substitution of inferior merchandise or service, or otherwise." 16 C.F.R. pt. 251.1(b).

392.   Because of this right, Federal regulations strictly limit the duration of any 'free' offers in any given trade area: "So that a 'Free' offer will be special and meaningful, a single size of a product or a single kind of service should not be advertised with a 'Free' offer in a trade area for more than 6 months in any 12-month period. At least 30 days should elapse before another such offer is promoted in the same trade area. No more than three such offers should be made in the same area in any 12-month period. In such period, the offeror's sale in that area of the product in the size promoted with a 'Free' offer should not

exceed 50 percent of the total volume of his sales of the product, in the same size, in the area."

393.   On information and belief, Defendants advertised false promotional offers of "Buy 3 Bottles, Get 2 Free" and "Buy 2 Bottles, Get 1 Free" for more than six months from at least February 2018 through the present time, and 100% of the sales were promoted with a "free" offer.

394.   Offers labeled as "free" must comply with strict Federal disclosure regulations: "When making 'Free' or similar offers all the terms, conditions and obligations upon which receipt and retention of the 'Free' item are contingent should be set forth clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood. Stated differently, all of the terms, conditions and obligations should appear in close conjunction with the offer of 'Free' merchandise or service. For example, disclosure of the terms of the offer set forth in a footnote of an advertisement to which reference is made by an asterisk or other symbol placed next to the offer, is not regarded as making disclosure at the outset." 16 C.F.R. pt. 251.1(c).

395.   Defendants failed to comply with these requirements to clearly and conspicuously disclose all terms, conditions, and obligations at the outset because on the https://ultrafastketoboost.com and https://instaketo.com/ landing pages, the terms were not disclosed, false representations were made about the actual prices of the Keto Products, and no disclosures were made to the consumers that they would be billed for five bottles, even though they did not order them nor consented to purchase them.

396.   Defendants' actions with respect to their use of the word "free" as described above are in violation of 16 C.F.R. pt. 251, *et seq.* and thus constitute unlawful business acts or practices under the UCL.

397.   Defendants David Flynn, Rickie Joe James, Beyond Global Inc., Brightree Holdings Corp. and BMOR Global LLC directly violated the UCL's "unlawful" prong. Those defendants sold and distributed the Keto Products, operated ultrafastketoboost.com

and instaketo.com, as well as the "false fronts," worked with other John Doe affiliates and affiliate networks to create fake celebrity advertisements, and hired TFL to ship the products. These acts were committed by Beyond Global Inc., Brightree Holdings Corp. and BMOR Global LLC, and supervised and controlled by David Flynn and Rickie Joe James personally. They thus are directly liable for violations of every law listed in this Cause of Action.

398.   Defendants The Fulfillment Lab Inc. and Rick Nelson directly violated the UCL's unlawful prong, in particular by committing mail fraud by shipping the products, by manufacturing and delivering the products in violation of the Sherman Food, Drug, & Cosmetic Law, and by introducing and delivering for introduction into interstate commerce the products in violation of the Federal Food, Drug, & Cosmetic Act. These acts were committed by TFL, and supervised and controlled by Rick Nelson personally. With respect to the remainder of the laws listed in this Cause of Action, TFL and Nelson are liable under theories of aiding and abetting and conspiracy.

399.   **Aiding and Abetting (TFL):** Defendant The Fulfillment Lab, Inc. aided and abetted Beyond Global Inc., the Keto Defendants, and other John Does, and is thus also responsible for and liable for their conduct under this Cause of Action. The Fulfillment Lab, Inc. knew about these violations of the UCL and knew that these misrepresentations were being made to Plaintiffs and the Class.

400.   TFL knew of the UCL violations and misrepresentations involving the Keto Products from the very beginning of the wrongful conduct. Plaintiff incorporates by reference the facts and allegations outlined in the Aiding and Abetting portion of the First Cause of Action as to TFL's knowledge. In addition to the BBB reviews specific to the Keto Products and the local news story, other circumstantial evidence about its business practices supports this allegation. As described herein, TFL acted as the returns processor for the Keto Products, and it was made aware of the UCL violations and misrepresentations through customer complaints. TFL provided its custom software to Beyond Global Inc. and the Keto Defendants, integrated that software into ultrafastketoboost.com and

instaketo.com, meaning it was aware of all of the misrepresentations on those websites. TFL further directly runs advertising campaigns for its customers and assists in that advertising, including for Beyond Global Inc. and the Keto Defendants, meaning that it was aware of the fake celebrity advertisements and other misrepresentations described herein as being part of the sales funnel. TFL was further familiar with schemes like this generally because it specifically targeted scammers as customers and recruited them as clients at conferences. TFL further acted as consultants for Beyond Global Inc. and the Keto Defendants in their scam, and in that role was necessarily aware of how the scam worked. Plaintiff incorporates by reference the facts from the First Cause of Action regarding the Mastercard rule changes, which TFL was aware of and intentionally designed its clients' shipments to circumvent. TFL further had an onboarding process and live customer chats resulting in its knowledge of the wrongs. TFL further had a policy of signing separate contracts with each shell company meaning it knew of the merchant account scheme and false fronts. TFL also knew of the violations of the Sherman Food, Drug, and Cosmetic Law and the Federal Food, Drug, and Cosmetic Act because it had access to the labels for the products, which make unlawful drug claims. The Fulfillment Lab, Inc. knew these violations and misrepresentations were a breach of duty to Plaintiffs and the Class because it knew Beyond Global Inc. and the Keto Defendants were committing fraud, intentional torts, were exposing Plaintiff and the Class to harms TFL could foresee, and TFL knew they were not being treated with due care but instead were being intentionally defrauded.

401.   The Fulfillment Lab, Inc. gave substantial assistance and encouragement to Beyond Global Inc., the Keto Defendants, and other John Does by: shipping the Keto Products, providing access to their fulfillment software and integrating it with the ultrafastketoboost.com and instaketo.com websites, providing white label product services, providing advice and encouragement, including advice on how to market the products and advice on how to structure the shipments to enable the fraud to avoid VISA and Mastercard rules, providing marketing resources and articles, handling returns and complaints, directly

running advertising campaigns, acting as general consultants advising on how to run the scam, and using their strategic partnerships to refer them to other service providers. The Fulfillment Lab, Inc.'s conduct was a substantial factor in causing harm to Plaintiffs and the Class. The shipping services and shipping of the unordered products were a necessary fig leaf to avoid detection of the fraud and to enable victims' credit cards and bank accounts to be billed without chargebacks being issued by their banks, and by knowingly shipping more bottles than consumers actually ordered TFL enabled the other defendants to issue unauthorized charges for more than the consumers agreed to. Without TFL's assistance, Beyond Global Inc., the Keto Defendants, and other John Does' scam could not have operated—they could not have shipped the products, they would not have had products to ship because of the white label services, they would not have been able to target customers using the software data, and they would not have had TFL's advice on how to avoid new card brand rules designed to flag and prevent the scam. The injuries to Plaintiffs and the Class would not have occurred but for The Fulfillment Lab, Inc.'s conduct because the scam would have been quickly flagged as fraud and the merchant accounts cancelled without these shipping services to provide the "fig leaf" of a purported product sale. The Fulfillment Lab's conduct was a proximate cause of the injuries to Plaintiffs and the Class because the injuries were direct and reasonably foreseeable results of the conduct, in that TFL knew how the scam worked and knew about the misrepresentations made on the websites, and it was reasonably foreseeable that providing this assistance would result in customers being billed for products they did not order and which were deceptively marketed. The Fulfillment Lab, Inc. had specific intent to facilitate the wrongful conduct by Beyond Global Inc., the Keto Defendants, and other John Does and consciously decided to participate in that tortious conduct, as evidenced by its recruitment of scammers at conferences, its continued participation despite consumer complaints and investigations by the BBB and the media, and the other facts suggesting its knowledge.

402.   Even if it did not have knowledge of the wrongful conduct, The Fulfillment Lab, Inc. is separately responsible for and liable for the UCL violations and

misrepresentations by Beyond Global Inc., the Keto Defendants, and other John Does as an aider and abettor because it gave them substantial assistance in achieving the tortious result and its own conduct, separately considered, constitutes a breach of duty to Plaintiff and the Class. The Fulfillment Lab, Inc. owed duties to Plaintiffs and the Class, including a duty not to commit fraud, a duty not to commit intentional torts, a general duty of due care to avoid exposing Plaintiffs and the Class to foreseeable harms, the duties imposed under Cal. Civ. Code 1714(a), duties not to injure Plaintiffs and the Class by violating California and Federal laws, and general duties of care arising from its relationship with and interaction with Plaintiffs and the Class. The Fulfillment Lab, Inc.'s own conduct, separately considered, breached these duties because it directly committed torts against Plaintiff and the Class, namely violations of the UCL "unlawful prong" described in the Fourth Cause of Action (specifically, mail fraud, violations of the Sherman Food, Drug, & Cosmetic Law, and violations of the Federal Food, Drug, & Cosmetic Act) and violations of RICO as described in the Fifth Cause of Action. As described above, it gave them substantial assistance in achieving the tortious result.

403. **Aiding and Abetting (Nelson):** Defendant Rick Nelson aided and abetted Beyond Global Inc., the Keto Defendants, and other John Does, and is thus also responsible for and liable for their conduct under this Cause of Action. Plaintiff incorporates by reference the facts and allegations outlined in the Aiding and Abetting portion of the First Cause of Action as to Nelson's knowledge. Mr. Nelson knew about these violations of the UCL and knew that these misrepresentations were being made to Plaintiffs and the Class. In particular and as described *supra*, Mr. Nelson knew because of his involvement in responding to BBB complaints, because of being questioned by local media, because of his personal attendance at conferences recruiting scammers as clients, because of his role as CEO, because of his involvement in live chat meetings and onboarding, and because of the length of the business relationship with Beyond Global Inc. and the Keto Defendants. Nelson also knew of the violations of the Sherman Food, Drug, and Cosmetic Law and the Federal Food, Drug, and Cosmetic Act because he had access to the labels for the products,

which make unlawful drug claims. Nelson knew of the UCL violations and misrepresentations involving the Keto Products from the very beginning of the wrongful conduct. Nelson knew these violations and misrepresentations were a breach of duty to Plaintiffs and the Class because he knew Beyond Global Inc. and the Keto Defendants were committing fraud, intentional torts, were exposing Plaintiff and the Class to harms he could foresee, and he knew they were not being treated with due care but instead were being intentionally defrauded.

404.   Nelson gave substantial assistance and encouragement to Beyond Global Inc., the Keto Defendants, and other John Does by: directing, controlling, and supervising TFL's conduct described herein, including shipping the Keto Products, providing access to their fulfillment software and integrating it with the ultrafastketoboost.com and instaketo.com websites, providing white label product services, providing marketing resources and articles, handling returns and complaints, directly running advertising campaigns, acting as general consultants advising on how to run the scam, and using their strategic partnerships to refer them to other service providers. Nelson personally was involved in providing advice and encouragement, both as part of the onboarding process and in live chat meetings, including advice on how to market the products and advice on how to structure the shipments to enable the fraud to avoid VISA and Mastercard rules. Nelson's conduct was a substantial factor in causing harm to Plaintiffs and the Class. The shipping services and shipping of the unordered products were a necessary fig leaf to avoid detection of the fraud and to enable victims' credit cards and bank accounts to be billed without chargebacks being issued by their banks, and by causing TFL to knowingly ship more bottles than consumers actually ordered Nelson enabled the other defendants to issue unauthorized charges for more than the consumers agreed to. Without Nelson's assistance, Beyond Global Inc., the Keto Defendants, and other John Does' scam could not have operated—they could not have shipped the products, they would not have had products to ship because of the white label services, they would not have been able to target customers using the software data, and they would not have had Nelson's advice on how to avoid new

card brand rules designed to flag and prevent the scam. The injuries to Plaintiffs and the Class would not have occurred but for Nelson's conduct because the scam would have been quickly flagged as fraud and the merchant accounts cancelled without these shipping services to provide the "fig leaf" of a purported product sale. Nelson's conduct was a proximate cause of the injuries to Plaintiffs and the Class because the injuries were direct and reasonably foreseeable results of the conduct, in that Nelson knew how the scam worked and knew about the misrepresentations made on the websites, and it was reasonably foreseeable that providing this assistance would result in customers being billed for products they did not order and which were marketed in violation of the UCL. Nelson had specific intent to facilitate the wrongful conduct by Beyond Global Inc., the Keto Defendants, and other John Does and consciously decided to participate in that tortious conduct, as evidenced by his recruitment of scammers at conferences, his continued participation despite consumer complaints and investigations by the BBB and the media, and the other facts suggesting his knowledge.

405. Even if he did not have knowledge of the wrongful conduct, Nelson is separately responsible for and liable for the UCL violations and misrepresentations by Beyond Global Inc., the Keto Defendants, and other John Does as an aider and abettor because he gave them substantial assistance in achieving the tortious result and his own conduct, separately considered, constitutes a breach of duty to Plaintiff and the Class. Nelson owed duties to Plaintiffs and the Class, including a duty not to commit fraud, a duty not to commit intentional torts, a general duty of due care to avoid exposing Plaintiffs and the Class to foreseeable harms, the duties imposed under Cal. Civ. Code 1714(a), duties not to injure Plaintiffs and the Class by violating California and Federal laws, and general duties of care arising from TFL's relationship with and interaction with Plaintiffs and the Class. Nelson's own conduct, separately considered, breached these duties because he directly committed torts against Plaintiff and the Class, namely violations of the UCL "unlawful prong" described in the Fourth Cause of Action (specifically, mail fraud, violations of the Sherman Food, Drug, & Cosmetic Law, and violations of the Federal

Food, Drug, & Cosmetic Act) and violations of RICO as described in the Fifth Cause of Action. As described above, Nelson gave them substantial assistance in achieving the tortious result.

406. **Conspiracy (General Allegations):** Defendants were part of a conspiracy to commit tortious conduct in violation of the UCL. The wrongful UCL "unlawful" prong violations were directly committed by Beyond Global Inc., the Keto Defendants, and other John Does, and violations consisting of mail fraud, violation of the Sherman Food, Drug, & Cosmetic Law, and violation of the Federal Food, Drug, & Cosmetic Act were also directly committed by TFL and Nelson, as described *supra*. The conspiracy was in existence between The Fulfillment Lab Inc., Rick Nelson, the Keto Defendants, and other John Does at least as of August 2019. The conspiracy operated at a high level as follows: the Keto Defendants created the products in conjunction with TFL and Nelson as part of TFL's white label product program; the Keto Defendants created the websites, false fronts, signed up for merchant accounts with shell companies, and sent false front websites to banks; the Keto Defendants marketed the products with advice and assistance from TFL and Nelson; Nelson personally advised the Keto Defendants on how to run the scam and on their marketing; Nelson directed, controlled, and supervised TFL's conduct; TFL shipped the products and provided other services in support of the scheme; and other John Does were hired by the Keto Defendants to perform other support services and to create "affiliate advertising" sending victims to the websites. Each Defendants' role in the conspiracy is described in further detail in this Complaint in the sections on each Defendant, which are incorporated here by reference.

407. The conspiracy damaged Plaintiffs and the Class, in that they lost money or property, time, and attention, were billed for products they did not order, and paid more for products than they would have had they been aware that Defendants' representations were false. Plaintiffs and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore suffered injury in fact.

408.   **Conspiracy (TFL):** Defendant The Fulfillment Lab Inc. was part of a conspiracy to commit the UCL violations described herein. TFL agreed with Beyond Global Inc., the Keto Defendants, and other John Does to commit these wrongful acts, and intended that these wrongful acts be committed. Such agreement is implied by the conduct of the parties and can be inferred from the nature of the acts done, as explained in the conspiracy section as to TFL in the First Cause of Action, which is incorporated by reference herein. The agreement can be inferred from the relationship between the parties because of the close consulting relationship, because of the length of the business relationship, and because it was structured such that TFL was contracting with numerous shell companies individually despite knowing it was actually working for other John Doe(s). The agreement can be inferred from the interests of the co-conspirators because TFL received payment according to how many items it shipped, and therefore had incentive to encourage the shipment of as many items as possible regardless of whether they were actually ordered. There was at least a tacit agreement to commit the wrongful acts because TFL was repeatedly informed of these wrongful acts, and yet it did not quit shipping the products or terminate the business relationship despite telling customers complaining about Ultrafast Keto Boost on the BBB website that "TFL carefully reviews its relationship with any company that has been accused of fraudulent business practices."

409.   TFL agreed to cooperate in the commission of these wrongful acts and committed wrongful conduct in furtherance of the conspiracy. Such cooperation includes all of the activities identified as substantial assistance and encouragement in the aiding and abetting section of the First Cause of Action, which is incorporated by reference here.  TFL acted in concert with its co-conspirators, as explained therein.

410.   TFL was aware that its co-conspirators planned to commit these UCL violations, and it knew of the unlawful purpose of the conspiracy, as described *supra* in the aiding and abetting section of the First Cause of Action as to TFL, which is incorporated here by reference. TFL acted in furtherance of its own financial gain, in that it was paid for its services by Beyond Global Inc. and the Keto Defendants and made money each time a

customer was injured. TFL owed duties to Plaintiffs and the Class, including a duty not to commit fraud, a duty not to commit intentional torts, a general duty of due care to avoid exposing Plaintiffs and the Class to foreseeable harms, the duties imposed under Cal. Civ. Code 1714(a), duties not to injure Plaintiffs and the Class by violating California and Federal laws, and general duties of care arising from its relationship with and interaction with Plaintiffs and the Class.

411.   **Conspiracy (Nelson):** Defendant Nelson was part of a conspiracy to commit the UCL violations described herein. Nelson agreed with Beyond Global Inc., the Keto Defendants, and other John Does to commit these wrongful acts, and intended that these wrongful acts be committed. Such agreement is implied by the conduct of the parties and can be inferred from the nature of the acts done as explained in the conspiracy section as to TFL in the First Cause of Action, which is incorporated by reference herein. The agreement can be inferred from the relationship between the parties because of the close consulting relationship, because of the length of the business relationship, because it was structured such that TFL was contracting with numerous shell companies individually despite knowing it was actually working for other John Doe(s), and because of Nelson's role in onboarding clients and in controlling TFL's activities. The agreement can be inferred from the interests of the co-conspirators because Nelson owns TFL, and TFL received payment according to how many items it shipped, and therefore he had incentive to encourage the shipment of as many items as possible regardless of whether they were actually ordered. There was at least a tacit agreement to commit the wrongful acts because Nelson was repeatedly informed of these wrongful acts, and yet he did not quit shipping the products or terminate the business relationship despite telling customers complaining about Ultrafast Keto Boost on the BBB website that "TFL carefully reviews its relationship with any company that has been accused of fraudulent business practices."

412.   Nelson agreed to cooperate in the commission of these wrongful acts and committed wrongful conduct in furtherance of the conspiracy. Such cooperation includes all of the activities identified as substantial assistance and encouragement in the aiding and

abetting section of the First Cause of Action, which is incorporated by reference here. Nelson acted in concert with his co-conspirators, as explained therein.

413.   Nelson was aware that his co-conspirators planned to commit these UCL violations, and he knew of the unlawful purpose of the conspiracy, as described *supra* in the aiding and abetting section of the First Cause of Action as to Nelson, which is incorporated here by reference. Nelson acted in furtherance of his own financial gain, in that TFL was paid for its services by Beyond Global Inc. and the Keto Defendants and made money each time a customer was injured, and Nelson further profited by providing other services through other companies he owned such as Skinutra. Nelson owed duties to Plaintiffs and the Class, including a duty not to commit fraud, a duty not to commit intentional torts, a general duty of due care to avoid exposing Plaintiffs and the Class to foreseeable harms, the duties imposed under Cal. Civ. Code 1714(a), duties not to injure Plaintiffs and the Class by violating California and Federal laws, and general duties of care arising from his role in TFL's relationship with and interaction with Plaintiffs and the Class.

## **FIFTH CAUSE OF ACTION**
### **Violation of the Racketeer Influenced and**
### **Corrupt Organizations Act ("RICO")**
### **18 U.S.C. §§ 1961, *et seq.***
### **(All Defendants)**

414.   Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

415.   Plaintiffs bring this claim individually and on behalf of the Class under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, on behalf of themselves and the Classes against all Defendants.

416.  18 U.S.C. § 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the

conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

417.   18 U.S.C. § 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

418.   All Defendants have committed violations of these two sections, as described in further detail below.

419.   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3), which defines a person as "any individual or entity capable of holding a legal or beneficial interest in property."

420.   **The TFL Enterprise:** TFL constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4) because it is a corporation ("the TFL enterprise"). TFL's President, Defendant Nelson, a person, conducted TFL's affairs through illegal acts, specifically multiple related acts of mail fraud, as well as conspiracy to commit wire fraud and bank fraud.

421.   The TFL Enterprise has been in operation as a racketeering enterprise since at least July 2017 (the date when a BBB investigation identified TFL as a hub for online free trial scam activity because of repeated complaints about its involvement in fraud). The company itself was formed on March 22, 2012. Defendant Richard Nelson is the CEO of TFL and has operated the company since it was founded. At some point between 2012 and 2017, Nelson caused TFL to begin seeking out free trial scammers as clients and to begin engaging in mail fraud on their behalf, as well as conspiring to assist them in committing bank fraud and wire fraud. Nelson was recruiting free trial scammers as customers at the Panama Global Banking Summit at least as of March 8, 2017, when he attended on behalf of TFL as a speaker and sponsor. In 2019, in response to changes in the Mastercard rules, Nelson advised his clients to modify their fraud by shipping multiple underordered products at once to evade rules on subscription/continuity billing.

422.   The TFL Enterprise qualifies as a closed-ended enterprise because the predicate acts occurred over a period exceeding three years (from March 2017 to the date

suit was filed). The TFL Enterprise qualifies as an open-ended enterprise, in that it was actively continuing to commit predicate acts as of the date of the filing of this lawsuit, and it has continued to receive BBB complaints of fraudulent billing post-suit. Its past conduct by its nature poses a threat of repetition not only because the conduct has continued post-suit, but because TFL's business has been structured around providing support services for clients known to be engaging in fraud, and such clients comprise a large part of TFL's client base. Committing these predicate acts has become a regular way of doing business at TFL and is thus likely to recur.

423.    TFL was providing services to the Keto Defendants at least as of August 2019.

424.    The services provided by TFL to the Keto Defendants and Beyond Global Inc. are described in the aiding and abetting section as to TFL in the First Cause of Action, which is incorporated by reference. Those services were not routine contracts or the acts of a routine service provider. First, TFL had knowledge of the scam, as described in detail in the aiding and abetting section as to TFL in the First Cause of Action, which is incorporated here by reference. Second, the nature of the services provided rules out any innocent explanation, such as that TFL was a mere shipping company. Those services included directly running advertising campaigns, which required knowledge of the fraudulent ads. The shipments were specifically structured at the advice of TFL and Nelson as one time five-bottle shipments to avoid new Mastercard rules targeting free trial scams by allowing the charges to be made under a different billing code which would avoid various restrictions. TFL further had a policy of signing separate contracts with each shell company used to create a merchant account, as evidenced by exhibits in a civil suit involving one of TFL's clients who was criminally indicted in Puerto Rico for running a "free trial" scam. Because the Keto Defendants were operating numerous shell companies, and TFL knew their true identities from its lengthy client onboarding process, when TFL signed separate service contracts with large numbers of these shell companies separately it knew it was providing services to a fraudulent scheme. TFL signed dozens upon dozens of

contracts with separate shell companies with nominal owners and executives it had never interacted with to ship the same two products from the same two websites, knowing that its real client for the Keto Products was someone else. There is no innocent explanation for structuring its contracts this way, and both TFL and Nelson were fully aware of the nature of the merchant account scheme both from Nelson's attendance at the Panama Global Banking Summit and from the Puerto Rico criminal indictment of one of TFL's clients. TFL and Nelson further publicly stated in BBB posts that the company had a policy of ending business relationships with clients who committed fraud, but despite being repeatedly notified of the fraud here, it continued the relationship with the Keto Defendants.

425.   As CEO and owner Nelson controls TFL and sets its policies. He caused TFL to directly commit numerous acts of mail fraud between at least March 8, 2017 and the present by shipping products for various clients who he and TFL knew to be operating fraudulent scams, including "free trial scams." Nelson supervised, controlled, and directed these acts of mail fraud. When the FTC began cracking down on subscription scams and VISA/Mastercard imposed new restrictions, Nelson caused TFL to restructure the shipments of its clients as a single bulk shipment of unordered products to avoid these restrictions and continue the fraud. Many of the specific predicate acts are described in detail *infra*, but there are far more predicate acts whose details are currently within the exclusive possession of TFL and Nelson, committed both with the Keto Defendants and Beyond Global Inc. and with other unrelated clients as well.

426.   Nelson and TFL's activities with respect to the Keto Defendants and Beyond Global Inc. are described in detail in the aiding and abetting section and conspiracy sections as to them in the First Cause of Action, which are incorporated here by reference. The TFL Enterprise provided substantially similar services to its other clients as it did to the Keto Defendants and Beyond Global Inc. Those client relationships were separate from the relationship with the Keto Defendants and Beyond Global Inc., but are part of the TFL Enterprise's own pattern of racketeering activity.

427.   The TFL Enterprise operated in partnership with the Keto Defendants and Beyond Global Inc. with respect to the Keto Products and to other unknown products proprietary to the Keto Defendants and Beyond Global Inc. Each of them agreed to operate different parts of the scam, with TFL and Nelson attempting to nominally separate themselves from the illegal activity by posing as a legitimate service provider for fulfillment services. The relationship between the Keto Defendants and Beyond Global Inc. and TFL/Nelson was structured as a vendor-vendee relationship, with TFL/Nelson as the vendor, except that the services being provided included illegal racketeering activity and were performed to knowingly advance a fraudulent scheme. TFL acted as a "hub" for various fraud operations including this one, coaching them, consulting for them, and passing information between them about how to effectively conduct the fraud and how to avoid being detected.

428.   **The Keto Enterprise:** The overall Keto scam constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4), which defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." As described herein, all of the Defendants are individuals and legal entities who associated in fact to comprise and operate the Keto scam (the "Keto Enterprise"). The Keto Enterprise consists of The Fulfillment Lab Inc., Richard Nelson, David Flynn, Rickie Joe James, Beyond Global Inc., Brightree Holdings Corp. and BMOR Global LLC and the currently unknown John Does. This enterprise has been in existence at least since February 20, 2018, when the first "false front" was registered for Ultrafast Keto Boost. Beyond Global Inc. joined the enterprise on or around its date of incorporation on July 16, 2019. TFL and Nelson joined the enterprise at least as of August 2019.

429.   Defendants agreed to—and did—operate the Keto Enterprise through a pattern of racketeering activity. Defendants conducted the Keto Enterprise's affairs through a pattern of illegal acts, specifically, multiple related acts of mail fraud, wire fraud, and bank fraud, as described *infra*.

430.   The individuals and entities comprising the Keto Enterprise had a common purpose, namely to defraud victims purchasing the Keto Products. Each individual and entity involved benefited financially from doing so. TFL was able to sell additional services, and earned money for each shipment. Nelson profited from this because he was TFL's owner and was paid as its CEO. The Keto Defendants profited from each sale because they were the ultimate owners of the Keto Products. TFL/Nelson's involvement went beyond routine commercial dealings into fraud, as described *supra*. Beyond Global Inc. and the Keto Defendants likewise were not engaging in routine commercial dealings because they knew the customers had not actually ordered the products they were selling, and intentionally deceived customers about what they were ordering and about endorsements and other characteristics of those products as described herein.

431.   The Keto Enterprise was structured as a vendor/vendee relationship, with Beyond Global Inc. and the Keto Defendants as the owners of the Keto Products hiring TFL/Nelson as well as other John Does as vendors to assist in the fraud. The relationship was a lengthy one, as described *supra*, and began with a multi-month onboarding process in which Nelson guided and advised Beyond Global Inc. and the Keto Defendants about how to set up this kind of fraud based on his experience with other clients running identical schemes. Nelson regularly conducted live chat meetings with Beyond Global Inc. and the Keto Defendants to coordinate their activities, and to advise them and consult for them. TFL regularly interacted with Beyond Global Inc. and the Keto Defendants and communicated with them, and also used the software designed by Nelson to allow Beyond Global Inc. and the Keto Defendants to monitor data about the shipments, their inventory, and TFL's activities. That software further allowed coordination by enabling Beyond Global Inc. and the Keto Defendants to make decisions and set parameters as to the services through an API, which among other things enabled them to submit orders and cancel orders. The TFL software further enabled coordination through a "management console" which among other things enabled Beyond Global Inc. and the Keto Defendants to review the reasons for customer returns, which were collected by TFL. Employees of TFL also

were in regular contact with Beyond Global Inc. and the Keto Defendants regarding issues which involved knowledge of the scam such as customer complaints. The relationship between Beyond Global Inc. and the Keto Defendants and TFL/Nelson was an ongoing organization with both formal and informal elements. It was formalized through contracts signed between various shell companies and TFL. However, there was also an informal aspect, in that TFL knew that these contracts were with sham entities and in fact it was providing services to the John Does behind the scheme. TFL knew this because those John Does were who it was actually communicating with and being compensated by. Beyond Global Inc., the Keto Defendants, TFL, and Nelson worked together in an indispensable and integrated manner to mutually engage in wrongful acts, in that: (1) none of the sales could have occurred without all of them acting together because each of them performed a necessary part of the transaction; (2) each predicate act involved coordination using specialized software, in which Beyond Global Inc. and the Keto Defendants would collect consumer information on their website and transfer it to TFL through TFL's fulfillment software, which had been integrated into their websites for that purpose.

432.   The Keto Defendants hired other additional John Doe vendors, such as affiliate networks and "crooked processors." These vendors were paid a portion of the proceeds in exchange for their services, knowing that they were assisting in a scam. The John Doe affiliate networks aggregated groups of freelance affiliates and were paid a flat amount by the Keto Defendants, generally on a "cost per action" basis (in other words, each time someone made a purchase). The "crooked processors" assisted with processing transactions through the merchant accounts and had a vendor/vendee relationship with the Keto Defendants. Further information regarding their role is within the exclusive possession of the Defendants.

433.   Each of the members of the Keto Enterprise knew about the general nature of the enterprise and knew that the enterprise extended beyond their individual role. The nature and structure of these scams was widely known across the industry, as evidenced by the keynote speech at the Affiliate Summit in 2019 described herein. TFL employees

attended that January 2019 Affiliate Summit, and TFL operated a vendor booth there seeking clients. The Keto Defendants knew about the entirety of the enterprise because they hired the vendors used to support the scam. TFL and Nelson knew about the general nature of the enterprise from the onboarding process, their consulting and coaching, their attendance at conferences, and for the various reasons described in the aiding and abetting sections in the First Cause of Action as to their knowledge. They knew the enterprise extended beyond their individual role, and in fact regularly referred partner vendors to scammers including the Keto Defendants. Nelson specifically discussed the various vendor relationships his clients had in a panel he spoke on at the 2017 Panama Global Banking Summit, and noted that he and other vendors talked to one another about their activities and reputations. TFL further interacted with these other vendors regularly as part of the software integration process and to transfer data.

434. The Keto Enterprise functioned as a continuing unit because these formal/informal relationships lasted for a long period of time, at least from February 20, 2018 until the date this lawsuit was filed on August 6, 2020, and continued post-suit at least through July 2021, as of which time TFL was continuing to ship the Keto Products for the Keto Defendants.

435. The Keto Enterprise qualifies as a closed-ended enterprise because the predicate acts occurred over a period exceeding a year and a half (from February 20, 2018 to the date suit was filed). The Keto Enterprise qualifies as an open-ended enterprise, in that it was actively continuing to commit predicate acts as of the date of the filing of this lawsuit, and it has continued to receive BBB complaints of fraudulent billing post-suit. Its past conduct by its nature poses a threat of repetition not only because the conduct has continued post-suit, but because both TFL and the Keto Defendants' businesses have been structured around fraudulently billing customers (with respect to TFL as described above, and with respect to the Keto Defendants in terms of using a shell company/merchant account scheme). Committing these predicate acts has become a regular way of doing business among these Defendants and is thus likely to recur.

436. **Predicate Acts:** Each of the Defendants committed, conspired to commit, and agreed to the commission of at least two predicate acts.

437. 18 U.S.C. § 1961(1) defines racketeering activity to include "any act which is indictable under any of the following provisions of title 18, United States Code... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to bank fraud)...."

438. 18 U.S.C. § 1961(1) defines a pattern of racketeering activity as "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

439. Two predicate acts of wire fraud were involved in the sale to Ms. Sihler. On or around December 11, 2019, Ms. Sihler was shown advertising claiming that InstaKeto had been endorsed by the six celebrity "Sharks" from Shark Tank and well-known magazines. This advertising was transmitted via the Internet through interstate commerce into California. The advertisement was false because InstaKeto had not actually been endorsed by any celebrities or well-known magazines. She was then taken to the InstaKeto landing page, where she was falsely told she would be billed for only three bottles, as described *supra*. The InstaKeto landing page was also transmitted via the Internet through interstate commerce into California. Both of these websites (the initial Shark Tank page and the InstaKeto landing page) were caused to be transmitted by Beyond Global Inc. and the Keto Defendants. They knew that Shark Tank cast members and magazines had not endorsed their product, because if true this would have been highly publicized and would have involved contracts and contact with journalists. They further knew that they intended to ship 5 bottles and not three, and knew they intended to charge Ms. Sihler a significantly higher price than what they had represented they would. Previously, Beyond Global Inc. and the Keto Defendants had run free trial scams. At the advice of Nelson and TFL, they devised this specifically as a scheme to defraud and to obtain money via false or fraudulent representations, and specifically chose to structure the scam as shipping additional bottles

to evade FTC scrutiny of subscription charges and Mastercard brand rules that went into place on April 12, 2019. Those Mastercard rules introduced stricter payment processing rules for subscription billing, but they did not apply to multiple bottles in a single shipment. This scheme enabled them to overcharge consumers without billing under MCC 5968 (Direct Marketing—Continuity/Subscription Merchants), the subscription code subject to the rule.

440.    These transmissions of the Shark Tank website and the InstaKeto website to Ms. Sihler constitute two separate predicate acts of wire fraud, which Beyond Global Inc. and the Keto Defendants directly committed, and which Nelson and TFL conspired to commit by agreeing to their commission and by advising them on the scam generally and specifically by advising them to structure their shipments to avoid Mastercard rules. Each Defendant had a specific intent to deceive or defraud. Defendants Flynn and James knew about the deceptions, and had supervised the creation of the websites at issue and purchased the advertising on behalf of Beyond Global Inc., Brightree Holdings Corp., and BMOR Global LLC, which they used as shell companies to sell the products. Nelson and TFL agreed to the commission of these predicate acts and intended that they occur. The place of origination of the websites is unknown, but the merchant account was listed as being located in Port Orange, Florida, and Nelson and TFL's activities took place in Florida.

441.    The sale to Ms. Sihler also involved one predicate act of mail fraud committed by each of the Defendants. TFL used United States mails to send the shipment, under the supervision, direction, and control of Nelson (who caused the shipment), and directed by Beyond Global Inc. and the Keto Defendants (who caused the shipment because they had hired TFL to ship their products). Shortly after December 11, 2019, TFL shipped five bottles of a product labeled "Instant Keto" to Ms. Sihler. That shipment came from Tampa, Florida and was sent to Ms. Sihler in Coronado, California. As stated above, on the advice of Nelson and TFL, those shipments were structured as a single five-bottle bundle, rather than the fake "free trial" subscription which Beyond Global Inc. and the Keto Defendants had previously used for other products. All of the Defendants specifically intended to

continue committing fraud despite FTC and Mastercard crackdowns on subscription fraud by restructuring the shipments to avoid a subscription. TFL and Nelson were both specifically aware of the nature of the Keto scam by then, as detailed in the aiding and abetting section as to Nelson in the First Cause of Action (incorporated here by reference). In particular, as noted there, TFL received complaints on its BBB page about the Keto scam describing both the fake Shark Tank ads and lying about the number of bottles that would be shipped. Two of those complaints occurred on September 30, 2019 (describing fake number of bottles) and November 20, 2019 (describing fake Shark Tank ads and laying out details of fake prices). TFL responded to these complaints on October 17, 2019 and December 4, 2019 respectively—meaning it knew well before it shipped the bottles to Ms. Sihler that it was shipping bottles that had not actually been ordered and that had been advertised with fake Shark Tank ads. TFL further received specific complaints on its BBB page about the pricing issue regarding Ultrafast Keto Boost on October 2, 2019 and November 1, 2019 which it did not respond to, but which it was aware of because Nelson monitored the TFL BBB page and personally wrote TFL's responses to the complaints (often signed in his own name).

442.   TFL, Nelson, Beyond Global Inc., and the Keto Defendants devised a scheme to defraud and to obtain money via false or fraudulent representations, as discussed *supra*. TFL used United States mails (via Postal Service or private or commercial interstate carrier) to deliver the shipment to Ms. Sihler, under the supervision, direction, and control of Nelson, and directed by Beyond Global Inc. and the Keto Defendants (who had hired TFL to ship their products). This act was in furtherance of the scheme, in that shipping the unordered products was a necessary "fig leaf" to allow Beyond Global Inc. and the Keto Defendants to keep billing for them. Each Defendant had a specific intent to deceive or defraud. The act of shipping went beyond an ordinary business transaction here, not only because of TFL and Nelson's knowledge of the wire fraud discussed above and intent to participate in it, but because the shipment was specifically structured this way on the advice of TFL/Nelson to knowingly evade Mastercard rules and FTC scrutiny which applied only

to subscriptions. By structuring the shipment this way, victims could be billed for unordered products just as in a traditional free trial scam, but because they were shipped the unordered products all at once, the billing code would not be identified as MCC 5968 (Direct Marketing—Continuity/Subscription Merchants) and the Mastercard rules would not apply.

443.   Two predicate acts of wire fraud were involved in the sale to Ms. Bavencoff. On or around October 14, 2019, Ms. Bavencoff was shown advertising on Facebook claiming that Ultrafast Keto Boost had been endorsed by the six celebrity "Sharks" from Shark Tank and well-known magazines. This advertising was transmitted via the Internet through interstate commerce into California. The advertisement was false because Ultrafast Keto Boost had not actually been endorsed by any celebrities or well-known magazines. She was then taken to the Ultrafast Keto Boost landing page, where she selected an option thinking she would not be billed for "free" bottles, as described *supra*. Instead she was billed for all five bottles. The Ultrafast Keto Boost landing page was also transmitted via the Internet through interstate commerce into California. Both of these websites (the initial Shark Tank page and the Ultrafast Keto Boost landing page) were caused to be transmitted by Beyond Global Inc. and the Keto Defendants. They knew that Shark Tank cast members and magazines had not endorsed their product, because if true this would have been highly publicized and would have involved contracts and contact with journalists. They further knew that they intended to ship 5 bottles and that none of the bottles were "free," and knew they intended to charge Ms. Bavencoff a significantly higher price than what they had represented they would. Just as with Ms. Sihler, Beyond Global Inc. and the Keto Defendants shipped all the unordered bottles structured as a single shipment to avoid Mastercard rules and FTC scrutiny.

444.   These transmissions of the Shark Tank website and the Ultrafast Keto Boost website to Ms. Bavencoff constitute two separate predicate acts of wire fraud, which Beyond Global Inc. and the Keto Defendants directly committed, and which Nelson and TFL conspired to commit by advising them on the scam generally and specifically by

advising them to structure their shipments to avoid Mastercard rules. Each Defendant had a specific intent to deceive or defraud. Defendants Flynn and James knew about the deceptions, and had supervised the creation of the websites at issue and purchased the advertising on behalf of Beyond Global Inc., Brightree Holdings Corp., and BMOR Global LLC, which they used as shell companies to sell the products. Nelson and TFL agreed to the commission of these predicate acts and intended that they occur. The place of origination of the websites is unknown, but the merchant account lists "NV," Beyond Global Inc. is incorporated in Wyoming but listed a Nevada address on the bottle, and Nelson and TFL's activities took place in Florida.

445.   The sale to Ms. Bavencoff also involved one predicate act of mail fraud committed by each of the Defendants. TFL used the mails to send the shipment, under the supervision, direction, and control of Nelson (who caused the shipment), and directed by Beyond Global Inc. and the Keto Defendants (who caused the shipment because they had hired TFL to ship their products).  Shortly after October 14, 2019, TFL shipped five bottles of Ultrafast Keto Boost to Ms. Bavencoff. That shipment came from Tampa, Florida and was sent to Ms. Bavencoff in Santee, California. As stated above, on the advice of Nelson and TFL, those shipments were structured as a single five-bottle bundle, rather than the fake "free trial" subscription which Beyond Global Inc. and the Keto Defendants had previously used for other products. All of the Defendants specifically intended to continue committing fraud despite FTC and Mastercard crackdowns on subscription fraud by restructuring the shipments to avoid a subscription. TFL and Nelson were both specifically aware of the nature of the Keto scam by then, as detailed in the aiding and abetting section as to Nelson in the First Cause of Action (incorporated here by reference). In particular, as noted there, TFL received complaints on its BBB page about the Keto scam describing both the fake Shark Tank ads and lying about the number of bottles that would be shipped. One of those complaints occurred on September 30, 2019 (describing fake number of bottles) and TFL further received specific complaints on its BBB page about the pricing issue regarding Ultrafast Keto Boost on October 2, 2019. TFL and Nelson were aware of

these complaints because Nelson monitored the TFL BBB page and personally wrote TFL's responses to the complaints (often signed in his own name). Their intent is further evidenced by the fact that they continued shipping the Keto Products long after receiving these complaints.

446.   TFL, Nelson, Beyond Global Inc., and the Keto Defendants devised a scheme to defraud and to obtain money via false or fraudulent representations, as discussed *supra*. TFL used United States mails (via Postal Service or private or commercial interstate carrier) to deliver the shipment to Ms. Bavencoff, under the supervision, direction, and control of Nelson, and directed by Beyond Global Inc. and the Keto Defendants (who had hired TFL to ship their products). This act was in furtherance of the scheme, in that shipping the unordered products was a necessary "fig leaf" to allow Beyond Global Inc. and the Keto Defendants to keep billing for them. Each Defendant had a specific intent to deceive or defraud. The act of shipping went beyond an ordinary business transaction here, not only because of TFL and Nelson's knowledge of the wire fraud discussed above and intent to participate in it, but because the shipment was specifically structured this way on the advice of TFL/Nelson to knowingly evade Mastercard rules and FTC scrutiny which applied only to subscriptions. By structuring the shipment this way, victims could be billed for unordered products just as in a traditional free trial scam, but because they were shipped the unordered products all at once, the billing code would not be identified as MCC 5968 (Direct Marketing—Continuity/Subscription Merchants) and the Mastercard rules would not apply.

447.   These sales and shipments of Ultrafast Keto Boost and Instant Keto were not isolated, but were part of a pattern of related shipments and predicate acts that occurred over a long period of time. The sales and shipments of these two products were occurring from at least February 2018. The Keto Defendants and/or Beyond Global Inc. registered the "false front" website for Ultrafast Keto Boost used to defraud the banks and credit card

companies on or about February 20, 2018.[63] The Keto Defendants first registered the Ultra Fast Keto Boost website - https://ultrafastketoboost.com - on July 3, 2019, and first registered Instant Keto's website - https://instaketo.com/ - on August 8, 2018, with a last update on September 20, 2019.[64]

448.   Plaintiffs are unable to fully plead details of those predicate acts because the facts are largely within the possession of the Defendants, but the examples below are representative and show that the predicate acts committed against Plaintiffs were part of a long-running pattern which was ongoing as of the date of filing of this lawsuit and has continued post-suit, and is thus likely to recur.

449.   A BBB complaint posted on November 12, 2019 reported the following regarding Ultra Fast Keto Boost:

> Sat 8/24:I purchased the online offer "buy 2 & get 1 more for free".They charged me full price,I cancelled,they never responded & still charged me. On Sat Aug. 24 of 2019, I purchased online an offer on Ultra Fast Keto Boost website "buy 2 bottles & get 1 more for free". They sent me a confirmation email without any details or any amount, but they were saying that I have paid for this offer. When I went online on Monday Aug. 26 (since nothing was updated on Sunday), on my online back account I saw that they charged my card with an extra 50 dollars (As if I never had the special offer, and they were charging me for all 3 bottles). I immediately emailed them and cancelled the order and of course I disputed the charge in my card. They never responded to my email, I never received the product (and to be honest I wouldn't care to receive it, after this SCAM and FRAUD they "played" on me), and now 3 months later they STILL have the nerve to demand from me to pay them and they causing me problems with my bank and my credit card. They ARE CROOKS, FRAUDS & SCAMMERS!!! THEY SHOULD NOT BE TRUSTED BY ANYONE!!!!!

450.   On information and belief, and based on the lengthy process required to file a BBB complaint that requires numerous consumer details, this shipment occurred as

---

[63] https://whois.domaintools.com/thesuperbooster.com
[64] http://whois.domaintools.com/instaketo.com and
http://whois.domaintools.com/ultrafastketoboost.com

described by the customer, and involved at least one predicate act of wire fraud directly committed by Beyond Global Inc. and the Keto Defendants substantially identical to those committed against Ms. Bavencoff (the transmission of the website via the Internet to an unknown location within the United States). That act occurred on August 24, 2019. The shipment constituted mail fraud, as the product was shipped by TFL (under the direction, control, and supervision of Nelson) from Tampa or Utah via United States mails to an unknown location within the United States. The shipment occurred in August or September 2019. The purpose of these transmissions and shipments was to obtain money from the consumer, and the transmissions and shipments were made in furtherance of the scheme to defraud. Otherwise, the facts and allegations as to these predicate acts are substantially identical to those involving Ms. Bavencoff, which are incorporated here by reference.

451. A BBB complaint posted on January 14, 2020 reported the following regarding Ultra Fast Keto Boost:

> I purchased 3 bottles of Keto Boost from Ultra Fast Keto Boost in Las vegas, Nv. online from an ad on facebook. The promotion was to buy 3 bottles of this product @ $39.95 & receive 2 free bottles. This was on 10/31/19. When I received the bottles they were not the item that was shown in the ad on facebook. This ad was also promoted by members of shark tank tv show. The ad shows dropping a tablet into a glass of water before bedtime & drinking it. When the product arrived the contents were capsules & not the pills shown in the ad. I have not been able to locate this company as the product was sent from Tampa, Fl. & there was no listing for that # in 411 I went to my credit union yesterday to try to locate the # of the company & discovered that an amount of $198.70 was charged to my account. Today I finally located a phone # in Las Vegas & when I talked to a person re: my bill he simply stated that the bottles were for 69.95 & not 39.95. I asked to speak to his manager & he informed me that there was no one higher up than him on the floor. I then asked to speak speak to someone other than billing & he then informed me that they no longer carry the product I purchased & they cannot help me with my complaint about the difference in the product I received & the product shown on the air. The name of this company is Ultra Fast Keto Boost. Address is 9121 W. Russell Rd., suite 116B, Las Vegas, Nv.,89148. There phone # is 888-970-0692.

452.   "Ultra Fast Keto Boost" responded on February 10, 2020 acknowledging the order but refusing to provide a refund. On information and belief, and based on the lengthy process required to file a BBB complaint that requires numerous consumer details, as well as the response, this shipment occurred as described by the customer, and involved at least two predicate acts of wire fraud directly committed by Beyond Global Inc. and the Keto Defendants substantially identical to those committed against Ms. Bavencoff (the transmission of the Facebook advertisement and the website via the Internet to an unknown location within the United States). That act occurred on October 31, 2019. The shipment constituted mail fraud, as the product was shipped by TFL (under the direction, control, and supervision of Nelson) from Tampa via United States mails to an unknown location within the United States. The shipment occurred in November 2019. The purpose of these transmissions and shipments was to obtain money from the consumer, and the transmissions and shipments were made in furtherance of the scheme to defraud. Otherwise, the facts and allegations as to these predicate acts are substantially identical to those involving Ms. Bavencoff, which are incorporated here by reference.

453.   A BBB complaint posted on February 28, 2020 reported the following regarding Ultra Fast Keto Boost:

> Returned product as info given me. No money returned. They signed for the product via usps. On Dec 1, 2019 I purchased 1 bottle of Ultra Fast Keto Boost for 69.00(or close). When I got the pkg it was 5 btls and they charged my account 198.60(or )I called the LV office and was given the address of PO Box 3011-145 Salt lake City Ut. I sent the product back on 12/11/2019 and they signed for it as recd on 12/17/2019. I have not been able to contact them as the numbers are all no longer avail. I want my money back. Also they want to charge me 5.00 for restock on each bottle. I told then I would pay that for the bottle I had ordered but not for the 4 bottles they sent and i had not authorized. I want my money back. I am a Sr Citizen and they put me in a very hard place by charging my account the astronomical amount from my account and causing me financial hardship. I have tried to locate them and work with them but to no avail so I need your help to get ALL my money back. I have my bank statement, I even filed a complaint with my bank because they took out so much money and I didnt know who had done it. I

also have the Certified mail receipt with the tracking number showing when they rec'd the product back.

454. On information and belief, and based on the lengthy process required to file a BBB complaint that requires numerous consumer details, as well as the response, this shipment occurred as described by the customer, and involved at least one predicate act of wire fraud directly committed by Beyond Global Inc. and the Keto Defendants substantially identical to those committed against Ms. Bavencoff (the transmission of the website via the Internet to an unknown location within the United States). That act occurred on December 1, 2019. The shipment constituted mail fraud, as the product was shipped by TFL via United States mails (under the direction, control, and supervision of Nelson) from Salt Lake City, Utah to Ohio. TFL is registered to do business in Utah at 1232 S GLADIOLA ST #200 Salt Lake City, UT 84104, and it operates a fulfillment center in Utah.[65] The shipment occurred between December 1, 2019 and December 11, 2019. The purpose of these transmissions and shipments was to obtain money from the consumer, and the transmissions and shipments were made in furtherance of the scheme to defraud. Otherwise, the facts and allegations as to these predicate acts are substantially identical to those involving Ms. Bavencoff, which are incorporated here by reference.

455. A BBB complaint posted on June 24, 2020 reported the following regarding "Instaketo":

> I returned a package (which I never ordered however transaction took place as a fraud) and never received a refund. In late 10/2019 I recognized a transaction on my credit card (for $201.68) which I am not aware of under the name of Instaketo in Tampa Florida. I reside in Little Rock, Arkansas. I called my bank (Bank of America) to report a fraud and they instantly processed me a refund and issued me a new credit card, meanwhile they told me they will do some investigations. A few days later, I received a package (package label is attached) from the company composed of 5 boxes of tablets or capsules to enhance a ketogenic state in the blood along with an email confirming delivery with order ID XXXXXX!! I was confused how they got my name, address and my credit card information. Also if someone wants to make a fraud why

---

[65] https://www.thefulfillmentlab.com/news/the-fulfillment-lab-is-a-fulfillment-solutions-business.

he/she sent it to me. So, I suspect that the company is involved in this process. So I reached out to the company by email (correspondence attached) to let them know about what happened and request to return it back and get a refund. I was surprised that they already have an account by name middle and last name which I have no idea about. What they did that they showered me with great offers to keep the package and not get a refund, which increased my suspicions that they are behind that process.

456.    On information and belief, and based on the lengthy process required to file a BBB complaint that requires numerous consumer details, this shipment occurred as described by the customer, and involved at least one predicate act of mail fraud, as the product was shipped by TFL via United States mails from Tampa, Florida to Little Rock, Arkansas. The shipment occurred in late October 2019. The purpose of these transmissions and shipments was to obtain money from the consumer, and the transmissions and shipments were made in furtherance of the scheme to defraud. Otherwise, the facts and allegations as to these predicate acts are substantially identical to those involving Ms. Sihler, which are incorporated here by reference.

457.    A BBB complaint posted on June 11, 2020 reported the following regarding "Insta Keto":

Price of total order was deceiving. Not returnable by Post Office. Located package and returned. Did not receive a full refund. I purchased Insta Keto supplements thinking I was paying $39.95. What I ended up being charged was $198.70. When I saw this pending on my account, I immediately called the customer service number to cancel. I was told to call back because it had already been shipped.

458.    The customer went on to state that the Insta Keto product was shipped from Salt Lake City, Utah, and that the customer lived in Ohio. "Ultra Fast Keto Boost Response" replied acknowledging that a refund had been requested, and stating it had been delayed due to COVID.

459.    On information and belief, and based on the lengthy process required to file a BBB complaint that requires numerous consumer details, as well as the response, this shipment occurred as described by the customer, and involved at least one predicate act of

3:20-cv-01528-LL-MSB

wire fraud directly committed by Beyond Global Inc. and the Keto Defendants substantially identical to those committed against Ms. Sihler (the transmission of the website via the Internet to an unknown location within the United States). That act occurred in mid-2020 based on the response stating that delays had occurred because of COVID. The shipment constituted mail fraud, as the product was shipped by TFL via United States mails (under the direction, control, and supervision of Nelson) from Salt Lake City, Utah to Ohio. The shipment occurred in mid-2020. The purpose of these transmissions and shipments was to obtain money from the consumer, and the transmissions and shipments were made in furtherance of the scheme to defraud. Otherwise, the facts and allegations as to these predicate acts are substantially identical to those involving Ms. Sihler, which are incorporated here by reference.

460.   A BBB complaint posted on June 29, 2020 reported the following regarding Instant Keto:

> I thought I only ordered the free bottle, but somehow ended up with the biggest order. I figured I would try it anyway because it had a guarantee that if it didn't work you could get your money back. Well it didn't work, so I went online to find out how/where to send it back for a refund. After visiting the website my computer came down with a virus. (They were the only new website I went to). After getting it fixed, I still have not heard from them on how to get my money back. Do not want to go back to their website and possibly get a virus again. Product_Or_Service: Instant Keto pills

461.   "Ultra Fast Keto Boost Response" responded to the complaint as follows:

> There has been no contact/correspondence from the customer. All customers receive an email with a Customer Support number to contact us, we operate a 24/7 customer support center. The customers order date is 14MAY2020 and the customers complaint date is 29JUNE2020 which puts the customer passed the 30 Day guarantee. We can offer the customer a partial refund of $173.70 and the customer may keep the product or return it. Customers are responsible for return shipping per our Terms and Conditions.

462.   On information and belief, and based on the lengthy process required to file a BBB complaint that requires numerous consumer details, as well as the response, this

shipment occurred as described by the customer, and involved at least one predicate act of wire fraud directly committed by Beyond Global Inc. and the Keto Defendants substantially identical to those committed against Ms. Sihler (the transmission of the website via the Internet to an unknown location within the United States). That act occurred on May 14, 2020. The shipment constituted mail fraud, as the product was shipped by TFL via United States mails (under the direction, control, and supervision of Nelson) from Tampa, Florida or Utah to an unknown location within the United States. The shipment occurred in late May 2020. The purpose of these transmissions and shipments was to obtain money from the consumer, and the transmissions and shipments were made in furtherance of the scheme to defraud. Otherwise, the facts and allegations as to these predicate acts are substantially identical to those involving Ms. Sihler, which are incorporated here by reference.

463. Similarly, a BBB complaint posted on October 13, 2020 reported the following regarding Instant Keto:[66]

> Unfortunately, I got caught up in this scam!! I saw an ad on Facebook for Instant Keto, buy 3 bottles at $39.70 each and get 2 bottles free. When they sent me my bill, they charged me for all 5 bottles. I insisted on getting compensated for the OVERCHARGE! Nothing was mentioned at the time that if I get that refund for an OVERCHARGE, it forfeits the money back guarantee! This was on August 22nd. In mid September, I called to tell them the pills were not working and wanted to return unused pills for a refund. The guy told me to wait un the end of September (he said September 28th) and then if the pills still did not work, I would get a refund. I did that and since then all **** broke loose. I sent them an email in detail and asked for my refund. They don't do that through email. I had to all and put me through all the stress. I called twice since then and this is when they try to tell me I cannot get a refund because I gave up that right with the warranty when I accepted a refund for an OVERCHARGE!! That is absurd!! Plus, they said I was past the warranty period of the 22nd of September, when the guy CLEARLY told me to call back on the 28th!! Was that a tactic on his part to ensure I would not get the refund'?? They not only scammed me but the pills DO NOT WORK!!! And if we do not do anything, they are going to continue to take advantage of

---

[66] https://www.bbb.org/us/fl/tampa/profile/high-risk-free-trial-offers/ultra-fast-keto-boost-0653-90369793/complaints (last visited Jan. 3, 2021).

so many other people, especially poor seniors like myself!! Product_Or_Service: Instant Keto Order_Number: XXXXXX Account_Number: none

464.   On information and belief, and based on the lengthy process required to file a BBB complaint that requires numerous consumer details, this shipment occurred as described by the customer, and involved two predicate acts of wire fraud directly committed by Beyond Global Inc. and the Keto Defendants and substantially identical to those committed against Ms. Sihler (the transmission of the Facebook ad and the website via the Internet to an unknown location within the United States). Those two acts occurred on August 22, 2020. Beyond Global Inc. and the Keto Defendants directly committed a third act of wire fraud against this unknown consumer by falsely promising the consumer a refund in mid-September 2020, with the sole intent of stalling to avoid paying a refund. That act was via wire (telephone) from an unknown location to an unknown location within the United States. The shipment constituted mail fraud, as the product was shipped by TFL via United States mails (under the direction, control, and supervision of Nelson) from Tampa, Florida or Utah to an unknown location within the United States. The shipment occurred in late August 2020. The purpose of these transmissions and shipments was to obtain money from the consumer, and the transmissions and shipments were made in furtherance of the scheme to defraud. Otherwise, the facts and allegations as to these predicate acts are substantially identical to those involving Ms. Sihler, which are incorporated here by reference.

465.   The predicate acts of bank fraud consisted of the Keto Defendants presenting "false front" websites to financial institutions when confronted with chargebacks. By falsely claiming that consumers purchased from a website where the terms were clearly disclosed and agreed to, the Keto Defendants prevented banks from issuing lawful chargebacks to the Class. This false front was first registered on February 20, 2018, and on information and belief has been used to defraud banks on an ongoing basis since then. Further details are unknown because they are in the exclusive possession of Beyond Global

Inc. and the Keto Defendants. The purpose was to further the scheme to defraud by preventing it from being detected. As described *supra* in the section on the Keto Defendants, Defendant Flynn, Defendant Brightree Holdings Corp., and Defendant TFL also committed the predicate act of bank fraud by working together to hide from a banking institution, VyaPay, the fact that the Instant Keto/InstaKeto products were both being shipped by Brightree Holdings. They did so by falsifying the name of the product in TFL's software, which VyaPay had access to, so that it would appear to be the same product as the Ultra Fast Keto Boost product. The details of that fraud are incorporated herein by reference.

466.   These predicate acts were both the but-for and proximate causes of injuries to Plaintiffs and the Class, as described in the aiding and abetting and conspiracy sections of the First Cause of Action as to Nelson and TFL, which are incorporated here by reference. But-for the acts of mail fraud by Nelson and TFL, the scam could not have existed because it would have had no "fig leaf" to bill consumers for unordered products. But-for structuring the shipments to evade subscription rules, the scam would have been flagged by the card brands and their merchant processing cut off. But-for the acts of wire fraud by Beyond Global Inc. and the Keto Defendants, consumers would not have been injured because they would have known the truth about the products and would have known the real number of products they were ordering. But-for sending the false fronts to banks and the bank fraud as to VyaPay, the banks would have reviewed the actual websites consumers bought from and flagged the products as fraudulent to prevent them from being sold. These predicate acts were a proximate cause of the injuries to Plaintiffs and the Class because the injuries were direct and reasonably foreseeable results of the conduct, in that the Defendants all knew how the scam worked and knew about the misrepresentations made on the websites, and it was reasonably foreseeable that shipping unordered products, sending false fronts to banks, lying about celebrity or corporate endorsements, lying about the number of products that would be shipped, or making the other misrepresentations would result in injury.

467. These predicate acts are related. They have the same participants (TFL, Nelson, Beyond Global Inc., and the Keto Defendants). They have the same purpose (shipping unordered products to consumers to fraudulently bill them). The method of commission was the same, as all involve near-identical Keto diet products shipped and sold by the same companies on similar websites using similar fraudulent advertising. They all were structured identically, with the consumer agreeing to purchase fewer bottles than were ultimately shipped. They are not isolated in that they continued over a long period.

468. Defendants' acts of wire fraud, mail fraud, and bank fraud were committed willfully and intentionally as described herein, and were made in furtherance of the scheme and common course of conduct in that they were designed to defraud customers of the Keto Products of money and property.

469. The predicate acts affected interstate commerce, in that the shipments crossed state lines and the advertisements were transmitted via wire across the country, resulting in purchases of the Keto Products through interstate commerce which were sent via United States mail and private shipping carriers.

470. The RICO violations alleged here have caused harm to a specific business or property interest. In particular, as a result of the misrepresentations and omissions described herein, Plaintiffs reasonably relied upon the representations regarding the products. In reasonable reliance on these false representations, and as a result of the RICO violations, Plaintiffs and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that Defendants' representations were false or had the Defendants not engaged in the unlawful conduct described herein. Plaintiffs and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiffs and other Class Members have suffered specific harm to a property interest, the money they paid to the Defendants. Plaintiff's banks were further harmed through the "false front" websites and the churning of merchant accounts.

471.   The RICO violations here have caused concrete financial loss. In particular, as described above, money was paid by Plaintiffs and members of the Classes to Beyond Global Inc. and the Keto Defendants in reliance on their misrepresentations and omissions. Plaintiffs and the Class Members were overcharged for those products relative to their actual value, and the value was substantially inflated by the various misrepresentations and omissions as described further herein.

472.   Beyond Global Inc., the Keto Defendants, TFL, and Nelson conspired to commit the predicate acts described above (and others substantially similar predicate acts against Plaintiff, the Class, and other victims) in violation of 18 U.S.C. § 1962(d). Plaintiff incorporates by reference the conspiracy sections of the First Cause of Action as to these respective defendants, which details the nature of this conspiracy, and the aiding and abetting sections of the First Cause of Action for the respective defendants, which details their knowledge of and assistance in the conspiracy. Beyond Global Inc. and the Keto Defendants knew they were participating in a criminal endeavor because they knew they were making the various false representations to consumers and banks described herein. Similarly, TFL and Nelson each knew they were participating in a criminal endeavor as described in their aiding and abetting sections as well as *supra* in this cause of action. All four of these Defendants adopted the goal of furthering that criminal endeavor, again as described in those conspiracy and aiding and abetting sections and *supra* in this cause of action. Beyond Global Inc., the Defendants, TFL, and Nelson both agreed to commit and participated in a violation of at least two predicate acts, as described in detail *supra* for each predicate act. The agreement between these Defendants can be inferred from their activities and relationships, as described in the conspiracy sections in the First Cause of Action. To the extent they did not directly commit predicate acts, TFL and Nelson knew about the scheme and agreed to facilitate it for the reasons described in the aiding and abetting section of the First Cause of Action (in particular the facts outlined there showing their knowledge and their substantial assistance, which also constitute facilitation under 1962(d)).

473.   On information and belief, many of the misrepresentations are actively being made to new customers and deceptive websites are still operative. On information and belief, additional predicate acts occurred far earlier and will be uncovered in discovery, particularly through the Keto Defendants' sales of earlier products and their current sales of the Keto products.

474.   Because of these violations and pursuant to 18 U.S.C. § 1964(c) and 1964(d), Defendants are liable to Plaintiffs and the Class Members for three times the damages Plaintiffs and the Class Members have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs demand judgment as follows:

A.   An order declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying this case as a class action, appointing Plaintiffs as representative of the Class, and designating their attorneys as Class Counsel;

B.   Declaratory judgment that Defendants' actions are unfair and unlawful;

C.   An award of injunctive relief as permitted by law or equity including an order prohibiting Defendants from engaging in the unlawful and tortious acts described above;

D.   A finding that such injunction constitutes public injunctive relief, has resulted in the enforcement of an important right affecting the public interest and otherwise meets the requirements of California Code of Civil Procedure § 1021.5, and an award of attorney's fees and costs pursuant to § 1021.5;

E.   For judgment for Plaintiffs and the Class on their claims in an amount to be proven at trial, for economic, monetary, consequential, compensatory or statutory damages caused by Defendants' practices, along with punitive damages;

F.   For restitution and/or other equitable relief, including without limitation disgorgement of all revenues, profits, and unjust enrichment that Defendants obtained from

Plaintiffs and the Class as a result of its unlawful, unfair, and deceptive business practices described herein;

    G.    For damages of three times the damages Plaintiffs and the Class Members have sustained, plus the cost of this suit, including reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c) and (d);

    H.    An award of attorney's fees and costs;

    I.    For pre-judgment and post-judgment interest as provided for by law or allowed in equity; and

    J.    Such other and further relief as is necessary and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. Proc. 38(b), Plaintiffs demand a trial by jury on all issues so triable.

DATED: March 7, 2022             Respectfully submitted,

**KNEUPPER & COVEY, PC**

/s/Kevin M. Kneupper

Kevin M. Kneupper, Esq.

*Attorneys for Plaintiffs Janet Sihler and Charlene Bavencoff and the putative Class*

# EXHIBIT 1



# Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements

**BBB International Investigations Initiative**

**BBB Chicago** *bbbinfo@chicago.bbb.org*
**BBB Dallas** *info@nctx.bbb.org*
**BBB Omaha** *info@bbbinc.org*
**BBB San Francisco** *info@bbbemail.org*
**BBB St. Louis** *bbb@stlouisbbb.org*

**C. Steven Baker** *stbaker@bbbinc.org*

*Issued December 2018*




# Better Business Bureau®

## Introduction

You've seen them on the internet: ads or links leading to pictures of celebrities and products that sound intriguing. The ads claim these "miracle" products will help you lose weight easily, combat wrinkles or whiten teeth. Often, fraudulent operations involved with these types of ads employ the latest internet marketing techniques and professional looking websites.

You may be enticed to try these products through a "risk-free" trial. You might think they seem like a good deal. You only have to pay $1.95 for shipping and handling. The claims look plausible, and celebrities would not endorse a product unless they believed it works. There may be a risk that the product doesn't work as claimed, but it costs next to nothing to find out. Just enter your name, address and credit card number and act quickly; supplies are limited.

Better Business Bureau's (BBB's) in-depth investigative study found that many of these free trial offers are not free. They do not just send free product samples to try. If you can locate and read the fine print on the order page, or the terms and conditions buried by a link, you'll discover that you may have only 14 days to receive, evaluate and return the product to avoid being charged $100 or more. In addition, the same hidden information may state that by accepting the offer, you've also signed up for monthly shipments of the products. Those also will be charged to your credit card and become subscription traps. Many people find it difficult to contact the seller to stop recurring charges, halt shipments and get a refund.

The study found that many of the celebrity endorsements are fake. Dozens of celebrity names are used by these frauds without their knowledge or permission, ranging from Oprah Winfrey, Chrissy Teigen and Ellen Degeneres to Mike Rowe, Tim Allen and Sally Field. Sometimes the fine print even admits these endorsements are not real.

BBB receives complaints from free trial offer victims nearly every day and warns consumers to use extreme caution before agreeing to the offer and entering their credit card information. The chance of encountering this type of deception is high; they have infested the internet and social media. Solving this issue will require widespread education, law enforcement and work by credit card companies to recognize these types of fraudulent activities and deter access to the credit card system.





Losses in cases of this type pursued by the Federal Trade Commission (FTC) over the last ten years total more than $1.3 billion. Fraudsters have created a global multi-billion dollar industry.

Free trial offers can be legitimate ways to introduce new products. Credible companies make sure consumers understand what they are signing up for and do not hide key information.

Megan Olsen at the Council for Responsible Nutrition, the trade association for the major dietary supplement companies, says, "No legitimate company selling dietary supplements would engage in bogus free trial offers, trick people into subscriptions for continuing shipments, make outrageous unsupportable claims for products, or employ the names of celebrities without permission. In fact, we work with BBB to identify bogus product claims and encourage law enforcement action against deceptive practices."

The fraud involves a variety of players, from those who obtain the products to advertisers, shippers and credit card processors. But locating these operations can be elusive and identifying those behind them challenging.

This study shows the scope of the problem, describes the components that make fraudulent operations successful, discusses efforts to combat this deception and offers recommendations.

1



# Better Business Bureau®



## Scope of the problem

### How large is the fake free trial offer industry?

The problem is growing. **Available data from the FTC shows that complaints about "free trials" more than doubled between 2015 to 2017,** though not all people who complain actually lose money. Victims in 14 resolved FTC cases lost $1.3 billion. There may have have been more than a million victims just in those cases.

**BBB has identified 36,986 complaints and Scam Tracker Reports over the last three years**, though not all involve monetary loss. **Consumers reporting to BBB lost an average of $186.**

In addition, the FBI's Internet Crime Complaint Center (IC3) has seen an increase in complaints about free trial offers.

| IC3 | | |
|---|---|---|
| Year | Complaints | Losses |
| 2015 | 1738 | $5,709,227 |
| 2016 | 1927 | $3,884,439 |
| 2017 | 2486 | $5,669,170 |
| **Total** | **6151** | **$15,262,836** |

The **Canadian Anti-Fraud Centre** (CAFC) examined free trials and subscription traps in April of 2017. They only received 54 complaints from 2011 to 2016, but from March 2016 to March 2017 they received 518 complaints, an 859 percent increase. Of the 518 complainants, 474 lost money, with a total loss of $192,419 Canadian dollars (approximately $146,812 U.S. dollars) and an average loss of CA$248.

The CAFC also identified 371 company names engaged in free trial offers. The most common "gifts" or products ordered by victims were facial and wrinkle creams.

This is undoubtedly a worldwide problem. UK law enforcement says they get complaints but "don't have reliable numbers."

The Australian Competition and Consumer Commission (ACCC) has noticed a sharp increase in complaints about free trial offers and issued a **warning** about this type of fraud in September 2018. The ACCC says: "reports to Scamwatch increase[ed] 400 percent and losses increasing a staggering 3,800 per cent so far in 2018." The ACCC also warned that these regularly include supposed endorsements from celebrities.

These numbers most likely are low for several reasons. First, FTC studies have found that less than 10 percent of fraud victims report their losses to BBB or law enforcement. Second, many of these products are sold internationally, and victims in other countries are unlikely to file complaints in the U.S. or Canada. Complaint numbers are difficult to obtain because law enforcement does not yet categorize these types of complaints separately.



### Who are the victims of free trial offer frauds?

An examination of complaints and reports to BBB found that 72 percent were females and 28 percent were male. This may be because so many of these products are skin creams geared to that demographic. Other products may be directed to a male audience and some, such as diet pills, may affect a general audience. In addition, victims appear to span all income and education levels.

**Ages of victims:** The Internet Crime Complaint Center complaints are spread fairly evenly over age ranges, with a slight increase in ages 30-39.

| From 2015 - 2017 | | | | | | |
|---|---|---|---|---|---|---|
| Under 20 | 20-29 | 30-39 | 40-49 | 50-59 | 60+ | Not given |
| 78 | 634 | 1303 | 1231 | 1056 | 1041 | 808 |

### Who is behind free trial offer frauds and where are they located?

The FTC's enforcement in this area strongly suggests that many of the free trial offer/subscription traps enterprises operate from the U.S. and Canada. FTC cases have all been against U.S. enterprises except Jesse Wilms, who ran his operation from Western Canada. Nevertheless, these may well use merchant processing accounts from overseas banks. The CAFC's study in April 2017 found 312 merchant accounts from banks in 14 countries. The most common location for banks behind the credit card processing were China, Latvia, Canada and the UK. These companies also sell extensively outside the U.S.; in one recent FTC case the defendants claim that 93 percent of their customers are in other countries.



# Better Business Bureau®



## How Free Trial Offer Frauds Work

An FTC case from 2010 may help illustrate how these free trial offer enterprises actually operate. The following contains the FTC's evidence and allegations made in court before the case ultimately settled:

**Central Coast Nutraceuticals** *(CCN)* sold a weight loss pill called AcaiPure, as well as a "colon cleansing" product dubbed Colopure. At the time, Acai berries were all the rage and were supposedly a miracle diet product. Acai berries grow on Acai palm trees in South America. CCN said its AcaiPure weight loss pills contained an extract of Acai berries.

CCN hired "affiliates" that placed ads at popular internet sites. Those who clicked on these links were first taken to "landing pages" that looked like independent news articles written by "reporters" who had supposedly investigated CCN's diet products and, to their surprise, found they produced amazing results. Readers were then provided with a link to click through to CCN's website. The affiliates were paid a commission from CCN when they got people to go to the website, or when they signed up for a free trial. The FTC separately **sued an affiliate network** that was using this tactic to get people to CCN's website.

CCN's website was well designed and very professional. It even had a "virtual spokesperson" in a video superimposed over the text who talked about the "benefits" of the products. In addition, CCN's site claimed that the products were endorsed by Rachel Ray and Oprah Winfrey.

The spokesperson claimed that the pills were "scientifically proven to help people lose up to five times their body fat, compared to a traditional diet and exercise program," and that they enable "rapid weight loss in a fiercely short time period, without any unwanted side effects, starvation, impossible to follow diet schemes or unnecessary fatigue." For its Colopure colon cleansing product, CCN listed dramatic information about the dangers of colon cancer and conveyed that its product would prevent colon cancer.

In addition, CCN claimed that people could get a free trial of these products for only a few dollars and see for themselves if they worked.

*Click here to download and view this short video of the speaking model and the website.*

**As CCN's video model said:**
"We stand behind  Pure, and by doing so, we're not even going to ask you to pay for it. That's right. We'll send you a risk-free 30-day supply of our incredible AcaiPure, absolutely free of charge, so you can experience the amazing and incredible, fat-fighting power of AcaiPure first-hand without any risk. All we ask for is for you to pay a small shipping and handling fee of $4.95 and we'll rush it to you right away. So, be quick. With all the media attention surrounding AcaiPure, supplies are going fast and we can't guarantee this free 30-day supply will still be available next time you visit us."



Customers were asked to provide their credit or debit card numbers to pay $4.95, or sometimes $1.95, for the "free" trial. Those who did were shipped a one month supply of the pills and were often charged $59.95 right away. And CCN would continue sending – and charging for – these pills every month.

These terms were only disclosed in very fine print if a customer scrolled down to the bottom of the order page where customers entered their credit card number. Another fine print statement said that by ordering, customers agreed to CCN's terms and conditions. You can see the fine print by going to the end of the video.

So how did the free trial actually work? Victims had to

 

# Better Business Bureau®



Acai berries are the latest weight loss fad. These so called Super Foods that you take as a supplement to lose weight have been getting a lot of international attention. And like you have probably already seen; they are all over the internet in blogs and success stories of people who have apparently used the pills and lost a ton of weight. But we here at News 6 are a little skeptical and aren't sure that we've seen any real proof that these pills work for weight loss. So we decided to put these products to the test. What better way to find out the truth than to conduct our own study?

**Julia** investigates the Acai Berry diet to find out for herself if this super diet works.

To get started, I volunteered to be the guinea pig. I applied for a bottle of the LeanSpa Acai. While there are ton's of Acai berry ads online, LeanSpa Acai is one of the most credible and trustworthy suppliers on the market. It included the Free trial of the product and it did not try to fool me into agreeing to additional hidden offers. Another reason why I chose LeanSpa Acai is because it is the most concentrated and purest acai products on the market. This would give me the most accurate results for my test.



receive the pills and return them within 14 days to avoid being charged. Of course it took several days for the product to arrive, so it was really not possible for people to try the pills and see if they worked before they had to be sent back.

The invoice victims received explained that in order to return the product they had to call and get a Return Merchandise Authorization Number *(RMA)* from CCN. But often, CCN didn't answer its phone number, so those were difficult to obtain.

In addition, victims not only had to pay to ship the product back, they also had to do so in a form that provided proof that CCN actually received them, such as certified mail. Again, victims did not learn of this condition until after they had received the pills.

Many victims struggled to get a refund. And all the while CCN kept shipping more bottles of pills and charging customers credit cards.

But what about the pills? The FTC alleged the Acaipure and Colopure pills were nearly the same pill, though Colopure did not contain the acai berry extract. According to a medical expert assisting the FTC, there was no reason to think either product worked as claimed. He said AcaiPure simply had a laxative effect and none of the ingredients could produce the weight loss effects CCN claimed. He also said that, contrary to CCN's claims, there had been no scientific studies conducted on either acai berries or AcaiPure.

**The FTC noted that BBB received over 2800 complaints about CCN.** The National Advertising Division of BBB found CCN's claims about colon cleansing deceptive, and although CCN promised to end those claims, it instead changed the product name and continued to make the claims. Despite being sued by **Oprah Winfrey** for claiming she endorsed the product, CCN continued using testimonials for her. CCN settled another case over its free

trial offer practices with the Arizona Attorney General's office but continued operating in violation of that court order.

**Victims lost at least $80 million to CCN.** The FTC sued the company in August 2010, and a federal court in Chicago froze its assets and appointed a receiver to take over operations. One and a half million dollars was recovered to refund to victims.

# Anatomy of the Fraud

*Several components must come together for the fraud to be effective. These usually include:*

**1. A product**
**2. Enticing advertising**
**3. A website**
**4. Celebrity endorsement**
**5. Product shipping**
**6. Payment processing**
**7. Customer service operations**

While these functions could be done from one office, a variety of players often work in tandem to make the deception effective.

## 1. The Product

To engage in a deceptive free trial offer there must be a product to sell. Over the last ten years these have mostly consisted of diet pills, teeth whiteners, wrinkle and anti-aging creams and, most recently, cannabis extract products.

Despite the fact that the pills are often sold for around $100 for a 30 day supply, the pills themselves are not necessarily costly. An online search for Acai berry pills found at least **one web site** offering pills in bulk at a cost of



# Better Business Bureau®



## Inside a Free Trial Scam

Consumer decides they would like to try the "FREE TRIAL".



They expect to pay $1.03 plus shipping.

When in actuality they are paying $94.31 for a trial pack and an auto monthly renewal subscription to Product A.



Consumer begins to complete checkout.

An additional $94.31 for a trial pack and monthly subscription to Product B is added to the total without the consumer's knowledge.



The total cost is $188.26 for the consumer trial packs and must subscriptions to Products A and B.

Much higher than the expected $1.03 plus shipping.



100 pills for three cents.

The claims made for the products sold through fraudulent free trials are often deceptive. **The FTC has issued a guide** for advertisers about weight loss claims that are basically never true, such as that a product "causes substantial weight loss no matter what or how much the consumer eats." Similarly, the FDA **has warned** that claims made for anti-aging creams or wrinkle removal are also unlikely to be true.

Some recent free trial offers include pills made from Cannabis extract with an ingredient called CBD. The FDA has again warned about claims made about CBD - particularly those that claim they can prevent or cure diseases.

The **FDA** in the U.S. and **Health Canada** both require that labels for dietary supplements list the ingredients they contain. Despite these requirements, how do you know that the products contain what they claim? **One FTC case** involved spam email selling male enhancement pills that were said to be "100% herbal and safe." In fact, the pills contained sildenafil (the active ingredient in Viagra) which can pose a health risk and requires a prescription. The company also claimed to sell generic versions of prescription drugs that were FDA approved. However, the pills, shipped from India, were not approved by the FDA and were sent without a required prescription. A recent article in **Scientific American** found that hundreds of dietary supplements actually contain prescription drugs.

**Advertising.** In order to get victims to decide to try a "free trial," these frauds often make extreme claims for the supposed merits of their products. In addition to claims that they are "miracle" products, medical breakthroughs or that new science proves that they work, deceptive claims are often conveyed in "testimonials" from supposedly happy customers or, as discussed below, endorsements by celebrities or other trusted figures.

**Substantiation.** Central to all consumer protection laws on advertising is the principle that claims for products must be truthful and substantiated. For some claims, absolute truth may be difficult to establish, and in those cases advertisers must be able to back up their claims with "substantiation." These are basic principles of advertising law supported by the FTC, the state attorneys general and BBB. Here is the **FTC policy statement on substantiation**. Under Canadian law, as well, companies must have adequate and proper testing to support their product claims. Some FTC free trial offer cases have challenged product claims while others have focused solely on the deceptive free trial marketing.

So what sort of substantiation, or support, must advertisers have before they make claims for their products? Testimonials from "happy" customers or popular articles will not suffice. Most claims about diet pills, wrinkle creams or other products sold as "free trials" are going to require some sort of clinical study or other scientific evidence. Needless to say, many of the "miracle" claims made for products sold through free trial offers lack any such support, and defendants in the FTC cases have made few attempts to justify the claims they make.

 

# Better Business Bureau®



**\*EDITOR'S NOTE:** Ryan Haughman has worked with the official suppliers of Nutri Fast Garcinia to temporarily provide free 1 month samples for our readers!

**\*\*Update: LIMITED FREE SAMPLES AVAILABLE** - As of Wednesday, April 05, 2017 , Thise Still FREE Samples!



Step 1

**FREE 30 DAY SUPPLY OF
NUTRI FAST GARCINIA**

GET A FREE SAMPLE
(http://xo1iv.voluumtrk.com/click/1)

Free Sample Promotion Ends On
**Wednesday, April 05, 2017 At Midnight!**

## 2. Deceptive Affiliate Marketing

Many fraudsters offering fake free trials drive traffic to their websites by using display ads and sponsored content. In addition, **BBB** found that nearly 30 percent of victims encountered these ads on social media.

For example, the "one tip for a tiny belly" ad has been used to promote free trial offers. As described in a **Washington Post article**, the FTC found that it led users to a health-related fake free trial.

Many fake free trial offers use affiliate networks to advertise their products. Someone who wants to drive traffic to their website hires an affiliate network, which in turn hires individual affiliates to place advertising. The affiliates often buy space for ads or sponsored content on popular websites. Clicking on one of these ads will take people to a website where products are sold, or to a "landing page" that then refers users to the main site for the product. Commissions are paid to the affiliate network, which in turn pays the affiliates. Affiliates can either be paid per click or per order placed. Commissions for these misleading "free trial" offers can be **$30 to $50** for every person who signs up.

Often, deceitful advertisements for these offers use landing pages that are designed to look like consumer articles from reputable news sites. In one offer, the articles promoted Acai berry diet pills. The fake articles appeared to be from news websites, and were hosted

on domains with names like **channel5healthnews.com**; **dailyconsumeralerts.com**, and **online6health.com**." these websites often include falsified celebrity endorsements and fantastic claims about products. Some had the term "advertorial" at the top of the page, but the FTC alleged that this term did not reduce the deception. In addition, the comments supposedly posted by satisfied users at the bottom of the page were phony.

These articles included links to the domains where users could order "free trials" of the products.

In 2011, the **FTC sued ten different affiliates** who directed traffic to fake articles with deceptive ads.

**Emails.** Claims for bogus free trials may also come by email. Many people have received emails that appeared to be from an acquaintance, and contain only a link in the email body. These are sent by fraudsters, some of whom also work as deceitful affiliates. The links in the emails often take users to sites selling products with free trial offers. This is not a legitimate marketing technique; sending unsolicited email is a crime.

## 3. The web page

After clicking through from ads or landing pages by affiliates, victims arrive at the web page where they can get the free trial of the product. As noted in the following section, these may have pictures of celebrities that supposedly endorse the products. In some cases, they claim that a celebrity has left their job to launch a new skin care business, or that celebrities have invested their own money in the business.

The web pages appear professional. They often try to create a sense of urgency by claiming limited supplies are available. Sometimes, they also have "countdown clocks" indicating that the offer will expire shortly if the consumer does not act immediately.

Customers are required to enter their address and payment information. If any disclosures letting people know that they have only a short period of time to try the product and return it or be charged, or that additional





supplies will be shipped monthly at a recurring cost, are on the landing page, they are often in very fine print and victims may have to scroll down to the bottom of the screen to encounter them.

These sites sometimes tell people that by entering their information they are agreeing to the terms and conditions which can only be seen if you click on a hyperlink and read pages of legalese. In some cases, people may be asked to check a box that they have read the terms and conditions. Most likely, people don't actually read the terms and conditions. As an April Fool's stunt, **one online game site** inserted a clause saying that by placing an order visitors were signing over their immortal soul. Very few people even noticed it.

It is illegal to offer a satisfaction guarantee, money back guarantee or free trial offer unless purchasers can get a full refund. Terms must be clearly disclosed. The FTC has **advertising guides**, compilations of rules developed through decades of law enforcement, that directly address free trial offers. The same provisions are contained in **BBB's Code of Advertising**. They state that claims of a satisfaction guarantee, money back guarantee or free trial

offer mean to the public that they can get a full refund, for any reason, if they are unhappy with the purchase. Many free trial offer scams refuse to give refunds.

These guides also state that an ad mentioning a satisfaction guarantee or similar offer should inform consumers of any material conditions or limitations on the offer. For example, a restriction on the offer to a specific time period, such as 30 days, is a material condition that should be clearly disclosed. Failing to disclose terms adequately is deceptive and therefore, illegal.

It is also illegal to trap people into continued monthly billing without full disclosure in advance and a simple way to cancel. The U.S. has a specific statute addressing this situation. Adopted at the end of 2010, the **Restore Online Shoppers Confidence Act** (ROSCA) followed **FTC hearings on negative option issues** on the internet. It helps consumers avoid subscription traps. ROSCA addresses recurring billing, and not just for free trial offers.



It also covers repeated billings for things such as health clubs, dating sites, book/magazine clubs, cooking or other products sold on television.

**There are three main ROSCA requirements.**

1. Such offers must "clearly and conspicuously" disclose all material terms of the offer BEFORE getting a consumer's billing information. So what does clearly and conspicuous mean? It basically means something that people can easily see and understand. The FTC has provided **some guidance** on how to do this. Important information can't be hidden in a hyperlink to terms and conditions, in fine print, or in a footnote.
2. Companies must get a "consumer's express informed consent" before charging people. In other words, consumers must affirmatively agree to the program of regular charges and understand them.
3. There must be a "simple mechanism" for a consumer to "stop recurring charges." California has its own **law on auto renewals** which has similar requirements.

Canada does not have a law as specific as ROSCA, though general principles of consumer protection law should reach the same result. It is illegal to create the false or misleading general impression that consumers can try a product for free, only paying for the shipping costs, when in reality they will be charged the full price of the product if they don't call and cancel within a certain number of days. The truth about how these offers work is often buried in the difficult to read and understand terms and conditions, or fine print. The same terms and conditions will often state that the consumer has been signed up for a monthly subscription to the product.

The Competition Bureau, the Canadian agency that addresses false and misleading conduct in the marketplace, says that deceptive and misleading conduct in the digital marketplace is a priority and that they are actively examining claims made to the public that might raise issues under Canadian law.

### 4. Celebrity endorsements

One of the oldest tactics in advertising is to claim that a celebrity uses the product. Celebrities are often paid for endorsing legitimate products.

Another basic rule of advertising law is that the endorsement must be real. In the case of the free trial offers, often the fraudsters simply obtain pictures of celebrities and claim that they tried the product and endorse it. Several of the FTC's free trial offer cases have directly challenged that celebrities have endorsed the products when they actually have not.

In some cases, the deceptive websites even have fine print admitting that the claimed endorsement is not real. For example, a website claiming that Joy Behar was leaving "The View" to set up her own line of skin-care products actually contained this **fine print disclaimer,** posted inconspicuously:

> **"This website is not a source of facts or real information. All the content featured on our website is artificial and falls under the umbrella of fiction. … Any celebrities shown or mentioned on this page do not endorse this product."** *(emphasis added)*

**One such website** is still live, claiming all five **Shark Tank** judges invested in a product, and that its product is used by celebrities. Fine print at the bottom states that it is all a fake. An internet search of one picture used shows the same picture being used for dozens of other products. **Similar claims** about people leaving to form their own skin care companies have used the names of **Joanna Gaines; Marc Zuckerberg's wife Priscilla Chan, Sean Hannity's wife Jill Rhodes,** and **Lara Spencer from Good Morning America.** Similar issues involve **celebrities in Canada**.

The Australian Consumer and Competition Commission issued a **warning** about the use of celebrities being used to endorse fake free trial offer products on September 24, 2018. They state that these fake offers have used the names

 

# Better Business Bureau®

of: **Cate Blanchett; Deborah Knight** *(Nine News Sydney presenter);* **Delta Goodrem; Dr David Sinclair** *(Head of Ageing Lab UNSW);* **Dr Oz; Emma Thompson; Georgie Gardner** *(Today Show);* **Jessica Rowe** *(Studio 10);* **Kyle Sandilands; Lisa Wilkinson** *(Ch 10);* **Mark Shuttleworth** *(BBC/CNN);* **Meghan Markle; Mikhail Varshavski** *(Dr Mike – US Celebrity);* **Nicole Kidman; Oprah; Sally Field** (American actress); **Sonia Kruger** *(The Voice, Today Extra);* and **Steve Baxter** *(Shark Tank).*

In addition, Clearwater, Florida BBB has received complaints about free trial offers that claim endorsements by: **Tim Allen; Christie Brinkley; Priscilla Chan; Chelsea Clinton; Ayesha Curry; Leonardo DiCaprio; Ellen DeGeneres; Christina El Moussa; Sally Field; Joanna Gaines; Kathy Lee Gifford; Lori Greiner; Dr. Steve Gundry; Mariska Hargitay; Laura Ingraham; Angelina Jolie; Mila Kunis; Ashton Kutcher; Matthew McConaughey; Marie Osmond; Victoria Osteen; Dr. Oz; Sarah Palin; Shark Tank; Pauley Perrette; Robertson family of Duck Dynasty; Kelly Ripa; Gwen Stefani; Martha Stewart; Chrissy Teigen; Ivanka Trump; Melania Trump; Vanna White; Oprah Winfrey; Giada De Laurentis; Good Morning America; and Facebook.**

Toronto Star, Canada's largest daily newspaper, recently published an **article** describing fake celebrity endorsements and subscription traps.



## 5. Product shipping

The free trial offer operations also have to get the product shipped to victims. Often, fraudulent free trial operations use fulfillment companies to ship the products and, presumably, accept returns.

One would think it would be easy to identify these companies. After all, postage has to be paid and most mail has a return address. And most products we receive contain an invoice from the seller. Because the web pages where victims place orders typically don't include physical addresses, the only address victims may have is the address of the fulfillment company. But those addresses may end up being post office boxes or mail boxes etc. and not the actual location of the warehouse.

For example, BBB in Clearwater, Florida identified a **fulfillment company** they have tied to 447 different products sold through deceptive free trials. They have received 2900 complaints about these products from 2017 to July 2018. **BBB** for Central Ontario has similarly **warned of fulfillment centers** in the Toronto area.

## 6. Payment Processing

**Credit and Debit cards.** For bogus free trial offers, the payment methods of choice are credit cards and debit cards. Victims that have paid by credit card should file a complaint at **bbb.org** and contact their card issuer using the phone number on the back of the card, and contest the charge, a process called a chargeback.



 

# Better Business Bureau®



Unfortunately, credit card companies have often been reluctant to provide refunds to victims of free trial offers or subscription traps. The FTC cases regularly found that large numbers of people have been unable to chargeback successfully, and the same holds true for those who have complained to BBB. More than 1000 victims who had previously complained about deceptive free trial offers to BBB responded to a recent survey. Only 57 percent filed for a chargeback with their credit card company. Of those who did request a refund, 44 percent did not receive one and 14 percent got a partial refund. It may be necessary for credit card issuers to review their chargeback policies as they relate to questionable advertising tactics.

A **story on free trial offer scams** by the Canadian Broadcasting Company (CBC) in 2017 found that credit card companies were not authorizing chargebacks even when the reality of these situations was disclosed only in the terms and conditions. As noted above, legally these types of key terms must be disclosed clearly and where people can actually see and understand them.

In addition, the scams employ a variety of methods to try to evade credit card companies' anti-fraud policies.

The credit card companies and payment networks do not want to support fraudulent activity, and they regularly terminate merchant accounts of fraudulent operations when they detect them. In 2016 the Canadian Antifraud Centre *(CAFC)* began getting complaints from people who had large charges on their credit cards bills after visiting Costco's website. What they learned was that victims at the site were seeing pop-ups asking them to do a short survey. Because the survey mentioned Costco, victims believed that this was by, or authorized by, Costco, and when they saw a free trial offer for wrinkle creams they often used their credit card for a small "shipping and handling" charge. These victims then learned that they had fallen for a subscription trap.

The CAFC was able to identify 400 or so merchant accounts being used in this ploy and reached out to MasterCard and Visa. Because these sites were not affiliated with Costco, the merchant accounts were shut down.

So how does a credit card company know if a company accepting credit card transactions is a scam? As a first step, the company can review the application for a merchant account and inspect a company's website before letting them join the system. Additionally, credit card companies track chargeback requests; if chargebacks constitute over 1 percent of transactions from a given merchant, that raises red flags, more investigation or fines, and possibly termination.

Visa has rules that apply to merchants who accept their cards as payment. Merchants that accept Visa cards must ensure that customers have a fair chance to review all terms and conditions they are agreeing to before completing any transactions. These rules apply worldwide.

Specifically, merchants must properly disclose any refund or exchange policies to the cardholder at the time of the transaction. This also would include any terms about ongoing transactions if the cardholder fails to cancel within the given time frame. For example, for internet transactions, merchants must properly disclose terms on how to avoid charges for free trials or subscriptions for continuing shipments on their web pages before final checkout and include a "click to accept" button, checkbox or other acknowledgement. When these terms are not disclosed, Visa recommends that victims contact the bank that issued

**Credit Card Refund Requests and Results After Free Trial Fraud**



- 🟦 Didn't ask for refund
- 🟦 Didn't receive requested refund
- 🟨 Received partial refund
- 🟥 Received full refund

 

# Better Business Bureau®



their credit card and ask for a chargeback to get their money back. Visa says that the burden of proof is on the merchant.

BBB efforts to reach MasterCard were unsuccessful. However, a story of these types of free trial offers by the Canadian Broadcasting Company in 2017 states: "MasterCard's customer service told a marketplace producer that consumers are responsible for finding any charges that may be listed in the terms and conditions, even if they're in "difficult places to see." American Express declined to comment on its practices, and Discover recommends that consumers dispute charges involving deceptive transactions.

Here are some ways fraudsters avoid detection by credit card companies.

**Using a crooked processor.** Banks that offer credit card processing hire Independent Sales Organizations *(ISO's)* to solicit and sign up merchants for them. The banks require that these agents comply with detailed rules before opening accounts to determine if they are legitimate and to monitor their activity for signs of fraud, such as reviewing chargeback rates and other suspicious activity.

But what if those providing processing services are in on the fraud? The FTC has **sued a number of these ISOs** over the years, often alleging that these third parties were aware of the fraud or actively assisted in helping a fraudulent company evade the rules of the credit card system. For example, in one FTC case an ISO spread the credit card charges over 26 merchant accounts to disguise the fraud activity.

**Getting many merchant accounts through shell**

**companies.** Even without the aid of a dodgy intermediary, fraudsters can find ways to evade detection. A defendant in **another FTC case** employed 51 shell corporations to get merchant accounts and avoid detection and lied to banks on his merchant account application.

**Having "clean" websites.** It is illegal to bury key terms in fine print or other places where victims are unlikely to see them. In **another FTC case** the company had different versions of its websites. If consumers simply typed in the URL of its websites, a version appeared with prominent disclosures. But consumers that arrived at the website after clicking through from an affiliate site saw something very different and would not have seen the disclosures. This can also make it difficult for victims to show that they have been deceived if they later go to the websites after finding unexpected charges on their cards.

**Laundering.** What if the credit card charges pass through the account of a merchant that has lots of legitimate business? Doing this can keep overall chargeback rates down. This tactic is illegal under the FTC's Telemarketing Sales Rule.

**Changing product names and website addresses.** Some companies may offer the same product under a variety of different names and change the web pages continuously. Fake news or other landing pages may only appear at a particular web address for a couple of days. This makes it harder for victims, law enforcement and credit card companies to find out what is really happening.

**Using offshore banks to process.** In some cases, the fraudsters get merchant accounts through offshore banks. Those banks may permit more risky behavior in exchange for charging more for the processing.

So what is a consumer to do? Most of us don't keep screen shots of the web sites we visit. But if someone can find the site and take a screenshot, it may help with a chargeback request. And requesting a chargeback is important -- not only for getting money returned, but also by helping credit card companies identify fraudulent operators.

Debit cards may offer more protection against continuing shipments when money is drawn directly from a bank account. **Regulation E** implements the Electronic Fund Transfer Act in the U.S. and provides special protections. Under Section 10(e):

- First, no recurring debits can be made unless the consumer has provided a written authorization signed OR has similarly authenticated their agreement to be charged repeatedly. Electronic signatures are permitted, but those are also subject to other rules; just clicking a box will not be sufficient.
- Second, no authorization is valid unless the terms are "clear and readily understandable" AND they "should evidence the consumer's identity and assent to the authorization."
- Third, a copy of the authorization must be provided to the consumer. Victims should complain to their banks if they see such charges on their bank statements.

The FTC has charged violations of Regulation E in several of its cases.



# Better Business Bureau®



## 7. Customer Service

Most free trial offer companies have telephone numbers to call, although many victims report to BBB that they have difficulty in getting a live person on the phone, and that many of those answering the calls can be quite rude. For the most part victims report that they are often able to stop future shipments and charges, but usually cannot get refunds for charges already made. At best victims are offered partial refunds.

Free trial offer frauds have an incentive to respond to complaints and discourage victims from going to their credit card company and seeking a chargeback, because more complaints to the credit card company can result in the loss of the merchant accounts needed to process credit cards.

## Victim Narratives

*Rose, a nurse from St. Louis,* reported seeing a social media ad on her phone for a skin cream product. It was sold by a company called Purely Organic Cosmetics, and the ad claimed that the product was endorsed by Shark Tank. Because it was just a few dollars to try the cream, and she said she believed Shark Tank was helping to market the product, she decided to give it a try.

Rose said she used a preloaded Visa card with $75 to pay $4.96 for shipping and handling on a free trial offer of the product. While online, she saw an offer for a second product for $2 shipping and handling, and also paid to try that product. She did not see an end date for the trial period, or that the company would continue to ship products. She thinks she may have clicked a box saying she agreed to terms and conditions, but is not sure.

When she told her family about the free trial product she received, they warned her that it could be a scam. Rose did an internet search for Purely Organic Cosmetics and found lots of complaints. She said she checked her credit card balance and found only $1.75 remaining.

After calling the company and waiting on hold for over an hour, she was told she could not get a refund, and that a third shipment of products was on the way. She said she was able to stop more shipments but could not get a refund for what she already paid.

When Rose called her credit card company to dispute the charges, she was told that the charges were in the terms and conditions, and that because she had accepted them, she could not get her money back. Her husband printed the terms and conditions, and did find information about continuing shipments.

Rose says she did try the lotion for a day or two, but didn't notice anything special and she threw the products away.

### Miracle Anti Aging Facial Rejuvenation Cream Nets Biggest Deal In Shark Tank History – See Why Sharks Jumped On This Wrinkle Remover

Posted By: Rose Wanderer On December 10,2016





*Kim, from Marin County, California,* said when she saw an online ad for a free trial of a diet product called Extreme Fit 180, she was impressed because the ad claimed the product was endorsed by the entire cast of Shark Tank and they had all invested in it.

She said the cost was only $4.95 for shipping and handling, so it seemed worth a try. Before she could check out, she had to view a pop up page for an "Extreme Cleanse," which she was not interested in, and another for a green tea diet supplement. She thought that at the end she could view her cart and remove these if there was a charge because she did not want them. She says she did nothing to indicate that she wanted the other items.

After Kim submitted her order she said got an email alert that her credit card had been charged for the two items she did not want so she immediately called to cancel, and was told the items had already shipped and to just keep them.

Two weeks later, after Kim found a charge of $79 on her credit card from the diet product company, she called the company and left messages, but no one returned her call. The third time she reached a

 

## Better Business Bureau®

M A G N O L I A

WACO, TEXAS  |  FRIDAY EVENING  |  APRIL 21, 2017

# DON'T BELIEVE
# EVERYTHING YOU READ

"People say believe half of what you see, son
and none of what you hear
But I can't help but be confused
If it's true, please tell me dear"
– Marvin Gaye

woman who was quite rude, telling her "Well, did you read the fine print? Your 14 day free trial is up and now you owe this." Kim explained that she had called immediately to cancel, and the operator told her notes showed that she had only cancelled the orders for the Extreme Cleanse and the Green Tea product. Kim said no, she had canceled everything and was going to complain to BBB. The operator said she would cancel her account, but would not refund her money.

After a quick internet search, she found complaints from other people that had the same experience. She called BBB and her bank to complain; the charges later were removed.

A box with the three products arrived, and she said she threw them away.

*Stacy, from Chicago,* reported that she saw an internet offer for a new skin care product, Luster Skin, from Joanna Gaines. It was a free trial, and customers only had to pay shipping and handling. She entered her address and credit card information but didn't think the order went through, so she went back to the site and in minutes the product had a different name. Stacy entered her information again and saw the same product being endorsed by Kate Middleton and Sally Field. She captured screenshots of some of the web pages that featured Sally Field.

She said she received two different products, a serum and an eye cream. She tried the products and concluded that they didn't work. Her credit card statements had small initial charges for the shipping and handling, and then two $95 charges for the

products appeared two weeks later. One charge was from San Diego and the other was from Texas. She said she called the phone number on the invoice to cancel and was told that she only had 14 days to cancel, and she was told on day 15. Stacy said she never saw disclosures that she had 14 days to cancel. After two more calls to the company, they refunded half of her money.

Stacy said that she would like to tell this company that they are lying crooks and to stop ripping people off.

*Julie works in HR in Omaha.* In 2017, she reported that she saw an article on Facebook about a UCLA student who discovered an excellent way to lose weight by using a product called Garcinia Cambogia. She thought it would be worthwhile to get a free sample by paying $4.95 for shipping, so she entered her credit card number. She saw no terms or conditions.

She tried the pills for a few days and said she didn't notice any results. She then received a second bottle of pills in the mail and thought it was a mistake, so she emailed the company and was told to call customer service. After spending 40 minutes explaining that she did not want more pills and wanted her money back, the operator told her that "you accepted the terms, and there is nothing we can do." They told her that the company could end her "membership" and stop shipping more, but she could not get her money back. She lost $184.

Julie went back to the web page where she had placed her order, and saw that the conditions of the trial and continuing shipments were mentioned in fine print on a gray background. She says she would never have provided her credit card information for the trial if she had seen the terms before purchasing.

She talked to a representative from her bank, who said there wasn't really anything she could do. She complained to BBB. She also found and joined a Facebook group with almost 1500 members called "STOP GARCINIA CAMBOGIA FREE TRIAL SCAM." She says that many of the experiences discussed in the group are very similar to hers.

Julie told BBB she wonders how the people at this company can sleep at night, and would like to tell them to quit stealing from people.

*Renee teaches fifth grade in Texas.* She stated that in December 2017, she saw an ad on Facebook stating that Joanna Gaines was promoting a new skin care line. She said she thought it was worth $5.95 to get a sample of an anti-aging skin cream product to see if she liked it. She looked to see if she was signing up for something unexpected and didn't see anything, so she entered her debit card to get the trial item.




# Better Business Bureau®

*The next day she saw charges on her bank statement for $109 and $103. She talked to her bank, which helped her call the company. Renee told the company that she had not authorized these charges and did not want the products. She was told that she would have to pay a $40 restocking fee to return the products, and would then get a refund in 7-10 days. Renee also went to the website of the company and saw that there were prominent disclosures about when the product had to be returned to avoid charges and that more would be shipped to her monthly. Renee said she felt certain that these disclosures were not on the ad she saw when she ordered.*

*She also reported that she found a blog by Johanna Gaines warning the public that she had not developed cosmetic products.*

*When Renee received the products, she shipped them back to the company by certified mail. She did not try the product because she said she felt the company was a scam. Despite calling the company several times, she has never received a refund. Her bank ensured that her card could not be charged again. She complained to BBB, but the company still did not give her money back.*

## Efforts to combat the fraud

### BBB's Role

Before doing business with any company it is a good idea to check them out with BBB. There are more than 100 BBBs across the U.S. and Canada, some also with regional offices, and all keep track of and list information online about businesses, not just ones that are "members" (known as Accredited Businesses). Visit **BBB.org** and enter the name of a company to learn more. Make sure to search nationwide, not just in your locality.

To be accredited, businesses must agree to comply with BBB Standards for Trust. Accredited businesses can use the BBB seal on their websites or in their advertising. But beware, there are companies out there that will use the BBB seal without permission.  If any doubt exists, check the business out on the BBB.org website. Businesses that do not comply with BBB's standards are ejected from BBB. Accredited businesses must also agree to resolve complaints.

BBB also collects and tries to resolve complaints about businesses that are not accredited. BBB has seen thousands of complaints about misleading free trial offers.

The FTC regularly reaches out to BBB for copies of complaints or other data on companies it investigates. In its cases the FTC often says that dishonest companies only give refunds if consumers report them to BBB or a law enforcement agency.

In addition, BBB assigns businesses a letter grade, from A+ to F, based on complaint activity, regulatory actions and other factors reflecting the BBB's opinion of how the business is likely to interact with its customers. Consumers are encouraged to check out a company's rating before

doing business and to report fraud.

BBBs have been able to tie many products and companies to fulfillment operations that ship products for different companies.  In fact, one fulfillment company has shipped over 400 of these products for many of the businesses in this category.

In addition, each of the local BBBs has a person assigned to advertising review, and consumers can submit questionable ads for free trials or other issues to **BBB Ad Truth** for review.

**BBB** has issued warnings about free trial offers in **Ontario**; **Northeast Florida**; **North Carolina**; **North Alabama**; **Central Georgia**; **Montana**; **New York**; and **Delaware**. Many other **BBB** offices have worked with the media to warn about this type of fraud.

## Law Enforcement

Over the last ten years, the Federal Trade Commission has been very active in challenging bogus free trial offers. Many of these, but not all, have also included continuing monthly shipments and charges for products. The FTC has consistently **warned** consumers about this type of fraud. They even **produced a video** on this subject.

Products involved have included diet pills, tooth whiteners, offers of supposedly free government grants, colon cleansers and wrinkle creams. Most have involved advertising and sales exclusively over the internet, but one, Berkeley, also advertised extensively on television.

BBB has identified 16 cases of this type that the FTC has brought over the last ten years. In many of these cases, courts have entered injunctions, freezing assets of the companies and their owners and effectively putting them out of business.

Many of these cases have been settled; others won in court. One, Triangle, is still litigating and has been appealed.

Losses to victims can be calculated, even in a settlement, because the FTC usually gets a judgment for the full amount of losses, subtracting refunds from the company or refunds obtained from credit card companies, but suspends that judgment if defendants provide available remaining assets for the FTC to return to victims. Much of the money made by such operations is spent along the way so there is rarely enough money to provide full refunds to victims.

Total losses in 15 cases resolved to date total $1.3 billion. If average losses were $100 (and they could be higher), that would mean there could be 13 million victims involved in these cases. See a list and descriptions of the these cases at **bbb.org/stlouis/ftc-free-trial-offer-cases**

**State cases.** Several state attorneys general have filed civil actions jointly with the FTC. In addition, another case against free trial offers was filed by the Santa Monica, California District Attorney's office. **Beachbody** was a settlement announced in 2017. The company sold exercise videos, supplements and weight loss products. The order required a separate check box for auto renewals, and the company paid a $3.6 million fine.

**Criminal cases.** After the FTC has taken civil action, it may refer cases for criminal prosecution. **BBB** is aware of two cases so far where that has occurred. Steve Warshak,



**Better Business Bureau®**

owner of Berkely, was **convicted and sentenced** to ten years in prison. Jeremy Johnson, the owner of Iworks, was **sentenced to 11 years in prison** after appeal.

In addition, a recent **indictment** in federal court in Tennessee charged several businesses and individuals over a massive healthcare fraud. The criminal charges also contended that the same enterprise was advertising "free trial offers" for "millions of dollars" worth of products such as weight loss pills, skin creams, and testosterone supplements.

**What should you do if you believe you have been a victim of a free trial offer fraud? You have options:**
- Complain to the company directly.
- If that is not successful call the customer service number on the back of your credit card to complain to the bank.
- Complain to **www.bbb.org**
- Report the fraud to **www.bbb.org/scamtracker**
- Report it to the **Federal Trade Commission (FTC)** or call **877-FTC-Help**
- Report it to the **Internet Crime Complaint Center**, or IC3
- Report it to the **Canadian Anti-Fraud Centre**. Toll free from the US at **1-888-495-8501.**
- In Canada you can also complain directly to the **Competition Bureau**.
- Report suspicious, confusing or misleading ads to **BBB Ad Truth.**

## UPSELLS

When buying things over the phone or internet, consumers also are often offered additional products or services - a practice known as an "upsell." For example, someone may see an item advertised on television and call to place an order. After providing their credit or debit card number the company may offer to send an additional product, perhaps by just saying: "and today we are also going to send you a second product to try" with no mention of the price. Because the company already has your credit card number, they may simply ship the product and charge you for it.

Or, the company you reached out to may simply transfer you to another company and it does the upsell. If the company you originally contacted shares your credit card number with a second company, they may be able to charge you even if you don't know the full price and didn't intend to agree.

Congress has responded to widespread complaints about such upsells, and the ROSCA law addresses it. For internet transactions, any upsell by third parties must first disclose clearly and conspicuously all material terms of the transaction, a description of the goods or service being offered, and what the cost is. They also must get the full credit or debit card number from the consumer, their name, address and a means of contacting them.

For telephone upsells, such as when you call to buy something advertised on TV, the rules are a bit different. If during the call, you are offered a "free trial" of an additional product, companies must get at least the last four digits of the debit or credit card, and obtain your express informed consent. They must record and keep an audio recording of the entire sales call, not just the part where you agree to the charge.

If the telephone call does not involve a free trial offer the requirements are not as strict.

## Recommendations

- BBB urges credit card companies to do more to ensure victims receive chargebacks where key conditions are not adequately disclosed. Because this fraud is dependent on the use of credit cards, more effort is needed to identify and combat deceptive free trial offers employing credit card systems. Also, it would helpful if they could do more to educate their customers.
- Additional criminal prosecutions of this conduct are needed. The FTC and BBB have done much to address the issue, but do not have the ability to bring criminal charges. Only criminal prosecutions are likely to deter this type of fraud.
- Social media sites should do more to curtail such deceptive advertising.
- International cooperation is needed to combat this fraud. U.S. and Canadian law authorities need more information about victims from other countries. In addition, evidence and other key information may be located in a variety of countries around the world.
- More consumer education is needed from news media and consumer groups like BBB.

*By Steve Baker, BBB International Investigations Specialist*

*BBB appreciates assistance provided by FTC and BBB Clearwater.*

*BBB and the Torch Logo are registered trademarks of the Council of Better Business Bureaus, Inc . All other trademarks, product names, logos, and brands depicted herein are property of their respective owners and are used for identification purposes only and not to imply endorsement.*

# EXHIBIT 2

1   **NEUPPER & COVEY, PC**
2   Kevin Kneupper, Esq. (CA SBN 325413)
    Kevin@kneuppercovey.com
3   321 N. Orange St. #306
    Glendale, CA 91203
4   Tel: (512) 420-8407
5
6   *Attorneys for Plaintiffs Janet Sihler,*
    *Charlene Bavencoff, and the putative Class*
7
8
9                    UNITED STATES DISTRICT COURT
10                   SOUTHERN DISTRICT OF CALIFORNIA
11
12  JANET SIHLER, Individually and On          Case No.:
13  Behalf of All Others Similarly Situated;
    CHARLENE BAVENCOFF, Individually           **DECLARATION OF KEVIN M.**
14  and On Behalf of All Others Similarly       **KNEUPPER RE: VENUE PURSUANT**
    Situated,,                                  **TO CAL. CIV. CODE § 1780(d)**
15
16                             Plaintiffs,
17  v.
18  THE FULFILLMENT LAB, INC;
    RICHARD NELSON; BEYOND
19  GLOBAL INC.; and JOHN DOES 1-10,
20                             Defendants.
21
22
23
24  I, Kevin M. Kneupper, do hereby declare as follows:
25        1.      I am a partner at Kneupper & Covey PC, counsel of record for Plaintiff Janet
26  Sihler and Charlene Bavencoff. I am licensed to practice law in the States of California and
27  Texas. I make this declaration to the best of my knowledge, information, and belief of the
28  facts stated herein.

2.     Venue is proper in this Court because Defendants are doing business in the County of San Diego, CA by selling and delivering their products there and the transactions at issue (the sales to Plaintiffs Janet Sihler and Charlene Bavencoff) also occurred in the County of San Diego, CA.

I declare and state under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct, and that this Declaration was executed this 5th day of August, 2020 in Glendale, California.

_____

Kevin M. Kneupper, Esq.
Declarant